IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | ) | |
| BRUTUS TRADING, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Case No. 18-cv-11117** |
| -against- | ) | |
| | ) | |
| STANDARD CHARTERED BANK, | ) | **FIRST AMENDED COMPLAINT** |
| STANDARD CHARTERED PLC and | ) | |
| STANDARD CHARTERED TRADE SERVICES | ) | |
| CORPORATION, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

Relator-Plaintiff Brutus Trading, LLC ("Relator"), through its attorneys, makes

this First Amended Complaint and Demand for Jury Trial against Standard Chartered Bank,

Standard Chartered PLC and Standard Chartered Trade Services Corporation (collectively

"SCB").  Relator alleges, based upon personal knowledge, relevant documents and information

and belief, as follows:

## I. NATURE OF THE CASE

1.      Relator brings this action on behalf of the United States against SCB for treble

damages and civil penalties arising from SCB's violations of the False Claims Act, 31 U.S.C. §§

3729 *et seq.*

2.      This case arises out of the financing of brutal terrorist atrocities across the globe

through the elaborate inter-bank system in the United States by which banks clear and settle

credits and debits in their Eurodollar[1] accounts with other banks around the world on a daily

---

[1] "Eurodollar" refers to a time deposit denominated in U.S. dollars that is maintained by a bank outside the United
States.

basis. This U.S. dollar clearing and settlement system is central to the operation of the global economy, among other things providing financial institutions and nations with essential access to global trade-finance credit denominated in U.S. dollars.

3.      Because over half of the Iranian government's revenues and the vast majority of Iran's export revenues originate from the sale of oil and gas, a market largely denominated in U.S. dollars, known as "petrodollars," and because Iran's currency, the Rial, is one of the world's least valued currencies, the Iranian regime is dependent on access to the U.S. dollars it maintains in the Eurodollar market and the interest income on its petrodollar funds.

4.      Important for this case, this financial dynamic also means that Iran depends on access to U.S. dollars to fuel its efforts to acquire weapons of mass destruction and to buy the increasingly sophisticated weaponry relied upon by its terrorist proxies.  For example, moving beyond the "improvised explosive devices" ("IEDs") from which American, British, and other Coalition personnel in Iraq have been protected by armored vehicles, Iran finances the manufacture of "explosively formed penetrators" ("EFPs") that requires sophisticated manufacturing equipment not found in Iraq to produce the specially formed copper disk inside an EFP which is central to its lethality. The detonation of an EFP inverts the copper plate into a deadly slug traveling over a mile per second that can punch through armor even 300 feet away.

5.      Thus in late 2005, shortly after EFPs were introduced, the BBC reported:

An armour-piercing version of the [IED] – blamed for the deaths of eight British soldiers this year – marks the latest advance in the insurgents' arsenal. The U.K. has accused Iran of supplying the new weapon to militants in southern Iraq, via the Lebanese Hezbollah militia group, although Tehran has denied this.

6.      The United States designated Iran a State Sponsor of Terrorism on January 19, 1984, pursuant to § 6(j) of the Export Administration Act, § 40 of the Arms Export Control Act, and § 620A of the Foreign Assistance Act. The United States and other Western governments

intensified their actions against terrorism financing after the September 11, 2001 attacks on the United States.

7.      Nevertheless, Iran redoubled its efforts to access the U.S. financial system while evading U.S. sanctions intended to circumscribe Iran's access to that system. Iran's financing of terrorism as a fundamental element of its foreign policy – including sponsorship of terrorist attacks on Coalition Forces in Iraq – would have been severely constrained by U.S. economic sanctions without the covert operational and technical assistance it received from SCB and other financial institutions to move its funds undetected through the Eurodollar market.

8.      From early 2001 to at least 2014, SCB illegally moved hundreds of billions of dollars in thousands of transactions through the U.S. financial system on behalf of individuals, businesses, and financial institutions that were subject to U.S. economic sanctions because of their links to Iran. Executive Orders Nos. 13059, 13590, 13599, 13628, and 31 CFR Part 560. By operation of U.S. law, these funds vested in the United States and were forfeited to the United States at the time of each illicit transaction. *See* 18 U.S.C. §§ 981(a)(1)(C), 981(f) & 1956(c)(7)(D); 50 U.S.C. § 1705(a). Accordingly, the amount of each illicit transaction became at the time the transaction was effected an obligation of SCB "to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G) & (b)(3).

9.      To avoid subsequent detection of these illegal transactions and revelation of the forfeited money involved in them, SCB knowingly falsified the electronic records and documentation by which these transactions were effected, knowingly falsified business records, and knowingly failed to maintain accurate books and records. In addition, the SCB knowingly made deceptive and misleading responses to the inquiries of Federal financial regulators. Finally, by knowingly making false and deceptive representations, SCB deprived the Justice Department

of full and accurate knowledge of the extent of SCB's illegal financial transactions, the full amount of SCB's existing obligations to pay or transmit hundreds of billions of dollars already forfeited to the Federal Government, and the fact that SCB's wrongdoing was ongoing.

10.     As a result of SCB's concealment of the extent and amount of their financial transactions in violation of the Iran sanctions and of the fact that such illegal transactions were ongoing, in 2012 the Justice Department agreed to defer prosecution of the SCB for those crimes and accept the forfeiture of an amount grossly below the true amount of SCB's then-existing obligations to pay or transmit money to the Federal Government.

11.     Thus SCB knowingly concealed its obligations to pay or transmit money to the Federal Government in violation of 31 U.S.C. § 3729(a)(G). Accordingly, this action seeks damages (a) in the amount of money forfeited to, but not yet paid to, the Federal Government as a result of the SCB' illegal financial transactions between 2012 and at least 2014, or whenever those transactions truly ended, and (b) the full amount of money forfeited to, but not paid to, the Federal Government in 2012 as a result of SCB's illegal transactions between 2001 and 2012, less the amount forfeited by the SCB in 2012, all trebled. In addition, this action seeks the imposition of the maximum penalty for each concealed illegal financial transaction that gave rise to SCB's obligation to pay or transmit money to the Federal Government between 2001 and at least 2014, or whenever those transactions truly ended.

12.     At bottom, as the New York Department of Financial Services has put it: "Motivated by greed, [Standard Chartered Bank] acted … without any regard for the legal, reputational, and national security consequences of its flagrantly deceptive actions. Led by its senior management, SCB designed and implemented an elaborate scheme by which to use its New York branch as a front for prohibited dealings with Iran – dealings that indisputably helped

sustain a global threat to peace and stability." New York State Department of Financial Services, Order Pursuant to Banking Law § 39, *In the Matter of Standard Chartered Bank, New York Branch,* at 22 (Aug. 6, 2012).

13.     Indeed, SCB's staggering greed and its disdain for its obligations under U.S. law were strikingly on display in the brazen retort of Standard Chartered Bank's Group Executive Director, Richard Meddings: "You f---ing Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians?" *Id.* at 5.

14.     SCB's conduct is so reprehensible by any civilized measure of morality and justice that refusing to respond to such a question would be amply justified. Beneath the green-eyeshade complexity and deception of the international financial transactions involved in this case, the unavoidable fact is that SCB used its resources to help terrorists kill and wound American, British, and other Coalition military personnel and thousands of innocent civilians.

15.     That SCB would express such contempt for the sanctions regime -- designed to prevent the use of the revenues derived from SCB's sanctioned transactions to fund the despicable actions which resulted in such injuries and death -- underscores the compelling need for this action to force SCB to disgorge the full amount of the blood money that, by statute, it has forfeited to the United States pursuant to the sanctions regime.

## II.   <u>JURISDICTION & VENUE</u>

16.     This Court has subject matter jurisdiction over the claims alleged in this Complaint under 28 U.S.C. § 1331 (Federal question), § 1345 (United States as plaintiff) and 31 U.S.C. § 3732(a) (False Claims Act).

17.     This Court has personal jurisdiction over the Defendants named in the Complaint pursuant to 31 U.S.C. § 3732(a), because at least one of the Defendants can be found, resides,

and/or transacts business in the Southern District of New York and because an act proscribed by 31 U.S.C. § 3729 occurred within this District.  Section 3732(a) further provides for nationwide service of process.

18.     This action is not precluded by the public disclosure bar of the False Claims Act, 31 U.S.C. § 3730(e)(4).  Upon information and belief, no "public disclosure" of the matters alleged herein occurred before December 14, 2012, when Relator voluntarily provided information to the United States Government not previous known by it.  This action is not "based upon" any publicly available information and in any event, Relator, through its principals, has "direct and independent knowledge" of the instant allegations. Therefore, to the extent any of these allegations are deemed to have been based upon a public disclosure, Relator is an "original source" of this information within the meaning of the False Claims Act and is expressly not subject to its public disclosure bar.

19.     Venue is proper in the Southern District of New York, under 28 U.S.C. §§ 1391(b) and (c), and 31 U.S.C. § 3732(a), because (a) the Defendants reside in this District, (b) a substantial part of the events or omissions giving rise to the violations of 31 U.S.C. § 3729 alleged in the Complaint occurred in this District, and (c) because at least one of the Defendants can be found and transacts business within this District.

### III.   PARTIES

20.     The United States is the real party in interest plaintiff in this action.

21.     Relator Brutus Trading, LLC ("Brutus"), is a Wyoming Limited Liability Corporation, and brings this action for violations of the False Claims Act on behalf of itself and the United States.  One of Brutus's principals was the Global Head of Transaction Banking and Foreign Exchange Sales for Standard Chartered Bank. The other principal is an American

currency trader who is expert in trading systems including those used by SCB. He has advised

members of Congress and the U.S. Federal Reserve on global currency markets. Both principals

have spoken at global investment conferences on foreign exchange issues. Accordingly, both

possess extensive knowledge and experience with international foreign exchange transactions

and banking and possess personal knowledge to support and establish the claims asserted in this

First Amended Complaint.

22.     Defendant Standard Chartered PLC, is a leading international banking institution

with headquarters in London, England.  Standard Chartered has $637 billion in assets with over

1,700 offices around the world.

23.     SC's wholly-owned subsidiary, Standard Chartered Bank, offers a complete range

of banking products and services to its personal, business and wholesale banking clients

worldwide.  Standard Chartered Bank has been licensed by the New York Department of

Financial Services ("DFS") to operate a foreign bank branch in New York State since 1976,

which branch is currently located at 1095 Avenue of the Americas, New York, NY 10036.  The

New York branch office is referred to hereinafter as SCB-NY. SCB-NY also constitutes a "U.S.

person" within the meanings of 31 C.F.R. § 560.314 and 18 U.S.C. § 2332d(b)(2).

24.     Defendant Standard Chartered Trade Services Corporation, a wholly-owned

subsidiary of Standard Chartered Bank, is a Delaware corporation registered to do business in

New York State as a foreign business corporation.

IV.     **GENERAL ALLEGATIONS**

25.     SCB-NY is the seventh largest U.S. dollar correspondent bank in the world,

clearing and settling approximately $195 billion per day.  While SCB claims not to service retail

customers in the United States, it does offer wholesale banking services, including trade finance

services, cash management, treasury, foreign exchange and interest rate products, commodity

finance, and structured import and export finance services.

26.     SCB's conduct of the U.S. dollar clearing business requires it to clear transactions

through SCB-NY and the correspondent U.S. dollar bank accounts domiciled in SCB-NY used to

facilitate such clearing transactions.  As a result, SCB and SCB-NY must comply with the rules

and regulation imposed by the U.S. Treasury's economic sanctions regulations.  In short, those

regulations forbid or restrict the conduct of financial transactions by institutions located in the

United States with certain foreign governments and their various instrumentalities and any

person or entity that has been identified on the list of Specially Designated Nationals ("SDN")

issued by the United States Treasury Department's Office of Foreign Assets Control ("OFAC").

### A.     **Prior Proceedings**

27.     On September 21, 2012, DFS and SCB entered into a Consent Order under New

York Banking Law § 44. *See In Re Standard Chartered Bank, New York Branch,* Consent Order

Under New York Banking Law § 44 (N.Y.S. Dep't of Fin'l Services) (Sept. 21, 2012) (the

"Consent Order"). According to the Consent Order, from January 2001 through 2007, SCB

illegally provided U.S. dollar clearing services to Iranian state and privately owned banks,

corporations and individuals.  In processing such transactions, SCB stripped or omitted Iranian-

identifying information from U.S. dollar wire payment messages to avoid having to comply with

OFAC banking rules and regulations. Approximately 59,000 transactions with nominal value of

approximately $250 billion were involved.  Consent Order ¶ ¶ 2-3.

28.     SCB agreed to pay a $340 million civil monetary penalty to DFS, consented to

having a compliance monitor on premises, and agreed to conduct a comprehensive review of the

bank's compliance programs, policies and procedure.

29.     Federal authorities addressed the same wrongdoing by SCB later in 2012. On
December 10, 2012, SCB entered into a Deferred Prosecution Agreement (the "2012 DPA") with
the Justice Department in which SCB consented to the filing of a criminal information by the
United States Attorney's Office for the District of Columbia, which charged that from 2001 until
2007, SCB illegally facilitated U.S. dollar transactions for financial institutions and other parties
affiliated with Iran. (A copy of the 2012 DPA is attached as Exhibit A and is incorporated by
reference herein.) In the Factual Statement of the 2012 DPA, SCB acknowledged that beginning
in "2001 and ending in 2007, SCB violated U.S. and New York State laws by illegally sending
payments through the U.S. financial system on behalf of entities subject to U.S. economic
sanctions."  2012 DPA, Factual Statement ¶ 2 (Exh. A); *see also id.* ¶¶ 42 & 43.  In addition,
"[o]n October 30, 2006, SCB informed the [Federal Reserve Bank of New York] that it was
ending its U.S.-dollar clearing activity for all the Iranian banks.  The bank ended its U.S.-dollar
activity by March 2007."  *Id.* ¶ 103.  Furthermore, "[f]rom August 2007, SCB suspended all new
Iranian business in any currency."  *Id.* ¶ 104.

30.     SCB acknowledged that "at least $227 million" was involved in the 2001 to 2007
transactions covered by the 2012 DPA, and agreed to forfeit that amount. 2012 DPA ¶ 3 (Exh.
A).

31.     On December 10, 2012, SCB also entered into a settlement with OFAC, agreeing
to pay $132,000,000 to settle its civil liability arising out of SCB's violations of OFAC's rules
and regulations. *See* Settlement Agreement between OFAC and SCB, ¶ 32 (Dec. 10, 2012)
("OFAC Settlement Agreement").  The OFAC Settlement Agreement states that "SCB has taken
remedial action by terminating its business and prohibiting new business since 2007 with Iranian
customers."  OFAC Settlement Agreement, ¶ 26.  Under the OFAC Settlement Agreement,

SCB's obligation to pay the $132,000,000 penalty would be satisfied by payment of an equal or greater amount that satisfied any penalty assessed by United States or county officials. *Id.* ¶ 32.

32.     Finally, on December 10, 2012, SCB also consented to a Cease and Desist Order ("Cease and Desist Order") with the Federal Reserve and agreed to pay a civil money penalty of $100 million, once again for violating U.S. law in the processing of payments involving parties subject to OFAC sanctions from at least 2001 through early 2007.

**B.     Relator's False Claims Act Litigation**

33.     On December 17, 2012, Relator filed its first False Claims Act lawsuit against the same Defendants as in this case. *See United States ex rel. Brutus Trading LLC v. Standard Chartered Bank, et al*., 12 CV 9160 (KBF) (S.D.N.Y.) (the "2012 Case").

34.     In that case, and in meetings that followed with the Federal and New York State authorities, the Relator brought to the attention of those authorities information, drawn from SCB's own records provided by the Relator, that SCB's course of conduct violating the Iran sanctions was far more extensive and elaborate during the 2001- 2007 period than had been portrayed to those authorities and, contrary to SCB's representations, was continuing. (This course of conduct by SCB exposed by the Relator's information is discussed below.)

35.     Indeed, the information provided by the Relator was so useful to the authorities that in early 2013 the FBI and Justice Department asked one of the principals of the Relator to try to get more data from a source in Dubai. The operation took several months to set up, but eventually that principal arranged for a contact with an individual in Dubai with that information, and delivered that information to the FBI on two data sticks containing 79 files showing thousands more illegal transactions by SCB through 2013 and 2014, along with other information. That contact has left Dubai.

36. The 2012 Case was unsealed by the Court on May 10, 2017. On September 19, 2017, the 2012 Case was voluntarily dismissed without prejudice.

37. The 2012 Case was effectively re-filed in the form of this case on November 28, 2018. The United States ultimately declined to intervene, and, by Order of March 20, 2019, the Court ordered this case to be unsealed on April 20, 2019.

C. **SCB's Course of Conduct Violating the Iran Sanctions**

38. To evade the Iran sanctions in a clearing transaction, SCB had two basic tasks. First, SCB had to process the transaction in a way that would not trigger software programs designed to identify and stop transactions involving sanctioned parties. Second, SCB had to ensure that no record that the transaction involved a sanctioned party was created that could be subject to scrutiny after-the-fact either by in-house compliance officers or by government authorities. SCB had to adopt procedures so the illicit transaction would always execute and the Iranian connection would never be discovered.

39. The method for SCB's violation of the sanctions on which the 2012 DPA focused was "wire-stripping" or "repairing," that is, the removal of any reference to Iran in the SWIFT[2] payment messages by which clearing transactions are effected. *See* 2012 DPA, Factual Statement ¶¶ 23, 26-28, 37 (Exh. A). Based on SCB's representations, the 2012 DPA accepted the notion that SCB had stopped this process in March 2006. *Id.,* ¶ 99.

40. The 2012 DPA also identified only $227 million as "at least" the amount of illegal clearing transactions in which SCB engaged between 2001 and 2007. 2012 DPA ¶ 3 (Exh. A);

---

[2] "SWIFT" refers to the Society for Worldwide Interbank Financial Telecommunications, which is the international system to transmit payment messages to financial institutions around the world. SWIFT messages contain various informational fields that are manipulated in wire-stripping or repairing to avoid disclosing any Iranian connection in a clearing transaction.

Factual Statement ¶ 2 (Exh. A). And SCB promised not to engage in any more illicit clearing transactions. 2012 DPA ¶ 5 (Exh. A).

41.     SCB's scheme to capture the lucrative rewards of a line of business that depended on evading the Iran sanctions – indeed, that evasion *was* the service offered by SCB – was far more robust, cunning, and extensive than the picture presented to Justice Department authorities in negotiating the 2012 DPA. A conservative estimate of the annual value of clearing transactions processed by SCB violating the Iran sanctions (excluding exempt transactions) in the 2001-2007 period is approximately $40 billion. It was the Relator who, in filing the 2012 Case and related disclosures, brought the following facts to the attention of Federal and New York State authorities.

42.     SCB's course of conduct to develop its Iran-related business and to evade the Iran sanctions was no haphazard affair. That course of conduct was the handiwork of a deliberate, if concealed, organizational structure.

(a) Since at least 2002, SCB operated a program known internally to high level SCB officials as "Project Green."  This was a program run by trade finance experts and senior geographical branch chief executive officers, deliberately excluding compliance officers.  Project Green was initiated at SCB London Headquarters and was headed by SCB's Iraq and Afghanistan CEO Stuart Horsewood and Managing Director Vikram Kukreja, a trade finance expert. Horsewood considered Iran to be a "major new market" for SCB. Project Green was designed to assist, conspire, aid and abet non-United States customers that have been made the subject of United States economic sanctions to evade those sanctions and engage in international financial transactions.  SCB continued to

operate Project Green at least until 2012, when SCB began the process of winding it down.

(b) SCB's Originations and Client Coverage Group ("OCC") covered all SCB clients and had more personnel than SCB's sales staff. OCC in Dubai was deployed to create fraudulent records that allowed Iranian-connected clients to open accounts without their Iranian connection being detected. In addition, OCC was very active in trying to get new clients in Iran even after 2010, when SCB was supposed to be "winding down" its Iran business. Indeed, the law does not allow for the "winding down" of illegal, sanctioned transactions. These transactions are crimes that must be halted.

(c) The Iran Committee was staffed by people from OCC, Global Cash Operations, and Global Trade Operations. The mandate of the Committee was to develop strategies to evade the Iran sanctions.

(d) The Iran Group operated from 2008 to 2014. It housed all of the management information systems ("MIS") concerning Iranian-client transactions and profitability. The MIS disseminated this information throughout the SCB organization, from low-level employees up to the Deputy CEO of SCB, Mike Rees.

(e) The Iran Cont Client Group focused on development of and services to a subset of SCB's Iran business, small to medium enterprises, many of which were located in Dubai.

(f) SCB-Dubai played a central role in SCB's scheme to evade the Iran sanctions in order to expand SCB's Iran business due to its proximity to Iran and the number of Iranian businesses in Dubai. Indeed, the actions of SCB-Dubai personnel often concealed

illegal clearing transactions from personnel in SCB-NY, who had to process every transaction clearing U.S. dollars.

(g) SCB's office in Iran – SCB-Tehran – was the "on-the-ground" representative of SCB with a significant outreach to potential Iranian clients.

43.    SCB employed various means, beyond the wire stripping or repairing addressed by the 2012 DPA, to aggressively evade the Iran sanctions and conceal the fact that it did so.

(a) Perhaps the most egregious measure SCB adopted to evade the Iran sanctions was the OLT3 system. OLT3 provided online trading for foreign exchange linked directly to the Straight-to-Bank SCB Client System, the main online portal to SCB's client accounts. OLT3 allowed Iranian clients to enter SCB's computer system on their own and conduct illegal foreign exchange transactions. OLT3 was designed to have no ability to suspend or block a deal potentially violating the sanctions and to create no record of the illegal transaction.

(b) SCB used hundreds of "sundry" accounts to conceal transactions violating the Iran sanctions. Sundry accounts have also been called "error" accounts because they were intended to be accounts in which to temporarily book a transaction in which a counterparty was not properly identified, or some other error was made.  As a result, such a transaction could not immediately be reconciled with an SCB customer account. Taking advantage of this device for the Iran scheme, SCB personnel would change some small part of the counterparty's name, such as changing a letter or dropping a word, so that the transaction would be executed, but then go into a sundry account. Because these revenues were not properly matched up to the customer, identifying whether the revenues were derived from customers on OFAC's list of Specially Designated Nationals ("SDNs") or

from entities otherwise associated with Iran, and so subject to sanctions, would prove very difficult, if not impossible, for any SCB-NY employee or Government official.

(c) Similarly, Customer Due Diligence records would be manipulated by the misspelling of names to avoid running afoul of the OFAC SDN list.

(d) Employees in SCB-Dubai would fill out and sign account paperwork for clients based in Iran, under the coordination of the Middle East North Africa OCC team, again to conceal the true account holder.

(e) In 2013, after the filing of the predecessor of this action and the related disclosures brought to light for Government authorities the central role of SCB-Dubai in SCB's course of conduct to evade the Iran sanctions, SCB engaged a consultant, Promontory Financial Group, LLC, to clean the SCB-Dubai servers of information that would disclose to investigators the extent and details of SCB's program to evade the Iran sanctions.

(f) A number of the accounts of Iranian-owned businesses were moved from the Iran Group to the SCB-Dubai Corporate Group to conceal their existence.

44.     Contrary to the representations that SCB made to induce the Justice Department to enter into the 2012 DPA, SCB continued to engage in U.S. dollar clearing and other financial transactions with and for the benefit of Iranian government entities and Iranian SDNs until at least 2014.

45.     SCB's records show that since at least 2006, SCB identified and targeted as customers, among others, the following Iranian government entities or SDNs:  Bank Keshavarzi, Bank Markazi, Bank Maskan, Bank Mellat, Bank Melli, Bank Tejarat, Export Development Bank of Iran, Bank Saderat and Sepah Bank.  In addition, since at least 2008, SCB's client lists

included the National Iranian Oil Company ("NIOC") and its subsidiaries as clients.  In 2008, OFAC identified NIOC as an entity owned or controlled by the Government of Iran within the meaning of the Iranian Transactions Regulations.  OFAC also identified NIOC as an affiliate of the Islamic Revolutionary Guard Corps ("IRGC").  OFAC added IRGC to the SDN list on October 21, 2007.

46.     The following are examples (a) of the many trades performed by SCB on behalf of banned Iranian government entities or Iranian related SDNs after 2007 or (b) of evidence that SCB was performing transactions after 2007 on behalf of clients that were banned Iranian entities, contrary to SCB's representations to representatives of the United States that "[f]rom August 2007, SCB suspended all new Iranian business in any currency."

47.     In or about January 2009, SCB performed an export finance transaction for Bank Tejerat, a bank owned by the Government of Iran.   Such a transaction necessarily involved dollar clearing by SCB-NY.

48.     In or about January 2009, SCB performed three structured trade finance transactions for National Iranian Tanker Company ("NITC"), an entity owned by the Iranian government and a subsidiary of NIOC.  Such transactions necessarily involved dollar clearing by SCB-NY.

49.     SCB conducted a U.S. dollar letter of credit transaction between Bank Markazi and four exporters in or about December 2009.  Bank Markazi-Iran-CB was added to OFAC's SDN list as of October 22, 2008.  Such a transaction necessarily involved dollar clearing by SCB-NY.

50.     SCB performed a trade finance and cash management transaction for the Iran Ministry of Economic Affairs and Finance in or about December 2009.  Such a transaction necessarily involved dollar clearing by SCB-NY.

51.     SCB records further show that it performed transactions in August, November, and December 2009 with the Ministry of Energy of Iran Group, an agency of the Government of Iran, with nominal value of $2,546,419, and cash management and trade finance revenues to the bank in the amount of $259,602.77.  Significant transactional foreign exchange revenues were also earned from this client during the period from August 2009 through December 2009.   Such transactions including U.S. dollar foreign exchange trades necessarily involved dollar clearing by SCB-NY.

52.     According to SCB records, as of June 2008, Bank Saderat had the authority to conduct foreign exchange transactions directly through SCB with a $1 million limit per transaction and a total settlement limit of $10 million.  This meant that Bank Saderat was independently and remotely able to log into SCB's OLT3 computer system to initiate U.S. dollar foreign exchange transactions that necessarily involved SCB-NY.  In addition, the Industrial Development and Renovation Organization of Iran and the Iranian Offshore Engineering Company had on-line trading access and independent authority to engage in U.S. dollar foreign exchange transactions in 2008 and 2009. Similarly, Bank Tejerat still had an account at SCB-Dubai (Master No. 3239713) open in 2012.  Any such foreign exchange trades would have involved SCB-NY.

53.     As of 2008, SCB had on its books significant approved U.S. dollar foreign exchange trading limits for the following entities that were listed as SDNs:  Bank Sepah, Bank Keshavarzi, and the Iranian Export Development Bank.

54.     SCB's continued efforts to do business with banned Iranian entities continued into 2009 and beyond.  In March 2009, SCB executives developed a list of priority accounts to be targeted for business development because they each had "good revenue potential."  The target list included National Iranian Tanker Company and National Iranian Oil Company.

55.     In April 2009, SCB targeted Iran as a source of business as part of "The Curve Campaign," a global financial markets campaign to cross-sell interest rate products to selected high value potential clients and acquire term U.S. dollar deposits from these clients.

56.     SCB internal reports showed that as of August 2009, the bank enjoyed profits of $4,365,000 from Iranian related transactions and customers.

57.     A report of customer transactions from August 2009, showed eight transactions with Bank Tejerat, 10 transactions with Iranian Tanker Company, seven transactions with Iran & Dubai Co., LLC, and transactions with Pasian High Voltage, Khorasan Steel, and Khouzestan Steel Company.

58.     Between 2009 and 2014, SCB continued its course of conduct to execute illegal clearing transactions for its Iranian-connected or Iranian owned customers such as: Amesco, FZE ($6 billion), Bank Markazi Jomhouri Islami Iran ($5 billion), Bright Crescent Trading Co. ($2 billion), Caspian Petrochemical ($5 billion), Iran & Dubai Co. ($6 billion), Iran Overseas Investment Bank, Ltd. ($1 billion), M& H Trading ($5 billion), Mahan Air General Trading LLC ($2 billion), PICO International Dubai ($2 billion), Piston Trading ($2 billion), and Schlumberger Overseas SA/Well Services of Iran ($6 billion).

59.     A reasonable, conservative calculation of the dollar-value of the clearing transactions in violation of the Iran sanctions that SCB handled between 2009 and 2014 is approximately $56.75 billion.

**D.**      **The 2019 Amended Deferred Prosecution Agreement**

60.      On April 8, 2019, the Justice Department and SCB entered into an Amended

Deferred Prosecution Agreement (the "2019 DPA"). (A copy of the 2019 DPA is attached as

Exhibit B and is incorporated by reference herein.) The 2019 DPA included the original Factual

Statement from the 2012 DPA plus a Supplemental Statement of Facts ("Facts Supp.").

61.      In the 2019 DPA, SCB admitted that it had processed $240 million of clearing

transactions in violation of the Iran sanctions between 2007 and 2011, contrary to what it had

represented in the 2012 DPA.  2019 DPA, Fact Supp. ¶¶ 4-5 (Exh. B). SCB agreed to forfeit that

amount. 2019 DPA ¶ 11 (Exh. B).

62.      The 2019 DPA did not address the broader course of conduct by SCB in violation

of the Iran sanctions set out in this action. Nor did it address the far greater sums that, by

operation of statute, had been forfeited by SCB to the United States as a consequence of that

conduct.

## CAUSE OF ACTION
### (31 U.S.C. § 3729(a)(1)(G))

63.      The allegations in the foregoing paragraphs of this First Amended Complaint are

incorporated here by reference.

64.      As set out above, the SCB adopted a course of conduct to conceal from the

Government hundreds of billions of dollars of clearing transactions in which they engaged from

2001 through 2014 in violation of applicable United States sanctions on Iran.  As part of this

scheme and course of conduct to conceal these enormously profitable transactions, the SCB

concealed the extent of this illegal activity during the period 2001 through 2007 and concealed

the fact that this illegal activity continued after that time in order to induce the Department of

Justice to enter into a Deferred Prosecution Agreement with SCB in 2012 that required SCB to

pay an amount billions of dollars less than the amounts of all the illegal transactions undertaken by SCB which had already been forfeited and which SCB was obliged and remain obliged to pay to the United States by operation of law:

(a) Title 18 U.S.C. § 981(a)(1)(C) provides that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to … any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense" is "subject to forfeiture to the United States."

(b) Further, Title 18 U.S.C. § 981(f) provides that "[a]ll right, title, and interest in property described in subsection (a) of this section shall vest in the United States upon commission of the act giving rise to forfeiture under this section."

(c) A "specified unlawful activity" under 18 U.S.C. § 1956(c)(7)(D) means "an offense under … section 206 … of the International Emergency Economic Powers Act."

(d) Section 206 of the International Emergency Economic Powers Act (50 U.S.C. § 1705(a)) provides that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter."

(e) Every transaction of SCB violating United States sanctions on Iran constitutes a violation of regulations and orders issued pursuant to the International Emergency Economic Powers Act, and, accordingly, by operation of 18 U.S.C. §§ 981(a)(1)(C) & (f), 18 U.S.C. § 1956(c)(7)(D), and 50 U.S.C. § 1705(a), every dollar in each of those transactions was forfeited to the United States at the instant those transactions took place.

65.    (a) By concealing the true amount of money that had already been forfeited to the United States by the illegal clearing transactions that occurred within the time period addressed

by the 2012 Deferred Prosecution Agreement, an amount which SCB was obliged to pay the United States in full, and (b) by concealing the illegal clearing transactions in which SCB engaged after that period through 2014, the amounts of which have been forfeited and which SCB is obliged to pay to the United States, SCB knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

### PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of itself, and acting on behalf of, and in the name of, the United States of America, demands and prays that judgment be entered against SCB as follows:

1.      That the United States be awarded judgment in the amount of three times the amount of damages the United States has sustained because of SCB's actions (that is, the amount already forfeited to the United States by SCB but not yet paid by SCB), plus the maximum civil penalty for each act in violation of the False Claims Act, as provided by 31 U.S.C. § 3729(a);

2.      That pre- and post-judgment interest be awarded;

3.      That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

3.      That Relator be awarded all costs of this action, including attorneys' fees and expenses, as provided by 31 U.S.C. § 3730(d).

4.      That this Court award such other and further relief as it deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to FED. R. CIV. P. 38, Relator demands trial by jury of any and all issues

in this action so triable by right.

Dated:      New York, New York
              July 18, 2019

                                   Respectfully submitted,

                                   BRUTUS TRADING, LLC

                                   By:      /s/ Robert J. Cynkar

                                   Robert J. Cynkar
                                   McSweeney, Cynkar & Kachouroff, PLLC
                                   10506 Milkweed Drive
                                   Great Falls, VA 22066
                                   (703) 621-3300
                                   rcynkar@mck-lawyers.com

                                   *Attorney for Brutus Trading, LLC*