UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA *ex rel.* BRUTUS
TRADING, LLC,

               Plaintiff,

     v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD CHARTERED
TRADE SERVICES CORPORATION,

            Defendants.

No. 18 Civ. 11117 (PAE)

## MEMORANDUM OF LAW IN SUPPORT OF
## THE GOVERNMENT'S MOTION TO DISMISS
## RELATOR'S SECOND AMENDED COMPLAINT

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007

JEAN-DAVID BARNEA
Assistant United States Attorney
    - Of Counsel -

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND .........................................................................................................2

    A.  The False Claims Act ..........................................................................................2

    B.  The Prior Government Investigation of SCB.......................................................3

    C.  The First Relator *Qui Tam* Action .....................................................................5

    D.  The Government Investigation of Relator's Allegations ......................................6

    E.  The Government Receives New Information Regarding Possible SCB Sanctions
         Violations from a Separate Investigation...........................................................8

    F.  The Agencies Investigate SCB's Receipt of Payment Instructions from Iran ....9

    G.  The Resolution of the Investigation of SCB ....................................................10

    H.  Dismissal of Relator's First *Qui Tam* Action and Filing of the Second *Qui Tam*
         Action ..............................................................................................................11

ARGUMENT ............................................................................................................14

    I.  Legal Standard for a Government Motion to Dismiss a Relator's Claim ..........14

    II.  The Court Should Dismiss Relator's Second Amended Complaint Under the *Swift*
        Standard .........................................................................................................16

    III.  Alternatively, the Court Should Dismiss Relator's Second Amended Complaint
        Under the *Sequoia* Standard of Review ..........................................................19

        A.  Relator's Legal Theory Is Not Cognizable Under the False Claims Act...................20

        B.  Relator's Allegations Did Not Lead to Discovery of Any FCA Violations, Nor
            Were They the Basis of the Separate Government Investigation ...............................23

        C.  Permitting Relator to Pursue the Second Amended Complaint Would Waste
            Government Resources .................................................................................28

CONCLUSION..........................................................................................................30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Health Choice All. LLC ex rel. United States v. Eli Lilly & Co.*,
 No. 5:17-CV-123-RWS-CMC, 2019 WL 4727422 (E.D. Tex. Sept. 27, 2019)...................... 30

*Heckler v. Chaney*,
 470 U.S. 821 (1985)............................................................................................................. 18

*Nasuti ex rel. United States v. Savage Farms, Inc.*,
 No. CIV.A. 12-30121-GAO, 2014 WL 1327015 (D. Mass. Mar. 27, 2014)........................... 25

*Ridenour v. Kaiser-Hill Co.*,
 397 F.3d 925 (10th Cir. 2005) ............................................................................................ 3, 15

*United States ex rel. Backer v. Cooperatieve Bank U.A.*,
 No. 17 Civ. 2708 (LGS), 2019 WL 5593302 (S.D.N.Y. Oct. 30, 2019) ............................. 3, 19

*United States ex rel. Borzilleri v. AbbVie, Inc.*,
 No. 15 Civ. 7881 (JMF), 2019 WL 3203000 (S.D.N.Y. July 16, 2019) ................................. 19

*United States ex rel. CIMZNHCA, LLC v. UCB, Inc.*,
 No. 17-cv-765-SMY-MAB, 2019 WL 1598109 (S.D. Ill. Apr. 15, 2019).............................. 25

*United States ex rel. Hyatt v. Northrop Corp.*,
 91 F.3d 1211 (9th Cir. 1996) ................................................................................................. 3

*United States ex rel. Mergent Servs. v. Flaherty*,
 540 F.3d 89 (2d Cir. 2008)..................................................................................................... 2

*United States ex rel. Pentagen Techs. Int'l Ltd. v. CACI Int'l, Inc.*,
 953 F. Supp. 74 (S.D.N.Y. 1995) .......................................................................................... 15

*United States ex rel. Piacentile v. Amgen Inc.*,
 No. 04 Civ. 3983 (SJ), 2013 WL 5460640 (E.D.N.Y. Sept. 30, 2013) ............................ 18, 29

*United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*,
 151 F.3d 1139 (9th Cir. 1998) .........................................................................................*passim*

*United States ex rel. Sequoia Orange v. Sunland Packing House Co.*,
 912 F. Supp. 1325 (E.D. Cal. 1995)....................................................................................... 17

*United States ex rel. Stevens v. Vt. Agency of Natural Resources*,
 162 F.3d 195 (2d Cir. 1998)................................................................................................... 15

ii

*United States v. $557,933.89,*
  287 F.3d 66 (2d Cir. 2002).................................................................................. 22

*United States v. 92 Buena Vista Ave.,*
  507 U.S. 111 (1993)........................................................................................... 22

*United States v. Acad. Mortg. Corp.,*
  No. 16-cv-2120-EMC, 2018 WL 4794231 (N.D. Cal. Oct. 3, 2018) ...................... 25

*United States v. Bonventre,*
  720 F.3d 126 (2d Cir. 2013)............................................................................... 21

*United States v. Contorinis,*
  692 F.3d 136 (2d Cir. 2012)........................................................................... 21, 22

*United States v. EMD Serono, Inc.,*
  370 F. Supp. 3d 483 (E.D. Pa. 2019) ................................................................. 25

*United States v. Gilead Sciences, Inc.,*
  No. 11-CV-00941-EMC, 2019 WL 5722618 (N.D. Cal. Nov. 5, 2019) ............ 24, 29

*Vt. Agency of Natural Res. v. United States ex rel. Stevens,*
  529 U.S. 765 (2000)......................................................................................... 2, 15

## Statutes and Rules

18 U.S.C. § 981.............................................................................................. 4, 13

18 U.S.C. § 981(a) ............................................................................................... 10

18 U.S.C. § 981(a)(1)............................................................................................ 21

18 U.S.C. § 981(a)(1)(C) ................................................................................. 20, 21

18 U.S.C. § 981(b)................................................................................................ 22

18 U.S.C. § 981(f).................................................................................... 14, 20, 22

18 U.S.C. § 982...................................................................................................... 4

18 U.S.C. § 983(d)................................................................................................ 23

18 U.S.C. § 1956(c)(7)........................................................................................... 21

False Claims Act,
   31 U.S.C. § 3729 *et seq.* ................................................................................. 2

31 U.S.C. § 3729(a)(1)(G) ................................................................................. *passim*

31 U.S.C. § 3729(b)(3) ...................................................................................... 21, 23

31 U.S.C. § 3730(a) ........................................................................................... 2

31 U.S.C. § 3730(b) ........................................................................................... 14

31 U.S.C. § 3730(b)(1) ....................................................................................... 2, 11

31 U.S.C. § 3730(b)(2) ....................................................................................... 5

31 U.S.C. § 3730(c)(1) ....................................................................................... 2

31 U.S.C. § 3730(c)(2)(A) .................................................................................. *passim*

31 U.S.C. § 3730(c)(2)(B) .................................................................................. 2, 18

31 U.S.C. § 3730(c)(2)(C) .................................................................................. 2

31 U.S.C. § 3730(c)(3) ....................................................................................... 3

31 U.S.C. § 3730(c)(5) ....................................................................................... 14

31 U.S.C. § 3730(d) ........................................................................................... 2

31 U.S.C. § 3733 ................................................................................................ 6

International Emergency Economic Powers Act,
   50 U.S.C. §§ 1701-06 ...................................................................................... 3

50 U.S.C. § 1705(a) ........................................................................................... 21

Federal Rule of Civil Procedure 41(a)(1) ............................................................ 11, 17, 19

## PRELIMINARY STATEMENT

The United States of America (the "United States" or the "Government"), by its attorney, Geoffrey S. Berman, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in support of its motion pursuant to 31 U.S.C. § 3730(c)(2)(A) to dismiss the second amended complaint ("2d Am. Compl."), ECF No. 22-1, filed by relator Brutus Trading, LLC ("Relator"), against defendants Standard Chartered Bank, Standard Chartered plc, and Standard Chartered Trade Services Corporation (together, "SCB" or the "Bank"). Attached to this memorandum are detailed factual declarations from Federal Bureau of Investigation ("FBI") Special Agents Matthew Komar ("Komar Decl.") and Wayne Boddy ("Boddy Decl."), from Alexandre Manfull ("Manfull Decl.") of the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), and from Patrick Bryan ("Bryan Decl.") of the Board of Governors of the Federal Reserve System (the "Federal Reserve"), which describe the relevant government investigations relating to SCB and Relator's complaint.

As explained herein, Relator's complaint is both legally and factually deficient, and permitting Relator to pursue it through litigation would waste government resources. The complaint is legally deficient as it is premised on an incorrect legal theory of liability that is inconsistent with both the False Claims Act and the law regarding civil forfeiture. It is factually deficient because the Government thoroughly investigated Relator's allegations and did not uncover any violations of the False Claims Act. For these reasons, permitting Relator to continue litigating this meritless case would result in the unnecessary expenditure of government resources on a meritless case. Relator's complaint should thus be dismissed.

## BACKGROUND

### A.      The False Claims Act

The False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, imposes civil penalties and treble damages on any person or entity that, as relevant to this case, "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).  Suits to enforce the FCA may be brought by the U.S. Department of Justice, *id.* § 3730(a), or by a private person or entity who files suit "for the person and for the United States Government" in the name of the United States, *id.* § 3730(b)(1).  The private person or entity is known as a "relator" and the suit it files is called a *qui tam* action.  *Id*.  If a *qui tam* action results in a monetary recovery to the Government, the relator may seek a share of that recovery, as allowed by 31 U.S.C. § 3730(d).  As the Supreme Court has made clear, although relators have standing as "partial assignee[s]" of the Government's damages claim, they bring suit to redress injuries-in-fact suffered by the Government, and not their own injuries.  *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 772-74 (2000).  "[T]he Government," therefore, "remains the real party in interest in any such action."  *United States ex rel. Mergent Servs. v. Flaherty*, 540 F.3d 89, 93 (2d Cir. 2008) (quotation marks omitted).

If the Government intervenes in the *qui tam* case, it assumes "the primary responsibility for prosecuting the action," and is not bound by an act of the relator.  31 U.S.C. § 3730(c)(1).  The relator remains a party to the suit, but the Government may settle the case over its objection, *id.* § 3730(c)(2)(B), or may seek to limit its participation in the litigation, *id.* § 3730(c)(2)(C).  Further, as the real party in interest, even when the Government initially declines to intervene, it retains significant control over the litigation and, thus, the relator's "right to conduct the action" is circumscribed.  *Id*. § 3730(b)(1) (relator cannot dismiss action without Government consent);

2

*id.* § 3730(c)(3) (Government may intervene at any time after declination for "good cause"); *see also Ridenour v. Kaiser-Hill Co.*, 397 F.3d 925, 932 (10th Cir. 2005) (affirming dismissal after declination); *cf. United States ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211, 1215 (9th Cir. 1996) ("*[Q]ui tam* plaintiffs are merely agents suing on behalf of the government, which is always the real party in interest.") (collecting cases).

As relevant here, the FCA provides that "[t]he Government may dismiss the action notwithstanding the objections of the [relator] if the [relator] has been notified by the Government of the filing of the motion and the court has provided the [relator] with an opportunity for a hearing on the motion." 31 U.S.C. § 3730(c)(2)(A); *see also United States ex rel. Backer v. Cooperatieve Bank U.A.*, No. 17 Civ. 2708 (LGS), 2019 WL 5593302, at *3 (S.D.N.Y. Oct. 30, 2019) ("hearing" on such a motion often consists simply of consideration of relator's written arguments).

### C.  The Prior Government Investigation of SCB

From 2010 until 2012, the U.S. Department of Justice's Criminal Division and the Criminal Division of the U.S. Attorney's Office for the District of Columbia (together, "DOJ"), FBI, OFAC, the Federal Reserve, the New York County District Attorney's Office ("DANY"), and the New York Department of Financial Services ("DFS") investigated SCB regarding potential violations of the sanctions rules forbidding the provision of financial services to Iran. Komar Decl. ¶¶ 5-6; Manfull Decl. ¶¶ 22-24, 26; *see also* Manfull Decl. ¶¶ 10-15 (describing Iran sanctions regime under International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-06, including prohibition on providing financial services to individuals and entities ordinarily resident in Iran). The investigation revealed that from 2001 to 2007, SCB had concealed the identity of its Iranian clients and Iranian bank correspondents from other banks

when processing U.S. dollar transactions on their behalf, and thus had improperly facilitated such transactions in circumvention of sanctions rules.  Komar Decl. ¶ 5; Manfull Decl. ¶¶ 23-24.

As part of the investigation, the Bank informed the agencies that it had suspended all new business with Iranian clients in U.S. dollars in 2006, and in all other currencies in 2007.  Komar Decl. ¶ 5; Manfull Decl. ¶¶ 18-19.  However, as SCB informed DOJ and OFAC, the Bank had been winding down its previous relationships with Iranian clients since that time, such as by continuing to collect payments on outstanding loans to such clients and continuing to honor preexisting trade-related agreements, like letters of credit.  Manfull Decl. ¶¶ 19-20, 25; *see also* Komar Decl. ¶ 20.  Indeed, in 2011, SCB produced to DOJ and OFAC certain reports detailing its efforts to wind down its preexisting relationships with Iranian clients in a manner compliant with sanctions rules, for example by making or accepting payments in currencies other than U.S. dollars, and by not involving U.S. banks or branches in any transactions except where permitted. Manfull Decl. ¶¶ 19-20, 25; Komar Decl. ¶ 20.

These investigations culminated in a series of agreements and consent orders between SCB and various agencies in late 2012, pursuant to which the Bank acknowledged its conduct and paid hundreds of millions of dollars in fines and penalties.  As relevant here, on December 10, 2012, SCB entered into a Deferred Prosecution Agreement (the "2012 DPA") with DOJ, pursuant to which the Bank acknowledged that it had facilitated at least $227 million in illegal transactions in 2001-07 by concealing the identities of its Iranian clients in U.S. dollar transactions, and agreed to forfeit $227 million to the United States under 18 U.S.C. §§ 981 and 982.  Komar Decl. ¶ 6 & Ex. 1.  On the same day, OFAC announced a settlement agreement with SCB, pursuant to which SCB agreed to pay a penalty of $132 million, which was satisfied by the

Bank's payment to other agencies, including DOJ. Manfull Decl. ¶ 26 & Ex. 1.[1]  As part of the resolutions with DOJ and OFAC, the Bank reiterated that it had stopped entering into new business with Iranian clients in 2006-07, and committed to continue strengthening its sanctions compliance procedures.  Manfull Decl. ¶ 26; Komar Decl. ¶¶ 5-6.

### C. The First Relator *Qui Tam* Action

On December 17, 2012, Relator filed in this Court a complaint captioned *United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank et al.*, No. 12 Civ. 9160 (KBF) ("*Standard Chartered I*"), ECF No. 36 ("Orig. Compl.").  Komar Decl. ¶ 7 & Ex. 2.  Pursuant to 31 U.S.C. § 3730(b)(2), the complaint was initially filed under seal and served only on the Civil Division of the United States Attorney's Office for the Southern District of New York ("SDNY").  In it, Relator alleged that the Bank had misled DOJ and OFAC into entering into the 2012 DPA and OFAC agreement because it had not disclosed certain sanctions-violative transactions in which it had engaged with Iranian clients after 2007.  Komar Decl. ¶ 8; Manfull Decl. ¶¶ 32-33; Orig. Compl. ¶¶ 25-26.[2]  Relator claimed that as a result of SCB's failure to disclose these violative transactions, the Bank had paid too little in connection with the 2012 DPA and OFAC agreement, and thus had violated the FCA.  Orig. Compl. ¶ 36.

In the *qui tam* complaint, Relator listed a handful of specific Iranian clients for which SCB had allegedly facilitated post-2007 illegal transactions—certain Iranian banks, government agencies and affiliated entities, and companies involved in Iran's petroleum industry—and

---

[1] The Federal Reserve investigated the Bank more broadly for its unsafe and unsound banking practices and deficiencies in its controls.  Bryan Decl. ¶ 5.  The Federal Reserve entered a cease and desist order against SCB in December 2012 and assessed a $100 million penalty for these violations, but did not make any independent findings regarding the Bank's sanctions violations, regarding which the Federal Reseve deferred to OFAC.  *Id.* ¶¶ 5-6 & Exs. A, B.

[2] On November 14, 2014, Relator amended his complaint to add similar allegations relating to the Federal Reserve's 2012 cease and desist order.  *Standard Chartered I*, ECF No. 21, ¶¶ 26-27, 39; Komar Decl. ¶ 8 n.1 & Ex. 3.

detailed particular, supposedly sanctions-violative transactions between SCB and those clients. Komar Decl. ¶¶ 8-9; Manfull Decl. ¶¶ 32-33; Orig. Compl. ¶¶ 26-34.  According to Relator, the Bank's name for these continuing illegal transactions, and its efforts to conceal them from U.S. authorities, was Project Green.  Komar Decl. ¶ 9; Orig. Compl. ¶ 14.

In addition, Relator provided the Government with a disclosure statement and certain documents supporting its allegations.  Komar Decl. ¶ 10; Manfull Decl. ¶ 32.  The documents provided by Relator included long lists of the clients of SCB's Dubai branch, access lists for the Bank's online foreign-exchange trading platform, and statements indicating the bank's profits and losses associated with certain customers.  Komar Decl. ¶ 10; Manfull Decl. ¶ 33.[3]  These lists and other documents included the specific Iranian SCB clients discussed in the *qui tam* complaint and disclosure statement.  Komar Decl. ¶ 10.  The disclosure statement also listed the names of certain SCB employees whom Relator suggested the agencies could interview to corroborate Relator's allegations.  *Id.*

### D.     The Government Investigation of Relator's Allegations

Upon receiving Relator's complaint, SDNY opened an investigation into the allegations contained therein, and invited the various agencies that had entered into the 2012 agreements with the Bank to participate.  Komar Decl. ¶ 11.[4]  The agencies first interviewed Relator's two members, Julian Knight (a former SCB employee) and Robert Marcellus (a hedge fund

---

[3] A few months before the *qui tam* complaint was filed—though after the DFS resolution was made public—Robert Marcellus, one of Relator's members, contacted OFAC and provided some of the information later included in the complaint and disclosure statement.  Manfull Decl. ¶¶ 28-31.

[4] The Government would not ordinarily provide publicly details regarding its investigation of a *qui tam* complaint, as they are protected by the law enforcement privilege.  However, we have elected to include this information here to explain why and how the Government concluded there was no merit to Relator's allegations and why they were not the source of the information that led to the agency settlements with the Bank in 2019.

manager), together on January 16, 2013.  Komar Decl. ¶ 12; Manfull Decl. ¶ 34.  At the

interview, Messrs. Knight and Marcellus explained their belief that the documents they had

provided reflected illegal transactions between SCB and its preexisting Iranian clients after 2006-

07, including trade-finance and foreign-exchange transactions involving U.S. dollars.  Komar

Decl. ¶¶ 12-15; Manfull Decl. ¶ 34.  Mr. Knight also gave the names of SCB employees who

could confirm his statements.  Komar Decl. ¶ 15.  After the interview, Relator produced

additional documents of the same type as had been provided previously.  *Id.* ¶ 16.

Thereafter, SDNY and other agencies requested information from the Bank regarding

Relator's allegations, including via a Civil Investigative Demand ("CID"), *see* 31 U.S.C. § 3733.

*Id.* ¶ 17.  SDNY also shared with the Bank, after consultation with Relator's then-counsel, a

subset of the documents provided by Relator (which were scrubbed of metadata by Relator's

counsel to avoid tracing them to Mr. Knight) that identified specific Iranian customers of the

Bank and particular transactions alleged to be connected to sanctions-violative conduct.  *Id.*

The Government's investigation into Relator's allegations and the purportedly illegal

Bank transactions with Iranian clients consisted of interviews of several SCB employees,

including most of the employees suggested by Relator as potential witnesses; review of a large

number of documents the Bank produced in response to the CID and other requests; two

presentations by the Bank's counsel regarding the transactions and clients at issue; and a detailed

analysis prepared by an independent consultant retained by the Bank of certain transactions

identified by the Government.  Komar Decl. ¶¶ 18-23; Manfull Decl. ¶¶ 35-36, 38.

As this investigation wrapped up in August 2013, the agencies had not found evidence

corroborating Relator's allegations.  Komar Decl. ¶¶ 24-25; Manfull Decl. ¶ 37.  Instead, they

concluded that Relator's information mostly related to SCB's winding down of its preexisting

relationships with its Iranian clients in a manner that did not appear to violate U.S. sanctions rules (such as by being executed in foreign currencies), and as the Bank had previously disclosed to DOJ and OFAC—and otherwise did not relate to sanctions violations. Komar Decl. ¶ 24; Manfull Decl. ¶¶ 25, 37. Moreover, the agencies did not uncover evidence that SCB had entered into any new business with Iranian clients after 2007. Manfull Decl. ¶ 37. They further learned that Project Green was the Bank's internal name for the investigation that had led to the 2012 resolutions with DOJ and other agencies. Komar Decl. ¶ 23.

As a result of these investigative findings, SDNY informed Relator's counsel that it intended to decline to intervene in the *qui tam* case. *See id.* ¶ 25.

### E. The Government Receives New Information Regarding Possible SCB Sanctions Violations from a Separate Investigation

Later in August 2013, DOJ and FBI received information through a separate criminal investigation of a different bank that a Dubai-based SCB client appeared to be connected to an Iranian company. Specifically, in 2013, DOJ and FBI were investigating another financial institution for its potential violations of Iran sanctions. Komar Decl. ¶ 26. The other financial institution revealed it had facilitated transactions for a Dubai-based petrochemical company with Iranian ties, that was an SCB client. *Id.* ¶ 27. DOJ and FBI shared this information with the other agencies that had previously investigated SCB, and requested information from the Bank regarding its dealings with this petrochemical company. *Id.* ¶¶ 28, 30; Manfull Decl. ¶ 39. Although SDNY had previously indicated to Relator's counsel that the Government intended to decline intervention in the *qui tam* case, it informed counsel that new information had come to light from a different source regarding the Bank, and so it would keep the *qui tam* complaint under seal so as not to interfere with the investigation, or in case the new information might corroborate any of Relator's allegations. Komar Decl. ¶ 31.

Based on the information learned in the other criminal investigation, the agencies began an investigation of SCB's dealings with the Dubai-based petrochemical company.  Komar Decl. ¶¶ 30, 32.  The agencies learned that the petrochemical company was registered in Dubai and controlled by an Iranian national who had a Dubai residence permit, Komar Decl. ¶ 30; Manfull Decl. ¶ 42, and was thus not necessarily subject to U.S. sanctions, Manfull Decl. ¶ 15.  The agencies uncovered evidence, however, that SCB employees knew the company was in fact closely affiliated with and a front for Iranian companies with which U.S. dollar transactions were prohibited.  Komar Decl. ¶ 33; Manfull Decl. ¶¶ 41-42.  This evidence included a fax transmission that the company's owner had sent to SCB's Dubai branch containing payment instructions in U.S. dollars; the fax header indicated it had been sent from an Iranian number. Komar Decl. ¶ 33; Manfull Decl. ¶¶ 41-42.  OFAC ultimately concluded that the Bank had improperly facilitated over $151 million in U.S. dollar transactions for this company from 2009 to 2012.  Manfull Decl. ¶¶ 40, 42.

### F.   The Agencies Investigate SCB's Receipt of Payment Instructions from Iran

After the discovery of the fax sent by the owner of the petrochemical company to SCB's Dubai office, the agencies decided to investigate more broadly the Bank's practices with regard to its Dubai-based corporate clients with possible Iranian connections.  DOJ asked the Bank in the spring of 2014 to provide copies of faxes requesting the execution of U.S. dollar transactions that SCB's Dubai branch had received from Iranian numbers.  Komar Decl. ¶ 34.  A review showed that SCB had received numerous such faxes, including many from a small number of SCB corporate customers.  *Id.*; Manfull Decl. ¶ 43.  Two of the bank's Dubai corporate customers—both of which were controlled by the same Iranian national, Mahmoud Reza Elyassi—generated the majority of the payment transaction volume based on faxes from Iran. Komar Decl. ¶ 35; Manfull Decl. ¶ 43.  Like the petrochemical company, these entities were

incorporated in Dubai, and their owner, Mr. Elyassi, had a Dubai residence permit.  Boddy Decl. ¶ 5; Manfull Decl. ¶ 43.

The agencies investigated the Bank's relationship with these customers, including conducting many witness interviews and reviewing large document productions.  Boddy Decl. ¶ 5; Manfull Decl. ¶ 41.  They concluded that several of these fax senders, including Mr. Elyassi's companies, were fronts for Iranian companies for which the Bank should not have facilitated transactions in U.S. dollars.  Boddy Decl. ¶¶ 6-7; Manfull Decl. ¶¶ 42-44. Moreover, they discovered that two employees of SCB's Dubai branch had conspired with Mr. Elyassi to manage his accounts, conceal their Iranian connections, and facilitate their U.S. dollar transactions.  Boddy Decl. ¶¶ 6-7; Manfull Decl. ¶ 42-43.

The agencies later also requested information about whether any clients of SCB's Dubai branch had logged on to Bank systems to request the execution of U.S. dollar transactions from IP addresses in Iran.  Boddy Decl. ¶ 8; Manfull Decl. ¶ 45.  Review of this information showed that certain SCB clients, including one of Mr. Elyassi's companies, had done so, and thus that SCB had improperly facilitated such transactions.  Boddy Decl. ¶ 8; Manfull Decl. ¶¶ 45-46.

### G.      The Resolution of the Investigation of SCB

The agencies announced the resolutions of their investigations on April 9, 2019.  Boddy Decl. ¶¶ 9-10; Manfull Decl. ¶ 49.  DOJ announced that it had entered into an Amended Deferred Prosecution Agreement with SCB (the "2019 DPA"), which resolved the Bank's criminal liability for the conduct it had uncovered.  Boddy Decl. ¶ 9 & Ex. 1.  SCB agreed to pay a criminal fine of $480 million and to the forfeiture pursuant to 18 U.S.C. § 981(a) of $240 million.  *Id.*; 2019 DPA ¶¶ 7-11.  These amounts were tied specifically to the value of the Bank's willful sanctions-violative transactions relating to Mr. Elyassi.  Boddy Decl. ¶ 9.  DOJ also unsealed an indictment against Mr. Elyassi.  *Id.* ¶ 9 & Ex. 2.

OFAC also announced a settlement with SCB on April 9, 2019, having concluded that the Bank had improperly facilitated almost 10,000 U.S. dollar transactions totaling more than $437 million from 2009 until 2014 in violation of sanctions rules, mostly from Iranian customers. Manfull Decl. ¶ 48 & Ex. 2.  OFAC assessed a fine of approximately $639 million, but this was deemed satisfied by the Bank's payments to other settling agencies.  *Id.* ¶ 49.[5]

### H.      Dismissal of Relator's First *Qui Tam* Action and Filing of the Second *Qui Tam* Action

While the agencies' investigations were still ongoing, the Government kept Relator's *qui tam* action under seal in order not to interfere with the investigation.  Komar Decl. ¶ 31.  On May 10, 2017, the district court unsealed the *qui tam* action.  *Standard Chartered I*, ECF No. 19; Boddy Decl. ¶ 13 & Ex. 3.  SDNY then informed Relator's counsel that, over the intervening years, the Government had not uncovered any evidence supporting Relator's allegations, and also notified him that DOJ and OFAC, among other agencies, were investigating the Bank for unrelated sanctions violations.  Boddy Decl. ¶ 13.  On July 14, 2017, SDNY notified the Court that the Government was not intervening in Relator's *qui tam* action, pursuant to 31 U.S.C. § 3730(b)(1).  *Standard Chartered I*, ECF No. 24; Boddy Decl. ¶ 13 & Ex. 4.  The Bank subsequently informed Relator that it planned to move to dismiss the *qui tam* complaint, and Relator elected to dismiss its complaint without prejudice on September 19, 2017, pursuant to Federal Rule of Civil Procedure 41(a)(1) and 31 U.S.C. § 3730(b)(1).  *Standard Chartered I*, ECF No. 28, 35; Boddy Decl. ¶ 14 & Exs. 5-6.

---

[5] The Federal Reserve issued another cease and desist order against the Bank on the same date, and assessed a $163 million penalty, again for the Bank's unsafe and unsound practices, and not based on any independent determinations of the Bank's sanctions violations.  Bryan Decl. ¶¶ 11-16 & Ex. C.

Over one year later, on November 28, 2018, and several months before the agencies announced their second set of settlements and resolutions with SCB, Relator filed its initial *qui tam* complaint in the instant action.  ECF No. 4; Boddy Decl. ¶ 15 & Ex. 7.  The complaint was nearly identical to the complaint Relator had voluntarily dismissed previously.  *See* ECF No. 4, ¶ 42; Boddy Decl. ¶ 15.  The Government declined to intervene in the case in March 2019.  ECF No. 3; Boddy Decl. ¶ 15.

After the various agency resolution agreements became public some months later, Relator obtained new counsel, ECF Nos. 12, 19, and filed a first amended complaint on July 19, 2019, ECF No. 15, and later the operative second amended complaint in September 2019, ECF Nos. 22, 23.  *See* Boddy Decl. ¶ 16 & Exs. 8-9.  These new complaints were still based on the same factual allegations that had underpinned all of Relator's prior complaints—*compare* 2d Am. Compl. ¶¶ 44-53, *with* Orig. Compl. ¶¶ 25-34; *see also* 2d Am. Compl. ¶¶ 42-43 (summarizing the allegations); Orig. Compl. ¶¶ 14-17 (similar).  As discussed above, the Government thoroughly investigated those allegations and identified no evidence corroborating Relator's claims.  However, the newly filed complaints attempted to reframe these same allegations by reference to the recent public settlement agreements, though Relator claimed that these settlements addressed only "a small subset of the course of conduct by SCB in violation of the Iran sanctions that is the gravamen of this action."  2d Am. Compl. ¶ 66.

The Second Amended Complaint claims that the information Relator provided in connection with the original 2012 *qui tam* complaint "inform[ed] th[e] [Government] for the first time of the Elyassi conspiracy between 2007 and 2011 to violate the Iran sanctions."  *Id.* ¶ 64 ("This information included facts such as the existence of Elyassi as a customer of SCB, that his limits in trading were set in U.S. dollars and that he collected his profits in U.S. dollars, that he

had authority to enter into trades 24/7 on SCB's online system, down to details such as his email contact for his business and telephone number.").  Relator claimed that its disclosure of "Elyassi-related information . . . materially added to, and formed the basis of, the Government's actions that concluded in the forfeiture of $240 million in the 2019 DPA."  *Id.* ¶ 65.

Upon seeing this new allegation, the investigating agencies re-reviewed the disclosure materials provided by Relator in 2012 and 2013 and found that Mr. Elyassi and his companies had been included—among approximately 1,400 other SCB clients—on some of the client lists of SCB's Dubai branch provided by Relator.  Komar Decl. ¶ 41; Boddy Decl. ¶¶ 17-18; Manfull Decl. ¶ 52.  However, neither in Relator's written disclosures nor at the interview of Messrs. Knight and Marcellus (or at any other time) did Relator specifically identify Mr. Elyassi or his companies, or suggest in any way that they were connected with Iran or involved in sanctions violations.  Komar Decl. ¶ 41; Boddy Decl. ¶¶ 17-18; Manfull Decl. ¶ 52.  Instead, Relator had focused the agencies' attention on the presence on these lists of a handful of known Iranian banks, agencies, and companies.  Komar Decl. ¶ 41; Boddy Decl. ¶¶ 17-18; Manfull Decl. ¶ 52.[6]

Moreover, the new complaints presented an entirely new legal theory for the Bank's liability under 31 U.S.C. § 3729(a)(1)(G).  The prior complaints asserted that SCB was liable because it had misled DOJ and other agencies in 2012 about its sanctions-violative activities and thus had paid too little in the 2012 settlements.  *E.g.*, Orig. Compl. ¶ 36.  The new complaints argued instead that each time the Bank had facilitated a financial transaction in violation of the sanctions laws, it instantly became obligated to pay the Government a civil forfeiture pursuant to 18 U.S.C. § 981 corresponding to that transaction.  2d Am. Compl. ¶¶ 71-72.  According to

---

[6] Moreover, none of the violative transactions uncovered by OFAC that did not relate to Mr. Elyassi's companies were made on behalf of any of the entities identified by Relator. Manfull Decl. ¶ 47.

Relator's theory, the Bank therefore violated the FCA by failing to immediately disclose and pay over to to the Government all property derived from or traceable to alleged sanctions violations, as soon as such transactions took place.  *Id.* ¶ 72.  This, according to Relator, violated the FCA provision that attaches liability to a person or entity who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government," 31 U.S.C. § 3729(a)(1)(G), often referred to as a "reverse false claim."  2d Am. Compl. ¶ 72.  Relator contends that SCB made reverse false claims to the Government in this matter because,  under 18 U.S.C. § 981(f), "[a]ll right, title, and interest in property" subject to civil forfeiture due to violations of criminal laws including sanctions rules, "shall vest in the United States upon commission of the act giving rise to forfeiture under this section."  2d Am. Compl. ¶ 71.

Relator further alleged that "the money forfeited pursuant to the 2019 DPA constitute[d] an alternative remedy to part of the claims made in this case within the meaning of 31 U.S.C. § 3739(c)(5) [*sic*]."  *Id.* ¶ 68.[7]

## ARGUMENT

## I.    Legal Standard for a Government Motion to Dismiss a Relator's Claim

The FCA limits the circumstances in which a relator is permitted to pursue an action, setting forth multiple circumstances under which *qui tam* complaints are to be dismissed.  As

---

[7] 31 U.S.C. § 3730(c)(5) provides that: "Notwithstanding [31 U.S.C. § 3730(b)], the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty.  If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section.  Any finding of fact or conclusion of law made in such other proceeding that has become final shall be conclusive on all parties to an action under this section."

relevant here, the statute authorizes the Government to dismiss a *qui tam* action over a relator's objection as follows:

> The Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion.

31 U.S.C. § 3730(c)(2)(A).  The United States has the authority to dismiss a relator's complaint regardless of whether it has intervened in the case or declined to do so.  *See United States ex rel. Pentagen Techs. Int'l Ltd. v. CACI Int'l, Inc.*, 953 F. Supp. 74, 77 (S.D.N.Y. 1995).  The Second Circuit has recognized that § 3730(c)(2)(A) affords the Government "ample authority . . . to bring the litigation to an early end, and although the *qui tam* plaintiff must be given a hearing, the court need not, in order to dismiss, determine that the government's decision is reasonable." *United States ex rel. Stevens v. Vt. Agency of Natural Res.*, 162 F.3d 195, 201 (2d Cir. 1998), *rev'd on other grounds*, 529 U.S. 765 (2000).  In *Stevens*, however, the Second Circuit did not articulate the standard to be applied in evaluating such motions to dismiss.

There are two different standards that other courts of appeals have adopted for evaluating Government motions under § 3730(c)(2)(A).  One standard, adopted by the D.C. Circuit, is that the Government has an "unfettered right" to dismiss a *qui tam* complaint under the FCA.  *See Swift v. United States*, 318 F.3d 250, 252 (D.C. Cir. 2003).  The other standard, adopted by the Ninth and Tenth Circuits, is that the Government's decision to dismiss a *qui tam* suit must have a "valid governmental purpose" that has some "rational relation" to the dismissal.  *United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1145 (9th Cir. 1998) (noting that § 3730(c)(2)(A) "may permit the government to dismiss a *qui tam* action without actually intervening in the case at all"); *accord Ridenour*, 397 F.3d at 936.

As discussed below, the Government submits that the *Swift* standard is the better reasoned approach, recognizing the appropriate contours of the Executive Branch's prosecutorial discretion and correcting certain errors made in the reasoning of the *Sequoia* court.  However, both standards are extremely deferential, and both acknowledge that the United States has broad discretion in deciding whether to dismiss a *qui tam* action.  Here, under either standard, the Court should dismiss this case.

## II.    The Court Should Dismiss Relator's Second Amended Complaint Under the *Swift* Standard

The D.C. Circuit has held that the United States has an "unfettered right to dismiss" a *qui tam* action under § 3730(c)(2)(A), unless there is "fraud on the court."  *Swift*, 318 F.3d at 252-53.  In *Swift,* the relator filed a *qui tam* action against certain DOJ employees alleging that they submitted false timesheets to the agency.  *See id.* at 250.  The Government moved to dismiss pursuant to § 3730(c)(2)(A) on the ground that the expected recovery to the United States did not justify the expected government burden if litigation continued.  *See id.* at 251.  The district court dismissed the complaint and the D.C. Circuit affirmed.  *See id.* at 251-54.

As the *Swift* court explained, the FCA operates against the backdrop of the general principle of separation of powers, that the Executive exercises control over whether to pursue litigation on behalf of the United States, and that full deference to the Executive Branch is particularly appropriate where the Government has not intervened and the defendant has not been served.  *Id.* at 251-52.  The D.C. Circuit observed that "we cannot see how § 3730(c)(2)(A) gives the judiciary general oversight of the Executive's judgment in this regard," given that: "'[t]he Government'—meaning the Executive Branch, not the Judicial—'may dismiss the action,' which at least suggests the absence of judicial constraint."  *Id.* at 252 (citation omitted). The D.C. Circuit further held that the Government's decision to prosecute—or not—a case that is

brought in its name is "unreviewable," including decisions to dismiss under section 3730(c)(2)(A). *Id.*; *see also id.* at 253 ("The decision whether to bring an action on behalf of the United States is . . . generally committed to the government's absolute discretion." (internal quotation marks omitted)).

*Swift* further reasoned that "[r]eading § 3730(c)(2)(A) to give the government an unfettered right to dismiss an action is also consistent" with Federal Rule of Civil Procedure 41(a)(l)(A), which "permits a plaintiff to dismiss a civil action 'without order of the court,'" so long as "'the adverse party has not yet filed an answer or a motion for summary judgment.'" *Id.* at 252. Moreover, the court rejected the notion that the relator's statutory right to a "hearing" conferred authority on the court to review the Government's reasons for dismissal. *Id.* at 253. The D.C. Circuit explained that nothing in the statute "purports to deprive the Executive Branch of its historical prerogative to decide which cases should go forward in the name of the United States." *Id.* Instead, the D.C. Circuit concluded that the relator's right to a hearing "is simply to give  the relator a formal opportunity to convince the government not to end the case." *Id.*

Finally, in *Swift* the D.C. Circuit expressly rejected the standard that the Ninth Circuit adopted in *Sequoia. See* 151 F.3d at 1144-45. In *Sequoia*, the Ninth Circuit held that the United States can dismiss an action under § 3730(c)(2)(A) when it identifies a valid governmental purpose and a rational relationship between dismissal and accomplishment of that purpose. *Id.* Even under this standard, the United States' decision to dismiss an action "need not be the best choice among competing alternatives, but merely a rational choice." *United States ex rel. Sequoia Orange v. Sunland Packing House Co.*, 912 F. Supp. 1325, 1341 (E.D. Cal. 1995). If the Government satisfies this test, the burden switches to the relator "to demonstrate that dismissal is fraudulent, arbitrary and capricious, or illegal." *Sequoia*, 151 F.3d 1145.

17

In rejecting the *Sequoia* standard, the D.C. Circuit found that the *Sequoia* decision was premised on an ill-founded articulation of the contours of prosecutorial discretion and that nothing in § 3730(c)(2)(A) "sets 'substantive priorities' []or circumscribes the government's 'power to discriminate among issues or cases it will pursue.'" *Swift*, 318 F.3d at 253 (citing *Heckler v. Chaney*, 470 U.S. 821, 833 (1985)). The *Swift* decision also noted that *Sequoia* had incorrectly justified its decision on the basis of legislative history that related to an "unenacted Senate version of the 1986 amendment" and that, in any event, related to cases in which the Government intervened, not declined to do so. *Id.* at 253.[8]

Some district courts in the Second Circuit have found the reasoning of the D.C. Circuit in *Swift* to be sounder and more persuasive than that of the Ninth Circuit in *Sequoia*. *See, e.g.*, *United States ex rel. Amico v. Citigroup, Inc.*, No. 14 Civ. 4370 (CS), ECF No. 44, at 8 (S.D.N.Y. Aug. 7, 2015) ("[T]his Court is more inclined toward *Swift* than *Sequoia*," but finding dismissal appropriate under both standards); *United States ex rel. Piacentile v. Amgen Inc.*, No. 04 Civ. 3983 (SJ), 2013 WL 5460640, at *2-3 (E.D.N.Y. Sept. 30, 2013) ("The government has provided the Court with authority [*Swift*] that, while nonbinding, fully persuades the Court that

---

[8] In addition, the plain language of § 3730(c)(2)(A) supports the "unfettered right" standard. Section 3730(c)(2)(A) provides a relator only with the right to a "hearing" if the Government determines to dismiss, a right that is satisfied by the Court's consideration of this motion. *See United States ex rel. Borzilleri v. AbbVie, Inc.*, No. 15 Civ. 7881 (JMF), 2019 WL 3203000, at *3 (S.D.N.Y. July 16, 2019) ("This Court's consideration of the arguments raised in [relators'] opposition has provided them with an opportunity to be heard on the Government's Motion." (quotation marks omitted)). This is in contrast to § 3730(c)(2)(B), which circumscribes the Government's ability to settle a *qui tam* case over the relator's objection: "The Government may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances." This provision expressly restricts DOJ's settlement authority when a relator objects to circumstances in which the court has found the proposed settlement is to be "fair, adequate, and reasonable under all the circumstances." Significantly, in contrast, no such requirement limits DOJ's authority to dismiss a *qui tam* case under § 3730(c)(2)(A).

the inquiry ought to end here."); *cf. United States ex rel. Borzilleri v. AbbVie, Inc.*, No. 15 Civ. 7881 (JMF), 2019 WL 3203000, at *2 (S.D.N.Y. July 16, 2019) ("The Court need not take a side in the dispute [about the standard of review], however, because it concludes that the Government may dismiss the case" under either standard). *But see Cooperatieve Bank*, 2019 WL 5593302, at *3 ("The Court adopts the *Sequoia* standard . . . ."), *on appeal*, No. 19-2947 (2d Cir.).

Application of the *Swift* standard is particularly appropriate here because of the procedural posture. The Government has moved to dismiss before the Bank responded to the Second Amended Complaint. Deference to the Government's decision to dismiss would thus comport with Rule 41(a)(1), which affords a plaintiff the right to voluntarily dismiss a complaint prior to service of a responsive pleading by the defendant without any approval by the court. *See* Fed. R. Civ. 41(a)(1)(A); *Swift*, 318 F.3d at 252; *Citigroup, Inc.*, ECF No. 44, at 8.

Accordingly, because the Government has determined in its discretion that this matter should be dismissed, the Court should dismiss Relator's Second Amended Complaint. This comports with *Swift* and its articulation of the Executive Branch's prosecutorial discretion. Dismissal would also comport with Rule 4l(a)(l)(A) as the Bank has not yet responded to this *qui tam* complaint.

### III. Alternatively, the Court Should Dismiss Relator's Second Amended Complaint Under the *Sequoia* Standard of Review

Even if the Court were to apply the somewhat more searching *Sequoia* standard of review, dismissal of the Second Amended Complaint would be amply justified for several reasons. *Sequoia* requires a "two step analysis": "(1) identification of a valid government purpose; and (2) a rational relation between dismissal and accomplishment of the purpose." 151 F.3d at 1145. "If the government satisfies the two-step test, the burden switches to the relator to demonstrate that dismissal is fraudulent, arbitrary and capricious, or illegal." *Id.* (quotation

marks omitted).  This test is "[t]he same analysis [as] is applied to determine whether executive action violates substantive due process," and "respect[s] the Executive Branch's prosecutorial authority by requiring no greater justification of the dismissal motion than is mandated by the Constitution itself."  *Id.* at 1145-46.

Here, the Government has three separate valid government purposes justifying its motion, each of which is more than rationally related to dismissal of Relator's complaint.  First, the legal theory underpinning Relator's latest complaint is plainly invalid.  *See* Point III.A.  Second, the Government thoroughly investigated the Relator's allegations and found them to be without merit.  *See* Point III.B.  And third, it would be a waste of the Government's resources to require it to monitor, and to the extent necessary, participate in the litigation of Relator's claim.  *See* Point III.C.  Each one of these reasons separately—and *a fortiori* all of them together—justifies dismissal of this action.

### A.        Relator's Legal Theory Is Not Cognizable Under the False Claims Act

The Court should dismiss Relator's currently operative complaint because, first, it is premised on an entirely unworkable and unsupported legal theory: that IEEPA violations by the Bank giving rise to potential civil forfeiture create established "obligations" under the FCA.  As Relator sees it, any funds handled by the Bank in violation of the Iran sanctions "were forfeited to the United States at the time of each illicit transaction" pursuant to the applicable civil forfeiture statute, 18 U.S.C. §§ 981(a)(1)(C), (f).  2d Am. Compl. ¶ 8.  In turn, "the amount of each illicit transaction became at the time the transaction was effected an obligation of SCB 'to pay or transmit money or property to the Government'" within the meaning of Section 3729(a)(1)(G) of the FCA.  *Id.*  This misunderstands both the law of civil forfeiture and of the relevant FCA provision, and Relator's complaint thus rests entirely on a facially invalid legal theory.

Put simply, an act giving rise to a potential civil forfeiture, even once the United States files a forfeiture action, does not create an obligation owed by the holder of the forfeitable party to the United States, and therefore does not constitute a reverse false claim to the Government. The reverse false claim provision of the FCA attaches liability to a person or entity who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).  The statute defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  *Id.* § 3729(b)(3).

An act giving rise to a potential civil forfeiture does not create any obligation by a person to pay the Government.  Rather, as relevant here, certain *property* that "constitutes or is derived from proceeds traceable to a violation" of certain criminal provisions[9] is "subject to forfeiture to the United States."  18 U.S.C. § 981(a)(1), (a)(1)(C).  Critically, a "civil forfeiture action is an action *in rem*, and therefore is based solely on the origin of the property, not upon the culpability of the owner."  *United States v. Bonventre*, 720 F.3d 126, 132 (2d Cir. 2013) (internal quotation marks and ellipsis omitted); *accord United States v. Contorinis*, 692 F.3d 136, 146 (2d Cir. 2012) ("In civil forfeiture, the United States brings a civil action against the property itself as an *in rem* proceeding—it is the property which is proceeded against . . . .") (internal quotation marks, citations, and alterations omitted)).  Rather than impose any duties or obligations on non-

---

[9] The relevant criminal provisions include IEEPA, which governs the sanctions rules at issue here.  *See* 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7); 50 U.S.C. § 1705(a); *see generally* Manfull Decl. ¶¶ 10-15.

governmental actors to turn over property to the Government, Section 981 instead authorizes certain government officials to seize property subject to forfeiture.  *See* 18 U.S.C. § 981(b).

Civil forfeiture laws thus do not impose an "obligation" within the meaning of the FCA on any person to pay forfeitable property to the Government; rather, they permit the Government to obtain title to the property through administrative processes or by filing a civil forfeiture complaint.  The Government's assertions in such an action are, in turn, subject to various defenses by the holder of the property, whether that is an alleged wrongdoer involved in the offenses giving rise to forfeiture or a third party.  *See, e.g.*, *Contorinis*, 692 F.3d at 146 ("In civil forfeiture proceedings, the burden often rests on the claimant, who may be an innocent third party, to prove that the property is not subject to forfeiture.  The claimant's culpability is also often irrelevant.") (internal quotation marks, citations, and alterations omitted).

It is in the context of adjudicating competing claims to the forfeited property that the provision cited by Relator arises, *see* 2d Am. Compl. ¶ 71: "[a]ll right, title, and interest in property [subject to forfeiture] shall vest in the United States upon commission of the act giving rise to forfeiture under this section," 18 U.S.C. § 981(f).  Just like the remainder of the relevant forfeiture statute, this provision does not, and is not intended to, impose any obligation on a person to pay the Government the forfeitable funds.  Instead, pursuant to this provision, "although the government's title must be perfected through administrative or judicial forfeiture proceedings, vesting will 'relate[] back to the moment when the property became forfeitable.'" *See United States v. $557,933.89*, 287 F.3d 66, 77 (2d Cir. 2002) (Sotomayor, J.) (quoting *United States v. 92 Buena Vista Ave.*, 507 U.S. 111, 123-29 (1993) (Scalia, J., concurring)).  This relation-back doctrine establishes the relative priority of the Government's claim to the property as against transferees who received the property after the offense was committed, which can be

overcome by the so-called "innocent owner defense" under certain circumstances.  *See id.* (citing 18 U.S.C. § 983(d)).

There is thus simply no basis for Relator's argument that "the amount of each illicit transaction [facilitated by SCB] became, at the time the transaction was effected, *an obligation of SCB* 'to pay or transmit money or property to the Government.'"  2d Am. Compl. ¶ 8 (quoting 31 U.S.C. § 3729(a)(1)(G)) (emphasis added).  Instead, to the extent the United States was able to establish that certain funds were subject to forfeiture, including as the proceeds of certain illegal transactions, it could choose to bring an *in rem* action against those funds to seek to forfeit them.

SCB's obligation to pay the Government was created only by the 2019 DPA itself, in which it agreed to forfeit $240 million and to pay a civil fine of $480 million.  2019 DPA, ¶¶ 10-11.  Forfeiture law did not create an obligation within the meaning of the FCA at the time the underlying sanctions-violative transactions occurred.  *See* 31 U.S.C. § 3729(b)(3) (defining "obligation" for purposes of reverse FCA claim as "an established duty" to pay the Government). Relator's complaint must thus be dismissed as it is premised on an untenable, and incorrect, legal theory.

### B.     Relator's Allegations Did Not Lead to Discovery of Any FCA Violations, Nor Were They the Basis of the Separate Government Investigation

Furthermore, even if Relator's legal theory were cognizable, the Second Amended Complaint should be dismissed because Relator's factual allegations did not lead the Government to uncover any FCA violations (or even any sanctions violations by SCB). Moreover, despite Relator's unfounded claim to the contrary, and to the extent it is relevant, the Government investigations that led to the 2019 settlements with SCB were not based on any information provided by Relator.

First, as explained above, several government agencies, including SDNY, DOJ, and OFAC, thoroughly investigated Relator's allegations. Komar Decl. ¶¶ 11-25; Manfull Decl. ¶¶ 34-38. The agencies carefully reviewed the Relator's submissions—the *qui tam* complaint, the disclosure statement, and the attached documents—and interviewed Messrs. Knight and Marcellus, the members of the Relator entity. Komar Decl. ¶¶ 10-16; Manfull Decl. ¶ 34. Furthermore, the agencies interviewed numerous Bank employees, and reviewed documents and information SCB provided in response to the CID and other inquiries, including two detailed presentations and the report of an outside accounting firm regarding the specific transactions that Relator had alleged to be undisclosed sanctions violations. Komar Decl. ¶¶ 17-23; Manfull Decl. ¶¶ 35-37. None of these sources of information corroborated Relator's allegations. Indeed, they supported the opposite view that most of the transactions at issue were legitimate winding-down of the Bank's preexisting relationships with its Iranian customers in currencies other than U.S. dollars, as it had previously disclosed to DOJ and OFAC; and the remaining transactions were otherwise not problematic. Komar Decl. ¶¶ 24-25; Manfull Decl. ¶¶ 37-38.[10]

A government investigation into the allegations of a *qui tam* complaint that does not support pursuing an FCA claim is a sufficient basis to justify dismissal of the action. *See, e.g.*, *United States v. Gilead Sciences, Inc.*, No. 11-CV-00941-EMC, 2019 WL 5722618, at *6-7 (N.D. Cal. Nov. 5, 2019) ("[T]he Court has been presented with substantial evidence that, after the [relators] filed their lawsuit in 2010, the United States [thoroughly] investigated their allegations . . . . Given the[se] investigations . . . , the Court finds that there is a concrete factual basis for the United States to argue that allowing the [relators] to proceed with the FCA claim

_____

[10] *See also* Bryan Decl. ¶¶ 10-11 (after investigation, the Federal Reserve "determined that the Relator's information did not warrant further administrative sanctions and did not undermine the basis for the Board's 2012 Orders").

would undermine the considered decisions of [the affected agencies] about how to address the conduct at issue here." (footnote and alterations omitted)); *United States v. EMD Serono, Inc.*, 370 F. Supp. 3d 483, 490 (E.D. Pa. 2019) ("The government has invested significant time and resources investigating the relators' claims over a lengthy period of time.  Eight United States Attorneys' Offices have concluded that the allegations in each of the cases lack sufficient factual and legal support to justify the cost of the litigation and that the allegations in this case conflict with public policy interests."); *Nasuti ex rel. United States v. Savage Farms, Inc.*, No. CIV.A. 12-30121-GAO, 2014 WL 1327015, at *11 (D. Mass. Mar. 27, 2014) (dismissing *qui tam* where "the United States Attorney's Office, in conjunction with the USDA Office of the Inspector General, investigated each of Relator's allegations and found that his allegations were either factually incorrect or without foundation" (alterations omitted)), *aff'd*, No. 14-1362, 2015 WL 9598315 (1st Cir. Mar. 12, 2015).[11]  Here, the Government's investigation of Relator's allegations was lengthy and thorough and did not uncover evidence of any FCA violations, thus justifying dismissal.

To the extent Relator questions the Government's diligence in its investigation of the *qui tam* allegations or the Government's good faith in making this motion based on the 2019 settlements with SCB, *see Sequoia*, 151 F.3d at 1145, such concerns are misplaced, as these

---

[11] On the other hand, a few district courts have denied Government motions to dismiss where they concluded that the Government had not sufficiently investigated the relator's claims, though these decisions are now on appeal.  *See United States ex rel. CIMZNHCA, LLC v. UCB, Inc.*, No. 17-cv-765-SMY-MAB, 2019 WL 1598109, at *3 (S.D. Ill. Apr. 15, 2019) (denying dismissal under *Sequoia* because the government "failed to fully investigate the allegations against the specific defendants in this case"), *on appeal*, No. 19-2273 (7th Cir.); *United States v. Acad. Mortg. Corp.*, No. 16-cv-2120-EMC, 2018 WL 4794231, at *4 (N.D. Cal. Oct. 3, 2018) ("Relator's evidence indicating that the Government may not have investigated the amended complaint at all, together with the Government's failure to submit any responsive evidence, means that the Government failed to meet the *Sequoia Orange* rational relation standard."), *on appeal*, No. 18-16408 (9th Cir.).

settlements were decidedly not based on any information provided by Relator.  Relator alleged that SCB had improperly, and knowingly, continued to engage in U.S. dollar transactions with its preexisting Iranian customers—such as Iranian banks and government agencies—after 2007. Orig. Compl. ¶¶ 14-15, 25-34; 2d Am. Compl. ¶¶ 42-53; Komar Decl. ¶¶ 8-10, 12-16; Manfull Decl. ¶¶ 33-34.  While this allegation was not corroborated, Komar Decl. ¶¶ 24-25; Manfull Decl. ¶ 37, DOJ and FBI separately learned, from a source unrelated to Relator (and as discussed in full above, *see* Background, Section E), of information that led the investigation of SCB in an entirely different direction.

This discovery, and not any information provided by Relator, led to a broader investigation of the Bank's relationships with its Dubai-based corporate clients that had Iranian connections.  Komar Decl. ¶¶ 34-36, 38-39; Boddy Decl. ¶¶ 4-8, 17; Manfull Decl. ¶¶ 41-47, 51. This was not prompted by Relator's allegations, which focused on the Bank's known, pre-2007 Iranian customers, such as Iranian banks and government agencies.  Orig. Compl. ¶¶ 14-15, 25-34; 2d Am. Compl. ¶¶ 42-53; Komar Decl. ¶¶ 8-10, 12-16, 40; Manfull Decl. ¶¶ 33-34, 53 ("[T]he types of allegedly violative transactions that the Relator disclosed are different in kind from the transactions OFAC and the other agencies uncovered in their recent investigations.").

Specifically, the agencies discovered through their own separate investigative efforts— not through any information provided by Relator or derived from anything provided by Relator—a number of suspect transactions connected to a handful of companies controlled by Mr. Elyassi, an Iranian national resident in Dubai.  Komar Decl. ¶¶ 34-35; Boddy Decl. ¶¶ 4-5; Manfull Decl. ¶¶ 41 43; *see supra* Background, Sections E, F.  This was how the Government learned of Mr. Elyassi.  Komar Decl. ¶¶ 35, 41; Boddy Decl. ¶¶ 4-5, 17-18; Manfull Decl. ¶¶ 43, 51-52.  From that point, the investigation largely focused on Mr. Elyassi's companies.  Komar

Decl. ¶ 36; Boddy Decl. ¶¶ 5-7; Manfull Decl. ¶ 43.  The investigating agencies then discovered that these companies were affiliated with an Iranian money-transfer business, and that two SCB employees knew of their Iranian connection and actively assisted Mr. Elyassi in concealing them and facilitating U.S. dollar transactions on their behalf.  Boddy Decl. ¶¶ 6-7; Manfull Decl. ¶ 43.

Relator's claim that it alerted DOJ to Mr. Elyassi's illegal activities is simply incorrect. As discussed above, neither Relator's original complaint nor its disclosure statement identified Mr. Elyassi, nor did either of Relator's members mention him when they were interviewed by the Government.  Komar Decl. ¶¶ 7-16, 41; Boddy Decl. ¶ 17; Manfull Decl. ¶¶ 33-34, 52; *see supra* Background, Section H.  Nor did Relator identify the two SCB employees who conspired with Mr. Elyassi.  Boddy Decl. ¶ 18.  Relator did provide some customer lists from SCB's Dubai branch with its disclosure materials, which simply listed Mr. Elyassi and his companies among well over a thousand other Dubai-based clients of SCB.  Komar Decl. ¶ 41; Boddy Decl. ¶¶ 17-18; Manfull Decl. ¶ 52.  However, neither in Relator's written disclosures nor at the interview of Messrs. Knight and Marcellus was it suggested that Mr. Elyassi or his companies were connected in any way with Iran, or should be a focus of the agencies' investigation of Relator's allegations. Komar Decl. ¶ 41; Boddy Decl. ¶¶ 17-18; Manfull Decl. ¶ 52.  Instead, Relator pointed the agencies to the presence on these lists of a handful of known Iranian banks, agencies, and companies, and never suggested that they should look into any of the hundreds of other Dubai-based SCB clients on those lists.  Komar Decl. ¶ 41; Boddy Decl. ¶¶ 17-18; Manfull Decl. ¶ 52. Relator is thus incorrect in claiming that its allegations were the impetus for the discovery of the Bank's improper relationship with Mr. Elyassi.

Finally, the agencies' investigation of faxed payment instructions from Iran led them to request information about logins to SCB's online portals from Iran and other sanctioned

countries.  Boddy Decl. ¶¶ 8, 17; Manfull Decl. ¶ 45.  This led to the discovery that some U.S.

dollar transactions that had been requested during such sessions, which were illegal largely

because they had been requested from within a sanctioned country.  Boddy Decl. ¶¶ 8, 17;

Manfull Decl. ¶¶ 45-46, 53.  This is unrelated to Relator's allegation that SCB had improperly

permitted its known Iranian customers to maintain logins to the Bank's online foreign-exchange

system after 2007—especially given that the agencies' investigation showed that none of these

Iranian clients had executed any transactions on this system in 2008 or later.  Boddy Decl. ¶ 17;

Manfull Decl. ¶¶ 54-55.

In sum, contrary to Relator's assertion, the information provided by Relator was simply

not the basis for the 2019 settlements with SCB, including the 2019 DPA.  This further supports

the argument that, despite a thorough investigation, the Government was not able to substantiate

Relator's allegations, and that the Court should therefore dismiss Relator's complaint.

### C.     Permitting Relator to Pursue the Second Amended Complaint Would Waste Government Resources

Finally, even if Relator had a valid legal theory or factual basis for its complaint,

permitting its case to continue would unjustifiably consume Government resources, which the

Government is legitimately permitted to avoid through a motion to dismiss.  Should this matter

proceed, the Government will need to expend considerable resources monitoring this action and

potentially responding to discovery requests.  Relator will likely seek discovery from the

Government concerning its internal deliberations, including seeking to depose Government

officials concerning the 2012 and 2019 resolutions, and the various agency investigations that led

to them.  The Government, in turn, will be required to expend resources litigating the scope and

propriety of such discovery requests and, should any discovery be allowed, responding to

document requests and defending depositions.

The Government's desire to minimize its expenditure of resources on discovery is itself a valid and rational basis for dismissing Relator's complaint. *See Backer*, 2019 WL 5593302, at *3 (argument that litigation of relator's claim "will require considerable governmental resources to address the scope of discovery requests and, should any discovery be allowed, to respond to document requests and to defend depositions" was a "valid purpose[] supporting dismissal"); *Citigroup*, ECF No. 44, at 9 (the government's goal of minimizing its expenses," including "complying with discovery requests," is legitimate even if the costs "would be relatively small"); *Sequoia,* 151 F.3d at 1146 ("[T]he government can legitimately consider the burden imposed on the taxpayers by its litigation, and that, even if the relators were to litigate the FCA claims, the government would continue to incur enormous internal staff costs"; recognizing that, under 31 U.S.C. § 3730(c)(2)(A), even "a meritorious suit may be dismissed upon a proper showing"); *Piacentile,* 2013 WL 5460640, at *3 (Government's "preference to avoid expending further resources on this action" was legitimate).

Some courts have invited the Government to engage in a cost-benefit analysis—comparing the burden of complying with discovery requests to the potential benefits to the Government if the relator's claims continued—to justify a motion to dismiss. *See, e.g.*, *Gilead Sciences*, 2019 WL 5722618, at *7 ("[T]he Court does not accept the [relators'] suggestion that a cost-benefit analysis must be quantitative in nature—*i.e.*, that the United States is required to do some kind of mathematical calculation. The critical question is whether the United States engaged in a meaningful consideration of cost and benefit such that its decision to seek dismissal is supported by a rational basis." (citations omitted)). Even if such an analysis were required, which the Government does not concede, the Government's application in this case is amply justified by Relator's fatally flawed legal theory and by the fact that the Government's

investigation of Relator's factual allegations did not substantiate them, as explained above. *See, e.g.*, *Health Choice All. LLC ex rel. United States v. Eli Lilly & Co.*, No. 5:17-CV-123-RWS-CMC, 2019 WL 4727422, at *3 (E.D. Tex. Sept. 27, 2019) ("The Government investigated [relators'] various FCA claims and concluded those claims are unlikely to lead to recovery. Thus, the Government concluded that [relators'] claims do not justify the expenditure of scarce government resources. . . . [T]his cost-benefit analysis was rationally related to the Government's legitimate purpose for dismissal." (citations omitted)), *on appeal*, No. 19-40906 (5th Cir.).

## CONCLUSION

For the foregoing reasons, the Court should dismiss Relator's second amended complaint pursuant to 31 U.S.C. § 3730(c)(2)(A).

Dated:     New York, New York
           November 21, 2019

                         Respectfully submitted,

                         GEOFFREY S. BERMAN
                         United States Attorney for the
                         Southern District of New York

                  By:    ___s/Jean-David Barnea_____
                         JEAN-DAVID BARNEA
                         Assistant United States Attorney
                         86 Chambers Street, Third Floor
                         New York, New York 10007
                         Tel.: (212) 637-2679
                         Fax: (212) 637-2686
                         Email: Jean-David.Barnea@usdoj.gov