UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

        Plaintiff,

v.

STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, and STANDARD CHARTERED TRADE SERVICES CORPORATION,

        Defendants.

No. 18 Civ. 11117 (PAE)

## DECLARATION OF SPECIAL AGENT WAYNE C. BODDY

I, Special Agent Wayne C. Boddy of the Federal Bureau of Investigation, hereby declare the following pursuant to 28 U.S.C. § 1746:

1. I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since 2011. From July 2012 to April 2019, I was assigned to a squad designated to investigate securities fraud, money laundering and other financial crimes in New York City. Since April 2019, I have been assigned to the New York office's Cyber Division.

2. Beginning in February 2015, I worked on, and later became the case agent for, an investigation of Standard Chartered Bank ("SCB" or the "Bank") with the Criminal Division of the U.S. Attorney's Office for the District of Columbia and what is now known as the Money Laundering and Asset Recovery Section of the U.S. Department of Justice's Criminal Division (together, "DOJ"). This investigation eventually resulted in an amended Deferred Prosecution Agreement with SCB on April 9, 2019 (the "2019 DPA") (Exhibit 1), which I understand was an amendment to an original Deferred Prosecution Agreement with the Bank dated December 10,

2012 (the "2012 DPA"). Other agencies, including the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the Board of Governors of the Federal Reserve System (the "Federal Reserve"), the New York County District Attorney's Office ("DANY"), and the New York State Department of Financial Services ("DFS"), conducted parallel investigations into the Bank.

3.  I make this declaration based on my own personal knowledge as well as a review of documents relating to these investigations, in support of the motion by the United States of America (the "United States") to dismiss the second amended complaint of relator Brutus Trading, LLC (the "Relator"), in the above-captioned case. This declaration does not set forth all of my knowledge of the matters discussed herein. All dates and amounts set forth are approximate and to the best of my recollection, unless otherwise noted.

### A. The SCB Investigation

4.  When I joined the SCB investigation, DOJ and FBI had already received from the Bank information regarding faxes received by SCB's Dubai branch that requested the execution of U.S. dollar transactions and had headers indicating they were received from Iranian numbers. A review of those fax transmissions showed that a substantial number of them came from a small number of customers, who had become the focus of the next phase of our investigation.

5.  Those customers included two Dubai-incorporated companies controlled by Mahmoud Reza Elyassi, an Iranian national who ordinarily resided in Iran and who, as explained below, was subsequently indicted by a federal grand jury empaneled in the District of Columbia in connection with this investigation. Over the following several years, DOJ and FBI investigated the Bank's relationships with Mr. Elyassi's companies and others like them. As part of its cooperation with our investigation, the Bank conducted an extensive and thorough internal

2

investigation, voluntarily made foreign-based employees available for interviews, and produced voluminous documentary materials to us. We reviewed these materials and interviewed a significant number of witnesses.

6. Prior to my arrival on the investigative team, DOJ and FBI had investigated SCB's relationship with a Dubai-based petrochemical company with links to Iran, for which the Bank had facilitated U.S. dollar transactions. Similar to the petrochemical company, Mr. Elyassi's companies, while nominally based in Dubai, were controlled by an Iranian national who ordinarily resided in Iran (but had a Dubai residence permit) and conducted the majority of their business operations in Iran. The investigation further identified two SCB employees who had conspired with Mr. Elyassi to manage his businesses' accounts, conceal the businesses' Iranian connections, and facilitate transactions in U.S. dollars for these businesses. These former SCB employees knew that Mr. Elyassi's companies were processing U.S. dollar transactions for the benefit of Iranian individuals and companies in violation of U.S. economic sanctions, among other things.

7. Specifically, we found, among other things, that Mr. Elyassi and his co-conspirators registered numerous corporate entities in the United Arab Emirates and used those companies as fronts for a money-exchange business located in Iran. From at least 2007 through 2011, Mr. Elyassi used a business account at SCB's Dubai branch to cause U.S. dollar transactions to be sent and received through the U.S. financial system for the benefit of individuals and entities ordinarily resident in Iran. The SCB employees, among other things, counseled Mr. Elyassi about how to structure his transactions in order to avoid scrutiny by SCB's compliance personnel.

8. Information that Mr. Elyassi (and others) had sent faxes from Iranian fax numbers led to a further inquiry as to whether SCB customers had accessed the Bank's online banking platform from Iranian Internet Protocol ("IP") addresses. This inquiry revealed that, among others, one of Mr. Elyassi's companies had initiated significant numbers of U.S. dollar transactions in this manner.

**B. The Conclusion of the SCB Investigation**

9. On April 9, 2019, DOJ announced that it had entered into the 2019 DPA with the Bank. This agreement resolved SCB's criminal liability for the conduct of the above-referenced two employees who conspired with Mr. Elyassi to conduct U.S. dollar transactions in violation of U.S. economic sanctions. In the 2019 DPA, SCB agreed to the forfeiture of $240 million pursuant to 18 U.S.C. § 981(a) (the full amount of the value of the willful sanctions-violative transactions relating to Mr. Elyassi) and to a fine of $480 million (twice the amount of those transactions). Also on April 9, 2019, DOJ announced that a grand jury had, on April 5, 2019, returned an indictment charging Mr. Elyassi with conspiracy to defraud the United States and to violate U.S. economic sanctions laws, and with conspiracy to launder money. *See* Exhibit 2.

10. Other agencies that participated in parallel investigations of SCB, including OFAC, the Federal Reserve, DANY, and DFS, also announced settlements or consensual resolutions with the Bank around this time.

**C. The Relator's *Qui Tam* Complaint**

11. I understand that the Relator in this case initially filed a *qui tam* complaint against SCB on December 17, 2012, alleging that SCB had misled DOJ and OFAC into entering into the 2012 DPA and OFAC's 2012 settlement with the Bank by failing to disclose U.S. dollar transactions the Bank had facilitated for its preexisting Iranian customers in 2008 and 2009.

12. I am told that these allegations were investigated by the Civil Division of the U.S. Attorney's Office for the Southern District of New York ("SDNY") in 2012 and 2013.

13. While our investigation of the Bank, discussed above, remained ongoing, on May 10, 2017, the Court unsealed the Relator's *qui tam* case. *See* Exhibit 3. SDNY informed the Relator's counsel that, over the intervening years, the investigation had not uncovered any evidence supporting the Relator's allegations, but notified him that DOJ and OFAC, among other agencies, were pursuing an investigation of the Bank for unrelated sanctions violations. On July 14, 2017, SDNY filed a notice that the United States was not intervening in the Relator's *qui tam* case. *See* Exhibit 4.

14. On September 19, 2017, after the Bank notified the Relator that it intended to move to dismiss the *qui tam* complaint, Relator voluntarily withdrew the action. *See* Exhibits 5, 6.

15. On November 28, 2018, about one year after the Relator had voluntarily withdrawn its first *qui tam* complaint, the Relator filed a second *qui tam* complaint, commencing the present action. *See* Exhibit 7. The new complaint essentially reiterated the allegations of the Relator's previously withdrawn complaint. The Government declined to intervene in the new case in March 2019.

16. On July 18, 2019, and again on September 23, 2019, the Relator—now represented by new counsel—amended the complaint in its second *qui tam* action. *See* Exhibits 8, 9. In these new complaints, the Relator alleges that its complaint and disclosures were the source of the information that led to the latest investigation of SCB and ultimately the 2019 DPA and other settlement agreements. This is incorrect.

17. The investigation in which I participated, which led to the 2019 DPA, was not based in any way on information provided by the Relator. Rather, the investigation began as the result of a separate criminal investigation of a different financial institution. This other investigation led DOJ and FBI to explore SCB's relationships with the petrochemical company discussed above. And the revelation that this petrochemical company had submitted instructions for U.S. dollar payments to SCB via fax led to a broader investigation of SCB's clients who submitted payment requests by fax or online, resulting in our discovery of Mr. Elyassi's companies.

18. Moreover, the two SCB employees who conspired with Mr. Elyassi were not included in any of the lists of names that the Relator provided for us to consider investigating or interviewing, nor did we investigate their actions until after we learned of Mr. Elyassi's companies as a result of the Iran-originated faxes.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:   November 21, 2019
         New York, New York

                                              _____
                                              Wayne C. Boddy
                                              Special Agent
                                              Federal Bureau of Investigation