SEALED

FILED IN OPEN COURT

APR - 5 2019

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on July 9, 2018

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | |
| v. | : | Grand Jury Original |
| | : | |
| | : | VIOLATIONS: |
| | : | |
| MAHMOUD REZA ELYASSI, | : | 18 U.S.C. § 371 |
| (a/k/a MAHMOUD REZA ELYASI) | : | (Conspiracy to Defraud United States |
| | : | and to Violate the International |
| | : | Emergency Economic Powers Act) |
| Defendant. | : | |
| | : | 18 U.S.C. § 1956 |
| | : | (Money Laundering Conspiracy) |
| | : | |
| | : | FORFEITURE: |
| | : | 18 U.S.C. § 981(a)(1)(C) |
| | : | 18 U.S.C. § 982(a)(1) |
| | : | 21 U.S.C. § 853(p) |
| | : | 28 U.S.C. § 2461(c) |
| | : | |

Case: 1:19-cr-000117
Assigned To : Judge James E. Boasberg
Assign. Date : 04/05/2019
Description: INDICTMENT (B)
Related Cases: 12-cr262 & 17-cr-190 (JEB)

**INDICTMENT**

The Grand Jury charges that:

## COUNT ONE

### GENERAL ALLEGATIONS

At all times material to this Indictment:

1.  Defendant MAHMOUD REZA ELYASSI ("ELYASSI") was an Iranian national who ordinarily resided in Iran. ELYASSI controlled Company C-1 and Company C-2, both of which conducted their business operations in Iran. Company C-1 was a customer of Standard Chartered Bank's ("SCB" or "the Bank") branch office in Dubai ("SCB Dubai") from around

1

December 2006 through February 2011. Company C-2 was a customer of SCB Dubai from around February 2011 through September 2011. Both Company C-1 and Company C-2 conducted U.S. dollar financial transactions through the United States using their accounts at SCB Dubai.

2. SCB was headquartered in London, United Kingdom, with branch offices around the world including in the United Arab Emirates ("UAE") and in New York, NY. The Bank's branch office in New York provided wholesale banking services, including U.S. dollar clearing services for international wire transactions.

3. Person A worked at SCB's branch office in Dubai ("SCB Dubai") as a Relationship Manager from 2007 through 2014. As a relationship manager, Person A was the main point of contact between the bank and numerous small and medium enterprise ("SME") companies that were in his portfolio. Person A interacted with his customers frequently: answering questions, conducting research, and representing the customer's interests to other SCB components (e.g., the foreign exchange desk).

4. Person B worked at SCB Dubai from approximately 2008 to 2014, as a Treasury Sales Manager (i.e., a foreign exchange sales manager). Person B serviced the needs of the SME customers for SCB Dubai, including encouraging and helping to facilitate foreign exchange transactions. Treasury Sales Managers partnered with Relationship Managers to develop customer relationships.

5. The United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia, among other things, administers and enforces economic and trade sanctions against certain foreign countries, including Iran, and entities associated with those countries.

The Iranian Sanctions

6. The International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706 ("IEEPA"), authorizes the President of the United States (the "President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declares a national emergency with respect to that threat. Pursuant to the authority under IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S.-origin goods.

7. Pursuant to 50 U.S.C. § 1705, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation or prohibition issued under IEEPA.

8. On March 15, 1995, the President issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declaring "a national emergency to deal with that threat." The President followed this with Executive Order No. 12959, issued on May 6, 1995, which imposed comprehensive trade and financial sanctions on Iran. These sanctions prohibited, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran of any goods, technology, or services from the United States or U.S. persons, wherever located. This includes persons in a third country with knowledge or reason to know that such goods, technology, or services are intended specifically for supply, transshipment, or re-exportation, directly or indirectly, to Iran or the Government of Iran. On August 19, 1997, the President issued Executive Order No. 13059, consolidating and clarifying Executive Order Nos. 12957 and 12959 (collectively, the "Executive

Orders"). The most recent continuation of this national emergency was executed on March 12, 2019. 84 Fed. Reg. 9219 (Mar. 13, 2019). Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transaction Regulations ("ITRs"),[1] 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.

9. With the exception of certain exempt transactions, the ITRs prohibit, among other things, U.S. depository institutions from servicing Iranian accounts and directly crediting or debiting Iranian accounts. The ITRs also prohibit transactions by any U.S. person who evades or avoids, has the purpose of evading or avoiding, or attempts to evade or avoid the restrictions imposed under the ITRs. The ITRs were in effect at all times relevant to the conduct described below.

### The Conspiracy

10. Between at least in or about 2006 and in or about 2011, in the District of Columbia and elsewhere, the defendant did knowingly and willfully combine, conspire, confederate, and agree with numerous persons, including Persons A and B and Companies C-1 and C-2, and other individuals and companies known and unknown to the Grand Jury, to commit offenses against the United States, and to defraud the United States, more particularly by:

    a. causing financial services to be exported without authorization or a license from the United States to Iran, and persons and entities resident and operating in Iran, in violation of the International Emergency Economic Powers Act, Title 50, United States Code, Section 1705; and

    b. defrauding the United States, including the U.S. Department of the Treasury, by interfering with and obstructing a lawful government function, that is, the

---

[1] Effective October 22, 2012, the Department of the Treasury renamed and reissued the ITRs as the Iranian Transactions and Sanctions Regulations. All of the conduct at issue herein took place prior to the renaming.

4

enforcement of laws and regulations prohibiting the export or supply of financial services from the United States to Iran, without authorization or a license, by deceit, craft, trickery, and dishonest means, in violation of Title 18, United States Code, Section 371.

**Manner and Means of the Conspiracy and Scheme to Defraud**

11. It was part of the conspiracy and scheme to defraud that ELYASSI and certain of his co-conspirators registered numerous general trading companies in the United Arab Emirates ("UAE"), including Company C-1 and Company C-2.

12. It was further part of the conspiracy and scheme to defraud that ELYASSI and certain of his co-conspirators used these UAE general trading companies as fronts for Company C-3, a money exchange business located in Mashhad, Iran, in order to provide services to Iranian individuals and companies seeking to conduct U.S. dollar transactions through the United States in violation of U.S. economic sanctions.

13. It was further part of the conspiracy and scheme to defraud that ELYASSI and his co-conspirators opened and maintained bank accounts in the UAE in the names of Companies C-1 and C-2 in several currencies, including U.S. dollars, at various banks in the UAE, including SCB Dubai, in order to process U.S. dollar transactions for the benefit of Iranian individuals and companies in violation of U.S. economic sanctions.

14. It was further part of the conspiracy and scheme to defraud that ELYASSI and his co-conspirators provided their customers with detailed bank account information for Companies C-1 and C-2 in order to receive fund transfers on their behalf, including the bank name, branch, bank address, SWIFT code,[2] beneficiary name, and account numbers.

---

[2] SWIFT, the Society for Worldwide Interbank Financial Telecommunications, is the international system to transmit

15. It was further part of the conspiracy and scheme to defraud that ELYASSI and his co-conspirators would receive funds from an individual or customer in one currency (such as U.S. dollars) and then disburse those funds to recipients in another currency (such as Iranian rials or toman).

16. It was further part of the conspiracy and scheme to defraud that ELYASSI and his co-conspirators would receive funds in one country, such as Iran, and disburse those funds to recipients in another country, such as the United States or China, through transactions processed through bank accounts held in the UAE by Companies C-1 and C-2.

17. It was further part of the conspiracy and scheme to defraud that, between in or about November 2007 and August 2011, Person B conspired with ELYASSI and others to facilitate foreign exchange transactions for Companies C-1 and C-2, including in U.S. dollars. Both Person A and Person B helped ELYASSI manage the accounts of Companies C-1 and C-2 and conduct foreign exchange transactions in U.S. dollars that cleared through the United States. Person A and Person B knew that ELYASSI operated from Iran and conducted U.S. dollar transactions with Iranian persons or entities, and that Companies C-1 and C-2 transacted U.S. dollar business for the benefit of Iranian entities. Through Companies C-1 and C-2's accounts at SCB Dubai, ELYASSI and his co-conspirators conducted approximately 9,500 U.S. dollar transactions worth over $240 million.

18. It was further part of the conspiracy and scheme to defraud that, between in or about November 2007 and August 2011, Person A and Person B instructed ELYASSI on how to structure financial transactions in ways that would not cause the Bank to suspect the transactions violated

---

payment messages with other financial institutions around the world, including U.S. correspondent banks. SWIFT messages contain various informational fields. A SWIFT code is a unique reference name identifying each financial institution.

U.S. laws, including IEEPA.

19.     It was further part of the conspiracy and scheme to defraud that, between in or about November 2007 and August 2011, Person A and Person B misled Bank compliance officials about ties that ELYASSI and Companies C-1 and C-2 had to Iran.

20.     It was further part of the conspiracy and scheme to defraud that, between in or about March 2011 and August 2011, Person A and Person B knew that Company C-1's account with the Bank had been closed due to potential IEEPA violations, including ELYASSI conducting transactions while resident in Iran or conducting U.S. dollar transactions with Iranian persons or entities, but continued providing services to ELYASSI and Company C-2 without disclosing to Bank compliance officials that Company C-2 was operated by ELYASSI.

## Overt Acts

21.     In furtherance of the above-described conspiracy, and in order to carry out the objects thereof, ELYASSI and others known and unknown to the Grand Jury committed or caused to be committed, in the District of Columbia and elsewhere, the following overt acts, among others:

    a.  On or about December 12, 2006, ELYASSI registered Company C-1 as a limited liability corporation in the UAE and obtained a commercial license from the Government of Dubai Department of Economic Development. ELYASSI was the sole manager of Company C-1.

    b.  On or about December 19, 2006, ELYASSI opened business accounts with SCB Dubai for Company C-1 in various currencies, including a U.S. dollar account ending in x1701.

    c.  During a telephone call on or about January 19, 2011, after learning that SCB Dubai would be closing Company C-1's account by December 31, 2010, ELYASSI asked

7

       Person A to extend the closure of Company C-1's account until January 31, 2011 in order to allow ELYASSI time to open a new account for Company C-2.

d.   On or about February 2, 2011, ELYASSI and his co-conspirators caused business accounts to be opened with SCB Dubai for Company C-2 in various currencies, including a U.S. dollar account ending in x5001. Although one of ELYASSI's co-conspirators was nominally the owner of Company C-2, ELYASSI exercised primary control over the Company C-2 accounts at all times.

e.   During a telephone call on or about March 9, 2011, Person A instructed ELYASSI not to send payment to Iranian individuals directly from Company C-2's account, but rather, to have a co-conspirator transfer the funds from Company C-2's account to his personal account at SCB Dubai and then send the payments to Iranian individuals in order to avoid having Company C-2's account closed.

f.   Between in or about November 2007 and August 2011, ELYASSI and his co-conspirators caused U.S. dollar transactions to be sent and received through SCB for the benefit of individuals and business organizations ordinarily resident in Iran. For example:

    i.   On or about February 2, 2009, ELYASSI requested an outgoing U.S. dollar transaction in the amount of approximately $9,142 from Company C-1's account at SCB Dubai to a company in China for the benefit of an individual located in Iran.

    ii.   On or about April 3, 2010, Company C-1 received an incoming U.S. dollar transaction in the amount of approximately $3,830 processed through SCB from a company in the United States for the benefit of a

    shipping company operating in Iran.

  iii. On or about April 10, 2010, Company C-1 received an incoming U.S. dollar transaction in the amount of approximately $7,760 processed through SCB from a company in the United States for the benefit of a shipping company operating in Iran.

  iv. On or about May 29, 2010, Company C-1 received an incoming U.S. dollar transaction in the amount of approximately $11,690 processed through SCB from a company in the United States for the benefit of a shipping company operating in Iran.

  v. On or about July 7, 2010, Company C-1 received an incoming U.S. dollar transaction in the amount of approximately $3,830 processed through SCB from a company in the United States for the benefit of a shipping company operating in Iran.

  vi. On or about April 7, 2011, ELYASSI and his co-conspirators submitted a request through SCB's online banking system for an outgoing U.S. dollar transaction in the amount of approximately $7,400 to a company in Turkey from Company C-2's account at SCB Dubai for the benefit of a company located in Iran.

g. A license from OFAC was required for at least some of the USD transactions conducted by Company C-1 and Company C-2, but a license was neither sought nor obtained by ELYASSI or his co-conspirators.

**(Conspiracy to Violate IEEPA and to Defraud the United States, in violation of Title 18, United States Code, Section 371)**

## COUNT TWO

### (Conspiracy to Commit Money Laundering)

22. The allegations in Paragraphs 1 through 24 of this Indictment are incorporated and re-alleged by reference herein.

23. Between at least in or about 2006 and in or about 2011, in the District of Columbia and elsewhere, ELYASSI, and co-conspirators including but not limited to Person A and Person B, did knowingly combine, conspire, confederate, and agree together and with other persons both known and unknown to the Grand Jury, to transmit or transfer funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States, with the intent to promote violations of IEEPA, 50 U.S.C. § 1705, in violation of Title 18, United States Code, Section 1956(h).

**(Conspiracy to Commit Money Laundering, in violation of Title 18, United States Code, Section 1956(h))**

### FORFEITURE ALLEGATION

24. Upon conviction for the offense alleged in Count One, ELYASSI shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission to the offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

25. Upon conviction for the offense alleged in Count Two, ELYASSI shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission to the

offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

26. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property that cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

**(Criminal Forfeiture, pursuant to Title 18, United States Code Sections 981(a)(1)(c) and 982(a)(1), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p))**

A TRUE BILL

███████████████

FOREPERSON

*Jessie K. Liu* /sjm/

Attorney of the United States in
and for the District of Columbia

11