UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
UNITED STATES OF AMERICA, *ex rel.*
BRUTUS TRADING, LLC,

                  Plaintiffs,

-against-

STANDARD CHARTERED BANK,
STANDARD CHARTERED PLC and
STANDARD CHATERED TRADE SERVICES
CORPORATION,

                  Defendants.
-------------------------------------------------------------x

18 CV _____

**FILED UNDER SEAL
Pursuant to 31 U.S.C.
§ 3730(b)**

**COMPLAINT**

**JURY TRIAL DEMANDED**

## Introduction

Relator-Plaintiff Brutus Trading, LLC ("Relator"), through its attorneys, Menz Bonner Komar & Koenigsberg LLP, makes this Complaint and Demand for Jury Trial under seal, against Standard Chartered Bank, Standard Chartered PLC and Standard Chartered Trade Services Corporation ("collectively Defendants"). Relator alleges, based upon personal knowledge, relevant documents and information and belief, as follows:

### I. NATURE OF ACTION

1. Relator brings this action on behalf of the United States against Defendants for treble damages and civil penalties arising from Defendants' violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.*

2. In connection with providing foreign exchange bank services to international customers, Defendants made false statements to the United States and thereby (a) knowingly presented and caused to be presented false and fraudulent claims for payment and

approval; (b) knowingly made, used, and caused to be made and used, false records and statements material to false and fraudulent claims; (c) knowingly, made, used or caused to be used, false records or statements material to an obligation to pay or transmit money and/or concealed, avoided and decreased an obligation to pay money; and (d) conspired to defraud the United States by means of false statements and false claims; all in violation of 31 U.S.C. §§ 3729(a)(1) (A), (B), (C) & (G).

## II. JURISDICTION & VENUE

3. This Court has subject matter jurisdiction over the claims alleged in this Complaint under 28 U.S.C. § 1331 (Federal question), § 1345 (United States as plaintiff) and 31 U.S.C. § 3732(a) (False Claims Act).

4. This Court has personal jurisdiction over the Defendants named in the Complaint pursuant to 31 U.S.C. § 3732(a), because at least one of the Defendants can be found, resides, and/or transacts business in the Southern District of New York and because an act proscribed by 31 U.S.C. § 3729 occurred within this District. Section 3732(a) further provides for nationwide service of process.

5. This action is not precluded by the public disclosure bar of the False Claims Act, 31 U.S.C. § 3730(e)(4). Upon information and belief, no "public disclosure" of the matters alleged herein occurred before December 14, 2012, when Relator voluntarily provided the information to the United States Government. This action is not "based upon" any publicly available information and in any event, Relator, through its principals, has "direct and independent knowledge" of the instant allegations. Therefore, to the extent any of these allegations are deemed to have been based upon a public disclosure, Relator is an "original

source" of this information within the meaning of the False Claims Act and is expressly not subject to its public disclosure bar.

6. Venue is proper in the Southern District of New York, under 28 U.S.C. §§ 1391(b) and (c), and 31 U.S.C. § 3732(a), because (a) the Defendants reside in this District, (b) a substantial part of the events or omissions giving rise to the violations of 31 U.S.C. § 3729 alleged in the Complaint occurred in this District, and (c) because at least one of the Defendants can be found and transacts business within this District.

### III. PARTIES

7. The United States is the real party in interest plaintiff in this action.

8. Relator Brutus Trading, LLC ("Brutus"), is a Wyoming Limited Liability Corporation, and brings this action for violations of the False Claims Act on behalf of itself and the United States. Brutus's principals possess extensive knowledge and experience with international foreign exchange transactions and banking and possess personal knowledge to support and establish the claims asserted in this Complaint.

9. Defendant Standard Chartered PLC ("SC"), is a leading international banking institution with headquarters in London, England. SC has over 1,700 offices around the world.

10. SC's wholly-owned subsidiary, Standard Chartered Bank ("SCB"), offers a complete range of banking products and services to its personal, business and wholesale banking clients worldwide. SCB has been licensed by the New York State Banking Department[1] to operate a foreign bank branch in New York State since 1976, which branch is currently

---

[1] In 2011, the State's Banking Department and Insurance Department were merged to create the New York Department of Financial Services ("DFS").

- 3 -

located at 1095 Avenue of the Americas, New York, NY 10036. The New York branch office is referred to hereinafter as SCB-NY.

11. Defendant Standard Chartered Trade Services Corporation, a wholly-owned subsidiary of SCB, is a Delaware corporation registered to do business in New York State as a foreign business corporation.

### IV. STANDARD CHARTERED'S ILLEGAL CONDUCT

#### A. The Bank's Project Green and Sundry Account Practices

12. SCB-NY primarily conducts a U.S. dollar clearing business which clears approximately $195 billion per day on the Clearing House International Payment System ("CHIPS"). While SCB claims not to service retail customers in the United States, it does offer wholesale banking services, including trade finance services, cash management, treasury, foreign exchange and interest rate products, commodity finance, and structured import and export finance services. As of March 31, 2012, SCB-NY held $40.8 billion in total assets.

13. Defendants' conduct of the U.S. dollar clearing business and use of U.S.-based U.S. dollar Nostro facilities for the purposes of settling any form of foreign exchange transaction with a U.S. dollar leg or component requires it to clear transactions through SCB-NY and the correspondent U.S. dollar bank accounts domiciled in SCB-NY, used to facilitate such clearing transactions. SCB was required to use U.S. dollar clearing systems such as Fedwires for any account conversions from U.S. dollars or into U.S. dollars against any other currency, whether or not the accounted was domiciled in the United States. As a result, SCB and SCB-NY must comply with the rules and regulation imposed by the U.S. Treasury's economic sanctions regulations. In short, those regulations forbid or restrict the conduct of financial transactions by institutions located in the United States with certain foreign governments and their various

instrumentalities and any person or entity that has been identified on the list of Specially Designated Nationals ("SDN") issued by the United States Treasury Department's Office of Foreign Assets Control ("OFAC").

14.     Notwithstanding its legal obligation to comply with the U.S. sanctions regulations, since at least 2002, SC operated a program known internally to high level SC officials as "Project Green." This was a program run by trade finance experts and senior geographical branch chief executive officers with no compliance officers involved in its management. Project Green was designed to assist, conspire, aid and abet non-United States customers that have been made the subject of United States economic sanctions to evade those sanctions and engage in international financial transactions. SC continued to operate Project Green until 2012, when SC began the process of winding down Project Green. Project Green was largely operated out of SCB's Dubai branch with support from SCB's Chennai, India offices.

15.     In addition to pursuing a policy of assisting, conspiring, aiding, and abetting its clients to operate in defiance of international economic sanctions, SC also failed to operate with proper financial controls and procedures in the processing and settling of foreign exchange transactions for its foreign customers. One example of SC's loose financial controls was the "Transaction Bank Sundry Foreign Exchange Account," in "OLT3" – the online trading system for all of the bank's transactional business. This system was at the heart of SCB's client back office for on line conversions from U.S. dollars to another currency from a client account in Straight 2 Bank ("S2B") operation. The system architecture around this platform prevented Anti-Money Laundering ("AML") procedures from being effective and transactions from being monitored for the purpose of OFAC compliance. This account was where SC booked banking

revenues from transactions that were not properly matched up and settled on SCB's books. As a result of failing to have proper controls for closing out transactions, by 2008 the Transaction Bank Sundry Foreign Exchange Account had grown to a balance of approximately $100 million in unassigned revenues. The revenues assigned to this account should have been matched to the branches of the client relationship managers and the branches that provided services to the bank's clients for the particular transaction, but instead were left without being properly attributed. In addition, because these revenues were not properly matched up to the customer, identifying whether the revenues were derived from customers on the SDN list or from entities associated with foreign governments, such as Iran, subject to economic sanctions, would prove very difficult, if not impossible, for any SCB-NY employee.

16. Normally, transactions performed for clients are associated with the bank's internal client identifier code number, labeled as the "SCI Customer ID" number. This number is used on internal bank spread sheets to associate transactions and revenues with the particular client. Banking employees have computer access to the SCI Customer ID number to obtain on-line the customers' profile information and transaction history. A New York based employee conducting a U.S. dollar clearing transaction for a customer would be able to query the bank's customer data base using the SCI Customer ID to pull up a full profile of that customer. This was true even if the client originated from the SCB Dubai Small Medium Enterprise ("SME") client office.

17. For example, if the bank processed a U.S. dollar clearing transaction for a client that earned the bank a fee of $50,000, up to 1/3 of that fee should have been booked as revenue earned by the SCB-NY branch for the services it performed in processing the U.S. dollar clearing transaction. But, because those revenues were not assigned to any particular branch,

revenues that should have been assigned to the New York branch were not included in the income and assets of the New York branch. OLT3, by design, did not process end counterparties to trades, leaving counterparties in Iran Group transactions and Dubai-based Iranian backed SME's labeled simply as "SCB Dubai."

### B. The Bank's Settlement with the N.Y. Department of Financial Services

18. On August 6, 2012, the New York Department of Financial Services ("DFS") issued an order pursuant to New York Banking Law § 39 requiring SCB-NY to explain why SCB-NY's license to operate in New York should not be revoked due to SCB's violations of various bank secrecy and anti-money laundering laws. *See In Re Standard Chartered Bank, New York Branch,* Order Pursuant to Banking Law § 39 (N.Y.S. Dep't of Fin'l Services) (Aug. 6, 2012) (the "Order"). The Order explained in great detail that SCB had concealed from regulators at DFS and OFAC, approximately 59,000 transactions conducted for Iranian clients that violated rules and regulations issued by DFS and OFAC. The Order provided that the Department's investigation initially focused upon SCB's systematic misconduct on behalf of Iranian customers but the investigation also uncovered evidence of similar schemes to do business with other countries that were subject to U.S. sanctions. Order at n. 1.

19. On September 21, 2012, DFS and SCB entered into a Consent Order under New York Banking Law § 44 (the "Consent Order"), whereby SCB agreed to pay a civil monetary penalty to DFS in the amount of $340 million, and SCB consented to having a compliance monitor on premises who reported directly to DFS and to conduct a comprehensive review of the bank's compliance programs, policies and procedure.

20. According to the Consent Order, from January 2001 through 2007, SCB provided U.S. dollar clearing services to Iranian state and privately owned banks, corporations

and individuals. In processing such transactions, SCB removed or omitted Iranian information from U.S. dollar wire payment messages to avoid having to comply with OFAC banking rules and regulations. This removal or stripping of wire transfer identifying information occurred with respect to approximately 59,000 transactions with nominal value of approximately $250 billion. Consent Order ¶¶ 2-3.

21. By its terms, the size of the civil penalty was determined based upon the 59,000 transactions that occurred during the period January 2001 through 2007 that SCB had disclosed to DFS in the course of the Department's investigation. Thus, in the Consent Order, DFS agreed that so long as SCB complied with the terms of the Consent Order, "no further action will be taken by the Department against SCB for the conduct set forth in the Consent Order or the August 6th Order, including the investigation referenced in footnote 1 of the August 6th Order." Consent Order ¶ 21. The Consent Order provided, however, that "the Department may undertake enforcement action against SCB for transactions or conduct that SCB did not disclose to the Department in written materials that SCB submitted to the Department in connection with this matter." Consent Order ¶ 21.

    **C.**    **The Bank's $327 Million Settlement with the United States Departments of the Treasury and Justice and the Federal Reserve Board of Governors**

22. On December 10, 2012, SCB entered into a global settlement with the United States Departments of the Treasury and Justice and the Board of Governors of the Federal Reserve System (the "Federal Reserve") by agreeing to pay a total of $327 million for SCB's violations of the laws and regulations administered by OFAC.

23. On December 10, 2012, SCB entered into a settlement with OFAC, agreeing to pay $132,000,000 to settle its civil liability arising out of SCB's violations of

OFAC's rules and regulations. *See* Settlement Agreement between OFAC and SCB, ¶ 32 (Dec. 10, 2012) ("OFAC Settlement Agreement"). The OFAC Settlement Agreement states that "SCB has taken remedial action by terminating its business and prohibiting new business since 2007 with Iranian customers." OFAC Settlement Agreement, ¶ 26. Under the OFAC Settlement Agreement, SCB's obligation to pay the $132,000,000 would be satisfied by payment of an equal or greater amount that satisfied the penalty assessed by United States or county officials. *Id.* ¶ 32.

24. On December 10, 2012, SCB consented to the filing of a criminal information by the United States Attorney's Office for the District of Columbia, which charged that from 2001 until 2007, SCB facilitated U.S. Dollar transactions for financial institutions and other parties affiliated with Iran. Information, *United States v. Standard Chartered Bank,* 12-CR.-262 (JEB) (D.D.C. Dec. 10, 2012) (Dkt. # 1). The same day, SCB entered into a Deferred Prosecution Agreement ("DPA") with the Asset Forfeiture and Money Laundering Section of the United States Department of Justice and the United States Attorney's Office for the District of Columbia. *United States v. Standard Chartered Bank,* 12-CR-262 (D.D.C.) (Dkt. # 2). Pursuant to the DPA, SCB agreed to pay the United States forfeiture in the amount of $227,000,000. DPA ¶ 3. The payment was made in order to "settle any and all civil and criminal claims currently held by the United States for any act within the scope of or related to the Factual Statement," Exhibit A to the DPA, and for which SCB accepted and acknowledged responsibility. *Id.* at ¶¶ 2, 4(f).

25. According to the Factual Statement, beginning in "2001 and ending in 2007, SCB violated U.S. and New York State laws by illegally sending payments through the U.S. financial system on behalf of entities subject to U.S. economic sanctions." Factual

Statement ¶ 2; *see also id.* ¶¶ 42 & 43. In addition, "[o]n October 30, 2006, SCB informed the [Federal Reserve Bank of New York] that it was ending its U.S.-dollar clearing activity for all the Iranian banks. The bank ended its U.S.-dollar activity by March 2007." *Id.* ¶ 103. The Factual Statement further states that "[f]rom August 2007, SCB suspended all new Iranian business in any currency." *Id.* ¶ 104.

26. On December 10, 2012, SCB consented to a Cease and Desist Order ("Cease and Desist Order ") with the Federal Reserve. The Cease and Desist Order recites that the Federal Reserve, along with DOJ, the DANY [District Attorney of New York] and OFAC "have been conducting an investigation into the practices of the Bank concerning the transmission of funds to and from the United States by and through entities and individuals subject to sanctions regimes . . . administered by OFAC." Cease and Desist Order at 2. In addition, SCB consented to an Order of Assessment of a Civil Money Penalty ("Order of Assessment") by the Federal Reserve in the amount of $100 million. The Order of Assessment states "in order to resolve the investigations, Standard Chartered has agreed to enter into settlement agreements with DOJ, DANY, and OFAC." Order of Assessment at 2. The Order of Assessment states that the Federal Reserve had obtained information that "[f]rom at least 2001 through early 2007" SCB had violated U.S. law in the processing of payments involving parties subject to OFAC sanctions. Order of Assessment at 3. As a consequence, the Federal Reserve assessed SCB a "civil money penalty" in the amount of $100,000,000, with $65,000,000 assessed for violations of OFAC regulations and $35,000,000 assessed for providing false information to Federal Reserve examiners. Order of Assessment at 5. But, in negotiating the settlement with each of the Government agencies, SCB failed to fully disclose the complete extent of the bank's "unsafe and unsound practices" with regard to its dealings with sanctioned

entities and individuals, as well as the significant number of compromised transactions with Iran Group Clients, Dubai-based Iranian-backed SME's, and OFAC identified SDNs.

### D. Defendants Fraudulently Induced the Settlements With the Treasury and Justice Departments and the Federal Reserve

27. Contrary to the representations that defendants made to induce the Treasury and Justice Departments and the Federal Reserve to enter into the OFAC Settlement Agreement, the DPA, and the Federal Reserve's Cease and Desist Order and Order of Assessment, after 2007, defendants knowingly engaged in U.S. dollar clearing and other financial transactions with and for the benefit of Iranian government entities and Iranian SDNs in at least 2008 and 2009 and as late as 2012 through the client franchise based in SCB Dubai, conducing transactions for Dubai-based, Iranian backed SME clients.

28. Defendants' records show that since at least 2006, SC and SCB identified and targeted as customers the following Iranian government entities or SDNs: Bank Keshavarzi, Bank Markazi, Bank Maskan, Bank Mellat, Bank Melli, Bank Tejarat, Export Development Bank of Iran, Bank Saderat and Sepah Bank. In addition, since at least 2008, SCB's client lists included the National Iranian Oil Company ("NIOC") and its subsidiaries as clients. In 2008, OFAC identified NIOC as an entity owned or controlled by the Government of Iran within the meaning of the Iranian Transactions Regulations. OFAC also identified NIOC as an affiliate of the Islamic Revolutionary Guard Corps ("IRGC"). OFAC added IRGC to the SDN list on October 21, 2007.

29. The following are examples of the many trades performed by SCB on behalf of banned Iranian government entities or Iranian related SDNs after 2007 or evidence that SCB was performing transactions after 2007 on behalf of clients that were banned Iranian

entities, contrary to SCB's representations to representatives of the United States that "[f]rom August 2007, SCB suspended all new Iranian business in any currency." *See* ¶ 24, *supra*.

30. In or about January 2009, SCB performed an export finance transaction for Bank Tejerat, a bank owned by the Government of Iran. Relator understands that such a transaction necessarily involved dollar clearing by SCB's New York branch.

31. In or about January 2009, SCB performed three structured trade finance transactions for National Iranian Tanker Company ("NITC"), an entity owned by the Iranian government and a subsidiary of NIOC. Relator understands that such transactions necessarily involved dollar clearing by SCB's New York branch.[2]

32. SCB conducted a U.S. dollar letter of credit transaction between Bank Markazi and four exporters in or about December 2009. Bank Markazi-Iran-CB was added to OFAC's SDN list as of October 22, 2008. Relator understands that such a transaction necessarily involved dollar clearing by SCB's New York branch.

33. SCB performed a trade finance and cash management transaction for the Iran Ministry of Economic Affairs and Finance in or about December 2009. Relator understands that such a transaction necessarily involved dollar clearing by SCB's New York branch.

34. SCB records further show that it performed transactions in August, November and December 2009 with the Ministry of Energy of Iran Group, an agency of the Government of Iran, with nominal value of $2,546,419, and cash management and trade finance revenues to the bank in the amount of $259,602.77. Significant transactional foreign exchange revenues were also earned from this client during the period from August 2009 through

---

[2] OFAC fined a U.S. corporation, General Reinsurance, for making reinsurance payments in 2005 for the benefit of NITC.

December 2009. Relator understands that such transactions including U.S. dollar foreign exchange trades necessarily involved dollar clearing by SCB's New York branch.

35. According to SCB records, as of June 2008, Bank Saderat had the authority to conduct foreign exchange transactions directly through SCB's OLT3 system with a $1 million limit per transaction and a total settlement limit of $10 million. This meant that Bank Saderat was independently and remotely able to log into SCB's OLT3 computer system to initiate U.S. dollar foreign exchange transactions that necessarily involved SCB-NY. In addition, each of the Industrial Development and Renovation Organization of Iran and the Iranian Offshore Engineering Company had on-line trading access and independent authority to engage in U.S. dollar foreign exchange transactions in 2008 and 2009. Any such foreign exchange trades would have involved SCB-NY.

36. As of 2008, SCB had on its books significant approved U.S. dollar foreign exchange trading limits for the following entities that were listed as SDNs: Bank Sepah, Bank Keshavarzi, and the Iranian Export Development Bank.

37. SCB's continued efforts to do business with banned Iranian entities continue into 2009 and beyond. In March 2009, SCB executives developed a list of priority accounts to be target for business development because they each had "good revenue potential." The target list included National Iranian Tanker Company and National Iranian Oil Company.

38. In April 2009, SCB targeted Iran as a source of business as part of "The Curve Campaign," a global financial markets campaign to cross-sell interest rate products to selected high value potential clients.

39. SCB internal reports showed that as of August 2009, the bank enjoyed profits of $4,365,000 from Iranian related transactions and customers.

40. A report of customer transactions from August 2009, showed eight transactions with Bank Tejerat, 10 transactions with Iranian Tanker Company, seven transactions with Iran & Dubai Co., LLC, and transactions with Pasian High Voltage, Khorasan Steel, and Khouzestan Steel Company.

41. As a result of SCB's false statements and concealment of information from the Government during the negotiations, the global settlement amount of $327,000,000 would have been materially greater, and each of the components of the $327,000,000 would have been materially greater.

42. This is Relator's second lawsuit filed in this district that makes these allegations. The first action was filed by Relator on December 17, 2012, pursuant to the qui tam provisions of the False Claims Act and assigned docket number 12 CV 9160. *See United States ex rel. Brutus Trading LLC v. Standard Chartered Bank, et al.*, 12 CV 9160 (KBF) (S.D.N.Y.). That action was unsealed by court order on May 10, 2017. On September 19, 2017, Relator filed with respect to that action a Notice of Voluntary Dismissal without prejudice which the Court approved the same day. Doc. 35, No. 12 CV 9160 (KBF).

**FIRST CAUSE OF ACTION**
**(31 U.S.C. §§ 3729(a)(1) (A), (B), (C) & (G))**

43. Relator incorporates by reference paragraphs 1 through 42 of this Complaint, as if fully set forth herein.

44. Defendants, by failing to disclose to the United States Treasury and Department of Justice and the Federal Reserve that after 2007 they were performing U.S. dollar foreign exchange transactions for Iranian government entities and Iranian SDNs, made false statements to the Treasury and Justice Departments and the Federal Reserve to induce them and each of them to settle their investigation for less than they would have if the true and complete

facts had been disclosed. By failing to disclose fully all facts concerning defendants' dealings with Iranian government entities and Iranian SDNs, defendants (a) knowingly presented, and caused to be presented false and fraudulent claims for payment and approval; (b) knowingly made, used, and caused to be made and used, false records and statements material to false and fraudulent claims; (c) knowingly made, used or caused to be used, a false record or statement material to an obligation to pay or transmit money to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government all in violation of 31 U.S.C. §§ 3729(a)(1) (A), (B), (C) & (G).

## **PRAYER FOR RELIEF**

WHEREFORE, Relator, on behalf of itself, and acting on behalf of, and in the name, of the United States of America, demands and prays that judgment be entered against the Defendants as follows:

1. That judgment shall be entered against Defendants in the amount of three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of $11,000.00 for each act in violation of the False Claims Act, as provided by 31 U.S.C. § 3729(a), with interest; and

2. That Relator shall be awarded the maximum amount available under 31 U.S.C. § 3730(d) of the Federal False Claims Act for bringing this action, namely, 25 percent of the proceeds of the action or settlement of the claim if the United States intervenes in the matter (or pursues its claim through any alternate remedy available to the United States, 31 U.S.C. § 3730(c)(5)), or, alternatively, 30 percent of the proceeds of the action or settlement of the claim, if the Government declines to intervene.

3. That Relator shall be awarded all reasonable expenses necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C. § 3730(d).

4. And, such other relief shall be granted in the favor of the United States and Relator as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

5. Relator hereby demands trial by jury of any issue of fact triable of right by a jury.

Dated:  New York, New York
        November 28, 2018

Respectfully submitted,

MENZ BONNER KOMAR & KOENIGSBERG LLP

By: _____
    David A. Koenigsberg

One North Lexington Avenue, Suite 1550
White Plains, New York 10601
Tel.: (914) 949-0222

*Attorneys for Relator Brutus Trading, LLC*