**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

                  Plaintiff,

      v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVICES
CORPORATION,

              Defendants.

No. 18 Civ. 11117 (PAE)

**DECLARATION OF ALEXANDRE MANFULL**

      I, Alexandre Manfull, hereby declare the following pursuant to 28 U.S.C. § 1746:

      1.      I have held multiple positions with the U.S. Department of the Treasury's Office

of Foreign Assets Control ("OFAC") since 1997.  I started as a Compliance Officer in 1997,

primarily providing guidance to financial institutions on the applicability of OFAC-administered

sanctions programs to various transactions.  In 2000, I became a Senior Compliance Officer and

performed largely the same functions.  In 2005, I became a Chief responsible for managing the

blocked assets reported to OFAC by U.S. persons or persons subject to U.S. jurisdiction.  I

briefly left OFAC in 2013 to join Citibank as a Senior Vice President, Global Sanctions

Compliance.  I returned to OFAC in 2014 to assume the position of Assistant Director, Sanctions

Compliance and Evaluation ("SC&E") within OFAC's Office of Compliance and Enforcement,

which remains my position today.

      2.      As the Assistant Director for SC&E, I manage all aspects of the division,

including providing guidance on the applicability of OFAC-administered sanctions to financial

institutions and the international trade community, engaging in outreach to the domestic and international financial services community, and managing OFAC's financial sector enforcement process. I have overseen the investigation and resolution of more than 600 financial sector enforcement cases in this position.

3.      I was peripherally involved in OFAC's 2012 settlement with Standard Chartered Bank ("SCB"), which is discussed herein. As stated above, my primary function within SC&E at the time, prior to when I became Assistant Director of the division, related to the administration of blocked assets, and typically did not involve in-depth involvement with the financial sector investigations conducted by others in the division. I attended some meetings at which SCB presented information. Based on my experience with banking products, I also provided advice to colleagues about types of transactions that could be considered likely apparent violations of OFAC's regulations.

4.      In relation to the investigation of the allegations of relator Brutus Trading, LLC ("Relator") in this case, I participated in OFAC's call with Robert Marcellus, as further discussed below, and attended the January 2013 multi-agency meeting with Mr. Marcellus and Julian Knight, as further discussed below. I left OFAC in March 2013, and participated in no further meetings pertaining to SCB or the Relator prior to that departure.

5.      Upon my return to OFAC in August 2014, as the Assistant Director of SC&E, I was directly involved in the investigation of SCB that led to its 2019 settlement with OFAC, which is also discussed herein. I reviewed and edited memos, participated in internal, inter-agency, and external meetings related to the investigation, and participated in the settlement negotiations.

6.       I make this declaration based on my own personal knowledge as well as a review of OFAC's files relating to these investigations, in support of the Government's motion to dismiss the Relator's second amended complaint in the above-captioned case.

## OFAC's Mission and Authority

7.       OFAC is principally responsible for administering U.S. economic sanctions programs on behalf of the U.S. government.  These programs are primarily directed against foreign states and nationals to implement U.S. foreign policy and national security goals. Pursuant to authority delegated by the President to the Secretary of the Treasury, OFAC acts under Presidential wartime and peacetime national emergency powers, as well as authority granted by specific legislation, to impose controls on transactions and to freeze, or "block," certain property and interests in property within the United States or in the possession or control of U.S. persons.  OFAC currently administers approximately thirty economic sanctions programs against foreign governments, entities, and individuals.  As part of its sanctions implementation efforts, OFAC publishes a list of individuals and companies whose property and interests in property are blocked (although this list is not exclusive, as there are persons not included on the list whose property and interests in property are blocked).  Listed individuals and companies are often referred to as "Specially Designated Nationals" or "SDNs."

## Sanctions Pursuant to IEEPA

8.       The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-06, grants the President a broad spectrum of powers to deal "with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat."  *Id.* § 1701(a); *see also id.* § 1702(a)

3

(enumerating Presidential powers permitted to be used in the case of a national emergency).  The President has exercised these powers through Executive orders by declaring national emergencies and imposing economic sanctions to address those emergencies.  Most of OFAC's economic sanctions programs are administered under the authority of IEEPA and various Executive orders issued pursuant to that statute.

9.      The President may, for instance, issue Executive orders that identify specific countries as subject to sanctions authorized by IEEPA, and prohibit any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which such a country has any interest, by any person, or with respect to any property, subject to the jurisdiction of the United States.

### OFAC-Administered Export Sanctions Against Iran

10.      In November 1979, after Iran seized the U.S. Embassy in Tehran and captured and held hostage U.S. diplomatic personnel working there, the President declared a national emergency with respect to Iran.  In 1995, the President declared another national emergency with respect to Iran, which is the basis for a variety of sanctions.  Most IEEPA-based sanctions on Iran are in place pursuant to the national emergency declared in 1995.  *See, e.g.*, Executive Order (E.O.) 12,957, 60 Fed. Reg. 14,615 (Mar. 15, 1995) (declaring national emergency); E.O. 12,959, 60 Fed. Reg. 24,757 (May 6, 1995) (imposing comprehensive trade and financial sanctions on Iran); E.O. 13,059, 62 Fed. Reg. 44,531 (Aug. 19, 1997) (among other things, clarifying export and import prohibitions from previous Executive orders).

11.      Section 2(a) of E.O. 13,059 broadly prohibits, with limited exceptions:

[T]he exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or

4

services to Iran or the Government of Iran, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

> (i) such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or

> (ii) such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran.

This prohibition has remained in place since 1997.

12.     IEEPA also authorizes the President to issue regulations necessary for the exercise of the authorities granted by that statute.  *See* 50 U.S.C. § 1704.  This regulatory authority is generally delegated to the Secretary of the Treasury by Executive order when the President issues Executive orders imposing sanctions.  *See, e.g.*, E.O. 13,059, § 5.  The Treasury Department promulgates regulations to implement economic sanctions which are generally codified in Chapter V of Title 31 of the Code of Federal Regulations.  The Iranian Transactions and Sanctions Regulations, 31 C.F.R. part 560, are the regulations that implement E.O. 13,059 and related orders.[1]  The regulatory authority delegated to the Secretary Treasury generally is further delegated to the Director of OFAC.  *See, e.g.*, 31 C.F.R. § 560.802.

13.     The export prohibition of E.O. 13,059 is implemented at 31 C.F.R. § 560.204, which prohibits "the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran[.]"

---

[1] On October 22, 2012, OFAC revised and renamed 31 C.F.R. part 560, and reissued the regulations in their entirety. *See* 77 Fed. Reg. 64,664 (Oct, 22, 2012).  This declaration discusses and cites the regulations that were in place at the relevant times.

14.     In an interpretive provision, 31 C.F.R. § 560.410(a), OFAC has made clear that:

The prohibition on the exportation, reexportation, sale or supply of services contained in § 560.204 applies to services performed on behalf of a person in Iran or the Government of Iran or where the benefit of such services is otherwise received in Iran, if such services are performed:

    (1)     In the United States, or

    (2)     Outside the United States by a United States person, including by an overseas branch of an entity located in the United States.

Section 560.410(b) further notes that "[t]he benefit of services performed anywhere in the world on behalf of the Government of Iran is presumed to be received in Iran." This provision has been in place in its current form since April 1999. *See* 64 Fed. Reg. 20,168 (Apr. 26, 1999).

15.     The prohibitions on exportation of services therefore apply (and applied during the times relevant to this matter) to the export of financial services to, *inter alia*, (i) the Government of Iran, including its agencies, and (ii) individuals and entities in Iran, including banks in Iran. However, these prohibitions do not necessarily apply to Iranian citizens who are ordinarily resident outside of Iran, or to corporate entities that such Iranian citizens ordinarily resident outside of Iran own and operate outside of Iran.

## OFAC'S INVESTIGATIONS OF STANDARD CHARTERED BANK

### A. Standard Chartered Bank

16.     SCB is a global financial institution registered and organized under the laws of England and Wales, and headquartered in London. It provides retail, wholesale, and corporate banking services to its customers through operations located predominantly in Asia, Africa, and the Middle East. SCB operates in approximately seventy-one markets and has approximately 90,000 employees, including U.S. offices in New York, California, Florida, and Texas.

**B. The 2012 OFAC Settlement with SCB and the Associated Investigation**

17.      As later established by OFAC in the course of an enforcement investigation undertaken by SC&E, in or around March 2005, SCB learned that another financial institution was facing regulatory scrutiny by U.S. authorities for Iranian payment practices that obscured the true identities of beneficiaries in funds transfers.  SCB launched an internal sanctions review to ascertain whether its Iranian business complied with OFAC regulations.  The results of this review led to an additional sanctions compliance review, which began in August of 2005.

18.      The findings and recommendations stemming from this review led to the implementation of additional controls and restrictions on SCB's Iranian business in late 2005 and 2006.  In March 2006, SCB took the following actions: (i) it no longer processed U.S. dollar payments that its Iranian bank clients made on the instructions of, or for the account of, their customers; (ii) SCB asked its Iranian bank customers to include a reference in their payment instructions indicating the type of transaction underlying each payment and to provide documentary evidence to enable SCB to undertake due diligence on a sample basis; and (iii) SCB stopped its prior procedure of altering the information it received in payment instructions from Iranian banks.

19.      SCB then decided to end its Iranian U.S. dollar business altogether as of November 2006.  Thereafter, its business with Iran in other currencies became increasingly restricted and eventually ceased altogether—save for certain pre-existing commitments—by the end of 2007.  Those outstanding commitments to Iranian customers fell into three categories: (i) outstanding loans (including syndicated and bilateral facilities); (ii) trade transactions

(including letters of credit and performance guarantees); and (iii) consumer and wholesale bank accounts.

20.     SCB, as a foreign financial institution, had multiple options for winding down its pre-existing obligations with its Iranian clients.  For transactions related to U.S. dollar-denominated obligations that did not involve an individual or entity blocked by OFAC, SCB could make or accept payments via the so-called U-turn general license, which was in place until November 10, 2008.[2]  For transactions related to pre-existing U.S. dollar-denominated obligations involving an individual or entity blocked by OFAC, or occurring after November 10, 2008, SCB could make or accept payments in currencies other than U.S. dollars, so long as they did not involve the U.S. financial system or any other element subjecting the transactions to the jurisdiction of the United States.

21.     As part of SCB's review and subsequent winding down of its relationships with Iranian clients, the bank identified certain conduct and transactions it had facilitated between 2001 and 2007 in apparent violation of multiple sanctions programs, including sanctions related to Iran.  SCB disclosed the conduct and transactions constituting apparent violations to OFAC in 2010.

22.     Based on SCB's disclosure, OFAC launched an investigation into the bank's payment practices from 2001 to 2007 that impaired compliance with U.S. economic sanctions by financial institutions located in the United States.[3]  This investigation was conducted jointly with the U.S. Department of Justice ("DOJ"), the Office of the District Attorney of New York County

---

[2] Under OFAC rules that were in place until November 2008, U.S. banks could serve as intermediaries in U.S. dollar transactions involving Iranian parties that both originated and terminated outside the United States.  This was often referred to as the "U-turn" general license.

[3] *See* Exhibit 1, Settlement Agreement between U.S. Department of Treasury's Office of Foreign Assets Control and Standard Chartered Bank, December 10, 2012 ("2012 Settlement Agreement"), paragraphs 19-23.

("DANY"), the Federal Reserve Bank of New York and the Board of Governors of the Federal Reserve System ("Federal Reserve"), and the New York State Department of Financial Services (which was then known as the New York State Banking Department) ("DFS").

23.     The investigation revealed that SCB's London branches had omitted or removed material references to the locations of entities (including Iranian entities) in SWIFT messages;[4] replaced the names of SCB customers (including Iranian customers) on SWIFT messages with special characters; and forwarded payment messages to U.S. financial institutions that had been originated by Iranian banks who were SCB customers, which falsely referenced SCB as the ordering financial institution.  SCB memorialized its procedures to process payments sent through the United States from Iranian banks in a document that included detailed instructions on how to omit the Iranian banks' identifiers.[5]

24.     Moreover, SCB's branches in the United Arab Emirates ("U.A.E."), including its Dubai branch, sent payment messages to or through the United States without references to locations or entities implicating U.S. sanctions (such as Iran), which prevented U.S. financial institutions from identifying prohibited payments.  There was typically no indication of the originating customers' Iranian nexus in payment messages to the U.S. intermediary beneficiary banks, and no indication that SCB had attempted to ascertain the permissibility under U.S. sanctions of the payments it was sending.  Thus, the U.S. banks would generally not have been in a position to identify the involvement of an Iranian entity and, as a result, processed hundreds of transactions in apparent violation of OFAC's regulations that were sent by SCB's Dubai branch involving Iranian entities.[6]

---

[4] The SWIFT network, named for the Society for Worldwide Interbank Financial Telecommunication, is the primary mechanism by which financial institutions in different countries transmit payment instructions to one another.
[5] *See* Exhibit 1, 2012 Settlement Agreement, paragraph 5.
[6] *See* Exhibit 1, 2012 Settlement Agreement, paragraph 13.

25.     Meanwhile, while the agencies' investigation was ongoing in 2011, SCB sent OFAC a number of wind-down reports regarding its attempts to close out its pre-August 2007 existing obligations related to its Iranian customers.  These reports explained how SCB was going about winding down these customer and trade relationships in a manner compliant with OFAC rules.  Specifically, SCB explained that for its outstanding lending and trade transactions with Iranian parties denominated in U.S. dollars, the bank was seeking payment in other currencies.  With regard to guarantees and counter-guarantees it had given to Iranian clients, SCB was seeking releases from the beneficiaries where possible, but where there had been payment demands under the guarantees that involved an SDN Iranian bank, SCB was attempting to place the funds it owed in the SDN bank's European accounts.  Finally, SCB had suspended all consumer and wholesale accounts for Iranian parties, and permitted account holders only to consummate transactions relating to pre-existing obligations or close their accounts.  SCB explained that any payments it made or facilitated to Iranian banks did not involve U.S. dollars and were made to frozen accounts where required, and that, per SCB policy, all payments and transactions were being approved by SCB's Group Sanctions Advisor.  OFAC had no objection to the manner in which SCB wound down these client relationships.

26.     Upon concluding its investigation, OFAC reached a settlement with SCB on December 10, 2012 resolving SCB's potential civil liability for its apparent violations of OFAC sanctions regulations.[7]  The bank agreed to settle with OFAC for $132 million,[8] with the obligation deemed satisfied by payment of a greater amount in satisfaction of penalties assessed by U.S. federal or state authorities arising out of the same pattern of conduct.  As a part of the

---

[7] OFAC generally refers to transactions with respect to which potential civil liability has been settled as "apparent violations" when no penalty notice has been issued.  *See* 31 C.F.R. Part 501 Appendix A.  Therefore this Declaration refers to the transactions it has settled with SCB as apparent violations.

[8] *See* Exhibit 1, 2012 Settlement Agreement, paragraph 32.

settlement with OFAC,[9] SCB stated that it had terminated its business and prohibited all new business since 2007, in any currency, with Iranian and other OFAC-sanctioned persons or entities; and had strengthened its sanctions compliance controls by implementing enhanced policies and procedures, customer due diligence, automated transaction and customer screening, training, and assurance.[10]

27.     DFS announced its regulatory action against SCB in relation to the same apparent violations and conduct on August 6, 2012, a few months before the other investigating agencies.

**C. Robert Marcellus Contacts OFAC Before the Relator's *Qui Tam* Complaint Is Filed**

28.     On September 13, 2012, an individual named Scott Anderegg told an OFAC staff member that a friend of his had information relating to some sanctions-related issues involving a bank in the U.A.E.  Mr. Anderegg then put OFAC in touch with Mr. Marcellus, who later became part of the Relator entity that filed the federal *qui tam* lawsuit.

29.     OFAC's Compliance Division first spoke by telephone with Mr. Marcellus on September 14, 2012.  On that phone call and in subsequent email exchanges in the fall of 2012, Mr. Marcellus told OFAC that he knew a source within SCB's Dubai branch who had information related to ongoing sanctions violations.  He also shared what he stated were internal SCB documents and excerpts thereof relating to SCB's dealings after 2006 in U.S. dollars with its Iranian clients, including Iranian banks such as Bank Markazi (which is Iran's central bank) and Bank Saderat, and Iranian companies such as the Iranian Offshore Oil Company.  According

---

[9] *See* Exhibit 1, 2012 Settlement Agreement, paragraph 26.
[10] Although SCB indicated to OFAC that it had ended its relationships with its Iranian clients in currencies other than the U.S. dollar, transactions in such other currencies are not subject to U.S. sanctions rules as long as those non-U.S. dollar transactions do not involve the U.S. financial system or otherwise involve transactions subject to the jurisdiction of the United States.

to the documents provided by Mr. Marcellus, these transactions included foreign-exchange transactions and letters of credit.[11]

30.   Mr. Marcellus told OFAC that because certain SCB letters of credit with Iranian clients referenced in his documents were denominated in U.S. dollars, the settlement of those letters of credit was necessarily in dollars and would have cleared through SCB's New York branch.   As for foreign-exchange transactions, the information Mr. Marcellus provided indicated that some Iranian financial institutions had access to an SCB foreign-exchange trading facility. According to Mr. Marcellus, if Iranian banks used this facility for any currency exchanges involving U.A.E. dirhams (which are pegged to the U.S. dollar), it would necessarily entail U.S. dollar clearing transactions involving SCB's New York branch.   That is because, according to Mr. Marcellus, whenever a client converted dirhams to another currency, such transactions required an intermediate step of converting the dirhams to U.S. dollars, which would necessarily be routed through the U.S. financial system.

31.   OFAC thanked Mr. Marcellus for this information and advised him that the agency would contact him with additional questions or issues.

**D.  The Relator's *Qui Tam* Complaint and Associated Investigation**

32.   On December 17, 2012, shortly after the 2012 OFAC settlement was finalized, the Relator filed its original complaint under seal, along with a disclosure statement explaining the allegations and enclosing certain documents.   OFAC was notified of the filing of this complaint by the U.S. Attorney's Office for the Southern District of New York ("SDNY") shortly thereafter, on December 28, 2012.

---

[11] A letter of credit is a commitment by a bank on behalf of an importer (buyer) that payment will be made to the beneficiary (exporter), provided the terms and conditions stated in the letter of credit have been met, as evidenced by the presentation of specified documents.   To expedite the receipt of funds, banks involved in letter of credit transactions typically use wire transfers to settle obligations.

33. In brief, the Relator claimed that SCB had misled DOJ and OFAC leading up to the 2012 settlement agreements by failing to disclose certain sanctions-violative transactions in which it had engaged with its Iranian clients after 2007. These Iranian clients included Iranian banks, government agencies, and companies. The documents attached to the disclosure statement included client lists and prospective client lists for SCB's Dubai branch, access lists for the bank's online foreign-exchange trading platform, and statements indicating the bank's profits and losses from certain customers. Several of the documents appeared to be spreadsheets from which the information Mr. Marcellus provided to OFAC in September 2012 was excerpted.

34. OFAC attended a multi-agency interview of the Relator's two members, Mr. Marcellus and Julian Knight, a former employee of SCB's Dubai branch, in January 2013. In this interview, Mr. Knight and Mr. Marcellus explained their belief that the documents they provided contained evidence that SCB likely engaged in U.S. dollar transactions with Iranian financial institutions and other clients after November 2006 (when SCB decided not to enter into any new U.S. dollar business with Iran) and after December 31, 2007 (at which point SCB had already decided not to enter into any new business with Iran in any currency). Many of the companies that the Relator mentioned had clear or otherwise obvious ties to Iran, including in their names. For example, many of the companies were large Iranian banks or commercial entities that were listed in SCB records as being part of the "Ministry of Energy of Iran Group," or otherwise readily associated with Iran, such as the National Iranian Tanker Company.

35. OFAC also attended presentations by SCB's counsel to several agencies in February and April 2013, which were given in response to inquiries from SDNY, DOJ, and DFS, based on the information and documents provided by the Relator. In these presentations, SCB identified several Iranian entities (banks and commercial entities related to government agencies)

13

on whose behalf it had processed numerous U.S. dollar transactions from November 14, 2006, to

December 31, 2007.  These transactions all related to SCB's winding down of its pre-existing

obligations to these clients, and, due to the "U-turn" general license in place at the time of the

transactions,[12] did not appear to violate OFAC regulations.  The Relator's documents further

showed that seven Iranian entities held U.S. dollar accounts at SCB after January 1, 2008.  Of

these, five accounts had no activity after 2007, and the remaining two (Bank Saderat and

National Iranian Tanker Company) reflected activity that was limited to wind-down obligations,

for which the Iranian customers' payments to SCB were made in non-U.S. dollar currencies.

36.     As for SCB's online foreign-exchange system, only one Iranian customer (Bank

Saderat) had access to this system after January 1, 2008, but SCB access logs showed that this

customer did not access the system in that timeframe.

37.     OFAC reviewed the information Mr. Marcellus provided to OFAC in September

of 2012, the information subsequently provided by the Relator in connection with the *qui tam*

complaint and disclosure statement, and the information provided by SCB in connection with its

presentations.  OFAC was furthermore aware that SCB had previously disclosed to OFAC that it

was continuing to wind-down certain business with Iran that existed prior to the 2007

determination by SCB to end new Iranian business in a manner that did not appear to violate

OFAC regulations.  OFAC concluded that the information the Relator had provided likely

reflected neither any new business with a U.S. nexus that SCB had entered into with Iran after

2007, nor transactions with any SDN, but rather the bank's wind-down of its pre-2007

relationships with its Iranian clients.  Moreover, to the extent any of the transactions between

---

[12] As noted above, under OFAC rules that were in place until November 2008, U.S. banks could serve as intermediaries in U.S. dollar transactions involving Iranian parties that both originated and terminated outside the United States.

Iranian clients and SCB reflected in the Relator's documents were processed through the U.S. financial system, OFAC concluded that those transactions were likely consistent with the "U-turn" general license, and did not constitute apparent violations of OFAC's regulations.

38.     OFAC is aware that SDNY, DOJ, and other agencies continued their investigations of the Relator's allegations for several more months after SCB's presentations, including by interviewing bank employees and reviewing documents provided by the bank. While OFAC was generally aware of these investigative steps, and received updates regarding them from the other agencies, it did not participate actively in the remaining investigation of Relator's allegations, as OFAC had already concluded that the conduct was likely related to SCB's winding down of its pre-existing obligations and that the transactions were likely processed in a manner consistent with OFAC regulations.  OFAC understands that this investigation had largely ended by August 2013.

**E.  New Evidence Separately Emerges of SCB's Sanctions Violations**

39.     A separate investigation of SCB began in August 2013, based on information obtained from an unrelated investigation by OFAC, DOJ, the Federal Reserve, DANY, and DFS into another financial institution (the "Other Financial Institution").  In the course of that investigation, OFAC and the other agencies learned about a Dubai-based petrochemical company (the "Dubai Petrochemical Company") that held an account at SCB's Dubai branch.[13]

40.     The agencies further learned that the Dubai Petrochemical Company was owned and controlled by an Iranian national ordinarily resident in Iran and was affiliated with several corporate entities in Iran, and that its U.S. dollar transactions processed to or through the United States pertained to Iranian commercial activity not authorized by OFAC's regulations or

---

[13] The agencies' investigation of the Other Financial Institution was entirely unrelated to their previous investigations of SCB or to any information that Mr. Marcellus or the Relator provided to OFAC or other agencies.

exempted by statute.  Beginning no later than June 27, 2009, and continuing through June 24, 2012, SCB processed 190 transactions totaling over $151 million to or through the United States on behalf of the Dubai Petrochemical Company.[14]

**F.  A New Investigation of SCB Begins**

41.     The new investigation of SCB began with its relationship with the Dubai Petrochemical Company, but the inquiry later expanded to other areas.  First, the investigating agencies discovered that the Dubai Petrochemical Company's president had sent a fax transmission to SCB's Dubai branch authorizing a U.S. dollar transaction, and that the fax transmission included a header indicating it had been sent from an Iranian number.  As a result, the agencies inquired more broadly about faxes SCB had received from Iranian numbers.  Later, the agencies also requested information about customers who had logged in to SCB's online systems from Iranian IP addresses.

42.     Through this new investigation, OFAC and the other agencies learned the following facts, which are detailed in OFAC's 2019 Settlement Agreement, discussed below. From 2009 to 2012, SCB processed numerous transactions for or on behalf of the Dubai Petrochemical Company, the benefit of which were received in Iran.[15]  These services included several U.S. dollar transactions that the Dubai Petrochemical Company had originated by faxing payment instructions to SCB's Dubai branch from Iran.  As relevant here, the Dubai Petrochemical Company was a Dubai-incorporated entity owned by an Iranian national who presented to SCB a Dubai residence permit.[16]  It was nevertheless improper for SCB to process transactions on behalf of the Dubai Petrochemical Company through the U.S. financial system

---

[14] *See* Exhibit 2, Settlement Agreement between U.S. Department of Treasury's Office of Foreign Assets Control and Standard Chartered Bank, April 9, 2019 ("2019 Settlement Agreement"), paragraph 7.
[15] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 7.
[16] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 10.

under U.S. sanctions regulations.  SCB had in its possession documents and information, including the faxes from Iran, suggesting that the Dubai Petrochemical Company was actually a front for, and closely affiliated with, an Iranian business controlled by the same individual.[17] Thus, SCB engaged in apparent violations of OFAC's regulations which prohibit the direct or indirect exportation of services to Iran from the United States or by a U.S. person.

43.    SCB's Dubai branch also received faxes whose headers showed Iranian numbers that authorized payment instructions in U.S. dollars from other customers.[18]  These payment instructions were used by SCB to originate a number of outgoing U.S. dollar transactions for these customers that the bank processed to or through the United States.  A review of these faxes, which SCB produced as part of the investigation, showed that two of the bank's Dubai corporate customers—both of which were part-owned by the same Iranian individual, Mahmoud Reza Elyassi—generated the majority of the payment transaction volume based on faxes from Iran.[19] Like the Dubai Petrochemical Company, these entities were incorporated in Dubai, and their owner, Mr. Elyassi, had a Dubai residence permit.  But a close examination of SCB's records and communications with these clients showed that the Bank should have been, and indeed was, aware of the improper Iranian connections of these clients and others like them.  The investigation further uncovered that two SCB employees actively assisted Mr. Elyassi in disguising his Iranian connections in order to facilitate SCB's processing of U.S. dollar transactions on behalf of his companies.[20]

44.    SCB appears to have had actual knowledge that some of the Bank's customers were misusing or misrepresenting their U.A.E. residency and, instead, were ordinarily resident in

---

[17] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 15.
[18] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 30.
[19] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 31.
[20] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 31.

or conducting business with or from Iran.  Although the bank had information connecting several

of its customers to Iran or Iranian-related payments, the bank failed to implement proper controls

or conduct a reasonable level of due diligence to identify problematic customers and prohibited

transactions.[21]

45.      Based on the volume and scope of potentially violative transactions that SCB

processed to or through the United States as a result of faxes and other communications it

received directly from Iran, OFAC and its interagency partners later requested that SCB

investigate whether it had engaged in similar conduct with sanctioned countries or parties

through SCB's online and mobile banking platforms.[22]  SCB subsequently reviewed U.S. dollar-

denominated online and mobile banking transactions it processed to or through the United States

that were for or on behalf of customers of certain branches (including Dubai) to determine

whether (i) the account holders were physically located in Iran or other countries subject to

comprehensive U.S. economic sanctions when they initiated the payments, or (ii) the payment

instructions originated from Iran or other countries subject to comprehensive U.S. economic

sanctions.

46.      The investigation determined that SCB did not block access to its online banking

platforms from sanctioned jurisdictions until 2014, which meant that entities and individuals

with SCB accounts could conduct transactions while they were physically located in Iran or other

countries subject to comprehensive sanctions.  Allowing entities and individuals to access the

U.S. financial system by conducting U.S. dollar transactions from sanctioned countries is an

improper exportation of services to that country.  SCB's failure to prevent such access led to

---

[21] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 30.
[22] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 44.

apparent violations of sanctions regulations relating to its online and mobile banking platform.[23] These apparent violations, like the others, showed that some of SCB's clients had improper connections with Iran and other sanctioned countries, which should have led SCB to restrict these clients' ability to transact in U.S. dollars.

47.     None of the online transactions that were eventually determined to constitute apparent violations, and none of the fax transactions that were eventually determined to constitute apparent violations, were made on behalf of any of the Iranian entities brought to OFAC's attention by Mr. Marcellus or the Relator.

### G.  Resolution of OFAC's Investigation of SCB

48.     In total, OFAC determined through its latest investigation that from June 2009 until June 2014, SCB processed almost 10,000 transactions totaling more than $437 million to or through the United States involving persons or countries subject to comprehensive sanctions programs administered by OFAC.  The majority of the conduct concerned Iran-related accounts maintained by SCB's Dubai branch.  This branch processed U.S. dollar transactions to or through SCB's New York branch and other U.S. financial institutions on behalf of customers that sent payment instructions to SCB Dubai while physically located and/or ordinarily resident in Iran.[24]

49.     SCB agreed to settle with OFAC its civil liability related to these transactions for approximately $639 million.  SCB's obligation to pay OFAC this settlement amount was deemed satisfied up to an equal amount by payments in satisfaction of penalties assessed by other U.S. federal agencies (DOJ and the Federal Reserve) arising out of the same patterns of conduct

---

[23] *See* Exhibit 2, 2019 Settlement Agreement, paragraphs 54-55.
[24] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 6.

during the same time periods.[25]  SCB's settlement with OFAC was part of a global settlement of

the bank's conduct that also involved DOJ, the Federal Reserve, DANY, DFS, and the United

Kingdom Financial Conduct Authority, SCB's home regulator.  All together, the bank paid in

excess of $1.1 billion to resolve the potential claims and charges of these agencies relating to the

conduct described herein.

### H.  The Relator's Second *Qui Tam* Complaint

50.     While the interagency investigation of SCB continued, the Relator withdrew its

original *qui tam* complaint against SCB in September 2017 after the Court unsealed it.  About

one year later, on November 28, 2018, while the agencies were negotiating their latest

settlements with the Bank, the Relator filed a new complaint, which essentially restated the

allegations in the earlier withdrawn complaint.  In April 2019 (and again in September 2019), the

Relator amended this second complaint somewhat.  The new complaint included allegations

suggesting that the then-recent interagency settlements (including OFAC's) were a result of, at

least in part, the agencies' investigations into the Relator's allegations in his original, withdrawn

complaint.  Furthermore, Relator's second amended complaint claims that it was the Relator who

brought Mr. Elyassi to OFAC's (and the other agencies') attention.  This contention is not

correct.

51.     As explained above, OFAC and the other agencies had largely ended their

investigation of the Relator's allegations *before* they received the information about the Dubai

Petrochemical Company via the investigation of the Other Financial Institution.  It was as part of

the investigation of the Dubai Petrochemical Company that the agencies learned that SCB's

Dubai branch received faxes that included payment instructions in U.S. dollars, which led to a

---

[25] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 64.

production of similar faxes from SCB that included many from Mr. Elyassi's companies. This inquiry was how OFAC and the other agencies first learned of Mr. Elyassi.

52.     Upon receipt of the Relator's latest complaint, OFAC re-reviewed the documents and communications that Mr. Marcellus and the Relator provided in 2012 and early 2013. While some of the lengthy customer lists of SCB's Dubai branch include Mr. Elyassi's name among approximately 1,400 others, nothing in the Relator's disclosure statement or communications at the time identified or pointed specifically to Mr. Elyassi's connection to Iran. Instead, at the time, the Relator pointed OFAC and the other agencies to completely unrelated customers on these lists, which were known Iranian banks and entities that were indisputably based in or connected to Iran. Even the contact information for Mr. Elyassi on these lists did not suggest an Iranian connection. It was thus not the Relator that led OFAC or its agency partners to Mr. Elyassi.

53.     Moreover, the types of allegedly violative transactions that the Relator disclosed are different in kind from the transactions OFAC and the other agencies uncovered in their recent investigations. While the Relator alleged that SCB intentionally, and improperly, continued to permit its known Iranian pre-2007 clients to transact in U.S. dollars after it had announced that it would no longer permit such transactions, the investigation that led to the recent round of settlements with SCB was based on independent discoveries that SCB's Dubai branch exercised insufficient due diligence with regard to, and in some instances knowingly overlooked, the Iranian connections and ownership of some of its Dubai-based corporate clients.

54.     With respect to SCB's online and mobile banking platforms, OFAC's investigation centered on the fact that SCB did not take appropriate measures to ensure that those transactions on its platforms that were initiated from countries subject to comprehensive OFAC-

administered sanctions were compliant with applicable prohibitions.[26]  OFAC's focus was on

clients of SCB's Dubai branch who logged into their online accounts to request transactions in

U.S. dollars while using an Iranian IP address (*i.e.*, while geographically located in Iran).

Because OFAC's regulations prohibit the exportation of services to Iran, these transactions were

likely violations of OFAC's regulations simply by virtue of the client having been located in Iran

at the time it requested the transaction.

55.     In contrast, the Relator's allegations were that preexisting Iranian clients

maintained and utilized their online access to SCB systems to effect foreign exchange

transactions that, because of the U.A.E. dirham peg to the U.S. dollar, would require an

intermediate U.S. dollar foreign-exchange leg that would clear through SCB's New York branch.

OFAC did not have to determine whether this allegation was correct because, as explained

above, the agencies found no evidence that any of the Iran-based clients identified as a result of

the Relator's information engaged in online foreign-exchange transactions with SCB after 2008.

56.     Relator is thus incorrect that its disclosures, or any of the information provided by

Mr. Marcellus to OFAC, prompted or contributed to the investigations that led to the 2019

settlements by OFAC and other agencies with SCB.

Dated: Washington, D.C.
       November 21, 2019

ALEXANDRE MANFULL
Assistant Director
Sanctions Compliance and Evaluation
Office of Compliance and Enforcement
Office of Foreign Assets Control

---

[26] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 44.