UNITED STATES OF AMERICA
BEFORE THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of | |
| | Docket Nos.   12-069-B-FB |
| STANDARD CHARTERED PLC | 12-069-B-FBR |
| London, United Kingdom | |
| | |
| STANDARD CHARTERED BANK | Cease and Desist Order Issued Upon |
| London, United Kingdom | Consent Pursuant to the Federal |
| | Deposit Insurance Act, as Amended |
| STANDARD CHARTERED BANK | |
|  NEW YORK BRANCH | |
| New York, New York | |

WHEREAS, Standard Chartered plc, London, United Kingdom is a foreign bank, as defined in section 1(b)(7) of the International Banking Act (12 U.S.C. § 3101(7)), that is a large complex financial organization that has a number of separate business lines and legal entities in many countries around the world;

WHEREAS, Standard Chartered Bank, London, United Kingdom (the "Bank") is a foreign bank as defined in section 1(b)(7) of the International Banking Act that is an indirect subsidiary of Standard Chartered plc;

WHEREAS, Standard Chartered plc and Standard Chartered Bank (collectively, "Standard Chartered") conduct operations in the United States through various offices and entities (the "U.S. Offices"), including, but not limited to, a branch of the Bank in New York, New York (the "Branch") for which the Board of Governors of the Federal Reserve System (the "Board of Governors") is the appropriate federal supervisor;

WHEREAS, effective October 7, 2004, Standard Chartered plc, the Bank, and the Branch consented to a Written Agreement (the "2004 Written Agreement") issued by the Federal Reserve Bank of New York (the "Reserve Bank") and the New York State Banking Department ("NYSBD") that required improvements in compliance with applicable federal and state laws, rules, and regulations relating to anti-money laundering ("AML"), including the Bank Secrecy Act ("BSA") (31 U.S.C. § 5311 et seq.); the rules and regulations issued thereunder by the U.S. Department of the Treasury (31 C.F.R. Part 103); and the suspicious activity reporting requirements of Regulation K of the Board of Governors (12 C.F.R. §§211.24(f) (collectively, "BSA/AML Requirements"); and those of the NYSBD (3 N.Y.C.R.R. Part 300), to fully address all deficiencies in the Branch's AML policies and procedures, customer due diligence practices, risk management processes and internal controls environment.

WHEREAS, the 2004 Written Agreement was terminated on July 10, 2007, by the FRBNY and the NYSBD;

WHEREAS, the U. S. Department of Justice ("DOJ"), the District Attorney for the County of New York, New York ("DANY"), the Office of Foreign Assets Control of the U. S. Department of the Treasury ("OFAC"), and the Federal Reserve have been conducting an investigation into the practices of the Bank concerning the transmission of funds to and from the United States by and through entities and individuals subject to sanctions regimes imposed under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-06, and the Trading with the Enemy Act, 50 U.S.C. §§ 5, 16, both of which are administered by OFAC;

WHEREAS, in order to resolve the investigations, Standard Chartered has agreed to enter into settlement agreements with DOJ, DANY, and OFAC;

WHEREAS, during the course of the investigations, the Board of Governors obtained information supporting allegations that:

A.      From at least 2001 through early 2007, Standard Chartered developed and implemented policies and procedures for processing certain U.S. dollar-denominated funds transfers through the Branch involving parties subject to sanctions administered by OFAC (the "OFAC Regulations") that deleted information from payment messages that was necessary for the Branch to determine whether these transactions were carried out in a manner consistent with U.S. law and to properly conduct the transaction review required under the 2004 Written Agreement; and

B.      In 2005 and 2006, while still under the 2004 Written Agreement, the Branch engaged in unsafe and unsound practices by providing inadequate and incomplete responses to examiner inquiries relating to the transmission of funds to and from parties subject to OFAC Regulations and by providing incomplete and misleading information to examiners regarding the scale of and practices for processing Standard Chartered's and the Branch's U.S. dollar clearing transactions, particularly with regard to Iranian customers;

WHEREAS, the most recent BSA/AML examination of the Branch disclosed deficiencies in the Branch's risk management and compliance with applicable laws, rules, and regulations relating to BSA/AML Requirements;

WHEREAS, the Branch is taking remedial action to address the deficiencies disclosed in the most recent BSA/AML examination;

WHEREAS, to address the deficiencies described above, Standard Chartered must continue to implement improvements in its oversight and compliance program with respect to the BSA/AML Requirements and OFAC Regulations for activities involving its U.S. Offices,

including activities originating from non-U.S. affiliates of the U.S. Offices that in whole or in part impact the U.S. Offices' ability to comply with applicable BSA/AML Requirements and OFAC Regulations;

WHEREAS, it is the common goal of the Board of Governors, the Reserve Bank, Standard Chartered and its U.S. Offices to ensure that the Standard Chartered organization complies with OFAC Regulations wherever they are applicable within the United States or across jurisdictional borders, that Standard Chartered fosters a strong commitment towards compliance with OFAC Regulations, and that Standard Chartered and the Branch have adequate OFAC compliance systems that cover in an appropriate manner all activities concerning the United States; and that Standard Chartered maintains effective corporate governance and oversight over its U.S. Offices, including the establishment and maintenance of robust risk management and compliance programs, and that Standard Chartered and the Branch fully address all deficiencies in the Branch's BSA/AML and OFAC compliance programs;

WHEREAS, the Board of Governors is issuing this Order to Cease and Desist against Standard Chartered plc, the Bank, and the Branch (the "Order");

WHEREAS, the United Kingdom's Financial Services Authority ("FSA"), as the home country supervisor of Standard Chartered plc, has agreed to assist the Board of Governors in the supervision of this Order; and

WHEREAS, pursuant to a resolution of Standard Chartered plc Board of Directors dated October 31, 2012; a resolution of the Court of the Bank dated November 2, 2012; and a resolution of a Committee of the Standard Chartered plc Board of Directors dated December 6, 2012, Dr. Tim Miller, Director, Property, Research & Assurance; James Ellington, Group Head of Legal; and Julio Rojas, Chief Executive Officer, Americas, have been authorized and directed to execute this Order on behalf of the Bank, Standard Chartered plc, and the Branch,

respectively, to consent to compliance with each and every applicable provision of this Order by the Bank, Standard Chartered plc, and the Branch, and their institution-affiliated parties, as defined in sections 3(u) and 8(b)(4) of the Federal Deposit Insurance Act, as amended (12 U.S.C. §§ 1813(u) and 1818(b)(4)) (the "FDI Act"), and to waive any and all rights that the Bank, Standard Chartered plc, and the Branch may have pursuant to section 8 of the FDI Act (12 U.S.C. § 1818), including, but not limited to:  (i) the issuance of a notice of charges; (ii) a hearing for the purpose of taking evidence in any matters set forth in this Order; (iii) judicial review of this Order; (iv) contest the issuance of this Order by the Board of Governors; and (v) challenge or contest, in any manner, the basis, issuance, validity, terms, effectiveness or enforceability of the Order or any provision hereof.

NOW, THEREFORE, before the filing of any notices, or taking of any testimony or adjudication of or finding on any issues of fact or law herein, and without this Order constituting an admission or denial by Standard Chartered plc, the Bank, or the Branch of any allegation made or implied by the Board of Governors in connection with this matter, and solely for the purpose of settling this matter without a formal proceeding being filed and without the necessity for protracted or extended hearings or testimony, it is hereby ordered that:

**U.S. Law Compliance Program**

1.      Within 120 days of this Order, Standard Chartered shall submit to the Reserve Bank an acceptable compliance program, including a timetable for implementation, to ensure compliance with all BSA/AML Requirements and OFAC Regulations applicable to its U.S. Offices (the "U.S. Law Compliance Program").  The U.S. Law Compliance Program shall, at a minimum, provide for:

**BSA/AML compliance elements**

(a)     Measures to ensure that Standard Chartered and its global subsidiaries appropriately identify and communicate activities or deficiencies within its operations that may impact the ability of the U.S. Offices to comply with BSA/AML Requirements; and

(b)     policies and procedures that require the escalation of significant issues related to AML to appropriate senior officers for resolution.

**OFAC compliance elements**

(c)     an annual assessment of OFAC compliance risks arising from the global business activities and customer base of Standard Chartered subsidiaries, including risks arising from transaction processing and trade finance activities conducted by or through Standard Chartered's global operations;

(d)     policies and procedures to ensure compliance with OFAC Regulations by Standard Chartered's global business lines, including screening with respect to transaction processing and trade financing activities for the direct and indirect customers of Standard Chartered subsidiaries;

(e)     the establishment of an OFAC compliance reporting system that is widely publicized within the global organization and integrated into Standard Chartered's other reporting systems in which employees report known or suspected violations of OFAC Regulations, and that includes a process to ensure that known or suspected OFAC violations are promptly escalated to appropriate compliance personnel for appropriate resolution and reporting;

(f)     procedures to ensure that the OFAC compliance elements of the U.S. Law Compliance Program are adequately staffed and funded;

(g)      training for Standard Chartered's employees in OFAC-related issues appropriate to the employee's job responsibilities that is provided on an ongoing, periodic basis; and

(h)      an audit program designed to test for Standard Chartered's compliance with OFAC Regulations.

2.      (a)      During the term of this Order, to ensure that the OFAC compliance elements of the U.S. Law Compliance Program are functioning effectively to detect, block or reject, and report OFAC sanction transactions when they occur, Standard Chartered shall cause to be conducted on an annual basis: (i) a review of OFAC compliance policies and procedures and their implementation, and (ii) an appropriate risk-focused sampling of U.S. dollar payments (the "OFAC Compliance Review").

(b)      Each OFAC Compliance Review, the first of which shall commence one year after the date of this Order, shall be conducted by an independent consultant acceptable to the Reserve Bank and the FSA.  No later than 30 days before scheduled commencement of each OFAC Compliance Review, Standard Chartered shall submit an engagement letter acceptable to the Reserve Bank and the FSA that details the independent consultant's scope of work and shall include a commitment that drafts and supporting material associated with the engagement will be made available to the Reserve Bank upon request.

(c)      Each OFAC Compliance Review shall be conducted in accordance with acceptable auditing standards and the results of each review shall be submitted to the Reserve Bank and the FSA within 90 days of the anniversary date of this Order.

3.      Within 90 days of the Reserve Bank's approval of the U.S. Law Compliance Program required by paragraph 1, Standard Chartered shall complete a global OFAC risk

assessment with particular attention to transactions involving its affiliates.  A copy of the risk assessment shall be submitted to the Reserve Bank and the FSA upon its completion.

**BSA/AML Branch Compliance Program**

4.      Within 150 days of this Order, Standard Chartered and the Branch shall jointly submit to the Reserve Bank an acceptable revised written BSA/AML compliance program for the Branch.  At a minimum, the program shall address, consider and include:

(a)      The required elements of a BSA/AML compliance program described in section 208.63 of Regulation H of the Board of Governors (12 C.F.R. §208.63), which are required for U.S. branches and representative offices of foreign banks under section 211.24(j) of Regulation K of the Board of Governors;

(b)      oversight and effective management of any BSA/AML compliance functions that are outsourced by the U.S. Offices to other Standard Chartered entities or third-party vendors;

(c)      enhancements to the internal control framework to ensure compliance with all aspects of the BSA/AML Requirements, including, at a minimum, customer due diligence, customer risk rating methodology, and suspicious activity monitoring;

(d)      policies that provide for effective training for all personnel that is provided on an ongoing, periodic basis, including targeted training for personnel with compliance-related responsibilities in all aspects of BSA/AML Requirements and internal policies and procedures;

(e)      a compliance monitoring program; and

(f)      an independent testing program designed to test for compliance with BSA/AML Requirements.

**Suspicious Activity Monitoring and Reporting**

5.      Within 150 days of this Order, Standard Chartered and the Branch shall jointly submit to the Reserve Bank an acceptable enhanced written customer due diligence program designed to reasonably ensure the identification and timely, accurate, and complete reporting by the Branch of all known or suspected violations of law or suspicious transactions to law enforcement and supervisory authorities, as required by applicable suspicious activity reporting laws and regulations.  At a minimum, the program shall include:

(a)      Policies, procedures, and controls to ensure that the Branch collects, analyzes, and retains complete and accurate customer information for all account holders, as well as a plan, with timelines, to remediate deficient due diligence for existing customers accounts;

(b)      a methodology for assigning risk levels to the New York Branch's customer base that considers factors such as type of customer, type of product or service, and geographic location;

(c)      a risk-focused assessment of the Branch's customer base that:

(i)      identifies the categories of customers whose transactions and banking activities are routine and usual; and

(ii)      determines the appropriate level of enhanced due diligence necessary for those categories of customers that pose a heightened risk of conducting potentially illicit activities at or through the Branch;

(d)      for each customer who requires enhanced due diligence, procedures to:

(i)      determine the appropriate documentation necessary to verify the identity and business activities of the customer;

(ii)     understand the normal and expected transactions of the customer; and

(iii)    periodically review the adequacy of the customer files documentation; and

(e)     establishment of procedures and appropriate monitoring criteria to ensure proper detection and timely reporting of all known or suspected violations of law and suspicious transactions, including, but not limited to:

(i)     effective monitoring of customer accounts and transactions;

(ii)    standards for defining suspicious activity and determining when an alert or case should be waived or escalated for further analysis;

(iii)   appropriate participation by Branch senior management in the process of identifying, reviewing, and reporting potentially suspicious activity;

(iv)    adequate escalation of information about potentially suspicious activity through appropriate levels of management; and

(v)     maintenance of sufficient documentation with respect to the investigation and analysis of potentially suspicious activity, including the resolution and escalation of concerns;

(f)     measures to ensure that transaction monitoring and suspicious activity reporting functions that are outsourced to affiliates of the Branch or third-party vendors are performed to meet regulatory requirements; and

(g)     a plan, including a timetable, for the re-review of alerts generated and/or reviewed by affiliates of the Branch or third-party vendors regarding foreign correspondent banking transactions, from June 1, 2010 to June 1, 2011, to determine whether suspicious

activity involving accounts or transactions at, by or through the Branch was properly identified, investigated and reported in accordance with applicable suspicious activity reporting regulations.

**Branch BSA/AML and OFAC Audit Program**

6.      Within 150 days of this Order, Standard Chartered and the Branch shall submit to the Reserve Bank an acceptable risk-based audit program to test the Branch's compliance with BSA/AML Requirements and OFAC Regulations to be performed on a regular basis by qualified parties that are independent of the Branch's business lines and compliance functions.  This program shall address, consider, and include:

(a)      An evaluation of the overall adequacy and effectiveness of the Branch's compliance with BSA/AML Requirements and OFAC Regulations, including compliance policies, procedures, and processes;

(b)      a review of the Branch's BSA/AML risk assessment for reasonableness given the risk profile (products, services, customers, entities, and geographic locations);

(c)      a review of the Branch's OFAC risk assessment, with particular attention to transactions involving affiliates;

(d)      an appropriate risk-focused sampling of U.S. dollar payments;

(e)      appropriate risk-based transaction testing to verify the Branch's adherence to the BSA recordkeeping and reporting requirements;

(f)      a review of the effectiveness of the suspicious activity monitoring system;

(g)      an assessment of the overall process for identifying and reporting suspicious activity, including a review of filed or prepared Suspicious Activity Reports to determine their accuracy, timeliness, completeness, and effectiveness of the Branch's policy;

(h)      a review of the effectiveness of OFAC screening;

(i)      an assessment of the adequacy and data integrity of the management

information system reporting used by the Branch to comply with BSA/AML Requirements and

OFAC Regulations;

(j)      a review of staff training for adequacy, accuracy, and completeness; and

(k)      an evaluation of management's efforts to resolve violations and

deficiencies noted in audits and regulatory examinations, including progress in addressing

outstanding supervisory action items.

7.      The first BSA/AML  and OFAC audit of the Branch  shall commence 180 days

after the date of this Order and shall be conducted by an independent consultant acceptable to the

Reserve Bank, which may be the same independent consultant engaged pursuant to paragraph

2(b).  No later than 30 days before scheduled commencement of the audit, Standard Chartered

and the Branch shall submit an engagement letter acceptable to the Reserve Bank that details the

independent consultant's scope of work and shall include a commitment that drafts and

supporting material associated with the engagement will be made available to the Reserve Bank

upon request.

**Interaction with Regulatory Authorities**

8.      Within 30 days of this Order, Standard Chartered shall submit to the Reserve

Bank acceptable written policies and procedures that govern the conduct of the U.S. Offices'

personnel in all supervisory and regulatory matters, including, but not limited to, interaction with

and requests for information by Reserve Bank examiners and other bank regulators for each U.S.

branch, agency, or other office.  The policies and procedures shall, at a minimum, ensure that all

U.S. Offices' personnel provide prompt, complete, and accurate information to examiners, and

provide for employee training that emphasizes the importance of full cooperation with banking regulators by all employees.

**Compliance with the Order**

9.      Within 10 days after the end of each calendar quarter following the date of this Order, Standard Chartered shall submit to the Reserve Bank written progress reports detailing the form and manner of all actions taken to secure compliance with this Order and the results thereof.

**Approval and Implementation**

10.      (a)      Standard Chartered and, as applicable, the Branch shall submit written programs, policies, procedures, and engagement letters that are acceptable to the Reserve Bank within the applicable time periods set forth in paragraphs 1, 2(b), 4, 5, 6, 7, and 8 of this Order. An independent consultant acceptable to the Reserve Bank and the FSA shall be retained within the time period set forth in paragraph 2(b) of this Order, and an independent consultant acceptable to the Reserve Bank shall be retained within the time period set forth in paragraph 7. An engagement letters acceptable to the Reserve Bank and the FSA shall be submitted within the time period set forth in paragraph 2(b) of this Order, and an engagement letter acceptable to the Reserve Bank shall be submitted within the time period set forth in paragraph 7.

(b)      Within 10 days of approval by the Reserve Bank, Standard Chartered and, as applicable, the Branch, shall adopt the approved programs, policies, and procedures.  Upon adoption, Standard Chartered and, as applicable, the Branch, shall implement the approved programs, policies, and procedures and thereafter fully comply with them.

(c)     During the term of this Order, the approved programs, policies,

procedures, and engagement letters shall not be amended or rescinded without the prior written

approval of the Reserve Bank.

**Notices**

11.     All communications regarding this Order shall be sent to:

(a)  Zahra El-Mekkawy
Senior Vice President
Federal Reserve Bank of New York
33  Liberty Street
New York, New York 10045

(b)  Dr. Tim Miller
Director, Property, Research & Assurance
Standard Chartered Bank
1 Basinghall Avenue
London EC2V 5DD
United Kingdom

(c)  Edward Kowalyck
Regional Head of Compliance Americas
Standard Chartered Bank
New York Branch
1095 Avenue of the Americas
New York, NY 10010

**Miscellaneous**

12.     The provisions of this Order shall be binding on Standard Chartered plc, the

Bank, and the Branch and each of their institution-affiliated parties in their capacities as such,

and their successors and assigns.

13.     Each provision of this Order shall remain effective and enforceable until stayed,

modified, terminated, or suspended in writing by the Reserve Bank.

14.     Notwithstanding any provision of this Order, the Reserve Bank may, in its sole discretion, grant written extensions of time to Standard Chartered plc, the Bank, and the Branch to comply with any provision of this Order.

15.     The provisions of this Order shall not bar, estop, or otherwise prevent the Board of Governors, the Reserve Bank, or any other federal or state agency from taking any further or other action affecting Standard Chartered plc, the Bank, the Branch, any subsidiary thereof, or any of their current or former institution-affiliated parties or their successors or assigns.

By Order of the Board of Governors of the Federal Reserve System effective this 10th day of December, 2012.

STANDARD CHARTERED PLC              BOARD OF GOVERNORS OF THE
                                                        FEDERAL RESERVE SYSTEM


By:  /s/ James Ellington_____              By:  /s/ Robert deV. Frierson
      James Ellington                                      Robert deV. Frierson
      Group Head of Legal                             Secretary of the Board


STANDARD CHARTERED BANK


By:  /s/ Dr. Tim Miller_____
      Dr. Tim Miller
      Director, Property, Research & Assurance


STANDARD CHARTERED BANK
 NEW YORK BRANCH


By:  /s/ Julio Rojas_____
      Julio Rojas
      Chief Executive Officer, Americas