IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* BRUTUS TRADING, LLC, | ) ) ) | |
| Plaintiff, | ) ) ) | Case No. 18-cv-11117 (PAE) |
| -against- | ) ) | |
| STANDARD CHARTERED BANK, STANDARD CHARTERED PLC and STANDARD CHARTERED TRADE SERVICES CORPORATION, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**RELATOR'S OPPOSITION TO
THE GOVERNMENT'S MOTION TO DISMISS
RELATOR'S SECOND AMENDED COMPLAINT**

Patrick M. McSweeney
McSweeney, Cynkar & Kachouroff, PLLC
3358 John Tree Hill Road
Powhatan, VA 23139
(804) 937-0895
patrick@mck-lawyers.com

Robert J. Cynkar
McSweeney, Cynkar & Kachouroff, PLLC
10506 Milkweed Drive
Great Falls, VA 22066
(703) 621-3300
rcynkar@mck-lawyers.com

*Attorneys for Brutus Trading, LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ...................................................................................................... 2

    A.    The Inaccurate, Unsupported Factual Premises of the Government's
           Motion .......................................................................................................... 2

          1. The Government's investigation was not thorough .................................... 2

          2. The Government could not corroborate Relator's allegations because it
             did not examine the massive volume of evidence Relator produced ......... 5

          3. Relator provided the evidence that exposed SCB's fraud in the 2012
             Settlement and spurred the renewed investigation that led directly to
             the 2019 Settlement ................................................................................ 6

          4. Most of Relator's allegations did not relate to any legitimate, so-called
             "wind down" transactions ........................................................................ 8

          5. "Project Green" was SCB's name for its calculated initiative to
             systematically violate the Iran sanctions ................................................. 9

          6. The claim that SCB did not enter into any new Iranian business after
             2007 is untrue ......................................................................................... 10

          7. Relator produced records of many sanctions-violating transactions that
             were not "wind downs" ........................................................................... 10

    B.    The International Financial Trading System .................................................. 10

    C.    The U.S Sanctions Regime .......................................................................... 12

    D.    Standard Chartered Bank's Operations ........................................................ 12

ARGUMENT............................................................................................................ 14

    I.    THE RELATOR HAS STATED A VALID CAUSE OF ACTION FOR A REVERSE
          FALSE CLAIM ........................................................................................... 14

    II.    THE MOTION TO DISMISS FAILS UNDER 31 U.S.C. § 3730(C)(2)(A) OR (B).... 20

A. The Legal Standards ............................................................... 20

B. The Government's Actions in This Case Are Arbitrary and
   Unreasonable ........................................................................... 22

C. "Wind-Down" Transactions Were Not Permitted .................................... 28

D. Currency Conversions in U.S. Dollar Accounts Were Not Allowed ....... 29

CONCLUSION ............................................................................... 30

<u>**TABLE OF AUTHORITIES**</u>

**CASES**                                                                                           **PAGE**

*Biesek v. Berryhill,* 139 S.Ct. 1148 (2019) ....................................................................... 22

*Bowen v. Massachusetts,* 487 U.S. 879 (1988) ................................................................ 18

*Heckler v. Chaney,* 470 U.S. 821 (1985) ......................................................................... 21

*ICC v. Louisville & Nashville R. Co.,* 227 U.S. 88 (1913) .............................................. 22

*Interstate Circuit, Inc. v. U.S.,* 306 U.S. 208 (1939) ....................................................... 22

*Kane ex rel. U.S. v. Healthfirst, Inc.,* 120 F.Supp.3d 370 (S.D.N.Y. 2015) .................... 15

*Mach Mining, LLC v. EEOC,* 135 S.Ct. 1645 (2018) ....................................................... 21

*Maryland Dept. of Human Resources v. Department of Health and Human Services,*
    763 F.2d 1441 (D.C. Cir. 1985) ................................................................................. 18

*Swift v. U.S.*, 318 F.3d 250 (D.C. Cir. 2003) ................................................................... 21

*U.S. v. Caremark, Inc.,* 64 F.3d 808 (5th Cir. 2011) ........................................................ 16

*U.S. v. Contorinis,* 692 F.3d 136 (2d Cir. 2012) .............................................................. 20

*U.S. v. Richardson,* 418 U.S. 166 (1974) ........................................................................ 20

*U.S. v. Watts*, 786 F.3d 152 (2d Cir. 2015) ...................................................................... 20

*U.S. ex rel. v. Bahrani v. Conagra, Inc.,*
    465 F.3d 1189 (10th Cir. 2006) .................................................................................. 16

*U.S. ex rel. CIMZNHCA, LLC v. UCB, Inc.,* 2019 WL 1598109
    (N.D. Ill. April 15, 2019) ........................................................................................... 22

*U.S. ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.,*
    839 F.3d 242 (3d Cir. 2016) .......................................................................... 3, 15, 18

*U.S. ex rel. Grubea v. Rosicki, Rosicki & Associates, P.C.,*
    318 F. Supp.3d 680 (S.D.N.Y. 2018) ......................................................................... 16

*U.S. ex rel. Landis v. Tailwind Sports Corp.,*
    51 F. Supp.3d 9 (D.D.C. 2014) .................................................................................. 16

*U.S. ex rel. Landis v. Tailwind Sports Corp.,*
    160 F.3d 253 (D.D.C. 2016)..................................................................................... 14

*U.S. ex rel. Sequoia Orange Co. v. Baird-Neece Packing Co.,*
    151 F.3d 1139 (9th Cir. 1998) ................................................................................. 21

*U.S. ex rel. Simoneaux v. E.I. duPont de Nemours,*
    843 F.3d 1033 (5th Cir. 2016) ........................................................................... 15, 16

*U.S. ex rel. Stevens v. Vt. Agency of Natural Res.,* 162 F.3d 195 (2d Cir. 1998)
    *rev'd on other grounds,* 529 U.S. 765 (2000) .......................................................... 21

### S<small>TATUTES</small>, L<small>EGISLATIVE</small> M<small>ATERIALS</small>, <small>AND</small> R<small>ULES</small>

18 U.S.C. § 981 ...................................................................................................... 18

18 U.S.C. § 981(a)(1)(C) ........................................................................................ 17

18 U.S.C. § 981(a)(2)(A) ........................................................................................ 17

18 U.S.C. § 981(f) ............................................................................................. 17, 19

18 U.S.C. § 1956(c)(7)(D) ...................................................................................... 17

19 U.S.C. § 1304(i) ................................................................................................ 15

31 U.S.C. § 3729(a)(1) ........................................................................................... 18

31 U.S.C. § 3729(a)(1)(G) ...................................................................................... 14

31 U.S.C. § 3729(b)(3) ........................................................................................... 14

31 U.S.C. § 3730(c)(2) .............................................................................................. 2

31 U.S.C. § 3730(c)(2)(A) ...................................................................................... 21

31 U.S.C. §3730 (c)(2)(B) ...................................................................................... 21

31 U.S.C. § 3730(c)(5) ........................................................................................... 20

50 U.S.C. 1705(a) .................................................................................................. 17

S. Rep. No. 111-10 (2009)...................................................................................... 14

31 C.F.R. Part 560 ................................................................................................. 12

31 C.F.R. § 560.211............................................................................... 12, 13, 25, 29

31 C.F.R. § 560.322........................................................................ 12, 13, 25, 28, 29

31 C.F.R. § 560.422............................................................................................ 29

31 C.F.R. § 560.424...................................................................................... 13, 29

31 C.F.R. § 560.516...................................................................................... 27, 28

31 C.F.R. § 560.527............................................................................................ 29

31 C.F.R. § 560.546............................................................................................ 13

71 Fed. Reg. 53569 (Sept. 12, 2006)............................................................ 25, 29

73 Fed. Reg. 66541 (Nov. 10. 2008) .................................................................. 28

**O**THER **A**UTHORITIES

The Clearing House, *About CHIPS, available at* https://www.theclearinghouse.org/
    payment-systems/chips.............................................................................. 11

The Clearing House*, AML/CFT, Bank Secrecy Act and Sanctions available at*
    https://www.theclearinghouse.org/advocacy/issues/anti-money-laundering ............... 4

J. Dawsey, C. Leonig, & M. Zapotosky, *Trump Sought Tillerson*
    *Help for a Guiliani Client,* WASHINGTON POST, Oct. 11, 2019.............................. 2, 27

Comm. on Payments and Market Infrastructures, RED BOOK,
    *available at* bis.org/cpmi/publ/d168.htm.................................................. 11

Federal Reserve System, *Purposes & Functions,* at 130-34 *available at*
    https://www.federalreserve.gov/aboutthefed/files/pf_complete.pdf .......................... 11

Henry Friendly, *Some Kind of Hearing,* 123 U. PA. L. REV. 1267 (1975)...................... 22

Ernest Gellhorn, *Official Notice in Administrative Adjudication,*
    20 TEX. L. REV. 131 (1941)................................................................ 22

Wesley Hohfeld, *Some Fundamental Legal Conceptions as Applied in Judicial*
    *Reasoning,* 23 YALE L.J. 16 (1913)........................................................ 20

A. Merle-Huet, *Overview of the U.S. Payments, Clearing and Settlement Landscape,*
    (Fed. Rev. Bank of N.Y., May 11, 2015) ............................................... 11, 12

Kenneth Katzman, *Iran Sanctions* (Cong. Research Serv., Sept. 11, 2019) ................... 12

Adam Luck, *US General Claims He Told Standard Chartered Its Client Helped
the Taliban – But the Bank Did Nothing,* THE MAIL ON SUNDAY (Dec. 12 2019)
*available at* https://www.thisismoney.co.uk/money/news/article-7767683/US-
general-told-Standard-Chartered-client-helped-Taliban-did-nothing.html ............... 26

Caleb Nelson, *The Constitutionality of Civil Forfeiture,*
125 YALE L.J. 2446 (2016)................................................................... 17, 20

Repub. Staff of H. Comm. on Financial Services, 114th Cong.,
*Too Big to Jail: Inside the Obama Justice Department's Decision
Not to Hold Wall Street Accountable* (2016)........................................... 2, 27

*Review of U.S. Treasury Department's License to Convert Iranian Assets
Using the U.S. Financial System,* Majority Staff Report, Sen. Perm. Subcomm.
on Investigations (June 6, 2018)............................................................... 29

James Y. Stern, *Property, Exclusivity, and Jurisdiction,*
100 VA. L. REV. 111 (2014) ..................................................................... 20

Claire M. Sylvia, THE FALSE CLAIMS ACT: FRAUD AGAINST
THE GOVERNMENT, § 4:16 (2019)............................................................ 14

U.S. Dept. of Justice, *DOJ Dismissal of a Civil* Qui Tam *Action,*
JUSTICE MANUAL § 4-4.111 .................................................................... 21

U.S. Department of the Treasury, *Terrorism and Illicit Finance,*
http://www.home.treasury.gov/policy-issues/terrorism-and-illicit-finance ............. 12

Kristie Xian, *The Price of Justice: Deferred Prosecution Agreements in the
Context of Iranian Sanctions,* 28 NOTRE DAME J.L. ETHICS &
PUB. POL'Y 632 (2014) ............................................................................ 1

**EXHIBITS**                                                              NO.

Declaration of Robert G. Marcellus ............................................................. 1

Declaration of Julian M. Knight.................................................................. 2

Declaration of Anshuman Chandra ............................................................. 3

Declaration of Dennis Sweeney ................................................................. 4

Letter from A. Szubin, OFAC to T. Scholar, Second Permanent Sec'y,
HM Treasury (Aug. 8, 2012)..................................................................... 5

OFAC Email Chain Concerning Sampling (Sept. 2012) ................................... 6

Relator's Presentation to DFS (Nov. 11, 2012) ............................................... 7

D. Alter, DFS, Letter to SCB Counsel (Dec. 20. 2012) .................................. 8

SCB's Presentation (Feb. 8, 2013) .................................................................. 9

D. Koenigsberg Memorandum (Sept. 24, 2013) ............................................. 10

DFS Consent Order (Aug. 19, 2014) ............................................................... 11

DFS, Report on Investigation of Promontory Financial Group, LLC (Aug. 2015) ......... 12

Financial Conduct Authority, Decision Notice (Feb. 5, 2019) ......................... 13

DFS Consent Order (April 9, 2019) ................................................................. 14

### Glossary

| | |
|---|---|
| CHIPS | Clearing House Interbank Payment Systems, a real-time system to settle funds between financial institutions operated by The Clearing House, a non-governmental entity owned by financial institutions and subject to Federal Reserve Board regulations |
| DFA | New York State Department of Financial Services |
| FCA | The False Claims Act, 31 U.S.C. §§ 3729 *et seq.* |
| Fedwire | The Federal Reserve Systems' Fedwire Funds Service, a real-time system to settle funds between financial institutions |
| Govt. Mem. | Memorandum of Law in Support of the Government's Motion to Dismiss Relator's Second Amended Complaint, Doc. 31 |
| MENA | the Middle East and North Africa regions of SCB |
| OFAC | Office of Foreign Assets Control, U.S. Treasury Department |
| SCB | Standard Chartered Bank, used to refer to the Defendants collectively |
| SCB Dubai | SCB's Dubai branch |
| SCB NY | SCB's New York branch |
| SCI | Single Client Identifier, a unique, seven-digit number assigned to each SCB client |
| Sundry account | an omnibus account where miscellaneous trades are recorded and settled, originated as a device to settle trades where an error has been made in identifying the counterparties, and so typically the trades in a sundry account are in the name of an SCB branch only |
| SWIFT | a secure global network messaging system (not a payment, clearing, or settlement system) run by the Society for Worldwide Interbank Financial Telecommunication, a non-profit cooperative of member financial institutions, by which customer payment instructions are communicated to transfer funds from one financial institution to another, and which memorializes the transaction in a SWIFT "trade ticket" |
| 2012 DPA | Deferred Prosecution Agreement (Dec. 10, 2012), Doc. No. 32-1. |
| 2019 DPA | Amended Deferred Prosecution Agreement (April 9, 2019), Doc. No. 33-1. |

Wire stripping          removing or omitting Iranian identifying information from U.S. dollar
                        wire payment messages

## PRELIMINARY STATEMENT

The U.S. sanctions imposed on Iran since 1979 serve the vitally important national interest of pressuring Iran to end its support for terrorist organizations and its development of nuclear weapons. The Government's 2019 Settlement with SCB provided for a forfeiture of only $240 million, when a conservative estimate drawn from the massive documentation provided by Relator places the total value of the illegal transactions SCB processed – forfeit by operation of law -- closer to a minimum of $56.75 *billion,* not including the forfeited revenue SCB itself realized in these deals. Knight decl., ¶¶ 46, 65.

The Government's decisionmaking that produced such toothless sanctions enforcement was plainly arbitrary, but sadly not unprecedented.[1] The Government dismissed Relator's allegations and supporting documentation and concluded its investigation of those allegations even before it received the most incriminating records. It accepted SCB's self-serving and conclusory justifications without attempting to verify them, even though admitting "SCB's inadequate disclosure … of known deficiencies in SCB's sanctions compliance program that allowed customers to order U.S. dollar transactions through payment instructions initiated from sanctioned countries, including Iran." 2019 DPA at 4. It reached legal conclusions in line with SCB's tortured rationalizations about "winding down" transactions that violated U.S. sanctions and using currencies other than the dollar when those representations were squarely at odds with the Government's previous legal positions. It ignored the findings of the UK's Financial Conduct Authority, which, contrary to SCB's claim that it stopped all illegal Iranian transactions by 2007, concluded that "most of SCB's conduct occurred *after* March 2010." Ex. 13, ¶ 6.8 (emphasis

---

[1] *See* Kristie Xian, *The Price of Justice: Deferred Prosecution Agreements in the Context of Iranian Sanctions,* 28 NOTRE DAME J.L. ETHICS & PUB. POL'Y 632, 634 (2014) (criticizing the SCB being "fined just 2.5%" of its Iranian transactions in the 2012 DPA).

added); *see also id.* ¶¶ 4.0, 4.107, Annex B ¶¶ 2.5, 4.5. The Government based its findings in large part on a report by an SCB consultant that had been discredited by DFS for helping SCB's cover-up.

The Court should reject a Motion to Dismiss justified only by bald conclusions and the Government's arbitrary and dismissive disposition of Relator's allegations and evidence. It is reasonable to question whether the Government's perplexing posture – frustrating the very purpose of the U.S. sanctions regime -- was due to an intentional refusal to enforce the sanctions vigorously, as has occurred before.[2] Relator is not simply quibbling about an investigation's details, but challenging a Motion driven by a grossly inadequate, arbitrary investigation and Settlement.

While the parties dispute which standard set out in 31 U.S.C. §3730(c)(2) governs here, the Government's conduct is so utterly arbitrary and so far removed from any valid governmental purpose that its Motion to Dismiss should be denied under either standard.

## BACKGROUND

### A.  The Inaccurate, Unsupported Factual Premises of the Government's Motion.

**1. The Government's investigation was not thorough.** The Government insists that its investigation of Relator's allegations and the documents that it submitted in support of its allegations was "thorough." Govt. Mem. at 20. That claim can be refuted readily.

---

[2] *See, e.g.* Repub. Staff of H. Comm. on Financial Services, 114th Cong., *Too Big to Jail: Inside the Obama Justice Department's Decision Not to Hold Wall Street Accountable* (2016) (describing the reluctance of the Justice and Treasury Departments to prosecute violations of U.S. sanctions and anti-money laundering laws by large international financial institutions, including SCB) ("*Too Big to Jail*"); J. Dawsey, C. Leonig, & M. Zapotosky, *Trump Sought Tillerson Help for a Guiliani Client,* WASHINGTON POST, Oct. 11, 2019, at A1 (reporting the President's requests to the Secretary of State for help getting sanction violation charges against a Turkish-Iranian banker dropped).

First, the Government reviewed only a small sample of the 1,400 transactions identified by Relator as likely involving Iranian customers of SCB trading in U.S. dollars. Komar decl., ¶ 22. Indeed, OFAC had made it "a practice in cases involving large numbers of transactions" to rely on the representations of the alleged violator's counsel and a sample of the transaction data. Ex. 6, at 2. *See also U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 257 (3d Cir. 2016)(expressing skepticism at sampling used to evaluate systemic fraud).

Second, Relator had informed the Government that it could determine the counterparties of approximately 1,400 SCB transactions by using SCB's SCI numbers, also provided by Relator, that are virtually impossible to modify. The Government had the means of cross-checking that list of SCB customers against OFAC's list of parties suspected of having ties to the Government of Iran and the list of parties with access to SCB's online trading platform. Daniel Alter, DFS General Counsel, was able to undertake this very simple exercise in November-December 2012. Marcellus decl., ¶¶ 57-69. The Government also had the ability, which Relator lacked, to compel SCB to produce the actual documentation of those transactions, for example, what is reflected in SCB's Omnibus Account ledgers and SWIFT tickets. Knight decl., ¶¶ 49, 60. The Government chose to do nothing other than to rely on the bare denials of SCB that any of those transactions occurred or that, if they had occurred, there were any violations of U.S. sanctions. Komar decl., ¶ 18; Manfull decl., ¶37.

Third, the Government refused to consider the documents submitted by Relator showing that SCB's senior personnel knew about and approved the multiple transactions with the companies controlled by Mahmoud Reza Elyassi, the focus of the 2019 DPA. Marcellus decl., ¶¶ 56-57. The Government simply accepted SCB's representation that only two low-level employees were involved. Komar decl., ¶ 40; Manfull decl., ¶¶ 43, 54.

3

Fourth, the Government failed to address the findings of the UK's Financial Conduct Authority (FCA) that SCB had been responsible for many more transactions that violated UK anti-laundering and anti-terrorism laws than the Government concluded were violations of U.S. sanctions regulations. Ex. 13, ¶ 6.8 and other findings discussed herein at 1-2, 8, 12. The UK's anti-money laundering and counter terrorist laws essentially overlap U.S. sanctions regulations. *See generally* The Clearing House, *AML/CFT, Bank Secrecy Act and Sanctions available at* https://www.theclearinghouse.org/advocacy/issues/anti-money-laundering.

Fifth, the Government's statement that the investigation of Relator's allegations was "wrapped up in August 2013," Govt. Mem. at 7, demonstrates that the Government generally ignored thousands of SCB files that it later received from Anshuman Chandra in September 2013 and as late as December 2016. Chandra decl., ¶¶ 12, 13, 36. The Government had agreed in the spring of 2013 to Relator's reaching out to Mr. Chandra, an SCB employee in Dubai, to obtain SCB records related to its relationships with Iran-linked customers. Marcellus decl., ¶¶ 91-112. The declarations of Government participants in the investigation (*i.e.,* Bryan, Komar, Manfull and Boddy) make no mention of the extensive files provided to the Government through Mr. Chandra's efforts. *Id.,* ¶¶ 12,13, 36. Among the documents that Mr. Chandra provided were at least 20,000 records of SCB sundry accounts that did not identify the true beneficiary of a U.S. dollar transaction, thereby evading the blocking mandated by OFAC regulations. One example from the Chandra production is an SCB document recording a 2012 U.S. dollar transaction on behalf of IFIC Holding AG, which had been identified by OFAC as an Iranian party. Ex.10 at 3; Marcellus decl., ¶ 104. There were tens of thousands of SCB transactions in the Chandra production that the Government could not have reviewed if its investigation "wrapped up in August 2013." Govt. Mem. at 7.

Sixth, the Government contended that SCB had cooperated with the investigation, 2019 DPA at 6, without acknowledging that SCB's consultant, Promontory Financial Group, LLC, had intentionally deleted dates and other relevant information from SCB records and had been found by DFS not to have been credible in its statements to investigators. DFS report (Ex. 12); Chandra decl., ¶¶ 11, 29-31. The Government also ignored SCB's retaliatory actions against two former employees who provided information indicating SCB's violations of U.S. sanctions. Knight decl., ¶ 23; Chandra decl., ¶¶ 23, 25, 29, 32-34, 36, 37.

**2. The Government could not corroborate Relator's allegations because it did not examine the massive volume of evidence Relator produced.** The Government states that it "had not found evidence corroborating Relator's allegations." Govt. Mem. at 7. This conclusory statement, which merely repeats the similarly non-specific statements in the declarations of Komar and Manfull, does not explain how the many spreadsheets, SWIFT trade tickets and other SCB records submitted did not support Relator's allegations. Knight decl., ¶ 49. Indeed, those documents conclusively establish that SCB violated U.S. sanctions by processing many U.S. dollar transactions for the benefit of known Iran-linked parties during the period 2009-2014. *Id.,* ¶¶ 40-43, 67. For example, one document produced by Relator illustrates how conclusive the corroborative evidence was. Ex. 5; Marcellus decl., ¶ 104. In addition, the Relator's evidence regarding the involvement of high-level SCB personnel in the conspiracy with Mr. Elyassi also established the extent of SCB's high-level complicity in that conspiracy. Knight decl., ¶ 34; Marcellus decl., ¶¶ 56-57.

The investigation was a joint undertaking of several agencies, including DFS, which ultimately concluded, as Relator had alleged, that SCB's "failure to block online banking access permitted more than 100 customers to conduct USD transactions from Iran and other sanctioned

countries through the iBanking and S2B platforms." Ex. 14, ¶ 19. The Government was also aware at the time it executed the 2019 Settlement of the findings of the UK's Financial Conduct Authority in its February 5, 2019, report that were at odds with the Government's determinations.

As described above, the Government simply did not cross-check a list of 1,400 SCB transactions, which Relator had narrowed from a much larger list to include only known or likely Iranian parties, against SCB's customer identification codes, SCB's customer access ledgers/logs and OFAC's list of sanctioned individuals and entities. Knight decl., ¶ 58. That additional, readily available information would have corroborated Relator's allegations, but the Government refused to access it, even though OFAC did look to SCB's access ledgers in other instances when it suited its purposes. Manfull decl., ¶ 36.

Many of the thousands of SCB records Mr. Chandra, at Relator's initiative, transmitted to the FBI from 2013 to 2016, Chandra decl., ¶¶ 11-13, showed illegal sundry accounts that hid the identity of SCB's Iranian customers. Ex. 10. Because the Government had "wrapped up" its investigation of Relator's allegation by August 2013, Govt. Mem. at 7, it never seriously considered these sundry records, which were transmitted in September 2013. Chandra decl., ¶¶ 12-13.

Moreover, many of the SCB records that Relator provided to the Government were self-proving. One example is from a spreadsheet transmitted to the FBI by Mr. Chandra that shows SCB's identification of a number of its Iranian customers. Marcellus decl., ¶ 104.

**3. Relator provided the evidence that exposed SCB's fraud in the 2012 Settlement and spurred the renewed investigation that led directly to the 2019 Settlement.** The Government's statement that Relator contributed nothing to the 2019 Settlement (Govt. Mem. at

23) is squarely contradicted by several actions of Relator. Most significant, perhaps, was the notice provided by Mr. Marcellus to OFAC in September 2012 before it executed the 2012 Settlement that SCB's violations went far beyond the "wire-stripping" and U-Turn trades that had been the entire focus of the just-announced DFS settlement. Marcellus decl., ¶¶ 36-37. Drawing from the decades of experience that he and Mr. Knight had in foreign exchange and international finance, he explained in detail SCB's trade financing practices, the sanctions evasion methods developed and implemented by Project Green, and other topics. *Id.,* ¶¶ 32-34. All of this information was "new" to OFAC and DFS. *Id.,* ¶¶ 45, 52.

Relator's consultations with Mr. Alter that led to his December 20, 2012, letter to SCB's legal counsel (Ex. 8), prompted the Government to open an investigation into Relator's allegations of SCB's sanctions violations. Marcellus decl., ¶¶ 76-78, 85. This expanded the Government's review of SCB's actions beyond "wire-stripping" before any other investigation of SCB by the Government had begun. *Id.,* ¶ 79. Relator's role in prompting the new investigation was significant.

As described in the discussion above, Relator's principals provided thousands of SCB records to the Government, which would have enabled diligent investigators to identify readily through simple cross-checking SCB's U.S. dollar transactions on behalf of Iranian customers. Marcellus decl., ¶¶ 57-69. The Government's failure to act on the information submitted by Relator does not negate the contribution made. Sufficient information about the Iranian petrochemical company and the two Elyassi-owned companies was provided to the Government in 2012 to have led them promptly to the violations of those entities addressed in the 2019 Settlement. *Id.*

**4. Most of Relator's allegations did not relate to any legitimate "wind down"**

**transactions.** The Government states that "Relator's information mostly related to SCB's

winding down of its preexisting relationships with its Iranian clients in a manner that did not

appear to violate U.S. sanctions (such as being executed in foreign currencies)…."[3] Govt. Mem.

at 7-8; also *id*. at 24. These statements, too, were false. The UK's Financial Conduct Authority

found in its 2019 report that "most of [SCB's] business is carried out in US dollars, or currencies

linked to the US dollar" (Ex. 13, ¶ 4.8), that "approximately 90% of income and profit generated

by SCB and its subsidiaries was earned from its operations in Asia, Africa and the Middle East"

(*Id.*, ¶ 4.7), that SCB became aware of potential sanctions concerns between 2009 and 2011 (*Id.* ,

¶4.107), that "[i]n 2011, concerns were raised within SCB's global investigations function about

staff at SCB's UAE branches being more concerned with maintaining client relationships than

with complying with financial crime policies" (*Id.*, ¶ 4.67), that "[t]he UK Wholesale Bank

executed just under $213bn for Correspondent Banking relationships that lacked a GIC [Group

Introduction Certificate] into the UK during the period from November 2010 to July 2013

inclusive" (*Id.*, ¶ 4.55), and that "most of SCB's misconduct occurred after 6 March 2010" (*Id.*,

¶6.8). The DFS April 9, 2019, Consent Order found that "during the period November 2008

through July 2014, the Bank processed nearly 15,000 illegal payments for the benefit of

sanctioned Iranian parties…." Ex. 14, ¶ 38. These findings confirm that there were transactions

other than "wind-down" transactions because they include transactions that were processed in

U.S. dollars and occurred after OFAC revoked the U-Turn general license in 2008. Even SCB's

---

[3] The "wind-down" process is described by the Government as settling preexisting contractual relationships pursuant to OFAC's general license permitting "U-Turn" transactions. Manfull decl., ¶ 35. It is unclear whether OFAC considers another method of settling such relationships, namely, paying preexisting obligations in a currency other than U.S. dollars, to which OFAC alludes (*Id.*), as part of the "wind-down" process. *Id.* Relator has addressed each method separately herein.

transactions with the Iranian petrochemical company and the two Elyassi companies that formed the basis for the Government's inadequate 2019 Settlement were not "wind-down" transactions. The SCB records that Relator submitted to the Government covering the period 2008-2014 obviously, then, did not involve "wind-down" transactions.

**5. "Project Green" was SCB's name for its calculated initiative to systematically violate the Iran Sanctions.** Among the telling demonstrations of the Government's arbitrariness is its false statement that Project Green was nothing more than "the Bank's internal name for the investigation that led to the 2012 [settlement]." Govt. Mem. at 8. In fact, Project Green was the embodiment of SCB's elaborate scheme to allow U.S. dollar transactions to be processed for sanctioned parties through tactics that evaded U.S. sanctions. Knight decl., ¶¶ 20-22. It was designed and implemented by SCB's senior management. *Id.*, ¶ 22. The Government was not aware of the true nature and purpose of Project Green until Mr. Marcellus participated in a September 14, 2012, telephone call with OFAC officials. Marcellus decl., ¶ 41. Only after the Government executed the 2012 Settlement in December of that year and learned of Mr. Alter's letter of December 20, 2012, to SCB's legal counsel (Ex. 8), which requested information about "the formation, purpose, design, staff structure, period of operation, and current status of Project Green" did the Government begin to pay serious attention to this Project. Marcellus decl., ¶¶ 70, 77. Much of a January 16, 2013, meeting of the joint investigation team with Relator was devoted to discussion of Project Green. *Id.,* ¶ 82.

The scope of the Project Green scheme was far broader than "wire-stripping," which was the limited activity covered by the 2012 Settlement. 2012 DPA at 9. For the Government to represent that Project Green was an internal investigation limited to the "wire-stripping"

settlement in 2012, Komar decl., ¶ 23, is not only false but also an obvious attempt to disguise the true purpose and impact of that Project Green. Knight decl., ¶ 22.

**6. The claim that SCB did not enter into any new Iranian business after 2007 is untrue.** The Government's statement that SCB had not "entered into any new business with Iranian clients after 2007," Govt. Mem. at 8, is contradicted by SCB's own presentation in February 2013 to the Government (Ex. 9), the UK's Financial Conduct Authority's findings (Ex. 13), the DFS findings (Ex. 14, ¶38), and the accounts opened with the Dubai Petrochemical Company and the Elyassi companies, which were the subject of the 2019 Settlement. 2019 DPA at 6. Relator submitted multiple SCB records showing new accounts opened by Iranian customers after 2007. Knight decl., ¶¶ 40-45; Ex. 10.

**7. Relator produced records of many sanction-violating transactions that were not "wind downs."** The Government asserts that SCB's transactions challenged by Relator as violating U.S. sanctions in addition to the "wind-down" transactions were not problematic. Govt. Mem. at 24. The 2019 Settlement itself contradicts that statement. SCB's transactions with the two Elyassi companies and the Dubai Petrochemical Company were not "wind-down" transactions. In addition, the probative value of the SCB records produced by Relator covering the period 2008-2014 plainly made the transactions reflected in those records "problematic." The Government does not explain why those records warranted its conclusion that no violations were involved when the records indicated violations on their face.

## B. The International Financial Trading System

Financial transactions across national borders are not conducted through a central control point or central marketplace unlike transactions within most nations that have established a central bank or the like. Some are cleared through a central counterparty, such as the UK's

Clearing House Automated Payments System (CHAPS), while others are processed through bilateral clearing. A. Merle-Huet, *Overview of the U.S. Payments, Clearing and Settlement Landscape,* at 5 (Fed. Rev. Bank of N.Y., May 11, 2015) ("Merle"). International trades are typically denominated in a specified national currency and are subject to the laws and regulations of the nation that issues the currency. These trades are generally processed electronically through a payment system, such as Fedwire and CHIPS. *See generally,* Federal Reserve System, *Purposes & Functions,* at 130-34 *available at* https://www.federalreserve.gov/aboutthefed/ files/pf_complete.pdf ; The Clearing House, *About CHIPS, available at* https://www.theclearinghouse.org/payment-systems/chips.

The Fedwire system is governed by Federal Reserve Regulation J, which defines the rights and responsibilities of financial institutions that use Fedwire. Participants in the Fedwire Funds Service originate fund transfers by instructing a Federal Reserve Bank to debit funds from the originator's account at the Federal Reserve Bank and credit funds to the account of another participant. Fedwire Funds processes and settles payment orders individually. Comm. on Payments and market Infrastructures (CPMI), RED BOOK, bis.org/cpmi/publ/d168.htm.

Foreign exchange (also known as forex or FX) is a global system for exchanging the currency of one nation for that of another. FX trades are also processed electronically, just as other international trades, through computer networks which serve as international payment systems. International trades are supported by global network messaging systems, especially that operated by the dominant SWIFT system. Sweeney decl., ¶ 10.

Transactions denominated in U.S. dollars must be cleared in accordance with the requirements set by the Federal Reserve Board. *Id.,* ¶ 16.  "Dollar clearing" is the process of

transmitting, reconciling, and in some cases, confirming transactions that are processed using the U.S. dollar as permitted under applicable U.S. law. *Id.*; Merle at 6.

**C. The U. S. Sanctions Regime**

Beginning in 1979 with EO 12170, the U.S. imposed a variety of economic sanctions on the Government of Iran and parties connected to it. *See* K. Katzman, *Iran Sanctions* (Cong. Research Serv., Nov. 15, 2019). The stated purpose of OFAC sanctions is to pressure the Government of Iran to cease its support for terrorist organizations and its development of nuclear weapons. U.S. Dept. of the Treasury, *Terrorism and Illicit Finance,* www.home.treasury.gov/policy-issues/terrorism-and-illicit-finance. A principal component of this sanctions regime is the regulatory program to restrict Iran's access to the U.S. financial system established pursuant to congressional authorization and executive orders in 31 CFR Part 560. Transactions that involve or benefit individuals or entities subject to U.S. sanctions when the transactions are based in U.S. dollars must be blocked during the dollar-clearing process. *E.g.,* 31 CFR §§ 560.211, 560.322.

**D. Standard Chartered Bank's Operations**

SCB is a global financial institution with headquarters in London. It provides a wide range of financial products and services for personal and business customers through its network of more than 1,109 branches and outlets in 68 markets. Ex. 13, ¶ 4.1. Before an SCB reorganization in 2014, its principal functions were divided between Consumer Banking and Wholesale Banking. *Id.,* at 4.5. Its UK Wholesale Bank undertook almost 1.9 million transactions with correspondent banking customers at a total value of approximately $1.14 trillion during the period November 2010 through July 2013. *Id.,* ¶ 4.6. Approximately 90% of SCB's income and profit is derived from operations in Asia and the MENA region. *Id.,* ¶4.7.

The overwhelming bulk of SCB's transactions are in U.S. dollars. *Id.,* ¶ 4.8. The typical transaction in SCB's Wholesale Bank operations begins with an instruction from the customer conveyed online, by telephone or by fax; followed by processing of the transaction by SCB; and concludes ultimately with the settling of the transaction to the benefit of the customer. Knight decl., ¶¶ 57-58.  Those transactions were subject to clearing in accordance with Federal Reserve requirements and blocking of the account if the transaction violated OFAC regulations. 31 CFR §§560.211, 560.322, 560.424, and 560.546; Sweeney decl., ¶ 14, 16.

SCB's online trading system included its initial-stage Straight-to-Bank (S2B) electronic program, which gave the customer access to SCB's electronic OLT3 program (*i.e.,* its online trading platform). Access to SCB's trading platforms was also allowed to customers who transmitted instructions by telephone or fax. Knight decl., ¶ 58.

These electronic systems, along with "sundry" accounts, are at the heart of SCB's scheme to enable Iranian parties to have access to the U.S. financial system and U.S. dollars because they allowed transactions to be processed without identifying to individuals processing those transactions at SCB NY or the New York Federal Reserve Bank the true beneficiary of a trade, which would then enable the transaction to be blocked. *Id.*, ¶¶ 58-59. SCB allowed its Iranian customers to trade by sending instructions by telephone or fax to an SCB dealer, who would arrange to get the customer directly onto SCB's electronic trading platform, where that customer could manipulate the fields to conceal his identity. SCB also enabled Iranian customers to engage in U.S. dollar transactions by having an SCB Middle Office operative book the trade manually to one of SCB Dubai's sundry accounts, which were originally designed to settle transactions with input errors regarding the identity of the counterparty. Sundry account transactions are processed in the name of the SCB branch, rather than the true beneficiary. The

trade would then be communicated to SCB NY to be settled. When the trade was communicated

back to SCB Dubai, a Middle Office operative would intervene to book the trade to the true

customer's account as a newly settled trade. *Id.,* ¶ 58.

## ARGUMENT

### I.  The Relator Has Stated a Valid Cause of Action for a Reverse False Claim.

**A.**  This action is brought pursuant to 31 U.S.C. § 3729(a)(1)(G), which provides that any

person who

> knowingly makes, uses, or causes to be made or used, a false record or statement
> material to an obligation to pay or transmit money or property to the Government, or
> knowingly conceals or knowingly and improperly avoids or decreases an obligation
> to pay or transmit money or property to the Government

is liable to the Government for treble damages plus a civil penalty for each such "reverse false

claim." An "obligation," in turn, means an established duty, whether or not fixed, arising from an

express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-

based or similar relationship, from statute or regulation, or from the retention of any

overpayment." 31 U.S.C. § 3729(b)(3). The Senate Judiciary Committee explained:

> The term "obligation" … includes fixed and contingent duties owed to the
> Government–including fixed liquidated obligations such as judgments, and fixed,
> unliquidated obligations such as tariffs on imported goods…. [T]his new section
> reflects the Committee's view … that an "obligation" arises across the spectrum of
> possibilities from the fixed amount debt obligation where all particulars are
> defined to the instance where there is a relationship between the Government and a
> person that "results in a duty to pay the Government money, whether or not the
> amount owed is yet fixed."

S. Rep. No. 111-10, at 14 (2009). *See also* Claire M. Sylvia, THE FALSE CLAIMS ACT: FRAUD

AGAINST THE Government, § 4:16 (2019).

"[W]hether an 'obligation' exists depends entirely on what the relevant legal instrument –

be it a contract, regulation, statute, or judicial order – requires a party to do." *U.S. ex rel. Landis*

14

*v. Tailwind Sports Corp.,* 160 F.3d 253, 272 (D.D.C. 2016). For example, when imported merchandise is not properly marked for tariff purposes, the Tariff Act imposes a 10 percent duty that is "deemed to have accrued at the time of importation." 19 U.S.C. § 1304(i). That duty constitutes an obligation within the meaning of the FCA. *Victaulic Co.,* 839 F.3d at 254-55. 2016). At the same time, an unassessed penalty under the Toxic Substances Control Act is not an FCA obligation. *U.S. ex rel. Simoneaux v. E.I. duPont de Nemours,* 843 F.3d 1033, 1040 (5th Cir. 2016).

   An FCA obligation is a duty to pay or transmit money that is fixed, even if the precise amount owed is not. This distinction is illustrated in *Kane ex rel. U.S. v. Healthfirst, Inc.,* 120 F.Supp.3d 370 (S.D.N.Y. 2015). A software glitch in Healthfirst's electronic remittances to hospitals participating in a managed care program incorrectly advised them that they could seek additional payment from secondary payors. The billing programs of those hospitals then automatically churned out bills to secondary payors, including Medicaid. *Id.,* at 376-77. When the problem was eventually recognized, Kane was tasked to identify all the improperly paid claims from the hospitals' billing data. He produced a spreadsheet listing 900 claims with erroneous billing codes, but warned management that further analysis was needed. Indeed, about half of the listed claims were not in fact overpaid, even though the majority of overpaid claims was included on the spreadsheet. *Id.*, at 377. The Court rejected the defendants' argument that this record did not establish a sufficiently fixed duty to constitute an FCA obligation. The Court concluded that after the defendants became aware of the software glitch, and "after Kane put [them] on notice of a set of claims likely to contain numerous overpayments, [they] had an established duty to report and return wrongly collected money." *Id.*, at 388.

Moreover, "the fact that further governmental action is required to collect a fine or penalty does not, standing alone, mean that a duty is not established." *Simoneaux,* 843 F.3d at 1039-40. As the Tenth Circuit explained even before the 2009 amendment, "[s]ome discretion inheres in a wide variety of government decisions. For example, government officials may have discretion as to whether to insist on a party's performance under a contract or whether to file a breach of contract action if a party does not perform. However, a contractual obligation falls within the scope of [the reverse false claim provision]." *U.S. ex rel. v. Bahrani v. Conagra, Inc.,* 465 F.3d 1189, 1204 (10th Cir. 2006). *See also U.S. ex rel. Landis v. Tailwind Sports Corp.,* 51 F. Supp.3d 9, 59 (D.D.C. 2014) ("Accepting the … argument [that the discretion to bring an action means no obligation exists] would also have the detrimental and counterproductive effect of allowing those with knowledge of contractual breaches or other non-compliance to make false statements about those matters, without penalty, unless and until the government files a lawsuit.").

Finally, the reverse false claim provision imposes "FCA liability for knowingly making a false statement that will cause a third party to impair its obligation to the federal government." *U.S. v. Caremark, Inc.,* 64 F.3d 808, 817 (5th Cir. 2011). As the Fifth Circuit went on, "[t]he statute does not require that the statement impair the *defendant's* obligation; instead, it requires that the statement impair '*an* obligation to pay or transmit money or property to the Government.'" *Id.* (emphases in original). *See also U.S. ex rel. Grubea v. Rosicki, Rosicki & Associates, P.C.,* 318 F. Supp.3d 680, 703 (S.D.N.Y. 2018) ("The FCA does not require that the obligation to pay or transmit money to the Government be the defendant's obligation – rather, the provision applies whenever a defendant has decreased 'an obligation' to pay the

Government."). The wrong of a reverse false claim is effectively "depriving the Government of money that it was owed." *Id.,* at 704.

**B.**  The obligation on which the Relator's reverse false claim is grounded arises from the application of straightforward statutory texts. *See* Second Amended Compl. ¶¶ 8, 71. SCB's violations of the Iran sanctions are violations of § 206 of IEEPA. 50 U.S.C. § 1705(a). Both the money involved in the illegal conversion transactions and the revenue that SCB earned from these sanction violations are "proceeds" subject to Title 18's civil forfeiture regime. § 981(a)(1)(C) ("Any property … which constitutes or is derived from proceeds traceable to … [a] 'specified unlawful activity'" is subject to forfeiture.); § 981(a)(2)(A) ("In cases involving … illegal services … 'proceeds' means property of any kind obtained directly or indirectly, as a result of the commission of the offense … and any property traceable thereto, and is not limited to the net gain or profit realize from the offense."); § 1956(c)(7)(D) ("'[S]pecified unlawful activity' means … an offense under section 206 … of [IEEPA]."). "All right, title, and interest in [such proceeds] shall vest in the United States upon commission of the act giving rise to forfeiture under this section." § 981(f). (This is a typical forfeiture provision. *See* Caleb Nelson, *The Constitutionality of Civil Forfeiture,* 125 YALE L.J. 2446, 2457 (2016) ("*Civil Forfeiture*".)

Thus, the billions of dollars involved in the Defendants' illegal clearing transactions became, at the time of those transactions, the property of the United States, though still in the hands of the Defendants. Like the defendants in *Kane,* the Defendants had an obligation to transmit this wrongly held money to the Government. The Defendants' actions in concealing their sanctions violations concealed the existence of this forfeited property and so prevented any effort of the Government to recover it. Notably, in each of their Deferred Prosecution

Agreements, SCB acknowledged that sums that were involved in the violation of the Iran sanctions were forfeitable under 18 U.S.C. § 981. *See* 2012 DPA at 2; 2019 DPA at 10-11.

**C.** The Government argues that this application of the FCA's reverse false claims provision cannot be correct because it is inconsistent with the procedures governing the civil forfeiture of property, especially "adjudicating competing claims to the forfeited property." Govt. Mem." at 22.  This argument is wrong most fundamentally because it misconceives the nature of a reverse false claims action. This is not an action to disgorge the forfeited property or in any other way to secure the Government's possession of that property. Nor is this reverse false claims action an effort to directly enforce the Iran sanctions, though it creates an incentive to comply with those sanctions. Rather, the wrong at issue here is the fraud by which the Defendants concealed their massive violations of the Iran sanctions, and so held and benefited from the Government's money and the revenue they made from their illegal conduct, as if that money remained theirs, avoiding any obligation to transmit that money to its rightful owner, the United States.

The remedy provided by a reverse false claims action is not disgorgement of the forfeited funds, but treble damages. 18 U.S.C. § 3729(a)(1). While the damages here are measured by the funds used in the sanctions violations and the money SCB made engaging in them, in principle they remain damages and not specific relief to recover that money. "Damages are given to the plaintiff to *substitute* for a suffered loss, whereas specific remedies are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Bowen v. Massachusetts,* 487 U.S. 879, 893 (1988) (quoting *Maryland Dept. of Human Resources v. Department of Health and Human Services,* 763 F.2d 1441, 1446 (D.C. Cir. 1985)) (emphasis in original). Indeed, the fact that the FCA awards *treble* damages underscores that this relief is no

garden variety disgorgement of forfeited property, but serves the very different purpose of creating an incentive to obey the law in the face of the Government's limited ability to discover illegal conduct. As the Third Circuit explained in the context of the mismarking of imported goods at issue in *Victaulic*:

> if the importer believes the value of bringing unmarked or improperly marked goods into the country exceeds the risk that the deception will be discovered and the ten percent ad valorem duty will be owed, an importer may decline to mention that its goods are mismarked, since the chance that some goods will be discovered as mismarked and that marking duties will be owed would still result in a net gain to the company. Reverse false claims liability changes that value proposition because a finding of deception carries the possibility of treble damages.

839 F.3d at 255-56.

Second, the Government simply mischaracterizes the forfeiture statute as "permit[ting] the Government *to obtain title* to the property through administrative processes or by filing a civil forfeiture complaint." Govt. Mem. at 22 (emphasis added). But the unambiguous text of the statute does not say that. Rather, "[a]ll right, title, and interest in property [that is the proceeds of specified illegal transactions] shall vest in the United States *upon commission of the act giving rise to forfeiture under this section*." 18 U.S.C. § 981(f) (emphasis added). To be sure, the Government has to take procedural steps to acquire possession of this property to which it already has title by operation of law, but that is akin to the need to bring a lawsuit to address a breach of contract, as discussed above.

Finally, the Government argues that the character of a civil forfeiture action as an action *in rem* somehow defeats the Defendants' obligation for their billions of dollars of sanctions violations and revenue benefiting from that illegal conduct, but it is far from clear how that could be correct. *See* Govt. Mem. at 21-22. Again, this is a reverse false claims, not a civil forfeiture,

action. The fraud at issue here deprives the United States of the money to which it already has "all right, title, and interest." It is the Defendants' culpability for *that* deceit that is at issue here.

The Government's argument fails even on its own terms. Modern jurisprudence has seen a convergence of *in rem* and *in personam* procedures that has greatly reduced their analytical significance. *See Civil Forfeiture,* 125 YALE L.J. at 2181-87; *U.S. v. Contorinis,* 692 F.3d 136, 145 n.2 (2d Cir. 2012) ("While § 981(a)(1)(C) is a civil forfeiture provision, it has been integrated into criminal proceedings via 28 U.S.C. § 2461(c)."); *U.S. v. Watts,* 786 F.3d 152, 175 n.15 (2d Cir. 2015) (same). As a result, the *Watts* Court rejected "an *in personam* theory of criminal forfeiture, limiting the government's reach to property that was once in the defendant's own possession." 786 F.3d at 175. After all, the *in rem* attribute of a property right means that a "property right concerns the use of a particular, discrete thing … and it is 'good against the world.'" James Y. Stern, *Property, Exclusivity, and Jurisdiction,* 100 VA. L. REV. 111, 116 (2014). *See, e.g.,* Wesley Hohfeld, *Some Fundamental Legal Conceptions as Applied in Judicial Reasoning,* 23 YALE L.J. 16, 32 (1913) ("'Duty' and 'right' are correlative terms. When a right is invaded, a duty is violated."); *U.S. v. Richardson,* 418 U.S. 166, 202 (1974) (Stewart, J., dissenting) (A claim to a right for information entails a correlative government duty to supply it.). Thus, at bottom the *in rem* character of civil forfeiture is congruent with the reverse false claims principle that the underlying obligation need not be that of the Defendants.

## II.  The Motion to Dismiss Fails Under 31 U.S.C. § 3730(c)(2)(A) or (B).

### A.  The Legal Standards

The Government admits that it is "making this motion based on the 2019 settlements with SCB." Govt. Mem. at 25. Relator had no opportunity to challenge those settlements at the time

they were concluded after several years of investigation,[4] but now, as the Government is making those settlements the engine for dismissal of this case, Relator does under 31 U.S.C. § 3730(c)(2)(B), which requires that those settlements, and their attendant dismissal of this case under the Government's reasoning, be "fair, adequate, and reasonable under all the circumstances."

For its part, the Government contends that this Motion is governed by § 3730(c)(2)(A), which provides for a hearing, but sets out no standard the Motion must satisfy, as does § 3730(c)(2)(B). The Government argues that it is entitled to an "unfettered right to dismiss," Govt. Mem. at 16, relying on *Swift v. U.S.,* 318 F.3d 250 (D.C.Cir. 2003).[5] But the posture of *Swift* was idiosyncratic – the case was only several months old, instead of seven years as in this case, and the defendant had not even been served – and it is an outlier among the courts who have construed § 3730(c)(2)(A). The Second Circuit has cited with approval the standard set out in *Sequoia Orange* under which the Government must establish that dismissal serves a "'valid governmental purpose' that is not arbitrary or irrational and has some 'rational relation' to the dismissal." *U.S. ex rel. Stevens v. Vt. Agency of Natural Res.,* 162 F. 3d 195, 201 (2d Cir. 1998), *rev'd on other grounds,* 529 U.S. 765 (2000).

The Court need not parse these standards, for the Government's Motion fails under either. But in addition, the Government's Motion falls short of the Justice Department's own guidance concerning Government efforts to dismiss a *qui tam* action. *See* U.S. Dept. of Justice, *DOJ Dismissal of a Civil* Qui Tam *Action,* JUSTICE MANUAL § 4-4.111, *available at*

---

[4] The 2019 DPA constitutes an alternate remedy within the meaning of 31 U.S.C. § 3730(c)(5), and Relator is entitled to its share of the forfeiture agreed to in it. Relator will be moving to secure that share.

[5] The Government "takes its observation about discretion too far." *Mach Mining, LLC v. EEOC,* 135 S.Ct. 1645, 1652 (2018). There is "a 'strong presumption' favoring judicial review of administration action." *Id.* at 1651. The Supreme Court has often distinguished between the Government's decision to take no action and Government actions actually taken. *See, e.g., Heckler v. Chaney,* 470 U.S. 821, 832 (1985).

https://www.justice.gov/jm/jm-4-4000-commercial-litigation#4-4.111. The MANUAL publishes a "non-exhaustive list" of seven factors that justify the Department moving to dismiss a *qui tam* action, only two of which are implicated here.

Under the first, the Department should seek to dismiss "meritless *qui tams* that facially lack merit (either because the relator's legal theory is inherently defective, or the relator's factual allegations are frivolous)." *Id.* As demonstrated above, Relator's legal theory is compelling, and certainly far removed from "inherently defective." So, too, Relator's factual allegations, as described above, are substantial, and it is the Government's factual position that is frivolous.

Second, the Department seeks dismissal to "preserv[e] government resources, particularly where the government's costs … are likely to exceed any expected gain." *Id.* The Government here purports to advance such an argument, Govt. Mem. 28-30, but makes no effort to come to grips with the information Relator has produced showing that billions of dollars have been forfeited by SCB because of its illegal scheme, and to compare any costs the Government could incur pursuing three times that sum under the FCA. "For the Government's stated purpose to be valid and for there to be a rational relationship between it and the dismissal, its decision to dismiss must have been based on a minimally adequate investigation, including a meaningful cost-benefit analysis." *U.S. ex rel. CIMZNHCA, LLC v UCB, Inc*., 2019 WL 1598109, at *3 (N.D. Ill. April 15, 2019) (denying Government motion to dismiss).

**B.  The Government's Actions in This Case Are Arbitrary and Unreasonable.**

The Government asks the Court to dismiss Relator's complaint based on the Government's conclusory statements and undisclosed and generally unidentified evidence. The only evidence actually specified is "a detailed analysis prepared by an independent consultant retained by the Bank of certain transactions identified by the Government." *Id.* That consultant

was Promontory Financial Group, LLC, which DFS found to have deleted and altered SCB records. Ex. 12. A significant portion of the consultant's analysis has never been produced. Reliance on an analysis by a discredited consultant was plainly unwarranted.

When the Government is allowed to justify its decisions based upon mere conclusions and undisclosed evidence, the door is opened to "arbitrary executive decisionmaking." *Biestek v. Berryhill,* 139 S.Ct. 1148, 1162 (2019) (Gorsuch & Ginsburg, JJ., dissenting); *ICC v. Louisville & Nashville R. Co.,* 227 U.S. 88, 93 (1913) (courts should not presume that the Government's findings have been supported); *see* Henry Friendly, *Some Kind of Hearing,* 123 U. PA. L. REV. 1267, 1313-14 (1975); Ernest Gellhorn, *Official Notice in Administrative Adjudication,* 20 TEX. L. REV. 131, 145 (1941). Indeed, "The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse." *Interstate Circuit, Inc. v. U.S.,* 306 U.S. 208, 226 (1939).[6]  Here, the Government offers conclusions, but no reasons derived from evidence, the epitome of *un*reasonableness. Indeed, the Government responded to Relator's allegations of SCB's sanctions violations in a manner that was demonstrably arbitrary.

1. It summarily dismissed Relator's allegations on the grounds that they could not be corroborated although most of those allegations were based on SCB records that merely required authentication and not corroboration, but the Government readily accepted every response provided by SCB without requiring corroboration. Some of SCB's responses were no more than bald assertions that could have been verified or disproven by records of payment, such as SWIFT tickets, if the Government had requested them. Knight decl., ¶¶ 49, 60.

---

[6] A case in point is the "'wind down' reports" submitted to the Government by SCB, upon which the Government relied, Komar decl. ¶ 22, but has neither produced nor even substantially quoted.

2. The Government failed without explanation or justification to include in the 2019 Settlement SCB's admitted sanctions violations, Govt. Mem. at 10-11, in transacting U.S. dollar business with a Dubai-based Iranian petrochemical company. Marcellus decl., ¶¶ 66-67.

3. The Government claims to have examined hundreds of thousands of pages of SCB records, Komar decl. ¶ 18, but it abruptly curtailed its investigations into Relator's allegations in August 2013 before it received tens of thousands of incriminating SCB records produced in September 2013 by Mr. Chandra. Chandra decl., ¶ 12 -13.

4. The Government interviewed "many current and former employees of SCB," Komar decl. ¶ 23, but it declined to follow up as it indicated it would with Mr. Knight after a January 16, 2013, meeting, Knight decl., ¶ 31, or to interview Mr. Chandra before it closed down the investigation of Relator's allegations. Chandra decl., ¶ 18.

5. The Government also closed down its investigation of Relator's allegations in August 2013, Komar decl., ¶ 24, without giving serious consideration to hidden data in SCB's files, which supported Relator's allegations. Komar decl. ¶ 24. Relator not only discovered the hidden cells and notified the Government of their existence on September 24, 2013, but it also explained how the Government could access the hidden information readily. Ex. 10.

6. The Government dismissed without examination Relator's evidence that SCB had violated U.S. sanctions in hundreds of transactions by allowing "flaws" in its online trading platform to enable Iranian parties to evade U.S. sanctions by hiding the identity of Iranian customers when they submitted voice or electronic instructions for SCB transactions in U.S. dollars. Manfull decl. ¶¶ 46-47. The Government clearly did not understand how SCB's online foreign exchange trading worked. Marcellus decl., ¶ 25. In the 2019 Settlement, the Government focused exclusively on several faxed instructions by Elyassi-related companies and an Iranian

petrochemical company, Manfull decl., ¶¶ 54-55, and refused to consider the evidence of many electronic and voice instructions to SCB from many other Iranian parties that Relator provided, including particularly the violations shown in the more than 20,000 sundry accounts produced by Mr. Chandra in September 2013. Marcellus decl., ¶ 104.

7. The Government effectively gave SCB a pass on its "wind-down" process from November 2006 through November 2008 despite the obvious illegality of those transactions. The illegality of SCB's "wind-down" transactions, particularly in its dealings with Bank Saderat (the "Export Bank of Iran") was well-established. "Bank Saderat has been a significant facilitator of Hizballah's financial activities and has served as a conduit between the Government of Iran and Hizballah, Hamas, the Popular Front for the Liberation of Palestine- General Command, and Palestinian Islamic Jihad." 71 Fed. Reg. 53569 (Sept. 12, 2006). These transactions were violations of explicit, unambiguous provisions of OFAC regulations (*e.g.,* 31 CFR §§560.211, 560.322), the terms of the Government's 2012 settlement, and the representations of Adam Szubin, OFAC Director, to Mr. Tom Scholar, Second Permanent Secretary, HM Treasury that even before the U-turn revocation in 2008, U-turn transactions could not involve an entity, such as Bank Saderat, that was an SDN. Ex. 5. Indeed, the Manfull declaration concedes that "wind-down" transactions could not involve "an individual or entity blocked by OFAC." Manfull decl. ¶ 20. All of the Iranian parties involved in the transactions at issue were subject to OFAC's sanctions.

The Government offered the additional justification that some of the transactions that Relator challenged as sanctions violations were a legitimate use of currencies other than the U.S. dollar. Govt. Mem. at 7-8. This included transactions described in SCB's February 8, 2013, presentation. Ex. 9 at 2, 7-8. A lending syndicate in which SCB was a member together with

three SDNs made a long-term loan to another SDN using a U.S. dollar account. *Id.* at 35. SCB argued that it should be able to repay the loan with currencies other than the U.S. dollar to complete the pre-existing commitment. *Id.* at __. Tacitly conceding that the loan transaction violated OFAC sanctions, SCB persuaded the Government that it should be permitted to repay itself its share of the unpaid loan balance, repay SDN members, and allow the loan recipient, another SDN to pay the remaining obligation in dirhams, euros or other non-US dollar currency. The Government failed to demonstrate that a currency conversion could have occurred in this situation as there was no new loan agreement, which would have been required. Knight decl., ¶ 61.  Its acceptance of SCB's tortured justification was unreasonable.

8. The Government relied without critical examination on the report of SCB's consultant, Promontory Financial Group, LLC, when the Government was aware through Relator's reports of Mr. Chandra's discovery that Promontory was scrubbing SCB's computer files, as well as through the DFS investigation of Promontory that Promontory lacked credibility and had removed dates and otherwise altered SCB records to hide SCB's sanctions violations. Ex. 12 at __; Ex. 3, ¶¶ 11, 30. The Government readily accepted SCB's representations that Relator's allegations were unfounded despite the fact that SCB had previously misled the Government in substantial respects in negotiating the 2012 Settlement. Marcellus decl., ¶ 37.

9. The Government could conclude that it "did not uncover evidence that SCB had entered into any new business with Iranian clients after 2007," Govt. Mem. at 8, only by not actually examining the massive evidence Relator provided, as described above, and by ignoring the findings of other authorities, such as the UK's Financial Conduct Authority, which concluded that "most of SCB's misconduct occurred after March 2010." Ex. 13, ¶ 6.8.[7] The Government's

---

[7] *See also* Adam Luck, *US General Claims He Told Standard Chartered Its Client Helped the Taliban – But the Bank Did Nothing,* THE MAIL ON SUNDAY (Dec. 12 2019) *available at*

conclusion is astonishing in light of the statement in the Manfull declaration that SCB had not restricted access by Iranian parties to its online trading platforms until 2014, Manfull decl., ¶¶ 46-47, which was the principal avenue by which SCB orchestrated sanctions violations.

10. The Government's arbitrary treatment of Relator's allegations and failure to hold SCB fully accountable appear to be part of a broader pattern of less than aggressive enforcement of U.S. sanctions. The *Too Big to Jail* report details the reluctance of the Justice and Treasury Departments from the mid-1990s to 2012 to prosecute violations of U.S. sanctions and anti-money laundering laws by the world's largest financial institutions, including SCB. *See supra* at 2 n.2. The questionable timing of the Government's investigative decisions and actions, and its arbitrary handling of Relator's submissions, contribute to a reasonable inference that it was motivated by a desire to limit SCB's exposure to the damages of its fraud on the public fisc and to preclude Relator from sharing in the Government's recovery, all with a blind eye to the terrible consequences of the conduct that fraud concealed. In yet another egregious example of unreasonableness, the Government ignored the fact that SCB was a member, along with SDNs, of a lending syndicate that made a long-term loan to another SDN; nevertheless. SCB insisted and the government agreed that SCB was obligated to honor a pre-existing commitment to repay the lenders, including itself and three SDNs, when the loan transaction involving U.S. dollars violated U.S. sanctions. Govt. Mem. at 7-8; Ex. 9 at 34-38.

11. In dramatic contrast to its highly deferential treatment of SCB and Promontory, the Government pushed back unfairly against Relator, its principals and Mr. Chandra, and generally

---

https://www.thisismoney.co.uk/money/news/article-7767683/US-general-told-Standard-Chartered-client-helped-Taliban-did-nothing.html (US Army General was ignored by SCB when he warned the bank in 2013 that the Fatima Group, to whom SCB provided foreign exchange and export finance services, was supplying the Taliban with materials for improvised explosive devices. Lt. Gen. Mike Barbero was quoted: "Anybody wounded or who lost a relative as a result of IEDs in Afghanistan should be angry especially at any British or US entity that enabled or at least looked the other way and did not care enough when presented with the evidence. It is shameful.").

ignored their submissions because their revelations embarrassed the Government by bringing to light the serious deficiencies in the 2012 settlement due to many violations concealed by SCB. Marcellus decl., ¶ 83.

**C. "Wind-Down" Transactions Were Not Permitted.**

The Government has contended that "most of the transactions at issue were legitimate winding-down of the Bank's preexisting relationships with its Iranian customers in currencies other than U.S. dollars…." Govt. Mem. at 24. As noted above, none of the transactions at issue were legitimate "wind-down" transactions.

"Wind-down" transactions were originally authorized by a general license for U-turn transactions in 31 CFR §560.516. This license was revoked by OFAC in 2008. 73 Fed. Reg. 66541 (Nov. 10, 2008). No other license is involved in this case. As OFAC explained:

> Prior to [the 2008 revocation], sub-paragraph (a)(1) authorized such [U-turn] transactions when the transfer was by order of a non-Iranian foreign bank from its won account in a domestic bank to an account held by a domestic bank for a non-Iranian foreign bank. This is commonly referred to as the 'U-turn' authorization. It is so termed because it is initiated offshore as a dollar-denominated transaction by order of a foreign bank's customer; it then becomes a transfer from a correspondent account held by a domestic bank for *another* foreign bank; and it ends up offshore as a transfer to a dollar-denominated account of the *second* foreign bank's customer.

*Id.* (emphasis added). None of the transactions identified by SCB and the Government as "wind-down" transactions satisfied the criteria stated above because no second foreign bank was involved in the transactions. Therefore, those transactions violated OFAC regulations, particularly 31 CFR §§ 560.322. As noted above, Adam Szubin, OFAC Director, in an August 8, 2012 letter to Mr. Tom Scholar, Second Permanent Secretary, HM Treasury, articulated the agency's position that even before the U-Turn regulation was revoked in 2008, transactions with

sanctioned parties was prohibited under that regulation. Ex. 5. The Government acknowledged this prohibition of sanctioned parties in its November 21, 2019, filing. Manfull decl. ¶ 20. [8]

### D. Currency Conversions in U.S. Dollar Accounts Were Not Allowed.

SCB asserted -- and the Government readily agreed -- that some transactions that Relator had claimed to be violations of U.S. sanctions were not violations because they involved payments in a currency other than the U.S. dollar.[9] That assertion is squarely at odds with OFAC regulations and the position that OFAC had otherwise consistently maintained. *See Review of U.S. Treasury Department's License to Convert Iranian Assets Using the U.S. Financial System,* Majority Staff Report, Sen. Perm. Subcomm. on Investigations (June 6, 2018), *available at* https://www.hsgac.senate.gov/imo/media/doc/2018-06-06%20PSI%20Majority%Staff% 20Report.pdf. A conversion to another currency of funds held in U.S. dollars in a blocked account is categorically prohibited. 31 CFR §§ 560.211, 560.322, 560.422, 560.424 and 560.527. Whether an account was actually blocked or should have been blocked (and would have been blocked but for SCB's evasive techniques employed to hide the fact that a sanctioned party was the beneficiary), a conversion from U.S. dollars to another currency was not permissible. Sweeney decl., ¶¶ 14, 16. The Government's failure to include these transactions as sanctions violations in the 2019 Settlements was, therefore, unreasonable.

---

[8] The Government fails to mention in its discussion of Bank Saderat's transactions that OFAC had amended § 560.516 in 2006 (before the U-turn license was revoked generally) "to cut off Bank Saderat…from the U.S. financial system." The amendment effectively prohibited all transactions directly or indirectly involving Bank Saderat because of its facilitation of financial support for terrorist organizations. 71 Fed. Reg. 53569-53571.

[9] Although it is far from clear what the Government and SCB were asserting regarding the use of a currency other than the U.S. dollar, it would have been simple for the Government to ascertain whether or not a U.S. dollar account was involved by getting the SWIFT trade tickets and SCB records for each transaction, which it apparently never attempted to do. If SCB's position was that it initiated transactions after 2008 that involved no U.S. dollars at any time, it never asserted that until after the Second Amended Complaint was filed. The February 8, 2013, power point presentation that SCB made to the Government asserted SCB's right to settle U.S. dollar accounts by converting to another currency. Ex. 9 at 34-37.

In its February 8, 2013, presentation to the Government, SCB represented that after August 2, 2007, it did not execute a new credit facility with any Iranian party. Yet, in the same presentation, SCB states that it converted currencies in accounts it held for NITC and Bank Saderat. Ex. 9 at 18, 34-38. A currency conversion would have required a new credit facility (*i.e.,* a new loan or a novation agreement) because each currency carries its own risks and rates, to which the syndicate of lenders in these transactions must agree. Knight decl., ¶ __. The Government never challenged SCB about this contradiction and appears not to have obtained SCB's loan documentation that would establish whether the accounts involved were U.S. dollar accounts or merely shown as such for internal bookkeeping purposes. The SCB February 8, 2013, presentation confirms that SCB processed transactions in U.S. dollars for Iranian parties in violation of OFAC sanctions and that the transactions were not covered by an OFAC license and were not legitimate "wind-down" transactions or lawful (or even actual) currency conversions. Ex. 9 at 30-39. These violations were not addressed in the 2019 Settlement. The Government's Settlement with SCB is not merely contrary to law and arbitrarily concluded; it is an unmitigated travesty.

The outrageous contention that the Government has "unfettered right" to dispose of Relator's False Claims Act complaint against SCB, Govt. Mem. at 16, based on the disgraceful exercise that it describes as a thorough investigation should not be accepted by the Court. The only waste of the Government's resources in this case is the inexcusable expenditure of time, taxpayer money and other resources devoted over many years to producing a result that allows SCB to avoid forfeiting billions of dollars that it rightfully is obligated to pay.

**CONCLUSION**

For the foregoing reasons, the Court should deny the Government's Motion to Dismiss.

January 10, 2020                                   Respectfully submitted,

                                                  BRUTUS TRADING, LLC

                                        By:       /s/ Patrick M. McSweeney

                                                  Patrick M. McSweeney
                                                  McSweeney, Cynkar & Kachouroff, PLLC
                                                  3358 John Tree Hill Road
                                                  Powhatan, VA 23139
                                                  (804) 937-0895
                                                  patrick@mck-lawyers.com

                                                  Robert J. Cynkar
                                                  McSweeney, Cynkar & Kachouroff, PLLC
                                                  10506 Milkweed Drive
                                                  Great Falls, VA 22066
                                                  (703) 621-3300
                                                  rcynkar@mck-lawyers.com