IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| United States of America *ex rel.* | ) | |
| Brutus Trading, LLC, | **)** | |
| Plaintiff, | ) | |
| -against | ) | **Case No. 18-cv-1111** |
| | **)** | |
| Standard Chartered Bank *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF ROBERT G. MARCELLUS

Robert G. Marcellus states the following under penalty of perjury:

1.      I am an American citizen and a resident of the Commonwealth of Virginia.

2.      I have been the chief executive officer and chairman of a US-based Commodity Trading Advisor since 2001 registered with the Commodity Futures Trading Commission (CFTC) and the National Futures Association specializing in foreign exchange trading and global financial markets.

3.      I own Richmond Group Fund Co., Ltd. and Richmond Optimus, LLC, specializing in foreign exchange trading and global financial markets.

4.      My position requires me to oversee the trading operations and executions department including our firm's compliance regime and regulatory responsibilities in dealing with the myriad of regulations typical of US Financial institutions.  These responsibilities range from "know your customer" (KYC) protocols and rules for account openings, US sanctions laws and compliance, and 'best industry practices' on financial disclosures of our trading activities. My firm is regularly and comprehensively audited during the normal course of business by the relevant US regulatory authorities.

**Exhibit 1**

5.     Neither I nor my firm have ever received any adverse regulatory action, any adverse audit finding, customer complaint, or negative arbitration decision.

6.     In 1988, I first registered with the CFTC as a broker and began my career in the commodity, currency and global futures markets as a broker, analyst and proprietary trader for major financial institutions and held asset management positions. My clients are major global investment banking houses, such as UBS, Deutsche Bank, CitiCorp and HSBC, and institutional class clients, such as sovereign wealth funds, global pension funds, and US listed alternative mutual funds that have currency exposure.

7.     I have provided expert testimony and briefings on currencies and global markets to legislative, law enforcement, and regulatory bodies in the United States and abroad, including the US Federal Reserve Bank in Richmond and various universities and investment industry conferences.

8.     In the course of trading (2001 – present) typically $30 to $70 billion annually of gross volumes in global currency markets for our clients, our counterparties were numerous global investment banking houses and international brokerage firms. To execute our strategies for our clients, we must purchase or sell on global stock or commodity futures exchanges a future such as gold or crude oil traded on a United States or foreign regulated futures or stock exchange by voice or electronic trading platform. Additionally, my companies also acquire cash spot or forward (futures) currency positions in both emerging and developed currency markets, such as the euro, Swiss franc, Turkish lira, South African rand or other currency.

9.     I have approximately over three decades of experience executing trades in currencies, commodities, and stocks on exchange or investment-house-provided electronic trading platforms. My companies were early movers into trading in emerging foreign currency

markets. We expanded trading beyond currencies traditionally traded by institutional class asset managers, which are the dollar, euro, yen and pound sterling, to include currencies of Latin American, African, Asian and Middle Eastern nations.

### A.  **My experience with the capital introductions services and trading desks of Standard Chartered Bank**

10.    Banks and brokerage firms often approached my companies to provide execution services of trades for our clients. We regularly were offered capital introduction services for asset managers, which involved their review of our strategies, due diligence background investigations of my companies, and subsequent referral to a bank's or brokerage firm's institutional clientele.

11.    Our bank counterparties frequently arranged meetings for my companies with prospective clients in foreign locations, including London, Singapore and Dubai.

12.     One of the capital introduction program opportunities for my companies involved Standard Chartered Bank (SCB), which was an executing counterparty on a portion of our currency trading business. After completing its due diligence investigation of my companies, SCB's senior management approved our relationship with the bank. From late 2007 or early 2008 to 2013, my companies executed some of our currency trades, both electronic and voice transactions, with SCB's currency trading desks in London, New York, Singapore and Dubai. The counterparty to those trades was typically SCB's branch in Dubai, Singapore, or in New York. In those trades, the SCB branch was our only counterparty. We did not need to trade directly with any SCB customer nor did we do so.

13.    My companies interacted with numerous SCB executives and trading desk personnel in New York, Singapore and Dubai, including Richard Selby, Mike Orefice, Julian Knight, Charlotte Hammond, Julian Gladwin, and many others.

14.     As a result of this in-depth interaction with my trading counterparties I have become very familiar with the business practices and clientele of my various executing counterparties.

15.     One of my regular contacts at SCB during the period 2008-2011 was Mr. Knight, then the global head of foreign exchange for SCB. My companies moved a substantial volume of trades to SCB because of our relationship with Mr. Knight, as I have known him and traded with his various employers since the late 90's. Mr. Knight was one of several executives who arranged for my companies to meet the trading desk personnel at SCB who, in turn, provided us with voice and electronic access to global currency markets.

16.     SCB invited me and personnel at my companies to SCB events, such as annual charity balls, and introduced them to the highest levels of SCB management and to its institutional customers as one of its leading hedge fund/currency manager clients.

17.     While visiting Dubai for an SCB event and client meetings in 2009 or 2010, an SCB trading desk officer, Haresh Hermandes, in Dubai asked if I would be interested in meeting some of SCB's Iranian customers on Kish Island in Iran. I declined, saying that I preferred to focus on Abu Dhabi, Dubai, Kuwait and Bahrain. I was uncomfortable with the idea of going to Iran in light of the political conditions there and the existing U.S. sanctions imposed on transactions with certain Iranian entities and individuals. This was a typical type of casual interaction with various sales staff, in that they would look to connect me, the asset manager with their client base.

18.     At the time of the suggestion that I visit SCB customers on Kish Island, I did not process the idea that SCB would knowingly violate the Iran sanctions regime by trading with persons subject to the U.S. sanctions. I assumed that SCB had found a compliant manner (in

terms of the U.S. sanctions regime) to transact business with their Iranian customers without violating the sanctions laws.

## B.  The 2012 Standard Chartered Bank Settlement.

19.     In August 2012, I read media reports that SCB had settled with the State of New York regarding violations of that State's laws and regulations and that SCB was being investigated by the U.S. Department of Justice (DOJ) the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC).

20.     Because SCB had been a trading counterparty of my companies, we carefully reviewed the settlement documents, which contained statements by SCB that it had ceased trading with Iranian persons subject to the U.S. sanctions regime in 2007 and was not undertaking new business with such persons. This was due to, primarily, the potential reputational risk for our firm when we would explain to clients which executing parties we used for their accounts.

21.     Notwithstanding those representations by SCB, I considered it likely that SCB had deceived New York and U.S regulators leading up to the New York settlement based in part on my recollection of the invitation that I had received to meet SCB customers on Kish Island and understanding of their general approach to business including specific customers over the years. I questioned whether SCB was prepared to terminate dealings with its Iranian customers and realized that their formal statements and representations denying Iranian business to the US authorities in 2012 were likely completely false.

22.     I then contacted Mr. Knight, who had left SCB during 2011, to discuss my apprehensions with him. He had been forced out of SCB after making a presentation to SCB senior management that prior year, which I have reviewed, describing flaws in its anti-money

laundering system and its electronic trading platforms and the bank's highly irregular practice of booking trades directly into a non-client specific "sundry" account structure thereby masking the end beneficiaries of USD transactions. It was apparent to me those flaws were purposefully designed and intended to facilitate evasion by SCB of U.S. sanctions on transactions with certain Iran-related persons. Indeed, any transaction coursing through the SCB non-client specific sundry account, whether with a sanctioned entity or otherwise, would necessarily mask the end beneficiary to the SCB New York office.

23.     I knew that Mr. Knight had specific knowledge of SCB's revenues derived from transactions with Iranian customers and discovered from him that he had retained documents reflecting those revenues.

24.     During these discussions with Mr. Knight, we both became concerned about SCB's admitted past dealings with entities associated with the Iran Republican Guard Corps and other Iran government entities that generated revenues to fund terrorist activities that were killing and maiming U.S., U.K. and other coalition military personnel, as well as many innocent civilians. Some of the Iranian entities, and others, that SCB had been doing business with, as shown on the spreadsheets Mr. Knight had in his possession, were involved in the supporting of, parts procurement, oil trading to gain US Dollars, funding of the development of atomic weapons, ballistic missiles,  the Arak nuclear project, US sanctions evasion and avoidance. They were even involved with the sale of ammonium nitrate explosives to terrorist groups that produced IED's that killed and maimed several thousand US and coalition troops in Afghanistan and the region.  The press reported that Fatima Group [Pakistan] (an SCB customer) fertilizers were found in over 80% of the IED's that killed US and coalition troop.  These companies were,

and are, readily and publicly associated with Iranian persons, Hezbollah, and the Iranian Republican Guards, to name a few.

### C. **My first contacts delivering evidence of Iran violations with US officials, OFAC and NY DFS prior to the filing of the Qui Tam**

25.     During August and September 2012, Mr. Knight and I reviewed the documents that he had regarding SCB's dealings with Iranian customers. These included: 1) his 2011 presentation to SCB senior management about very specific SCB's defects in its anti-money laundering and electronic trading systems; 2) SCB revenue reports pertaining to Iran business; 3) numerous SCB emails that were typically copied to ten to twenty SCB personnel in senior management positions pertaining to Iran business; 4) sales campaign documents reflecting efforts targeted at specific Iranian customers; 5) a list of SCB authorized Iranian national customers with direct and unfettered access to SCB's electronic trading platforms [noting that the electronic trading platforms did NOT retain the actual log in times for the Iranian customers]; and 6) reports concerning SCB's highly irregular sundry account practices and activities. These documents indicated intentional violations by SCB of the U.S. sanctions regime by disguising the actual counterparty or beneficiary of the transaction during the dollar-clearing process and by showing an SCB branch as counterparty rather than the true counterparty end client, which was often an Iran-related party.

26.     Mr. Knight and I concluded that SCB had continued engaging with Iranian customers who were subject to the U.S. sanctions well after 2007, contrary to SCB's representations and the conclusion of the New York regulators in the 2012 DFS settlement. And, we concluded that the 2012 settlements did not appear to cover the true extent of the volume of Iran transactions from even the 2001-2007 period. The enormous volume of transactions by SCB

with Iranian persons after 2007 recorded on the spreadsheets prompted us to contact appropriate authorities in New York and Washington to alert them to our information and conclusions.

27.     I promptly sought out the Attorney General of Virginia, Hon. Kenneth Cuccinelli, with whom I had a relationship as a policy advisor and friend. I requested his advice as to the appropriate individuals to contact. He determined that Virginia had no role to play because there was no apparent violation of Virginia statutes or regulations. He recommended that I communicate directly with New York State regulators and with federal authorities and provided me some contact information.

28.     I contacted the office of the New York State Attorney General in September 2012 and reported the concerns that Mr. Knight and I had about SCB's apparent violations of New York laws and regulations. I also left a similar message with the New York State Department of Financial Services.

29.     I then reached out to a lawyer whom I knew at the Securities & Exchange Commission (SEC) in Washington, D.C., assuming that the SEC had some jurisdiction over SCB's activities. He and the SEC recommended that I bring our concerns to the U.S. Department of the Treasury and arranged for an official at the Treasury Department to contact me.

30.     Michael Dondarski, the Deputy Chief of Regulated Industries Oversight & Evaluation at Treasury, emailed me on September 13, 2012, to arrange a telephone conversation with him that same day. During that conversation, we agreed to a telephone conference between his team and me on September 14, 2012.

31.     On the September 14, 2012 call with me were Mr. Dondarski; Jonathan Thomas, Chief, Regulated Industries Oversight & Evaluation; Alexandre Manfull, Chief, Blocked Assess Administration & Analysis, Office of Financial Assets Control (OFAC); Brandon Reddington,

Compliance Officer & Sanctions Advisor, OFAC Iranian Section; Dennis Wood, Assistant

Director, OFAC Sanctions Compliance & Evaluation; and perhaps other Treasury personnel who

were not identified during the call.

32.     The September 14, 2012 call lasted for at least an hour and covered multiple

topics, beginning with my request that my British associate, Mr. Knight, whose name was not

disclosed to participants in that telephone call, be provided protection and anonymity. Several of

the Treasury personnel emphasized that they would absolutely be able to protect my inside

"source."  I emphasized the significance of the 2011 presentation made by Mr. Knight as SCB's

global head of foreign exchange to SCB's senior management describing SCB's evasions of U.S.

sanctions. I described SCB's activities that had prompted me to contact federal authorities and

noted the documents that I had provided by email before the September 14, 2012, telephone

meeting, including sample trades derived from SCB documents. I elaborated on (a) SCB's

transactions with entities connected with the Iran government and other specially designated

nationals subject to the sanctions (SDNs), (b) the identity of enabled and authorized users of

SCB's OLT3 [online trading] system, (c) evidence of email traffic and telephone contacts

showing Iranian country and area codes and internal SCI numbers [SCB's unique customer

identification codes], (d) SCB's consistent use of irregular sundry accounts to avoid disclosing

the identity of counterparties who were subject to U.S. sanctions, (e) SCB's practice of

maintaining incomplete client due diligence files to further mask the actual end clients, and (f)

Mr. Knight's very significant presentation to SCB management about the defects in its systems

that enabled evasions of U.S. sanctions.  OFAC expressed strong interest in meeting Mr. Knight

and assured me the contact with the US Government would be kept completely confidential.

33.     It became obvious to me during the September 14, 2012, call that the Treasury participants had only been focused on U-Turn and wire-stripping activities of SCB prior to 2007 as described in the 2012 settlements, and had not considered other significant systemic violations of the US Iran Sanctions laws.

34.     I explained to OFAC that the 2012 settlement covered four areas of generally "manual" interventions to avoid US sanctions and hide Iranian businesses:

a) *instructing* customers to falsify or misrepresent payment instructions,
b) *replacing* references to sanctioned entities by bank employees,
c) *deleting* of payment data involved with sanctioned entities,
d) setting up a separate and specific repair processes for only Iranian customers, or "cover payments" called "wire stripping."

35.     I then described to OFAC what the 2012 Settlement had missed:

a) SCB violations continued after 2007 and were ongoing.
b) SCB's undisclosed violations involved complex trade financing practices including its use of letters of credit supporting Iranian business import and export transactions that were unlike the "wire-stripping" described in the 2012 DFS settlement.
c) US dollar reserves were established to support Iranian customer foreign exchange transactions that necessarily required dollar-clearing by the New York Federal Reserve because all customer accounts require the set aside of a reserve in order to trade US dollars.
d) There was a significant use of pegged currencies, like the UAE dirham and others, to divert regulators' attention from the US dollar component (leg) of the trade, meaning the bank could say that a trade was done in "dirhams," but conveniently omitting the fact that a trade in a pegged currency does indeed require part of the transaction to touch the US financial system.
e) The systemic practices of omitting or manipulating the original client "know your client" (KYC) files in the account-opening documents to mask any relation to Iran, including the practice of bank employees filling out Iranian client paperwork for them and classifying actual Iranian citizens as having any residency visa in a different country.
f)  Major and significant systemic flaws in the online trading platforms which consistently masked the end-beneficiary to the US Government.
g) The highly irregular use of non-client specific sundry accounts omitting the true beneficiaries' identity.

36.     The Treasury participants were not aware of the massively large volumes of US dollars coursing through SCB's electronic systems.  Electronic currency trading volumes began

10

to explode globally in the mid 2000's with the advent of high-speed internet access to pricing, the speed of which severely tested many regulatory bodies in tackling financial fraud in the currency sector. OFAC noted to me in our conversations that they hadn't fully considered the online platforms as potential vehicles to avoid sanctions, nor were the sundry account practices familiar to them. I devoted considerable time explaining the concept of trade financing, the currency transactions necessarily involved in the transaction banking business, the nuanced yet material significance of trading a non-US currency that is "pegged" or "fixed" to the US dollar, and how SCB had evaded the identification of sanctioned counterparties during the dollar-clearing process.

37.    During the September 14 call, I also alerted OFAC to the activities of SCB's Dubai branch, as the 2012 Settlement had focused on SCB's New York and London branches. I pointed out that SCB's Dubai branch records in Mr. Knight's possession showed its involvement with suspicious banks, including Lebanese Canadian Bank and Arab Bank, which suggested that SCB was not properly identifying the real counterparties when it forwarded transactions to SCB's N.Y. branch for dollar-clearing purposes. I focused on a samples of trades that I extracted from a spreadsheet showing SCB earning strong foreign exchange revenues from Bank Markazi, the Iranian Central Bank, and recorded profit from transactions with Bank Saderat, a well-known conduit between the Government of Iran and major terrorist organizations like Hamas and Hezbollah.

38.    I advised OFAC that the following Iranian counterparties had SCB-authorized trading limits in place on customer files and some had current access to SCB's online USD payments systems: Bank Kesharvarzi, Bank Markazi, Bank Maskan, Bank Saderat (the "Export Development Bank of Iran"), Sepah Bank, Iranian Offshore Oil Company Iran and Dubai Co.

LLC. I noted that there were many other files and spreadsheets in my and Mr. Knight's possession that showed evasions of U.S. sanctions regulations.

39.     I explained to OFAC that SCB considered itself a "frontier bank" unabashedly pursuing the highly profitable business opportunities in the emerging markets of the Middle East and North Africa by acquiring a country's central bank's U.S. dollar-clearing and deposit business and then expanding SCB's relationship from there. This business strategy was abetted by a "revolving door" between SCB and Iranian banks in which high level personnel were regularly moving from one to the other. Mr. Knight had both emails and supporting documents showing that many SCB senior executives were copied in emails on performance reports noting Iran revenues. .

40.     Finally, I briefly described the informal SCB invitation for me to join a Kish Island meeting with SCB's Iranian customers and, on another occasion, to meet with SCB's Libyan contacts and customers to explore development of possible business relationships with my companies as an example of how cavalier the bank appeared to be with its business relationships. I had declined all such invitations.

41.     Following the September 14, 2012, telephonic meeting, there were several communications between the OFAC participants and myself confirming that they were looking into the concerns that I raised and indicating that they would get back to me very soon. Mr. Dondarski expressed thanks to me and mentioned that my concerns rose to such a level that they would be aired during what he described as OFAC's weekly interagency conference call.  Ex._.

42.     More than one of the OFAC participants on the recorded conference call told me that the detail and scope of what I shared with them was new and another specifically noted to me that there was no other 'whistleblower" at the time that they knew of, as any post-2007 SCB-

Iran business that I was discussing with them was new, not part of any current settlement discussions, or otherwise being investigated.

43.     One of the Treasury officials told me not to be concerned about the wording of the impending OFAC settlement, as they were focused on the period ending in 2007 but to give them a chance to wrap up the 2012 settlement. He said that after the settlement, Treasury could address the serious and alarming concerns that I had raised. I was again reassured that protection for Mr. Knight would be provided by the federal government.

44.     At no time during 2012 did anyone at Treasury suggest that the information that Mr. Knight and I had presented to them was redundant or of no value to their investigation of SCB. To the contrary, Mr. Dondarski remarked that what Mr. Knight and I were providing was effectively "new information."

45.     I was left with the impression that the OFAC personnel were not familiar with the scope of the online trading platforms that underpinned much of the currency business or the internal architecture of those systems. They also did not appear to understand how sanctions could be violated and identities systemically masked through the nuanced  mechanics of clearing a pegged currency pegged to the U.S. dollar.

46.     Following the September 14, 2019, telephone meeting, I had no further contact with Treasury Department personnel until a January 16, 2013, meeting in New York City at which several on the September 14, 2012, conference call were participants.

### D.  My interaction with the New York DFS part of the global investigative team prior to the filing of the Qui Tam in 2012

47.     Shortly after the September 14, 2012, telephone call with Treasury officials, Daniel Alter, Chief Counsel to the New York State Department of Financial Services (DFS) contacted me. I summarized the same information that we had provided to the OFAC officials

and agreed that I would meet with him in New York.  This began a series of extensive contacts in

2012 with Mr. Alter and DFS for myself and Mr. Knight.

48.     On September 25, 2012, I met with Mr. Alter and Gaurav Vasisth of DFS at their

offices in New York City. They were startled by the information that I provided OFAC and

remarked that it was new information. I had been able to bring my laptop with files and

spreadsheets of what would ultimately be in the Brutus Trading, LLC formal disclosures to the

government.  This meant that I was able to show them actual spreadsheets of trades, revenues,

and other files exposing the scope and duration of SCB's Iran business post-2007 and discuss in

detail SCB's methods for evading the sanctions.

49.      Mr. Alter and Mr. Vasisth told me they had not been aware before my meeting

with them that SCB had used non-client specific sundry accounts to evade U.S. sanctions nor

aware of such detail as how SCB exploited the electronic trading platforms and masked Iranian

client names and dollar volumes from their N.Y. branch to evade sanctions. They were alarmed

that there were management reports noting "Iran revenues" post 2007 and that there were any

Iran trades at all post 2007.  Although DFS had reached a settlement with SCB several weeks

earlier, Mr. Alter told me he considered our revelations a "game-changer and absolutely

explosive," expressed shock and dismay that SCB's representations regarding the extent and

scope of their Iran business appeared to be patently false. He indicated that they would

investigate SCB aggressively based on our information, and all would be shared with the federal

authorities because it was a joint investigation.

50.     At the September 25, 2012, meeting, Mr. Alter said he wanted to meet Mr. Knight

and recommended that we should consider retaining legal counsel to represent us and further

suggested that we discuss our potential options under the federal False Claims Act and a comparable New York statute prior to speaking with him again.

51.     Shortly thereafter, Mr. Knight and I retained David Koenigsberg as our legal counsel.

52.     Mr. Knight and I had several follow-up meetings with Mr. Alter in his office in New York and on the telephone from October through December 2012, 2012.

53.     Mr. Knight and I formed Brutus Trading, LLC on October 31, 2012.

### E.  Transmissions of spreadsheets, files, and evidence of SCB illegal Iran-related trading activity to investigators

54.     In 2012, Mr. Knight and I shared with investigators our observations and the specific details of over 55 spreadsheets with thousands of entries noting Iran business post-2007 and other files and documents. This transmission of evidence became part of our prefiling and initial disclosures to the U.S. in our December 2012 Qui Tam filing.

55.     During 2012, we submitted the name of Mahmoud Reza Elyassi to Mr. Alter on five of the spreadsheets in our possession as an individual with whom SCB transacted business out of the SCB Dubai office. Mr. Elyassi was an Iranian national with full and unfettered access to SCB's on-line electronic trading platforms at the time.  Elyassi's name was displayed on the spreadsheets with many other Iranian transactions and Iranian persons noted as authorized users for different SCB accounts.  The spreadsheets contained contact telephones for these clients with Iranian country code telephone prefixes and emails, some of which contained the ".ir" designation for an Iran email address.

56.     One of the five spreadsheets we produced containing evidence of the Elyassi companies listed approximately 1400 names of Iran persons and companies that likely did

considerable trade with Iran.  We pointed to areas where Iranian-owned entities and individuals

were likely to be listed in trade records.  Elyassi and his companies are found in:

Master file S2B pmt clients.xls-  sheet '1'

 Row 595 --forms received on August 20, 2007 (includes telephone and email contacts)

I.1 CLIENT, BRANCH & USER SET UP 2008-  sheet 'Client'

Row 651

I.1 CLIENT, BRANCH & USER SET UP 2008-  sheet 'USER'

Row 656

Dubai_pos_client_limits_extern_credit_chk29Aug08.xls 'sheet 1'

Row 1431

Final List of OLT clients off 340 names v2.xlsx

[the row 5600 was 'hidden' on the spreadsheet, in an attempt to divert attention to it's presence along
with other Iranian related entities, and had to be uncovered by right clicking and clicking on 'unhide']]

 Row 5600

57.     The name of Tanootas Taban Engineering of Iran appeared on several of the

revenue and trade spreadsheets provided by Mr. Knight to DFS and the Government. Tanootas is

publicly known as a procurement specialist and engineering resource for the Iran oil and gas and

nuclear industry.

58.     The authorized trader of Tanootas was an Iranian national named Seyed

Abrishami who had open access to SCB's U.S. dollar online trading platforms.  Mr. Abrishami

was listed on an earlier version of the company's website with his title and Tehran address, as

having full U.S. dollar trading capability and access live to SCB's OLT3 trading platform. Mr.

Abrishami's name, among other easily identifiable Iranians, was plainly shown on an SCB

spreadsheet provided by Mr. Knight.  However, all reference to the Iran origins, Iran ownership,

and the Tehran, Iran corporate address was scrubbed from the website in the mid-2000's and

replaced with a new Dubai address with only a generic description of the company's business. Even the executives and board members listed on the old version of the website had been scrubbed to remove all personal names by 2008, including Mr. Abrishami's.

59.     As we pointed out to the investigators, a simple review of the website Wayback Machine, which archives websites and IP addresses around the world in order to "catalog" the internet plainly, showed the changing content of the Tanootas website over the years.. The significance of this example was that the company name was consistently and purposefully misspelled and listed as "Tandootas" on the SCB books.  This maneuver avoided the initial OFAC SDN check due to the lack of a fuzzy logic filter on the Treasury website. The slight misspelling would also consistently create a mismatch to any trade reconciliation process which ensured a foreign exchange transaction in the name of the company would be placed in a sundry account after execution of the trade,  thereby masking the end company name to anyone checking sanction compliance.

### F.  Hidden cells on numerous bank spreadsheets designed to avoid attention to Iran persons, Iran entities, and Iran related business transactions

60.     I saw many hidden cells on the SCB spreadsheets, which always contained just Iranian related entities. Mr. Knight and I sent written instructions to the investigators on how to uncover these cells to view more Iran related data. We had also explained the presence of hidden cells in the spreadsheets and management reports in interviews, emails and on the phone. The hidden cells were not just isolated in a single spreadsheet.  On the Juniper35 spreadsheet, for example, there were hidden at least 16 Iran names such as IRAN & DUBAI COMPANY on row A57, PARS GRUNDIG KISH on row A89, and Iranian owned HILI GENERAL TRADING on row A52, to name a few.  These names were also found on other spreadsheets related to revenues, deposits, and U.S. dollar transactional activity.

17

61.     The Tanootas connection to Iran, and multiple warnings of similar Dubai-based small and medium enterprises that acted as front companies for Iran were communicated both verbally and in written form to the investigative team during the 2012 period.  There were also at least two emails and spreadsheets noting the full detail of the Tanootas example sent to the government by counsel in 2013, early 2015, and again in 2019, which was in addition to the initial 2012 and early 2013 disclosures to the government via the spreadsheets and testimony. Tanootas was also one of the companies listed in the files received by Mr. Chandra in September 2013 as having access to SCB's electronic systems.

62.     Another example we shared concerned the Dubai front company of conglomerate Caspian Chemical, whose origins and ownership were also in Tehran, Iran but was changed in the mid-2000s to a Dubai address. Caspian Chemical was authorized by SCB to access U.S. dollars in 2006 according to Mr. Knight's various spreadsheets. We shared this detail on spreadsheets and in interviews during 2012 and repeated the assertions in mid-2013. The petrochemical company referenced in the 2019 Settlement is an entity in the Caspian conglomerate, Caspian Petrochemical Company.

63.     Caspian is a well-known conglomerate with multiple subsidiaries which began its existence in Iran over forty years ago.  Again, the internet archive tracked the same company ".ip" address and website over the years with the same pattern as seen in the Tanootas example, of suddenly altering all reference to Iran around 2007 and 2008 to only generic descriptions of business activities. The same Iranian owners and Iranian citizens would appear to now simply have a Dubai contact with no reference to their Iran citizenship or location.

64.     I had emphasized to investigators that one of the methods of evading U.S. sanctions was to alter the name of a counterparty slightly so that a Caspian Chemical should be

crossed checked with similar sounding names, as typically some or part of a name was dropped or altered, and a full list of subsidiaries and joint ventures should be vetted as well.  Mr. Alter from DFS indicated this could be very helpful in eliciting disclosures by other banks in separate but related Iran sanctions violations.

65.     Mr. Alter questioned us extensively and indicated that he would cross check the names on our spreadsheets, and all of the names on the spreadsheets with other investigations. He indicated he could confront other banks with this information of Iran business in addition to SCB in the hopes he could elicit a response or self-disclosure from SCB or other banks.

66.     Mr. Alter requested our assistance in drafting specific questions with which to confront SCB about their undisclosed Iran business after several meetings and DFS's review of our evidence. This letter was sent to SCB on December 20, 2012.

67.     We submitted a number of other files to Mr. Alter during this period, including the transaction banking revenue files per client country, authorized users of the OLT3 systems, Mr. Knight's 2011 report to SCB management on the use of sundry accounts and the flaws in the electronic systems, and ultimately all of the files noting Iran business post-2007. We also submitted all this material to the federal investigators.

68.     Around the time of our pre-filings in December of 2012, our counsel notified the Government that we had had significant contact with DFS since my interactions with OFAC in September.  They advised us that they could easily coordinate with DFS.

69.     AUSA Jean-David Barnea arranged for a meeting in New York City between Mr. Knight, Mr. Koenigsberg and me with officials representing Department of Justice, the Federal Bureau of Investigation, the Treasury Department, other federal agencies, the New York Attorney General's Office, the District of Columbia and DFS on January 16, 2013. Before that

meeting, both DFS and DOJ advised me that they were undertaking a joint review of the information that Brutus Trading, LLC had provided.

70.     Among the topics we discussed at the January 16, 2013 meeting were our concerns that the U.S. had been misled by SCB, my observations of SCB's conduct related to Iran, how the U.S. dollar clears and how it trades with both pegged and floating rate currencies. I was asked why the U.S. dollar was always so prevalent in banking transactions and why so many non-U.S. banks and non-U.S. companies still used the U.S. dollar in transactions that seemingly would not involve the United States. The example I used was a cross-border trade between Russia and China and their respective currencies. Despite the ability in this example for the Russian ruble to be converted directly to the Chinese yuan,  it still made more sense to trade with ruble/USD and yuan/USD, as the liquidity of either currency pair was much greater and, therefore, much more efficient and cheaper than trading directly between two non-U.S. currencies.  Plus, it is a known fact that many emerging markets currencies are not desired by exporters compared with the stable U.S. dollar when part of a trade finance or transaction banking trade.  This makes emerging market currencies transactions highly profitable to banks, which is why so many non-U.S. banks simply open a single branch in the U.S. to clear U.S. dollars.   Finally, I  discussed SCB's offer to me to meet with SCB's Kish Island Iranian clients.

71.     As a former senior SCB executive.  Mr. Knight explained that SCB's highest levels were familiar with SCB's ongoing Iran business and were aware of his 2011 report that exposed, among other things, the flaws in SCB's electronic trading systems and its highly irregular sundry account practices.  Our complaint was reviewed, as well as various spreadhseets we had produced. Mr. Knight described his knowledge of Project Green as designed to evade U.S. sanctions. He provided many names of senior SCB management who would be aware of the

20

Iran business from the most senior levels of the bank down to the Iran-desk sales persons.  Mr. Knight discussed the exact spreadsheet that Mahmoud Reza Eyassi's name was found on and noted that there were many Iranian-related entities authorized to use SCB's electroninc platform, whose email and telephone contacts were set out in these spreadsheets.  He touched specifically on several corporate names and explained which columns and lines to look for in terms of client users.  He also explained the profit and loss management reports of SCB's Iran business, the sales efforts directed toward Iran.  He was questioned in detail on many of the files and practices of the bank.

72.     The meeting lasted more than six hours.  At one point during Mr. Knight's presentation, a participant angrily interrupted the proceedings.  He vociferously said to Mr. Knight: "We have been investigating this bank heavily for the past three years and you are telling us we have missed millions of dollars of Iran trades and that the bank is still trading with Iran?  You know you're under oath." Then he stated: "I don't believe this. You must be wrong."  Mr. Knight responded by noting that in fact there has been much business with Iran post 2007 and noted one of the spreadsheets that showed revenues from several Iranian entites related to supporting the Iran's Arak nuclear project as just one example. Then the individual who had interrupted stated: "I don't believe this. You must be wrong."

73.     Throughout the meeting, both Mr. Knight and I attempted to explain that the irregular use of sundry accounts, which hid the names of the end Iranian beneficiaries by listing SCB's branch instead, combined with the flawed electronic trading systems simply not being programmed to show anything other than the Dubai branch as the counterparty, were deceptive and quite difficult for even a trained auditor or regulator to detect.  To us, due to the complexity of the trading systems and intracacies of U.S. dollar currency clearing, it was not completely a

surprise that the true nature of SCB's deception had gone undetected. SCB's efforts to continue to do business with Iran was a highly sophisticated and effective fraud designed to keep the N.Y. branch of SCB in a state of plausible deniability and the regulators in the U.S. and abroad in the dark.

74.     Approximately one week after the January 13, 2013 meeting, Mr. Barnea contacted Mr. Koenigsberg to inform him that DOJ had decided to investigate SCB and requested the assistance of Mr. Knight and me in that investigation.

75.     Mr. Barnea notified Mr. Koenigsberg in January 2013 that F.B.I. Special Agent Matthew Komar, who sat next to Mr. Barnea during the January 2013 meeting, had been assigned to the investigation and that all of the agencies were cooperating and sharing in the effort. Following the Justice Department decision in January 2013 to launch an investigation of SCB's dealings with sanctioned persons, both federal and New York regulators sought the active involvement of Mr. Knight and me in reviewing the huge volume of documents gathered as a part of the investigation and requested our explanations of many of those documents and the transactions or activities involved beyond just the January 2013 meeting. We devoted hundreds of hours to those tasks.  The size of the hundreds of files given over to investigators was very large measuring many gigabytes, involving literally thousands of suspect and Iranian transactions to analyze.  Just the sundry account transactions we had provided in the spreadsheets accounted for $100 to $200 million worth of unallocated trades in less than a year comprising more than 50,000 individual transactions.  We explained that virtually every single trade that coursed through a sundry account and the OLT3 electronic trading systems by definition was out of compliance normal practice, as it did not carry the identity of the end beneficiary, whether Iranian or not.

76.     We were involved extensively throughout the first half of 2013 answering questions from investigators.  Many of these were verbal conversations in which we passed on information through our counsel.  Mr. Barnea proposed another face-to-face meeting in an email to Mr. Koenigsberg in late 2013 to continue the dialogue.  He noted DOJ was going to rely on an expected report on our initial information that an independent consultant was preparing for SCB. That turned out to be Promontory Financial Group, LLC, which was ultimately discredited for participating in a cover-up of SCB's sanctions violations and fined by DFS for impeding its investigation.

77.     Mr. Knight found an additional data stick with over 30 files in his possession around February 2013 containing Iran-related activity, which we reviewed, and then passed on to the investigative team.

78.     In early 2013, Mr. Knight's identity was revealed to SCB, despite the assurances of Mr. Barnea that Mr. Knight's name would not be disclosed. Mr. Barnea reported to our counsel that in one of the confrontational meetings between investigators and SCB, Mr. Knight's name was disclosed "inadvertently" to SCB and then discussed.  He mentioned that SCB had nothing good to say about Mr. Knight and had accused Mr. Knight of being a rogue employee and having an affair with a co-worker.

79.     Once SCB discovered Mr. Knight's involvement as a whistleblower, it immediately launched a campaign in New York, Washington, London, Dubai and elsewhere to discredit Mr. Knight and damage his reputation.

**G.  Relator's Involvement of Anshuman Chandra in the Investigation**

80.     Anshuman Chandra, an SCB employee in Dubai, emailed Mr. Knight on April 23, 2013, offering to share information about SCB's illegal and post-2007 Iran activities. Mr.

Chandra was Head of e-Commerce for SCB Dubai and in a strategic position to access internal bank records of illegal Iranian business.  Concerned that the Chandra emails and contact might be a trap set by SCB, among other concerns, Mr. Barnea, Mr. Koenigsberg, Mr. Alter and Agent Komar and I conferred on whether and how to respond to Mr. Chandra. We had to wait several weeks before being given the formal go ahead by the DOJ and FBI to enlist Mr. Chandra's further help and to ascertain what additional files he may have that could be helpful to the investigation.  After Agent Komar advised us that the F.B.I. would be pleased to receive the information from Mr. Chandra, I made arrangements with a colleague in Dubai to serve as an intermediary with Mr. Chandra.

81.     Mr. Chandra delivered five critical files revealing SCB business violating the Iran sanctions. In addition, there was a verbal warning from Mr. Chandra that individuals from a Washington, DC company hired by SCB was currently in the Dubai office "cleaning" and wiping hard drives of trade data.  This company turned out to be the Promontory Financial Group. We reported this to the investigative teams and were told they would consider what to do with the information and for us to hold off on any further contact.

88.     Two of the five documents that Mr. Chandra provided were (a) an SCB internal email noting serious concerns that the bank was doing business with a money launderer involved with terrorism, Bank Al Rhajhi and (b) a spreadsheet entry of U.S. dollar activity by SCB on behalf of Bank Al Rhajhi.

89.     Bank Al Rhajhi had previously been identified as having been involved in financing Al Queda through transactions that it conducted with HSBC Holdings, PLC and HSBC Bank USA, NA, which had been fined for inadequate anti-money-laundering procedures and having an illegal financial relationship with Bank Al Rhajhi.

90.     Mr. Chandra provided me a photograph of the executed Bank Saderat Iran Internet Dealing Agreement between Bank Saderat and SCB for Bank Saderat's access to SCB's online trading platform.  The names and signatures of the Iranian officials of that bank were clearly visible.

91.     Mr. Chandra did not know at the time that we had already provided one of those three names, Mahdulal Bhatia, to Government investigators in 2012 as an authorized and current user of SCB's online trading platforms for both Bank Saderat and Arveen Trading, a Dubai front company. Mr. Bhatia had been the Chief Dealer/Assistant Manager of Bank Saderat Iran, Regional Office Dubai, UAE, Banking for 32 years from October 1975 to February 2007. Mr. Bhatia's name is also found on a spreadsheet that Mr. Knight had provided the Government in 2012 showing Mr. Bhatia as both a current authorized user with full U.S. dollar and other currency access to OLT3 with normal trading status noted under the Bank Saderat Iran row on line 36 and a current authorized user for Arveen General Trading on line 428 with the same unrestricted access to both accounts.

92.     Mr. Chandra provided photographs of two other spreadsheets that showed access for Iran-related parties to SCB's OLT3 platform, as well as details about Iranian ownership and, in the case of certain non-Iranian owned companies, notes on their sales to Iran.

93.     Both my colleague in Dubai and Mr. Chandra needed protection and anonymity because of the great risk to them associated with uncovering sanctions violations by SCB and Iranian government entities.  Agent Komar stated to me at the time that they would be protected, even relocated if necessary, but I was to ascertain if there was anything else Mr. Chandra would want in exchange for helping with the investigation. I was given Agent Komar's mobile telephone to keep him informed as to my progress in dealing with Mr. Chandra.  Agent Komar

noted to me and counsel that the FBI might want to interview Chandra in a secure location.  I was also instructed by Mr. Barnea and Agent Komar not to discuss any of this further with Mr. Knight because of his previous employment with SCB.

94.     On September 17, 2013, Mr. Chandra gave the Dubai intermediary more files than the five initially, totaling 79 files, all of which were sent to a secure Dropbox. I immediately downloaded those files and submitted them to our counsel, Mr. Koenigsberg, for him to transmit to DOJ.

95.     Mr. Koenigsberg transmitted to AUSA Barnea 70 of the 79 files received from Mr. Chandra on September 18, 2013. He concluded that the remaining 9 files might be privileged and sent them to another Government official. An example of the evidence of SCB's sanctions violations in the 70 files were records reflecting the U.S. dollar activities of numerous SCB Iranian customers during the period 2010-2013. One of those customers, IFIC Holdings AG, an SDN, was shown on a number of those records engaged in a variety of U.S. dollar activities. Months earlier, Mr. Koenigsberg had given Mr. Barnea other SCB records for the period 2008-2010 showing substantial U.S. dollar activities by IFIC Holdings AG. In a follow-up memorandum dated September 24, 2013, Mr. Koenigsberg highlighted the transactions of IFIC Holdings AG and a handful of other SCB customers included in the 70 SCB files. That memorandum also described hidden cells in the spreadsheets and explained for Mr. Barnea how he could access the information in those hidden cells.

96.     On September 12, 2013, Mr. Barnea had requested that I contact Mr. Chandra and advise him to get in touch with Agent Komar. I telephoned Agent Komar and repeated that Mr. Chandra was very frightened and needed protection but was still willing to help. Agent Komar responded: "We will make sure his name remains confidential, tell him we can protect him, we

can relocate him if there is a problem, find out what else he requires to come in. We may need to get him into the Embassy in Abu Dhabi for a secure interview which you can arrange."

97.    We had difficulty reaching Mr. Chandra through the intermediary throughout the summer of 2013. Mr. Chandra was evidently extremely frightened.  At this point, the intermediary and I were the only contact that Mr. Chandra had with the investigation. We kept the details of the investigation from Mr. Chandra and had only told him we could get his valuable information into good hands in the United States.  To my knowledge at the time, the FBI, DOJ and OFAC were using me and my Dubai colleague as the only points of contact with Mr. Chandra.

98.     During a telephone discussion with Agent Komar in September 2013, he said that the FBI could relocate Mr. Chandra and his family, if necessary, provide them with green cards.

99.    Toward the end of September 2013, the third meeting between Mr. Chandra and the intermediary was set to occur at the U.S. Consulate in Dubai. At the last minute, with Mr. Chandra expecting a coordinating call from the intermediary as to when he would be escorted to the Consulate, Agent Komar called me in a rushed and slightly agitated manner and said: "Stand down. We are going to take it from here." He said that the Government was taking over all contact with Mr. Chandra and for me and the Dubai intermediary to terminate all contact with Mr. Chandra.  We complied.

100.    At the same time of the leak of Mr. Chandra's name, I had received notice on September 25, 2013, from my prime broker, Deutsche Bank, that SCB had suddenly, with no explanation, terminated my trading lines with SCB (for currency executions for my customers)

for no apparent reason.  This led me to believe that my name had also been exposed by the

Government along with Mr. Chandra's and Mr. Knight's.

101.    I have read the declaration of Agent Komar and the other three declarations

submitted by the Government on November 21, 2019. I note that there is no mention at all of Mr.

Chandra's assistance from 2013 to 2016 to the Government's investigation and the Brutus

investigation.

102.    Brutus Trading, LLC, through its principals, Mr. Knight and this declarant, and

with the assistance of Mr. Chandra, our Dubai intermediary, and our legal counsel, provided DOJ

and OFAC with detailed information about thousands of SCB transactions with parties regulated

by U.S. sanctions against dealings with Iran-related persons. We provided information regarding

the significant and previously unknown trading system flaws and practices being exploited by

SCB to evade US Iran sanctions. I have described only a few of those transactions in this

declaration for the purpose of illustrating SCB's scheme to evade the U.S. sanctions regime.

After carefully reviewing the DOJ and OFAC settlement documents for both 2012 and 2019 and

other related documents, it is apparent that DOJ and OFAC declined to act on thousands of SCB

transactions that were shown by Relator to violate the U.S. sanctions regime.

103.    DOJ's announcement of the 2019 DOJ-SCB Deferred Prosecution Agreement

states that SCB's "criminal conspiracy, lasting from 2007 through 2011, resulted in SCB

processing approximately 9,500 financial transactions worth approximately $240 million through

U.S. financial institutions for the benefit of Iranian entities." OFAC's April 9, 2019,

announcement of its settlement with SCB stated: "From June 2009 until May 2014, SCB

processed 9,335 transactions totaling $437,553,380 that were processed to or through the United

States." The information that Brutus Trading, LLC provided to DOJ and OFAC showed that the

conspiracy continued well beyond 2011 and involved tens of thousands of transactions having a value of $56.75 billion at a minimum, which we were able to estimate from SCB records of revenues and profits derived from Iran-related transactions during the relevant period.

104.    The 2019 OFAC-SCB settlement agreement states: "SCB fully cooperated with OFAC's investigation, including (1) through the production of a voluminous quantity of documents, (2) through presentations of the bank's own extensive and thorough internal investigation laying out the facts, bringing the misconduct of two former junior employees to OFAC's attention, and answering numerous follow-up inquiries for information over the course of OFAC's investigation, and (3) by entering into a statute of limitations tolling agreement and multiple extensions of the agreement." Brutus Trading, LLC produced information demonstrating that SCB continued to withhold relevant information from OFAC and DOJ and to mislead those agencies, that SCB represented falsely that its misconduct involved  junior employees only when senior officials were involved, that SCB retained a consulting firm to alter its records and otherwise remove, hide or disguise relevant information, and that SCB retaliated against employees and former employees who provided useful information to OFAC and DOJ during the investigation.

105.    The Financial Conduct Authority of the United Kingdom (FCA) published a report on February 5, 2019, concluding that SCB had generated profits of £2,071,843,541 during the period November 24, 2009, through December 31, 2014. SCB's transactions in the UAE (including SCB Dubai) failed to conduct adequate due diligence reviews in most of its transactions from September 2, 2010, to April 30, 2014. ¶ 4.92. The FCA found that there were just under 400,000 transactions in the relevant region for the period at issue here involving violations of UK laws requiring a Group Identification Certificate, which would confirm an

adequate customer due diligence review by SCB. ¶ 4.55. Those transactions had a total value of $ 231 billion, which is consistent with the estimate of the value of SCB's transactions that violated U.S. sanctions for the same period. ¶ 4.55FCA also concluded that the number of transactions involved in these violations were in the hundreds of thousands. It is reasonable to conclude that the sheer magnitude of these UK violations should have prompted a careful investigation of SCB's violations of obviously overlapping U.S. sanctions

106.    Beginning on September 13, 2012, Mr. Knight and I provided documents and explanations related to SCB's methodology of evading sanctions imposed on Iran-related persons by the U.S. to the Justice Department and the Treasury Department. We also arranged for Mr. Chandra to deliver 79 voluminous electronic files from SCB's Dubai branch demonstrating sanctions violations involving numerous Iran-related individuals and entities. Those individuals and entities included many of the Iranian parties that we had identified beginning in September 2102 and through the following 13 months.

107.    The Justice Department and the Treasury Department failed to act upon a significant portion of the information that we provided and, as a result, reached settlements with SCB in 2019 that hold SCB responsible for only a small fraction of the transactions which violated applicable U.S. laws and regulations, as set forth in our Second Amended Complaint filed in the U.S. District Court for the Southern District of New York in the False Claims Act litigation brought by Brutus Trading, LLC.

108.    Based upon several SCB profit and loss reports and other reports that we were able to review for the relevant period of 2010 through 2014, we calculated that with respect to transactions involving Iran-related customers, there were U.S. dollars processed in a minimum amount of $56.75.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 10, 2020

Robert G. Marcellus