IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| United States of America *ex rel.* ) | |
| Brutus Trading, LLC, ) | |
| Plaintiff, ) | |
| -against- ) | |
| ) | **Case No. 18-cv-11117** |
| Standard Chartered Bank *et al.*, ) | |
| Defendants. ) | |

## DECLARATION OF JULIAN M. KNIGHT

Julian M Knight states the following under penalty of perjury:

I received a Bachelor of Sciences degree in Physics and Chemistry of Materials with Joint Honours from the University of Durham in 1991.

1. I was born in the United Kingdom and am currently resident in the United Kingdom.

2. I was awarded a Master of Arts in international Relations with Honours by the University of Nottingham in 1994.

3. I received a Bachelor of Sciences degree in Physics and Chemistry of Materials with Joint Honours from the University of Durham in 1991.

4. I am a Fellow of the Royal Society for Arts and Sciences in Environmental Science.

5. From September 1988 to October 1994, I served in the Royal Air Force, attaining the rank of Flight Lieutenant with Squadron Leader seniority. Until 2011, I served as a Commissioned Officer in the Royal Air Force Reserve.

6. In 1995, I served as foreign exchange trader in London for NM Rothschild & Sons Ltd.

1

**Exhibit 2**

7. From 1996 to 2004, I was employed at Fimat International Banque, U.K., as a Senior Foreign Exchange Trader and Global Head of Foreign Exchange.

8. I was a member of the Advisory Board of the Financial Exchange Division of the New York Board of Trade from September 2000 through November 2006. I remain the youngest individual to have held that position.

9. In 2004 and continuing until 2006, I served as the Global Head of Foreign Exchange of Man Group, PLC, a global fund and investment manager, and as Chairman and CEO of Global Cool Productions, a wholly owned subsidiary of the Man Group established to combat climate change through public outreach and consultancies to advise individuals and businesses on how to reduce their carbon footprint.

10. In April 2008, I was hired by the Chairman of Standard Chartered Bank, Lord Mervyn Davies, as a consultant to the Head of Wholesale Bank Strategy in Singapore to write a policy for the bank concerning the impact of SCB's entire footprint on water resources and on private equity fund investments in water infrastructure. I raised assets for this fund from sovereign wealth funds in SCB's Asia, Middle East and Africa regions (MENA). I was interviewed by CEO Wholesale banking, Mike Rees, and Head of HR, Tracey Clarke.

11. From July 2008 to December 2008, I was the Director of Hedge Fund Sales at SCB Singapore. In January 2009, I became Head of MENA Central Bank/Sovereign Wealth Fund Sales, working from Dubai and Abu Dhabi and exercising responsibility for financial market sales to MENA sovereign wealth funds, central banks, and ministries of finance.

12. In October 2009, I became Global Head of Transaction Banking Foreign Exchange Sales, until I was forced out in November 2011.

13. I am personally familiar with the organization and roles played by SCB and its companion companies. Standard Chartered Bank (SCB UK) is a public limited liability incorporated in England and with headquarters in London. It is an indirect subsidiary of Standard Chartered PLC, a bank holding company, which is also headquartered in London.

14. I am familiar with the U.S. sanctions laws and regulations and how they affect financial institutions that engage in foreign exchange and international finance generally.

15. I have experience with the blocking effect of U.S. sanctions on transactions of financial institutions that attempt to process trades in U.S. dollars for parties subject to U.S. sanctions.

16. As the dominant currency in global finance, most international financial transactions are conducted in U.S. dollars.

17. All international transactions involving the U.S. dollar require clearing in accordance with the regulations of the Federal Reserve System as authorized by U.S. laws.

18. When a U.S. dollar transaction violates the U.S. sanctions regime, the transaction is blocked by the Federal Reserve Bank.

19. SCB officials are well aware of the U.S. sanctions regime; nevertheless, at senior levels, SCB adopted a multi-faceted scheme to evade that regime in transactions SCB processed for the Government of Iran, its agencies and parties associated with Iran and subject to U.S. sanctions:

20. I searched various SCB Departments listed on that Intranet for evidence of Green/Eco projects in the Group for consultation for my paper for Mike Rees. I found a Project Green, which was run by Stuart Horsewood and based in Dubai. Mr. Horsewood was a MD and a Trade Finance Specialist. Upon my secondment to SCB Dubai, I met with Mr. Horsewood in

April 2009. I asked him about Project Green. He was very evasive but eluded to it being based in frontier markets and as a client assistance project.

21.     In late 2009, I hired a member of OCC in Dubai called Julian Gladwin. He sat next to Horsewood and informed me that Project Green was a project to manage clients around the U.S. sanctions regime and to help clients navigate this as well as interfacing with the regulators.

22.     Project Green was a long-term project within SCB and had a significant budget of approximately $30 mio USD behind it on an annual basis. I learned this from MENA accounts lead by Darren Warner in 2010. Project Green was a closely held operation within SCB, the purpose of which was to assist clients subject to U.S. sanctions to evade those sanctions in conducting international USD transactions. The operation was part of SCB's aggressive efforts to attract and maintain Iranian, Syrian and Libyan clients. Three high-level SCB managing directors specializing in sovereign trade finance devised methods by which SCB could provide trade finance and cash management services to clients that were subject to U.S. sanctions so that those clients could evade the sanctions.

23.     In retaliation for these efforts to alert SCB management of the evasion scheme and to develop corrective measures, I was advised that I would be terminated on October 11, 2011.

24.     In August 2012, I read media reports about a settlement executed between the New York State Department of Financial Services (DFS) and SCB related to violations of New York laws involving SCB's transactions with Iran-related parties. I reviewed the settlement details and concluded that the settlement was limited to only a portion of the violations that I had

4

discovered at SCB. Its violations were far greater in number and nominal value than announced in the settlement.

25. An American colleague with whom I had conducted business, Robert Marcellus, contacted me with a response to the DFS that was similar to mine. We devoted considerable time to a review of SCB records that I had been given as I left SCB in 2011, confirmed our initial conclusions, and decided to bring our conclusions to the attention of New York and U.S. regulators.

26. We agreed that Mr. Marcellus would contact DFS and U.S. officials to open an exchange with them about our conclusions.

27. I attended meetings with Daniel Alter, then General counsel of DFS, in November 2012 in New York City and described my concerns to him and another DFS official, G.V. Mr. Marcellus and I established Brutus Trading LLC on October 31, 2012, and retained David Koenigsberg as legal counsel for Brutus to file False Claims Act complaints on behalf of Brutus. We directed Mr. Koenigsberg to submit a massive amount of SCB records with DFS and the U.S. Department of Justice (DOJ) during November and December 2012. During the same period, Mr. Marcellus, Mr. Koenigsberg and I had extensive communications with Mr. Alter, including a detailed power point presentation that we submitted on November 7, 2012,.and urged Mr. Alter to pose specific inquiries to SCB's legal counsel for the purpose of causing and focusing an investigation of SCB by DOJ and OFAC.

28. Mr. Alter prepared a letter based on our recommended questions and delivered it to SCB's counsel on December 20, 2012.

29. Assistant U.S. Attorney Jean-David Barnea learned of Mr. Alter's letter and requested that Mr. Koenigsberg, Mr. Marcellus and I attend a January 16, 2013, meeting with

representative of the several agencies engaged in investigating our allegations about SCB's violations of U.S. sanctions and the laws of other jurisdictions in its dealings with Iran-related parties.

30. Mr. Marcellus, Mr. Koenigsberg and I attended the January 16, 2013, meeting in New York City. Mr. Barnea, assisted by FBI Special Agent Matthew Komar, chaired the meeting. Mr. Barnea, assisted by FBI Special Agent Matthew Komar, chaired the meeting. The meeting lasted approximately five hours and was divided between Mr. Marcellus and myself. I focused on SCB Dubai and SCB MENA, Transaction Banking FX (Currency Conversions, Trade Finance FX and Custody FX). I also described SCB On Line FX Trading platforms and the reliance on Sundry Accounts. I also discussed the focus on Iranian Clients and those Iranian Clients based in Dubai, I briefed on the SCB Representative Office in Tehran and the Curve Campaign targeting Iranian USD Deposits. It was clear that all of this subject matter had never been considered by the regulators and it was all new to them. One participant reminded me that I was under oath and that he did not believe me. I was made to feel that I was misinforming because the detailed information I was passing over had never before been investigated in the previous investigation, therefore leaving a number of the investigators embarrassed that they had not been thorough enough. I was not misinforming and for the first time showed the investigators a wide range of Management Information Systems evidence from SCB that I had in my possession. Because it took time to educate the team, we did not dive into great details.

31. My presentation at the January 16, 2013, meeting was more general and unfocused than I had anticipated and expected investigators to follow up with me as they had assured me they would. They never did.

32. Weeks after the meeting, Mr. Barnea confirmed that DOJ, the FBI and OFAC were pursuing an investigation of our allegations against SCB.

33. We were provided a power point presentation, dated February 8, 2013, that SCB had submitted to investigators, which we rebutted.

34. We continued to submit information supporting our allegations against SCB to DFS and DOJ during the winter and spring of 2013. I provided the names of Salar Khan, Harish Hermandes, and others to DOJ in early 2013. In our 2012 disclosures, we supplied over 50 witness names, including Salar Khan, who was the Head of Origination and Client Coverage Committee (OCC) for Iranian Accounts and Dubai-based Small and Medium Enterprises (SMEs) that were Iranian-owned, Iranian-backed or Iranian-managed. Relator had identified Mr. Khan in 2012 as the supervisor of one of the SCB employees cited as a co-conspirator in the indictment involving the Elyassi-owned companies. Mr. Khan was never charged and, presumably, never interviewed as I had urged. Relator had identified Mr. Hermandes as the ultimate supervisor of the other co-conspirator in the Elyassi case. He was never charged and, apparently, never interviewed.

35. In May 2013, Anshuman Chandra, an employee of SCB Dubai, emailed me and offered to forward SCB records that he believed supported the allegations against SCB that he understood that we had made. We communicated Mr. Chandra overture to DFS and DOJ.

36. Mr. Chandra handed five SCB records to a colleague of Mr. Marcellus in Dubai who had agreed to act as an intermediary. Those records were sent to Mr. Marcellus, who promptly saw that DOJ and the FBI received them. One of the records was an account opening document (or client agreement form) executed on behalf of Bank Saderat by Madhulal Bhatia and others. The date on the record appeared to have been whited out.

37. Mr. Chandra transmitted enormous volumes of SCB records beginning with his first transmission in May 2013 and continuing until December 2016. Those records included thousands of sundry account documents transmitted in September 2013 that plainly indicated sanctions violations. The Government did not review these records before it decided to end the investigation into Relator's allegations in August 2013.

38. Relator advised the Government in 2013 that there were hidden "cells" in SCB's computer records and explained how the Government could discover what was contained in those hidden "cells."

39. We learned from Mr. Chandra that SCB's consultant, Promontory, had its team working in the offices of SCB Dubai to review and alter SCB records. We notified DFS, which launched an investigation of Promontory.

40. We notified the Government that SCB had processed three structured trade finance transactions in 2009 for National Iranian Tanker Company (NITC) that were U.S. dollar transactions.

41. We notified the Government that SCB had conducted a U.S. dollar letter of credit transactions between Bank Markazi and four exporters in 2009.

42. We notified the Government that SCB had conducted a U.S. dollar trade finance and cash management transaction in 2009 for the Iranian Ministry of Economic Affairs and Finance.

43. We produced SCB records that showed that SCB had performed U.S. dollar transactions during 2009 for the Iranian Ministry of Energy with a nominal value of $2,546,419, as well as cash management and trade finance transactions in the amount of $259,602.77. There were other transactions for this customer during 2009.

8

44. SCB records for 2009 showed eight transactions with Bank Tejerat, ten with NITC, seven with Iran & Dubai Co., LLC and transactions with Parsian High Voltage, Khoraasan Steel Co., and Khouzestan Steel Company.

45. Between 2009 and 2014, SCB executed clearing transactions in violation of U.S. sanctions for Iranian parties Amesco, FZE ($6 billion), Bank Markazi Jomhouri Islami Iran ($5 billion), Bright Crescent Trading Co. ($2 billion), Caspian Petrochemical ($5 billion), Iran & Dubai Co., LLC ($6 billion), Iran Overseas Investment Bank, Ltd. ($1 billion), M & H Trading ($5 billion), Mahan Air General Trading LLC ($2 billion), PICO International Dubai ($2 billion), Piston Trading ($2 billion), and Schlumberger Overseas SA/Well Services of Iran ($6 billion). These parties were subject to U.S. sanctions.

46. A reasonable, conservative calculation of the dollar value of SCB's U.S. dollar transactions with customer subject to U.S. sanctions between 2009 and 2014 is approximately $56.75 billion.

47. SCB records for 2009 showed that it enjoyed profits of $4,365,000 from a selection of Iran-related transactions in 2009.

48. When OFAC published Sanctions Lists, SCB Compliance had a responsibility to immediately block all U.S. dollar accounts for SDNs. This would lock the account out and only allow for interest to be added to the account. No other function of the account could take place. Any payments into the account would be rejected. In both cases, blocking and rejections would be reported to OFAC via email.

49. Federal Reserve System's Fedwire clearing system was necessarily involved in any transaction involving U.S. dollars. Fedwire is a clearing mechanism approved by the Federal Reserve and used widely globally to effect USD settlement in conjunction with Continuous

Linked Settlement and SWIFT MY MESSAGES formats. This system allows the Federal Reserve to monitor USD settlements worldwide and thus ensure that OFAC SDNs are not settled with USD.

50. Trade finance represents the financial instruments and products that are used by companies to facilitate international trade and commerce. Trade finance makes it possible and easier for importers and exporters to transact business through trade. Trade finance is an umbrella term meaning it covers many financial products that banks and companies utilize to make trade transactions feasible.

51. SCB is a trade finance bank and operates in that role across its geographic footprint. The function of trade finance is to introduce a third-party to transactions to remove the payment risk and the supply risk. Trade finance provides the exporter with receivables or payment according to the agreement while the importer might be extended credit to fulfill the trade order. The parties involved in trade finance are numerous and can include: Banks; Trade finance companies; Importers and exporters; Insurers Export Credit Agencies and service providers.

52. In October 2006, SCB maintained that it had ceased all new USD-denominated Trade Finance deals with Iranian SDNs with immediate effect for Import and Export. It represented to the Government that there was no issuance of guarantees and that all trade transactions outstanding as of 30 Oct 2006 were completed. This was confused by further statements from the Bank that in fact in Aug 2007, no new Trade transactions in any currency were being permitted and all Trade transactions were complete, transactions were not denominated in USD unless the obligation was pre 26 Oct 2006. In December 2011, there were still approximately 50 trade transactions currently happening on an annual basis.

53. In the February 2013 SCB presentation provided to Relator in hard copy by DOJ, we learned that there had been 10 SDNs showing trade transaction steps after 1 Jan 2008. Nine of these entities involved USD-denominated transactions and all activity related to pre-2008 legacy transactions (after the date that SCB claimed it Oct 2006 line in the sand). Apparently, all transactions were completed in non-U.S. dollar currencies, which implies that an FX conversion was applied to the legacy SDN accounts in U.S. dollars, which should have been blocked according to OFAC rules.

54. A campaign, known internally as the Curve Campaign, was launched by the SCB's Global Head of Financial Markets, Lenny Feder, who was a direct report to the Head of Wholesale Banking, Mike Rees. This Campaign was driven by the fixed income product teams and aimed at all areas of Financial Market Sales. It was simply designed to boost USD deposits from all areas of the Group. Target regions were drawn up formally in MENA and included a specifically targeted Iran. All entities in Iran were targeted, including government institutions and large corporations. Soliciting and taking USDs from Iranian SDNs would have contravened the OFAC rules. In a selection of files entitled TDU Deposit Reports through the Summer and Fall of 2009, the increases in USD deposits achieved for a target group of Iranian clients is mapped and recorded in the SCB management information system (MIS). Mr. Feder would have received this report.

55. SCB maintained a presence in Tehran until 2014, with a CEO stationed there who had ongoing and significant outreach to potential Iranian customers.

56. SCB's On Line Treasury System version 3 (OLT3) was an off-the-shelf, procured system that connected Transaction Bank and Global Markets clients to online trading of FX. It was acquired in or around 2003 and was launched shortly thereafter. Latterly, the system was

11

connected to the Bank's main online portal for Account Management, known as Straight to Bank (S2B), as described below. OLT3 would allow clients to transact online FX Spot markets in about 30 or so different currencies vs USD. The system could be tailored for how long it would hold currency quotes per clients.

57. Straight to Bank (S2B) was the main online portal for any client of the Bank to access their account information online and make simple transactions. It was managed withing the Transaction Banking Division of the Bank.

58. In SCB's trading system, a customer could log onto S2B and request a price for a transaction. That would give the customer access to OLT3, which would display current FX prices, including the U.S. dollar rate and those of many other currencies. At this point, there would be no "line of sight" to the customer because it would constitute a request for a quote by a sundry account. An SCB employee would then book the transaction to an SCB sundry account, not to the customer's account. The transaction would be settled at SCB NY if it was transacted in U.S. dollars. Once the account has been settled by SCB NY, an SCB employee would manually change the account from a sundry account to a customer account and notify the customer, typically by letter.

59. In order for any change to be made in a U.S. dollar account, it must comply with the requirements of the Federal Reserve System and OFAC. A change in a blocked U.S. dollar account was not allowed except to add interest to the account.

60. A change in an account would be recorded in SCB's customer access ledgers, the SWIFT messaging system, and the Fedwire or other payment system. The Government could have confirmed SCB's representation about its currency conversions by reviewing the history of the transactions captured in the records of the systems identified above.

61.     Even if it had been lawful and in compliance with OFAC regulations to convert from one currency to another in a loan account, a novation of the loan agreement or a new loan agreement would have been required. Each currency carries its own risks and rates. The original parties to the loan agreement must approve the conversion because it would affect payments going forward and entail different risks. The Government could have confirmed that a novation or new loan agreement had been executed, but it appears that none was executed or the Government did not confirm the execution. A conversion to a currency pegged to the U.S. dollar would also have required clearance in accordance with Federal Reserve Bank and OFAC rules (or an OFAC license), as the celebrated fight over the Omani blocked and frozen accounts in 2015 (?) demonstrated.

62.     SCB's February 8, 2013, presentation acknowledges a violation of OFAC regulations when it notes a transaction involving Bank Saderat in 2007, which is after OFAC adopted a regulation in 2006 that prohibited any transaction with Bank Saderat because of its support for numerous terrorist organizations. The Government does not dispute that the loan transaction between Bank Saderat and a syndicate of lenders was processed by SCB in U.S. dollars and that it constituted a violation of U.S. sanctions. This pre-existing commitment, the Government agreed, should be honoured by SCB through payments to satisfy the unpaid loan balance to the syndicate that included three SDNs, Bank Melli, Persia International Bank, and Bank Tejerat.

63.     SCB represented to the Government in its February 8, 2013, presentation that no new credit facility (such as a novation or new loan agreement) had been executed in any currency with an Iranian party after August 2, 2007. Yet, in the same presentation, SCB states

that there were currency conversions in the accounts of NITC and Bank Saderat, which would have required novations or new loan agreements.

64. We have direct evidence that the following accounts were not blocked as stated and continued trading after the "Blocking":

> ACME GENERAL TRADING (2573059) BLI in 3/9/2007 but still active in 2008 as Evidenced by *Master File S2B pmt clients (08/01/2008) also*
> APM INTERNATIONAL FZE (2815079) BLI in 3/9/2007 but still active in 2009 as Evidenced by *MENA Customerwise Sales Report Jan 09*
> BLUE CALM MARINE SERVICES(4298802) BLI in 3/9/2007 but still active in 2008 as Evidenced by *Master File S2B pmt clients (08/01/2008)*
> KHOUZESTAN STEEL (2415496 / 2814730) BLI in 3/9/2007 but still active in 31/12/2008 as Evidenced by *Performance Summary IRAN SNPC(2)*
> MAPNA INTERNATIONAL (7024762) BLI in 3/9/2007 but still active in 20/03/20012 as Evidenced by *Performance Summary IRAN SNPC(1)*
> PARSIAN HIGH VOLTAGE (2147165) BLI in 3/9/2007 but still active in 2008 31/12/2008 as Evidenced by *Performance Summary IRAN SNPC(2)*
> SCHLUMBERGER WELL SERVICES OF IRAN (4255178) BLI in 3/9/2007 but still active in 2011/12 as Evidenced by *Sundry xls*

65. By reviewing all available SCB spreadsheets and other reports, including profit and loss statements for the relevant period, I was able to determine that SCB had processed tens of billions of dollars in transactions that violated U.S. sanctions that were not included in the forfeiture required by the 2019 Settlement. My conservation estimate is $56.75.

66. The Government never addressed whether the transactions that it claimed were legitimate "wind-down" transactions were not otherwise in violation of U.S. sanctions because they all occurred during the period when SCB was engaged in a widespread scheme to "wire-strip" information to hide the identity of sanctioned parties in U.S. dollar transactions. "Wire-stripping" is the method of evading sanctions that was addressed in the 2012 Settlement with SCB.

67. The Government generally denied that SCB had violated U.S. sanctions after 2008 but never refuted the evidence Brutus produced based on SCB's own records that there

were many SCB transactions post-2008 on behalf of Iran-related parties including, but not limited to, Amesco, FZE; Arjomandi Trading Co.; Bright Crescent Trading; Fal Oil Co.; IFIC Holding AG; Iran Dubai Co., LLC; Khouzestan Steel Co.; Mapna Co., LLC; Al Zarooni Exchange; Parsian H; Schlumberger Well Services Iran; Bank Sepah; Persia International Bank; Bank Amrkazi; National Iranian Tanker Co.; MOE Group Iran; Hadi Shipping; Khorasan Steel Co.; Dubai Aluminum; FAL Oil Co., and Mahan Air/Blue Sky Aviation. A number of these accounts traded FX that settled via SCB Dubai Sundry accounts, notably Amesco and FAL Oil. Amesco is a known Iranian owned Dubai-based company and FAL Oil an SDN.

68. For each of the parties listed in the preceding paragraph, Brutus provided documentation, typically in the form of spreadsheets. Those spreadsheets cannot be filed electronically in this Court, but we made available to investigators if they had cared to examine them. A sanctioned party with whom SCB had transacted business in U.S. dollars was often listed on spreadsheets with hundreds of other SCB customers.

69. The Government argues that Brutus did not draw sufficient focus to violators, such as the Elyassi-owned companies. Doc. 32 ¶ 41. There were so many potential and actual sanctions violators that Brutus was not inclined to highlight a handful for fear that the Government would conclude that we were concerned only with one or a handful. We made it clear to the investigators that we believed that most of the documents we submitted supported our allegations of sanctions violations. Elyassi's name was included five times on spreadsheets submitted to investigators.

70. Although DOJ, the FBI and OFAC declined to cross-check the names on our narrowed list of 1,400, Mr. Alter and his DFS team did undertake that task and reported that probable violations were identified for further investigation.

71. Bank Saderat is a particularly egregious example of SCB's indifference to its responsibility under U.S. law to prevent the most notorious funders of terrorist organizations from having access to the U.S. financial system. OFAC had singled out Bank Saderat in 2006 because of its support for terrorist organizations by adopting a regulation prohibiting Bank Saderat from dealing in U.S. dollars, either directly or indirectly. The regulation specifically denied Bank Saderat the right to take advantage of OFAC's general license authorizing U-Turn transactions. 71 FR 53569. Yet, Bank Saderat had full, "always execute" access to SCB's online trading platform at least through 2008 and had access again on 18 April 2013.

72. The Government is in error in stating that the allegations that Brutus made of SCB violations were different in kind from the violations uncovered in the subsequent investigation of SCB.  Doc. 32 ¶ 40. From the earliest communications with OFAC through the multi-agency meeting in January 2013, Brutus carefully detailed the flaws in SCB's trading systems. In fact, one of the techniques employed by SCB was to alter the name of a customer slightly so that the electronic screening program could not identify the customer. This should have alerted investigators to the probability that names similar to an SDN might appear on SCB records, such as "Caspian Chemical" instead of "Caspian Petrochemical." The Government's confusion about the nature of SCB's evasion techniques underscores the fact that it ignored our explanations.

73. The deficiencies in SCB's trading procedures and in its online systems was known by senior SCB officials Lenny Feder and Karen Fawcett. Corrective measures were no put in place until 2014.

74. SCB had an Origination and Client Coverage program that targeted new Iranian customers through 2014, headed by Salar Khan.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 10, 2020                    _____
                                                  Julian M. Knight

17

Scanned with CamScanner