IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| United States of America *ex rel.* ) | |
| Brutus Trading, LLC, ) | |
|                 Plaintiff, ) | |
|     -against- ) | |
| ) | **Case No. 18-cv-11117** |
| Standard Chartered Bank *et al.*, ) | |
|                 Defendants. ) | |

## DECLARATION OF ANSHUMAN CHANDRA

I, Anshuman Chandra, declare the following pursuant to 28 U.S.C. §1746:

1.  I am a citizen and resident of India.

2.  Between 1995 and 1998, I studied at the National Defence Academy, the joint services academy of the Indian Armed Forces. I decided not to pursue a commission in the Indian Army, but instead in 2001 received a Bachelors of Arts in economics from Chaudhary Charan Singh University. I received post-graduate certification in Business Administration, Accounting and Business/Management from Bradford University School of Management in the United Kingdom, and a professional certificate in Renewable Energy and Clean Power from Imperial College London.

3.  Before my employment by Standard Chartered Bank (SCB) in August 2011, I served as an assistant manager with Jukaso Hotels Palaces & Resorts (1999-2000); Aviation Security Agent, British Airways (2000-2002); Business Analyst, American Express (2002-2004); and Customer Service & Operations Executive in India (2004-2007), and Customer Service & Operations Manager in Dubai for British Airways (2007-2011), which awarded me for outstanding performance in 2011.

**Exhibit 3**

4.     I served as SCB's head of eCommerce Client Services, Financial Markets, for the Middle East, South Asia, Africa regions and operated out of SCB Dubai from 2011 to 2016. In my position, I was engaged with back office, middle office and front office functions of SCB Dubai. This enabled me to have extensive access to the full range of SCB's transactional processes, systems and records.

5.     In July 2012, I read media reports that Al Rajhi Bank of Saudi Arabia had funded terrorist activities, including those that resulted in the deaths of former colleagues and other individuals in my native India. Realizing that Al Rajhi Bank was an SCB customer, I reported this information to my superior.

6.     Later in 2012, I read other media reports that SCB had been fined for violating U.S. sanctions, which prompted me to do a search of SCB trades with parties suspected of having ties to Iran. I discovered numerous suspicious parties with whom SCB had transacted business on its online trading platforms.

7.     I also discovered that there were deliberate "flaws" in SCB's online systems that were designed to conceal, and succeeded in concealing, transactions in U.S. dollars by SCB customers who were subject to U.S. sanctions. I found that SCB used sundry accounts to evade U.S. sanctions for the benefit of customers who were subject to U.S. sanctions.

8.     I concluded that the revenues derived from SCB's scheme to evade U.S. sanctions contributed to funds made available to Iran-related parties and ultimately used to support terrorist activities that killed and wounded soldiers serving in the U.S.-led coalition and many innocent civilians.

9.     I overheard discussions of other SCB Dubai employees in 2013 that targeted Julian Knight, a former SCB officer, for his reporting SCB's scheme to evade U.S. sanctions. I

emailed Mr. Knight in April 2013 and offered to provide him with SCB records that related to the implementation of the illicit scheme.

10. I was contacted in Dubai in May 2013 by an email from an individual who represented that he was authorized to assist me in transmitting records that I could obtain that related to SCB's transactions with Iran-related parties.

11. A week after I received the email from the individual who said that he could act as an intermediary, I met with him in person and handed him five computer files from SCB Dubai which contained information about SCB's transactions with parties suspected of connections to Iran and asked him to transmit them to the U.S. I also told the intermediary that a team from an outside firm had arrived in the offices of SCB Dubai and was examining the branch's computer hard drives and other data storage in an apparent attempt to "clean" SCB records.

12. I made a second delivery of 75 SCB files to the same intermediary on September 17, 2013, and asked him to transmit them to the U.S.

13. On September 29, 2013, upon instructions from FBI Special Agent Matthew Komar, I personally delivered three additional computer disks containing SCB files to an FBI operative at the U.S. Consulate in Dubai.

14. I learned in September 2013 that my name and involvement in transmitting SCB information to investigators had been disclosed to SCB. When I complained to Agent Komar, he advised me that someone on the investigation team ha inadvertently disclosed my name to attorneys for SCB. He later reported to me that SCB lawyers had assured the investigators that they would not provide my name to SCB.

15. I received an email from Agent Komar, dated September 30, 2013, confirming that he had received the three computer disks would follow up with me because he was certain to have questions.

16. In October 2013, my computer system was checked by SCB's IT specialist in what was obviously not a random or regular office-wide inspection.

17. On October 4, 2013, I emailed Agent Komar and asked him again about the SCB files that I had sent him. He replied that he planned to look at them during the following week, but did not seem eager to do so.

18. On October 12, 2013, I again emailed Agent Komar and expressed my willingness to go over the SCB files with him. I repeated that offer in an October 14, 2013, email to him.

19. On October 15, 2013, I emailed Agent Komar again and expressed my frustration that no member of the investigation team had contacted me about the records that I had provided.

20. Agent Komar finally replied to my inquiries on October 25, 2013. He apologized for the delay and said he was busy with another case. He offered to arrange a call for October 29, 2013. That call was a brief one that did not involve any discussion of the files that I had provided.

21. On October 31, 2013, I received an email from Agent Komar that informed me that a call scheduled for the next day would have to be cancelled because something in another case would take up his time.

22. When I had not received any contact from Agent Komar for days, I emailed him on November 9 and 12, 2013, and offered to talk by telephone during that week. On November 13, 2013, Agent Komar emailed me to let me know that he was attending to important family

matters and was uncertain when we could talk by telephone, but he said that he would contact me when he could.

23. During this period, my computer and hard drive were removed from my office on November 27, 2013, in what the SCB Dubai IT specialists claimed was a random check.

24. On November 29, 2013, I emailed Agent Komar again because he had not contacted me. He responded on the same day that he was still dealing with a family matter.

25. In the weeks that followed, there were obvious signs that I was under suspicion for transmitting information about SCB Dubai transactions to other outside of SCB. Measures were implemented to reduce access to shared files. There were discussions about my team being move to an organizational level where there would be little or no visibility into the business of SCB Dubai. I noticed hostility toward me for the first time from my superior, Zeeshan Khan.

26. On December 15, 2013, I emailed Agent Komar and asked him if there had been any changes in the investigation. He responded on December 17, 2013, saying that he was now in a position to talk about the files that I had sent.

27. During December 2013 and January 2014, there were several telephone calls with Ageent Komar and one or more with him and his colleague. I attempted to explain FX deals between SCB branches, FX sundry accounts, methods by which customers directly or through bank staff made trades, how data was reported, areas that should be investigated, information about travels by SCB employees to Iran, breaking deals into different legs in cross pairs risk booking, among other subjects. It appeared to me that Agent Komar was not taking much interest in what I had provided. I began to think that I had not made the right decision to help out with this investigation at some considerable risk to my family and me.

28. Throughout 2014, retaliation against me by SCB became more intense. I filed an official grievance against Zeeshan Khan for discrimination.

29. On April 16, 2014, I emailed Agent Komar to alert him that a team of consultants from the U.S. had been at SCB Dubai going through computers, hard drives, phone records and undertaking other inspections. I was concerned that I this team was gathering information against me. On April 17, 2014, Agent Komar replied that he was not aware of any government team visiting Dubai but it might be a private group hired by SCB to respond to inquiries that the Government had made to SCB.

30. I did not hear from Agent Komar and sent him another email on May 7, 2014, reminding him that he had said he find out about the team that was operating in SCB Dubai. He responded by email: "Our understanding is the team going through records are focused on communications with clients. I don't know how they are performing searches based on our requests, but we do not believe there is concern they would identify you."

31. There was no communication between Agent Komar and me until July 9, 2014, when I emailed him to alert him to the fact that the team of consultants had found quite a few call records where there were calls received and made to sanctioned countries. I heard from him on July 25, 2014, that U.S. authorities were aware and had asked SCB to investigate further.

32. I continued to receive subtle and not so subtle pressure from my superiors. My grievance claim was rejected. I was advised that SCB was considering terminating my team in Dubai. My immediate supervisor was terminated without notice on the grounds that his position was redundant.

33. On October 27, 2014, I received the first of three telephone calls saying: "We know you helped the Americans. It's not good and we will take care of you."

34. I advised Agent Komar about the threats in an October 28, 2014, email. He responded that nothing that I had provided could have caused trouble for me and that I should report the calls to the local authorities. I told him that relying on the local authorities was out of the question because it would only lead to prosecution without good cause. He said he could not do anything for me. I did not hear from Agent Komar for months after that day.

35. A devastating earthquake struck Nepal in April 2015. SCB agreed to my request to go to Nepal to assist My wife's relatives in Nepal who were affected severely. I spent a considerable amount of time in Nepal helping the people in remote areas where government agencies and relief teams had not been able to reach. Upon my return to Dubai, I learned that I had been nominated for the SCB Group Chairman's Award, which I was then selected to receive. This award spared me from the ultimate retaliation for a time. I was advised in December 2016 that my position would be eliminated as redundant.

36. On December 14, 2016, I emailed Agent Komar that I had been informed that my position would be terminated and advised him of another SCB customer had been engaged in anti-money laundering transactions involving millions of dollars and provided information about other suspected illegal activities at SCB Dubai in a December 15, 2106, email. Agent Komar responded that he was no longer assigned to the case but would forward my information to his colleagues and they would get back to me. I never received a follow-up.

37. On December 23, 2019, I joined Julian M. Knight in a retaliation complaint filed in this Court against Standard Chartered Bank, Standard Chartered Bank Dubai, and Standard Chartered Bank New York.

38. I was assured, as was Robert Marcellus, who dealt directly with Agent Komar in 2013 when I was first asked to assist in the investigation of SCB, that the FBI would provide me

7

with protection if and when I encountered risks and threats to myself or my family as a result of my cooperation with the Government. The FBI has denied that it ever made such assurances and has provided no assistance to me or my family. The Government has advised me that the information that I provide it at some considerable risk to my family and myself was of no value to the investigation although the FBI continued to engage with me for more than three years without suggesting that my contribution was worthless.

    I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 10, 2020          _____
                                                                  Anshuman Chandra