IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* BRUTUS TRADING, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| -against- | ) ) ) |
| STANDARD CHARTERED BANK, STANDARD CHARTERED PLC and STANDARD CHARTERED TRADE SERVICES CORPORATION, | ) ) ) ) ) |
| Defendants. | ) |

Case No. 18-cv-11117

### DECLARATION OF DENNIS A. SWEENEY

I, Dennis A. Sweeney, state the following is true to the best of my knowledge, information, and belief:

1.  I am a citizen and resident of the United Kingdom and have been for 67 years.

2.  I have worked in the financial services industry for over 50 years in diverse senior positions at various firms including Midland Bank, Citibank, Charterhouse, Lehman Brothers, Societe Generale Investment Bank, Newedge UK Financial Limited & FIMAT. These positions have given me a depth and breadth of experience in international financial transactions, an essential part of which includes "settling" or "clearing" transactions to convert sums in one currency into another currency.

3.  One example of my relevant experience was my work as Manager, Banking Operations at Charterhouse. I introduced into that bank's operations the SWIFT global network messaging service. "SWIFT" is the acronym for the Belgium-based Society for Worldwide Interbank Financial Telecommunication (legally, S.W.I.F.T. SCRL). SWIFT is a messaging

1

**Exhibit 4**

network that has supplanted the telex as the secure communication means of choice by banks and other financial institutions to quickly, accurately, and securely send and receive information, such as the money transfer instructions that are central to a clearing transaction, The SWIFT system does not itself execute a clearing or settling transaction, but sends ISO, International Standards Organisation messages, which must be acted upon in a timely manner, in many cases causing settlement by correspondent accounts that banking institutions have with each other. Today, nearly 10,000+ SWIFT member institutions each day send approximately 24 million messages on the network.

4.  My implementation of SWIFT at Charterhouse was so successful that I ultimately managed the bank's migration to SWIFT II. In the end, I was responsible for settling an average of 4,500 transactions per day with an average transaction value of £2 Billion per day via the SWIFT system.

5.  Similarly at Lehman Brothers in 1994, I integrated global responsibility for SWIFT into the firm's European Cash Management System as one of the three co-directors of European Cash & Collateral Management. Lehman ultimately used SWIFT messaging services globally. At this point I joined the Board of SWIFT UK Limited as a Board Director.

6.  In 1998, I was Senior Director and Group Head of Treasury Operations and Group Treasurer for Global Treasury Operations at Newedge, in which position I was responsible for all aspects of Treasury including Global Cash Management, Global Liquidity Management, Global Network Management and Global SWIFT administration, and served as a member of the internal Global Steerco regarding Treasury, Securities and Foreign Exchange. At this juncture I joined The London Foreign Exchange Joint Standing Committee representing Societe Generale, for

Foreign Exchange, https://www.bankofengland.co.uk/markets/london-foreign-exchange-joint-standing-committee.

7. More recently, in 2015 to 2018, I was Managing Director/Group Head Treasury Operations at Societe Generale, London and was that institution's appointed Board Director on the Board of "CHAPS," the Clearing House Automated Payment System used for Sterling transactions in the United Kingdom. I also served as Chairman of the EUREX Collateral Board which constituted me chairing quarterly meetings of users of EUREX derivatives platform regarding all aspects of Collateral Management. Discussion was not confined to Collateral related matters and included Clearstream & Deutsche Borse who are members of the Deutsche Borse Group of companies.

8. At present, I am Treasury Operations Director of DAG Global Limited, a start-up financial services group bridging traditional fiat currency custody and trading with the emerging digital asset and cryptocurrency sector. I also serve as a Director of 3LDC a Reg Tech Compliance Company and Brand Ambassador / Consultant for Nucleus Software Exports Limited, a financial services company.

9. For more than 35 years, I served on the board of SWIFT U.K. Ltd., the national member and user group for the U.K. SWIFT community.

10. SWIFT also organizes the annual Sibos conference, which is the premier business forum for the global financial community to debate and collaborate in the areas of payments, securities, cash management, and trade. Sibos is the place at which leaders in the world of international finance discuss business strategy, build networks, and collectively shape the future of the financial industry. I have participated in 26 Sibos conferences and have been a speaker at three.

11. My experience in the financial sector over 50 years has provided me with extensive knowledge of banking and derivative products, as well as the management of group treasury and foreign exchange systems architecture. Moreover, because the U.S. dollar is the world's reserve currency due to the size and strength of the U.S. economy and the dominance of U.S. financial markets, U.S. dollars are used in some way in almost every international transaction. As a result, my work in international finance has required me to be fully conversant with U.S. laws and regulations governing the use of U.S. dollars in these transactions.

12. I have reviewed and analyzed a document prepared by Standard Chartered Bank (SCB), "Bulletin 1," dated 23 October 2008, titled "US Sanctions Against Iran – Export Development Bank of Iran (a.k.a. Bank Toseh Saderat Iran; a.k.a. Bank Towseeh Saderat Iran; a.k.a. EDBI), EDBI Exchange Company, EDBI Stock Brokerage Company," which purports to have been distributed widely within SCB.

13. In that 23 October 2008 document, SCB states, in part, that, notwithstanding U.S. sanctions against Iran, it would "continue to honour commitments which predate [SCB's] suspension [of all new business involving Iran] to the extent possible in accordance with applicable sanctions. We are keen to ensure if possible that USD transactions which predate that suspension are processed and settled in a way that avoids delay or financial loss to our clients. We are working with the Designated Parties to settle outstanding USD obligations in alternative freely convertible currency. Existing transactions denominated in USD may generally be settled by payment in alternative currencies."

14. The SCB statement quoted in the preceding paragraph is erroneous. Once sanctions are imposed, all transactional activity involving an account covered by those sanctions is blocked. 31 CFR §§560.211, 560.322, 560.424, 560.422, 560.546. There is no provision for a

partially blocked transaction. All trade documentation inside a letter of credit or a trade finance deal is subject to the sanction. Settlement of the USD commitment to a sanctioned party cannot be reassigned to an alternative currency or alternative bank. A sanction imposed on a transaction involving a party subject to the U.S. sanctions regime covers all currencies. "Delay or financial loss to [SCB's] clients" is not an excuse from the full constraints of those sanctions.

15. In SCB's 23 October 2008 Bulletin 1, there appears another statement that "[f]or existing commitments, if the transaction does not involve USD, the FX [foreign exchange] transaction may be undertaken. We may also make an FX conversion out of USD so as to perform an existing USD obligation involving a Designated Party in another currency, provided that the exchange is not made on the account of the Designated Party."

16. The SCB statement set out in the preceding paragraph is erroneous. There can be no FX conversion out of a USD account so as to perform or settle a USD obligation because all transactions involving the subject USD account would be blocked. 31 CFR §§ 560.211, 560.322. Furthermore, such a conversion out of a USD account would require clearing by the Federal Reserve Bank in New York subject to U.S. sanctions. A conversion would, therefore, be blocked.

17. Every country committed to enforcing United Nations Security Council Resolutions 1267 and 1373 and the recommendations of the Financial Action Task Force (FATF), an inter-governmental body established by the representatives of the world's major financial centers, including the U.S., the UK, China, France, Germany and the Russian Federation, would have a role in blocking transactions such as those identified in SCB's 23 Oct.2008 Bulletin, which are for the benefit of parties subject to sanctions designed to prevent and suppress financial support for terrorist organizations. FATF Recommendation 16 provides : "Countries should ensure that, in the context of processing wire transfers, financial institutions take freezing actions with

designated persons and entities, as per obligations set out in the relevant United Nations Security Council resolutions, such as resolution 1267 (1999) its successor resolutions, and resolution 1373 (2001), relating to the prevention and suppression of terrorism and terrorist financing."

18. The sundry accounts utilized by SCB, Dubai would have failed audits by the United Arab Emirates regulator, whose requirements mirror those of the UK Financial Conduct Authority, and the misuse of sundry account by SCB, Dubai should have resulted in an immediate FAIL as they defy the most fundamental FATF Principles of International Banking.

19. The resort by SCB to the use of a currency other than the USD to repay loans to sanctioned parties where the USD account established to service the loans has been blocked in accordance constitutes the type of transaction intended to benefit sanctioned parties that FATF recommendation 16 and UN resolutions 1267 and 1373 are designed to address.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

*Dennis A. Sweeney*

Executed on 9 January, 2020