

# New York State Department of Financial Services

*Report on Investigation*
*of*
*Promontory Financial Group, LLC*

August 2015

**Exhibit 12**

**I.**     **Summary**

The New York State Department of Financial Services (the "Department") was created in 2011 to help ensure the safety and soundness of New York's banking, insurance and financial services industries, to help ensure prudent conduct by providers of financial products and services, and to promote the reduction and elimination of unethical conduct by and with respect to banking, insurance and other financial services institutions.  Pursuant to this mandate, on September 4, 2013, the Department undertook an investigation into Promontory Financial Group, LLC ("Promontory").  The conduct in question relates to reports that Promontory prepared and submitted to the Department in 2010-2011 detailing the findings of its review of certain transactions by Standard Chartered Bank ("Standard Chartered" or the "Bank"), an institution regulated by the Department.

The Department's extensive, two-year investigation included the collection and review of thousands of documents, the taking of sworn testimony of five current and two former employees of Promontory, including two managing directors and the Chief Operating Officer, and the review of four written submissions made by Promontory's counsel over the course of the investigation (including reports by four purported experts hired by Promontory).  After careful consideration of the documents, testimony and submissions:

> The investigation shows that Promontory exhibited a lack of independent judgment in the preparation and submission of certain reports to the Department in 2010-2011; and

> Certain testimony regarding key issues provided by the Promontory witnesses during the course of the Department's investigation lacked credibility.

Accordingly, the Superintendent has determined that the ends of justice and the public advantage would not be served by providing Promontory with access to confidential supervisory information pursuant to New York State Banking Law § 36(10). Therefore, the Department will review all pending and future requests to provide Promontory with confidential supervisory information under Section 36(10) and, barring any change in circumstances, the Department intends to deny all such requests until further notice.

## II.     Factual Background

At least as early as 2007, Standard Chartered hired Promontory to conduct a number of engagements pertaining to the Bank's compliance with Bank Secrecy Act ("BSA") / Anti-Money Laundering ("AML") laws and regulations, and sanctions imposed by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"). Pursuant to a March 10, 2009 Agreement between Standard Chartered and Promontory, Promontory agreed to provide "general advice in relation to sanctions compliance and regulatory relations issues" and, on July 16, 2009, Promontory contracted with the Bank's counsel to provide "consulting services in connection with the identification and collection of historical transaction records relating to cross-border financial transactions." In the first half of 2010, Standard Chartered reported to various regulators, including the New York State Banking Department ("NYSBD"), the Department's predecessor, that it had engaged in conduct related to the evasion of U.S. sanctions. On April 15, 2010, Promontory was engaged by Standard Chartered's counsel to identify, collect and review historical transaction records "with certain countries or certain Specially Designated Nationals

("SDNs") subject to sanctions" administered by OFAC. The engagement was known as Project Green.[1]

As part of the engagement, Promontory produced a number of reports and made various presentations to the Bank and government authorities, including the NYSBD. These reports included interim reports throughout 2010, final reports in January and March of 2011, and updates to those final reports in October 2011.

In connection with the Department's investigation of Standard Chartered, the Department relied in part upon the work conducted and presented by Promontory to identify the scope of the Bank's improper conduct and to determine an appropriate resolution of the investigation. On September 21, 2012, Standard Chartered and the Department executed a Consent Order pursuant to New York Banking Law § 44, resolving charges that, from at least 2001 through 2007, Standard Chartered provided U.S. dollar clearing services to Iranian customers subject to U.S. economic sanctions, with respect to approximately 59,000 transactions totaling approximately $250 billion, through the Bank's New York-licensed branch. The Bank facilitated these transactions by removing or omitting information identifying sanctioned counterparties from payment messages (through the use of wire-stripping and cover payments), thereby concealing its unsafe and unsound conduct from regulators, including the NYSBD, and law enforcement authorities. The 2012 Order required Standard Chartered to pay a penalty of $340 million and to install an independent on-site monitor, for a period of two years, to examine and evaluate the Bank's BSA/AML compliance programs, policies and procedures.

---

[1] Promontory earned $54.5 million in total revenue from its work on Project Green and an additional $12.4 million in total revenue from work on other Standard Chartered engagements from 2007-2014.

3

Following the 2012 Order, Standard Chartered engaged the required monitor. The monitor identified failures with respect to the Bank's BSA/AML transaction monitoring systems that the Bank had not disclosed to the Department prior to the 2012 Order. Accordingly, on August 19, 2014, Standard Chartered and the Department entered into a second Consent Order, pursuant to which Standard Chartered suspended certain U.S. dollar clearing through its New York branch, paid an additional $300 million penalty, extended the term of the monitor for two years and agreed to take additional remedial steps.

### III. Promontory Exhibited a Lack of Independent Judgment in the Preparation and Submission of Reports

*A. Promontory's Role*

Established in 2001, Promontory is a consulting firm that markets its investigatory expertise, stressing qualities of credibility and independence. Promontory's current Code of Business Conduct and Ethics states that in all engagements, Promontory's "success depends on the ability of our professionals to exercise independent judgment in the conduct of their assignments." During the relevant time period, Promontory did not have a written code of conduct that addressed independence. However, all seven Promontory witnesses that the Department questioned testified that Promontory maintained an unwritten – one witness called it an "innate" – code of conduct that required employees to exercise their "best independent judgment" in all engagements, including Project Green.[2]

---

[2] Additionally, Promontory's agreements with Standard Chartered's counsel stated that Promontory shall provide services in compliance with "Good Industry Practice," defined within the agreement as encompassing the qualities of "skill, diligence and prudence, integrity and foresight." Furthermore, an accompanying schedule of services to one of the agreements related to Promontory's work for Standard Chartered provided that, "Promontory's work will be independent in the sense of comprehensiveness, thoroughness, consistency, and documentation."

4

Promontory currently touts on its website that "credibility is critical" and that credibility "depends upon independence and subject matter expertise." Promontory also claims on its website that it possesses "unparalleled regulatory credibility and insight." Indeed, Promontory's Chief Operating Officer testified before the Department:

> I think we are often listed because the law firms believe that our brand stands for more independence than theirs does. So even though, in some cases they could probably do the same work, they think it's probably useful to have our imprimatur because we are seen as a firm that has a strong commitment to independence.

Similarly, a Managing Director testified that Promontory "has a reputation to manage" as a "more independently minded firm."

With respect to Project Green, one employee recalled Standard Chartered informing regulators that Promontory's role in Project Green was to conduct its review and let "the chips fall where they may." A written submission made to the Department by Promontory's counsel on June 12, 2015 confirms that Promontory's reports were supposed to be "dispassionate" and that "Promontory's own values require it to report objectively in any submission that bore its name."

The two Promontory employees with primary responsibility for much of Project Green testified that because Promontory was submitting reports to regulators, Promontory was supposed to be independent and transparent – and that this was a "key difference" between Project Green and other engagements. One of them also testified that when clients would ask Promontory to make changes to its reports, Promontory would correct factual inaccuracies (such as "if you're headquartered in Boston and we said New York, you would change it to Boston")

5

and make stylistic changes (such as using a different font size), but would never change the "substance" or "change what we write because the bank wants to look better."[3]

However, as detailed below, email communications and other documents reviewed by the Department, as well as witness testimony taken by the Department, contradict Promontory's statements above regarding its independent judgment.  For example, one Senior Analyst wrote during Project Green, "[t]he most important thing is that we get to the end of the project without jeopardizing our relationship with [Standard Chartered Bank] as a whole."

### B. Promontory's Changes to the Reports

There are numerous instances where Promontory, at the direction of the Bank or its counsel, or at its own initiative, made changes to "soften" and "tone down" the language used in its reports, avoid additional questions from regulators, omit red flag terms or otherwise make the reports more favorable to the Bank.

### 1. Changes to Language

A key focus of the Department's investigation of Standard Chartered was to determine whether or not the Bank concealed information regarding transactions with sanctioned counterparties from the New York branch in order to evade sanctions screening.  Originally, a draft of Promontory's report stated that Promontory's review was conducted in order "to determine whether Iranian payments were processed in a manner that might hide information from Standard Chartered New York or evade sanctions screening."  The final report was revised to state instead that the review was conducted "to determine whether they [Iranian corporate payments] were treated differently than payments sent on behalf of non-Iranian corporates."

---

[3] Surprisingly, the Chief Operating Officer, who was responsible for updating Promontory's current Code of Business Conduct and Ethics, testified that, in engagements like Project Green, Promontory is not required to be "transparent" with regulators.

While the original text made clear that the Bank took efforts to evade sanctions, such as wire-stripping or using cover payments, the revised version only speaks vaguely of different treatment.

Another instance of Promontory's efforts to remove red flags highlighting the Bank's misconduct includes a December 9, 2010 email in which a Senior Analyst requested that the Promontory team change the title of a table from "missed terms" to "'[t]ransactions containing geographic references' or something equally as sterile." The table included transactions not only where the Bank's filtering system "missed" payments containing sanction terms, but also where the system caught the payments and the Bank processed them anyway. The "sterile" language that the Senior Analyst suggested failed to convey the fact that both of these types of transactions reflected failures of the Bank's compliance systems.[4]

Additionally, on January 19, 2011, the Bank's counsel wrote to Promontory that the title of a particular slide entitled "The 77 non-u-turn payments fell into 3 categories" – meaning the transactions were potential OFAC violations – should be made "more bland" and suggested a rewording to "Categories identified in Amendment Analysis." Promontory made the change to the more vague language requested by the Bank.

As another example, on June 17, 2010, Standard Chartered's in-house counsel provided Promontory with comments on a draft of an interim report. The draft disclosed that Promontory had identified certain other transactions "that should be called to the attention of authorities."

---

[4] Promontory did not complete this task which was listed in its project plans as a "timeline of reportable transactions and indicative swifts from different points in time that have keywords that should have been picked up." However, a Managing Director admitted in testimony that it would have provided insight into when the Bank changed its sanctions filters. Emails show that the timeline would have provided misleading information regarding the effectiveness of the Bank's filters, which, according to a Managing Director, may have been because of the sample size. The Managing Director further testified that authorities may have asked Promontory to look at a larger sample of trade transactions. The Department has concerns that this project was not completed because it could have signaled to regulators that Promontory should have increased the sample size of the trade finance review.

7

The Bank's counsel stated, "I think it would be slightly less alarming if we toned down" the language to read that the transactions "may be of interest to the authorities." Promontory revised the presentation based on, according to a Managing Director, the "very helpful comments" from the Bank and used this toned down language in the final report.

    *2. Removal or Omission of Information*

On March 9, 2011, Standard Chartered commented on a draft report, stating, "[d]o we have to include this slide? Or at the very least can we not spell out [the names of certain] branches? If they are listed, likely the US Authorities may ask further questions on this for which we will have to go to those branches (most of which are currently not aware of Green)." The slide had indicated the volume and value of U.S. dollar payments sent by each of these branches to Standard Chartered New York. At the Bank's request, Promontory removed the names of the branches and the corresponding data. A Managing Director testified that the Bank employee who made this request was "very aggressive" and a "somewhat inflexible champion" of the Bank's interests. A Senior Analyst testified that Promontory removed this information to avoid wasting time arguing with the Bank. The Senior Analyst admitted that had the Bank not asked Promontory to remove this information, it probably would have been kept in the final report.

The above email exchange led a Managing Director to testify that if he could "do it over again" it would have been "helpful" to have better guidance on how Promontory employees should have interacted with Standard Chartered.

Additionally, Promontory omitted certain timelines from the reports that would have indicated an increase in violations over time. A Senior Analyst wrote that the Bank and the Bank's counsel would deliver "strong pushback" against showing this "painful information."

8

However, Promontory believed there was a "strong purpose" to include (and did include) other timelines, such as for Standard Chartered Jersey, where the timeline showed a decrease in violations over time, and was thus positive for the Bank. On December 17, 2010, a Senior Analyst explained:

> Generally, the timelines serve a strong purpose with the Jersey payments. That is, there appears to be a positive trend over time to reduce the involvement with potential violations. This will not be true with Dubai. I have a strong suspicion that people will not want to show the timelines for Dubai ([a particular client for which the Bank processed prohibited transactions] for example shows an upwardly sloping curve of violations). If we are going to go ahead with the visuals across the workstreams, we should be cognizant of the graphics showing painful information and expect strong pushback from the bank and [the Bank's counsel].

Promontory ultimately did not include timelines showing potential violations for Standard Chartered Dubai in its January 2011 Report on Iranian Payments. A former Associate testified that the timelines Promontory chose to include showed that the Bank was improving its sanctions compliance policies, whereas the excluded timelines "didn't reflect as positively, and obviously any information that didn't reflect well on the bank, the lawyers were going to push back on."[5]

### 3. "Potential Violations"

On a January 5, 2011 call, the Bank's counsel directed Promontory to rephrase a category of transactions, originally referred to as "potential violations," to a much longer, more ambiguous and innocuous phrase – "Payments with a US nexus for which no exemption or potential violation has been identified." In response to this request, Promontory rephrased the category of transactions to remove the red flag term "potential violations."

---

[5] A written submission made to the Department by Promontory's counsel on June 17, 2015 confirms that the number of potential violations for Standard Chartered Dubai did increase by more than eight-fold from 2001 through 2004.

Similarly, when Promontory was preparing an update report, a Managing Director instructed another employee to change a heading from "New Potential Violations" to "Highlights of Changes." The final report removed the heading altogether.

Promontory employees admitted that the Bank's counsel requested that they remove the term "violations" from the reports. They testified that the Bank's counsel asserted to Promontory that OFAC preferred that the term "violation" not be used, reasoning that it was too similar to the OFAC term of art "apparent violation," and that Promontory should not be making legal judgments. However, Promontory's project plans throughout the duration of Project Green often referred to its mandate to identify potential violations, stating, for example, to "[c]ontinue to investigate potential violations." Additionally, in a submission to OFAC in October 2011, the Bank's counsel wrote that Promontory worked to identify potential violations.

### C. *Promontory's Advocacy on Behalf of the Bank*

While Promontory was preparing reports for the Department, Promontory was also providing arguments to the Bank's counsel to help it assert that certain transactions should not be considered violations. On September 16, 2011, a Senior Analyst suggested some "fresh thinking" about emphasizing categories of transactions that were potentially exempt from OFAC sanctions. Several days later, on September 19, 2011, a Managing Director replied, "[g]ood points on fresh thinking although I think that fresh thinking about reducing the number of violations is more likely to command attention for obvious reasons." The Senior Analyst replied about the value that Promontory might add, stating that "big wins" will come from payments that Promontory "might be able to drop off."

Regarding this email exchange, the Senior Analyst testified that Promontory provided information to the Bank's counsel to help reduce the number of violations and a Managing

10

Director testified that the Bank and its counsel asked Promontory if they had observed anything that "might have an impact on reducing the amount of violations."

Additional examples of Promontory's efforts to advocate on behalf of the Bank include:

- On January 22, 2011, a Senior Analyst wrote regarding a report, "[n]o question the bank is going to have a big problem in trying to present some of these figures… and our report can go a long way to softening the blow…" Accordingly, Promontory strategized to emphasize mitigating factors that were "useful" and "not edging too far into advocacy."

- On February 24, 2011, a Senior Analyst discussed the addition of newly identified transactions and asked if they added the transactions to a report and slightly reworded, whether "this makes the Bank's case look better?"

- On October 17, 2011, a Senior Analyst recommended to "[s]often the language a bit" with respect to proposed language regarding cover payments.

- On June 22, 2010, the Bank's counsel requested that Promontory replace an example in an interim report because it referred to a procedure that had not yet been mentioned to regulators, and may "draw questions which we're not yet prepared to answer." Promontory ultimately decided, "[l]et's do it. We've come this far, we might as well go for the three pointer."

*D. Unreported Transactions*

On February 3, 2011, several weeks after the submission of a certain report to the Department, a Promontory employee identified two sanctionable transactions that the employee stated "fell through the cracks" and were not disclosed in the report as they should have been. The transactions passed from the originator to SCB New York to SCB Dubai to an Iranian bank.

11

According to Promontory, the Bank asserted that it was not the Bank's "responsibility" to know that the originator was a U.S. person (in which case the transactions would not be permissible under OFAC's U-Turn exemption), so Promontory deliberately removed the transactions from their report. However, Promontory referred to this description as a "cockup" because the Bank's files plainly identified the originator's U.S. address. A Senior Analyst admitted, "[d]amn. Was trying to evidence [the originator] as being not a USP in these cases," and a Senior Principal replied, "[s]o what should we do? Do you really want to add something to the Iranian report?" Despite follow-up discussion of the issue, Promontory failed to disclose these transactions upon discovery and failed to include them in the update reports.[6]

### IV.  Certain Promontory Testimony Lacked Credibility

Certain testimony regarding key issues provided by Promontory witnesses during the course of the Department's investigation lacked credibility.

First, the testimony revealed that several witnesses discussed substantive information regarding the investigation with each other in preparation for the depositions. For example, two witnesses discussed the omission of the "painful" timelines in advance of their testimony. Other witnesses discussed the methodology Promontory used and whether they had missed any transactions between the payments and trade portion of the review. Additionally, one witness

---

[6] Promontory included in its reports certain trade transactions that were identified during the payments review if they involved an SDN, but excluded those that involved a geographical sanctions hit. Email communications reveal that several months after the submission of the reports, both the senior-most Managing Director responsible for Project Green and senior Bank personnel were under the impression that the reports captured all sanctioned trade transactions identified in the payments review. A Senior Analyst laid out the options Promontory could take to move forward from this problem, "…one alternative is to give in to this misunderstanding and put all of those unsampled trade payments back in our data. This means again redoing our payments data submission... Or we keep pushing on the methodology point..." Promontory testified that, if anything, their reports were over-inclusive and that they may have double counted transactions. However, the Department has concerns that certain trade transactions with a geographical sanctions hit were excluded from the review.

12

told another witness, before he was to be deposed, what he had meant in a particular email that the Department was likely to ask about.

Additionally, in a number of instances, answers that employees provided were directly contradicted by the plain language of the documents they were shown in the depositions – in many cases emails that they had themselves written. The answers provided were not plausible or credible. Examples include:

- In a September 19, 2011 email, after a Managing Director instructed a Senior Analyst to focus on reducing the number of violations to assist with advocacy for the Bank, the Senior Analyst wrote "[b]ig wins will come from [certain payments] we might be able to drop off." When questioned about this email, the Senior Analyst testified that he did not necessarily mean "big wins" for the Bank, but rather "I think there is an argument to say that OFAC wins and that the US sanctions regimes also win . . . and so the big win, it is in the US national interest to have a reduction of national sanctions violations."

- When asked about an email in which a Senior Analyst asked another employee to use a "more sterile" term for the title of a chart, a Managing Director testified that he understood "sterile" to mean "factually accurate."

- A former Analyst testified that they had interpreted an instruction from the Bank's counsel to make certain language "more bland" to mean make it "more accurate."

- When asked what he thought the phrase "soften the language" meant – which he was instructed to do by a Senior Analyst – another Analyst testified, "[p]erhaps make it sound more eloquent," although he acknowledged that in a "certain

13

context," this phrase might mean "make the language weaker" – but just not in the context of Project Green.

- In a February 24, 2011 email, a Senior Analyst wrote, "[s]o is it the case then that if we include [certain information and language] that this makes the bank's case look better? I think that would be correct. If so, let's go ahead." When questioned about this email, the Senior Analyst testified, "[s]o that's what was going through my head at the time, is not so much to – not to make the bank's case look better, but rather, how do we do this in a way that – or can we include these into the analysis without causing, what do you call, a sort of reaction that would take time and energy away. . . . I would disagree that my intent was to make the bank's case look better."

- In a March 10, 2011 email, a Senior Analyst wrote, "[i]t's important that we drive the NIP report otherwise will get hijacked as soon as [the Bank's counsel] and others slow down on the Trade Stuff." When questioned about this email, the Senior Analyst testified "I didn't feel that they would hijack it and drive our report. Not at all." When asked again if he really had no concern about the bank's counsel hijacking the report, the Senior Analyst responded, "[n]o. That's exactly right. I believe it now. I believed it then."

- In a January 22, 2011 email, a Senior Analyst wrote "[n]o question the bank is going to have a big problem in trying to present some of these figures . . . and our report can go a long way to softening the blow in explaining how complicated some of this." When questioned about this email, the Senior Analyst testified that his intention was not to help the Bank.

14

**V.      Conclusion**

The investigation showed that Promontory exhibited a lack of independent judgment in the preparation and submission of certain reports to the Department in 2010-2011.  Furthermore, certain testimony regarding key issues provided by the Promontory witnesses during the course of the Department's investigation lacked credibility.

Accordingly, the Superintendent has determined that the ends of justice and the public advantage would not be served by providing Promontory with access to confidential supervisory information pursuant to New York State Banking Law § 36(10).  Therefore, the Department will review all pending and future requests to provide Promontory with confidential supervisory information under Section 36(10) and, barring any change in circumstances, the Department intends to deny all such requests until further notice.