UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA *ex rel.* BRUTUS
TRADING, LLC,

                 Plaintiff,

      v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD CHARTERED
TRADE SERVICES CORPORATION,

                 Defendants.

No. 18 Civ. 11117 (PAE)

**REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF THE GOVERNMENT'S MOTION TO
DISMISS RELATOR'S SECOND AMENDED COMPLAINT**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007

JEAN-DAVID BARNEA
Assistant United States Attorney
    - Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT .................................................................................................................... 2

   I.   Standard for Motion to Dismiss Under 31 U.S.C. § 3730(c)(2)(A) ................................. 2

   II.  Relator's FCA Legal Theory Is Invalid ................................................................ 4

   III. The Government Thoroughly and Appropriately Investigated Relator's Allegations........ 8

   IV. The Government Should Not Be Required to Expend Resources in the Litigation of
       Meritless Claims ...................................................................................... 14

CONCLUSION ............................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Hoyte ex rel. United States v. Am. Nat'l Red Cross*,
  518 F.3d 61 (D.C. Cir. 2008) ................................................................................ 2

*Kane ex rel. United States v. Healthfirst, Inc.*,
  120 F. Supp. 3d 370 (S.D.N.Y. 2015) .................................................................. 5

*Nasuti ex rel. United States v. Savage Farms, Inc.*,
  No. CIV.A. 12-30121-GAO, 2014 WL 1327015 (D. Mass. Mar. 27, 2014) ................... 3, 9, 11

*New York ex rel. Khurana v. Spherion Corp.*,
  246 F. Supp. 3d 995 (S.D.N.Y. 2017) .................................................................. 12

*Swift v. United States*,
  318 F.3d 250 (D.C. Cir. 2003) ............................................................................ 2

*United States ex rel. Backer v. Cooperatieve Bank U.A.*,
  No. 17 CIV 2708 (LGS), 2019 WL 5593302 (S.D.N.Y. Oct. 30, 2019) .................... 4

*United States ex rel. Borzilleri v. AbbVie, Inc.*,
  No. 15 Civ. 7881 (JMF), 2019 WL 3203000 (S.D.N.Y. July 16, 2019) .................. 2, 3

*United States ex rel. CIMZNHCA, LLC v UCB, Inc.*,
  No. 17-CV-765-SMY-MAB, 2019 WL 1598109 (S.D. Ill. Apr. 15, 2019) .................. 3, 9

*United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*,
  839 F.3d 242 (3d Cir. 2016) ................................................................................ 5

*United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*,
  151 F.3d 1139 (9th Cir. 1998) ........................................................................... 3, 14

*United States ex rel. Sequoia Orange v. Sunland Packing House Co.*,
  912 F. Supp. 1325 (E.D. Cal. 1995) .................................................................... 3

*United States ex rel. Stevens v. Vt. Agency of Natural Res.*,
  162 F.3d 195 (2d Cir. 1998) ................................................................................ 2

*United States v. $17,900.00*,
  859 F.3d 1085 (D.C. Cir. 2017) .......................................................................... 6

*United States v. $557,933.89*,
  287 F.3d 66 (2d Cir. 2002) .................................................................................. 6

*United States v. Contorinis,*
  692 F.3d 136 (2d Cir. 2012)..............................................................................6

*United States v. EMD Serono, Inc.,*
  370 F. Supp. 3d 483 (E.D. Pa. 2019) ..............................................................3, 9

*United States v. Gilead Sciences, Inc.,*
  No. 11-CV-00941-EMC, 2019 WL 5722618 (N.D. Cal. Nov. 5, 2019) ...................8

*United States v. L-3 Commc'ns EOTech, Inc.,*
  921 F.3d 11 (2d Cir. 2019)...............................................................................11

**Statutes and Regulations**

18 U.S.C. § 981.......................................................................................6, 7

18 U.S.C. § 981(f) ........................................................................................6

18 U.S.C. § 981(a)(1).....................................................................................7

18 U.S.C. § 982...........................................................................................7

19 U.S.C. § 1304(i) .......................................................................................5

31 U.S.C. § 3729(a)(1)(G) ..................................................................... 1, 4, 5, 6

31 U.S.C. § 3729(b)(3) ...........................................................................4, 5, 6

31 U.S.C. § 3730(c)(2)(A) .......................................................................*passim*

31 U.S.C. § 3730(c)(2)(B) ...............................................................................11

31 U.S.C. § 3730(c)(5) ...................................................................................11

42 U.S.C. § 1320a–7k(d) ..................................................................................5

31 C.F.R. § 560.211 ......................................................................................10

**PRELIMINARY STATEMENT**

The United States, by its attorney, Geoffrey S. Berman, United States Attorney for the Southern District of New York, respectfully submits this reply memorandum of law in further support of its motion pursuant to 31 U.S.C. § 3730(c)(2)(A) to dismiss Relator's second amended complaint, ECF No. 31 ("Gov't Mot.") and in response to the arguments in Relator's opposition, ECF No. 49 ("Relator Opp.").[1]  As explained herein and in the Government's opening brief, Relator's complaint should be dismissed for several independent reasons.

First, Relator's complaint suffers from a fatal legal defect in that it does not allege a cognizable violation of the FCA: Even had Relator credibly alleged violations of the criminal sanctions laws, those do not give rise to an "obligation" under 31 U.S.C. § 3729(a)(1)(G) on the part of SCB to pay any money to the Government.  Second, as shown by the Government's detailed submissions in support of its motion to dismiss, the Government thoroughly investigated Relator's allegations and decided not to pursue them as it could not corroborate them.  The fact that Relator may continue to believe in the claims is not sufficient to defeat a motion to dismiss, and any such belief is undermined by the many objective inadequacies in Relator's arguments and allegations, including a basic misunderstanding of the applicable sanctions rules.  And finally, it is clear that any continued litigation of Relator's claims would involve substantial Government resources, and the Government is entitled not to expend those resources given the plain defects in Relator's claims.  Thus, regardless of which of the highly deferential standards the Court applies to the Government's motion, it should be granted.

---

[1] This memorandum uses capitalized terms and abbreviations defined in the Government's opening brief.  It cites the declarations accompanying the opening brief as cited therein, the supplemental declarations accompanying this brief as "Supp. Komar Decl.," "Supp. Boddy Decl.," and "Supp. Manfull Decl.," the declaration of Elizabeth Nochlin of DFS as "Nochlin Decl.," and the declarations accompanying Relator's opposition as "____ Decl."

**ARGUMENT**

**I.      Standard for Motion to Dismiss Under 31 U.S.C. § 3730(c)(2)(A)**

Although the Government recognizes that the precise standard courts apply to evaluate

motions to dismiss under 31 U.S.C. § 3730(c)(2)(A) is not yet settled in this Circuit, there is no

debate that the standard is extremely deferential.  The Second Circuit has recognized that this

provision affords the Government "ample authority . . . to bring the litigation to an early end, and

although the *qui tam* plaintiff must be given a hearing, *the court need not, in order to dismiss,*

*determine that the government's decision is reasonable*."  *United States ex rel. Stevens v. Vt.*

*Agency of Natural Res.*, 162 F.3d 195, 201 (2d Cir. 1998), *rev'd on other grounds*, 529 U.S. 765

(2000) (emphasis added).  Given that a *qui tam* lawsuit is an affirmative fraud claim brought in

the Government's name for a fraud in which a government agency is the alleged victim, courts

have uniformly recognized that a minimal showing is all that is needed to justify a motion to

dismiss.

The Government maintains the correct standard is the one employed by the D.C. Circuit

and courts that have followed it, which analogizes a decision to dismiss a *qui tam* to a decision

not to prosecute a potential criminal offense.  *See Hoyte ex rel. United States v. Am. Nat'l Red*

*Cross*, 518 F.3d 61, 65 (D.C. Cir. 2008) (citing *Swift v. United States*, 318 F.3d 250, 252 (D.C.

Cir. 2003)) (listing one of the animating principles behind *Swift*'s "unfettered" discretion

standard as "the Government's broad discretion in initiating or continuing a criminal

prosecution").  Under this standard, a motion to dismiss should be denied only if there is fraud

on the court.  *Swift*, 318 F.3d at 252-53.

But even the alternative standard is highly deferential, and indeed many courts do not

decide between them.  *See, e.g.*, *United States ex rel. Borzilleri v. AbbVie, Inc.*, No. 15 Civ. 7881

(JMF), 2019 WL 3203000, at *2 (S.D.N.Y. July 16, 2019) ("The Court need not take a side in

2

the dispute [about the standard of review], however, because it concludes that the Government may dismiss the case" under either standard).  The Ninth Circuit requires what amounts to rational-basis review, requiring only a "valid government purpose" that has some "rational relation" to the dismissal.  *United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1145 (9th Cir. 1998) (internal quotation marks omitted).  The Government's decision to dismiss "need not be the best choice among competing alternatives, but merely a rational choice."  *United States ex rel. Sequoia Orange v. Sunland Packing House Co.*, 912 F. Supp. 1325, 1341 (E.D. Cal. 1995).  If the Government satisfies this test, the burden switches to the relator "to demonstrate that dismissal is fraudulent, arbitrary and capricious, or illegal."  *Sequoia*, 151 F.3d 1145.

Courts applying this standard have made clear just how deferential it is.  For example, with regard to the adequacy of the Government's investigation of a relator's claim, courts have evaluated whether there was "a minimally adequate investigation."  *United States ex rel. CIMZNHCA, LLC v UCB, Inc.*, No. 17-CV-765-SMY-MAB, 2019 WL 1598109, at *3 (S.D. Ill. Apr. 15, 2019), *on appeal*, No. 19-2273 (7th Cir.).  And as for the results of such an investigation, courts generally defer to the investigating agencies' conclusions, *see, e.g.*, *United States v. EMD Serono, Inc.*, 370 F. Supp. 3d 483, 490 (E.D. Pa. 2019); *Nasuti ex rel. United States v. Savage Farms, Inc.*, No. CIV.A. 12-30121-GAO, 2014 WL 1327015, at *11 (D. Mass. Mar. 27, 2014), *aff'd on other grounds*, No. 14-1362, 2015 WL 9598315 (1st Cir. Mar. 12, 2015), and have denied such motions only when they concluded the Government essentially abdicated its investigative responsibility, *see* Gov't Mot. at 25 n.11 (collecting cases).

Importantly, a relator's mere disagreement with the Government's conclusions is no basis to deny a motion to dismiss.  *See AbbVie*, 2019 WL 3203000, at *2-3 (where "none of [relator's]

3

allegations about the Government's investigative choices demonstrate that its stated rationale is fraudulent, arbitrary and capricious," and the "Government undertook a lengthy, costly, and substantial investigation into [relator's] claims that spanned several years and multiple offices and agencies," relator's "subjective disagreement with the Government's investigative strategy and ultimate decision does not provide the Court with a basis to second-guess the Government's decision to dismiss the case"); *United States ex rel. Backer v. Cooperatieve Bank U.A.*, No. 17 Civ. 2708 (LGS), 2019 WL 5593302, at *3 (S.D.N.Y. Oct. 30, 2019) ("Relator objects that the U.S. Attorney's Office did not sufficiently investigate his claims and evidence.  Even assuming the truth of this assertion (which appears to be based only on surmise and Relator's own limited contacts with the Government), it does not rise to the level of showing that dismissal is fraudulent, arbitrary and capricious, or illegal."), *on appeal*, No. 19-4088 (2d Cir.).

Here, where Relator's legal claim is invalid as a matter of law and the Government substantially investigated Relator's factual allegations and did not uncover any evidence of fraud, either standard is easily met.

## II.    Relator's FCA Legal Theory Is Invalid

As explained in the Government's opening brief, Gov't Mot. at 20-23, in order to violate the reverse false claims provision of the FCA, a person must "knowingly conceal[] or knowingly and improperly avoid[] or decrease[] *an obligation to pay or transmit money or property to the Government*." 31 U.S.C. § 3729(a)(1)(G) (emphasis added).  An "obligation" is, in turn, defined as "*an established duty*, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." *Id.* § 3729(b)(3) (emphasis added).  Thus, absent "an established duty" on behalf of a potential FCA defendant to "pay . . . money . . . to the Government," there can be no FCA claim.

Relator's allegations, even if credited factually, would not give rise to any such duty on behalf of SCB.  This is in direct contrast to the various circumstances in the cases cited by Relator that have identified such a duty to pay.  Relator Opp. at 14-16.  For example, when an importer releases pipe fittings into commerce in the United States that are not properly marked with their country of origin, the importer owes a 10% duty on the value of those fittings at the time of importation.  *See United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 246 (3d Cir. 2016) (citing 19 U.S.C. § 1304(i)).  The "[i]mposition of th[is] duty is non-discretionary since, by statute, such duties 'shall not be remitted wholly or in part nor shall payment thereof be avoidable for any cause.'"  *Id.* (quoting 19 U.S.C. § 1304(i)).  Thus, when an importer "falsif[ied] its entry documents and otherwise conceal[ed] the foreign source of its pipe fittings," it commited a reverse false claim by failing to pay the Government the mandatory duty that arose upon entry of the merchandise into the United States.  *Id.*; *see id.* at 253-56.  That is because, by entering the unmarked fittings into the United States, the importer "improperly avoid[ed]" an "established duty . . . arising . . . from statute" to "pay . . . money . . . to the Government."  31 U.S.C. § 3729(a)(1)(G), (b)(3).

In another case cited by Relator, several hospitals overbilled Medicaid but failed to remit the overpayment to the Government for two years after they discovered it.  *See Kane ex rel. United States v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 375-78 (S.D.N.Y. 2015).  A federal statute, however, requires any "person who receives an overpayment of Medicare or Medicaid funds to 'report and return' the overpayment to [the Government] . . . within sixty days of the 'date on which the overpayment was identified.'"  *Id.* at 381 (quoting 42 U.S.C. § 1320a–7k(d)(1)-(2)).  The statute specifies that the requirement to timely remit such overpaid funds is an "obligation" for purposes of the FCA.  *See id.* (citing 42 U.S.C. § 1320a–7k(d)(3)).  The reverse

5

false claims against the hospitals thus had merit, *see id.* at 383-96, because the hospitals had

"knowingly . . . avoid[ed] an obligation to pay . . . money . . . to the Government" due to "an

established duty . . . arising . . . from the retention of an[] overpayment."  31 U.S.C.

§ 3729(a)(1)(G), (b)(3).

In contrast, here, Relator's purported claims are premised on a civil forfeiture statute, 18

U.S.C. § 981, which like other such statutes, does not create an obligation to pay the Government

by any person.  Instead, civil forfeiture statutes simply permit the Government to assert and

obtain title to, and seize, property that constitutes the proceeds of certain criminal activity.  *See*

*United States v. $17,900.00*, 859 F.3d 1085, 1087 (D.C. Cir. 2017).  Such property may be seized

from whomever may hold it, regardless of whether that person committed a criminal offense,

subject to the innocent-owner defense.  *See United States v. $557,933.89*, 287 F.3d 66, 77 (2d

Cir. 2002).  Unlike a statutory penalty or statutory obligation to refund overpayments, in which

the defendant is personally required to pay or repay the relevant funds to the Government, civil

forfeiture proceedings are *in rem* against the property itself, and criminal offenders are parties to

such proceedings only if they assert claims to the property.  *See United States v. Contorinis*, 692

F.3d 136, 146 (2d Cir. 2012); *United States v. All Funds in Account Nos. 747.034/278*, 295 F.3d

23, 25 (D.C. Cir. 2002) ("Civil forfeiture actions are brought against property, not people.  The

owner of the property may intervene to protect his interest.").

The provision cited by Relator, which relates the Government's title to forfeited property

back to the date of the offense, 18 U.S.C. § 981(f), does not imply an immediate (or any)

payment "obligation" by any person, but instead merely puts the Government in a position to

claim title to the property superior to that of subsequent transferees.  *See $557,933.89*, 287 F.3d

at 77.  Put simply, while 18 U.S.C. § 981 provides a mechanism for the Government to obtain

title to certain money and property, the statute imposes no "obligation to pay . . . money . . . to the Government" on any person, including the criminal offender.

It is true, as Relator notes, that some obligations to the Government mature only when the Government takes steps to formally demand them, while others arise directly through statutory, contractual or other provisions. *See* Relator Opp. at 16. But the relevant question here is not *when* SCB's obligation to pay the United States arose, but rather *whether* such an obligation can arise at all under 18 U.S.C. § 981. Because that provision creates no payment obligations on any person at any time, the answer is no.[2]

Relator's misconstruction of the civil forfeiture statute at issue is fundamental. Under its incorrect reading, any person who commits one of the myriad criminal offenses encompassed by civil forfeiture provisions becomes instantaneously obligated to the Government, within the meaning of the FCA, as of the moment of the commission of the crime. This would mean that, in addition to criminal liability, penalties, and restitution payments to victims, such offenders would also be personally liable for FCA treble damages and statutory penalties. And it would further mean that any person who witnessed or otherwise became aware of such a crime could

---

[2] Contrary to Relator's argument, *see* Relator Opp. at 17-18, this is not changed by the Bank's acknowledgement that the Government "could [have] institute[d] a civil and/or criminal forfeiture action" in 2012 "*against certain funds held by SCB* and that such funds *would be forfeitable* pursuant to [18 U.S.C. §§] 981 and 982," and that *as part of the 2012 DPA*, "SCB agreed to pay to the United States [$227 million] as substitute *res* for the purpose of forfeiture to the United States . . . and . . . released any and all claims it may have had to such funds." 2019 DPA (Boddy Decl. Ex. 1), ¶ 10 (emphasis added). Similarly in 2019, the Bank "agree[d] that the facts [of the investigation] establish[ed] that [$240 million] is subject to civil forfeiture to the United States pursuant to [18 U.S.C. §] 981(a)(1)" and "release[d] any and all claims it may have to the funds used to pay" that amount. *Id.* ¶ 11. SCB's obligations to pay the Government arose only as a result of its entry into the DPAs themselves, and thus there is no basis to argue that the Bank "knowingly and improperly avoid[ed] or decrease[d] an obligation to pay or transmit money or property to the Government," even assuming it had engaged in criminal activity before entering into the DPAs.

become a *qui tam* relator and seek a percentage of the Government's recovery.  This is not a correct construction of civil forfeiture law or of the FCA.

The Court should thus dismiss Relator's complaint as it is founded on a facially invalid legal theory.

### III.    The Government Thoroughly and Appropriately Investigated Relator's Allegations

Moreover, as explained in the Government's opening brief and attached declarations—in much greater detail than is typical in such cases—numerous agencies thoroughly investigated Relator's allegations and did not corroborate them.  Gov't Mot. at 6-8; Komar Decl. ¶¶ 11-25; Manfull Decl. ¶¶ 34-38.  Instead, their investigations concluded that the transactions Relator brought to the Government's attention related mostly to the Bank's legitimate winding down of its relationships with its preexisting Iranian clients, which the Bank had previously disclosed to the Government (before Relator's complaint) and were done in compliance with applicable sanctions rules.  Gov't Mot. at 7-8; Komar Decl. ¶ 24; Manfull Decl. ¶¶ 25, 37.  For this reason, even if Relator had presented a viable FCA legal theory, the Government was well within its discretion in declining to pursue Relator's factual claims.

Relator's opposition offers a litany of arguments against this conclusion, none of which has any merit.  The arguments are based variously on Relator's misunderstanding of the applicable sanctions rules, its mischaracterization of the actions of various agencies, or its simple insistence that its allegations have merit despite the findings of the investigating agencies to the contrary.  In any event, they are insufficient to overcome a motion to dismiss under 31 U.S.C. § 3730(c)(2)(A).  To justify dismissal (on this basis), a Government investigation need not closely examine every shred of evidence presented by a relator, nor is a relator's disagreement with the Government's conclusions a sufficient basis to oppose dismissal.  Instead, the Government's investigation must be sufficient only to persuade a court under a deferential

standard that it adequately looked into the relator's allegations and concluded in good faith not to pursue them.  *See, e.g.*, *United States v. Gilead Sciences, Inc.*, No. 11-CV-00941-EMC, 2019 WL 5722618, at \*6-7 (N.D. Cal. Nov. 5, 2019); *EMD Serono*, 370 F. Supp. 3d at 490; *Nasuti*, 2014 WL 1327015, at \*11; *CIMZNHCA*, 2019 WL 1598109, at \*3 (requiring only "a minimally adequate investigation").  That standard is more than met here.

As explained in the Government's opening papers, most of the SCB transactions with Iranian parties identified in Relator's disclosures had previously been disclosed to the Government by SCB and, more importantly, complied with the applicable sanctions rules, including by legitimately winding down preexisting relationships with such parties.  Gov't Mot. at 7-8; Komar Decl. ¶ 24; Manfull Decl. ¶¶ 25, 37.[3]  Relator argues that the Government—and specifically OFAC—does not understand the sanctions system it administers.  Relator Opp. at 8, 25 ("The Government effectively gave SCB a pass on its 'wind-down' process . . . despite the obvious illegality of those transactions."), 28-30; Relator Opp. Ex. 5.  This argument is unsustainable.

As OFAC's declarant explains, Relator is mistaken, in several critical respects, in its understanding of the applicable Iranian sanctions.  Specifically, and critically, the relevant sanctions rules did not prohibit all transactions between foreign banks such as SCB and Iranian entities—nor even all such transactions denominated in U.S. dollars.  Supp. Manfull Decl. ¶¶ 16-17.  Instead, they prohibited such transactions only to the extent they were specifically processed

---

[3] Relator's remaining disclosures were of transactions by non-Iranian clients mistakenly labeled as Iranian, or of Iranian clients' mere access to SCB electronic systems that did not result in any illegal transactions during the relevant period.  Komar Decl. ¶¶ 20-21 & n.2; Supp. Manfull Decl. ¶¶ 21-22.

by the U.S. financial system.  *See id.*[4]  Moreover, until November 2008, foreign banks could

route U.S. dollar payments with most Iranian parties through the United States so long as the

transactions both originated and terminated abroad (known as "U-turn" transactions), even at the

same bank.  *Id.* ¶¶ 13-15 (citing 31 C.F.R. § 560.516(a)(1) (2007)).  As part of the investigation,

OFAC reviewed in detail the transactions with Iranian parties disclosed in Relator's materials

and concluded that they complied with the relevant rules—they either were completed in non-

U.S. currencies or in accordance with the U-turn rule.  *Id.* ¶¶ 21-22; Manfull Decl. ¶¶ 35-37.

It was this conclusion, above all, that led the Government to wrap up its investigation of

Relator's claims in August 2013—after reviewing large numbers of documents from Relator and

the Bank and interviewing numerous witnesses, including those suggested by Relator, which did

not corroborate Relator's allegations.  Komar Decl. ¶¶ 18-23; Supp. Komar Decl. ¶¶ 2-3;

Manfull Decl. ¶¶ 34-37; Supp. Manfull Decl. ¶¶ 21-24.  The agencies did not "accept[] every

response provided by SCB without . . . corroboration," Relator Opp. at 23, but to the contrary,

fully examined Relator's disclosures and concluded that they did not reveal illegal activity and

that the transactions and client relationships therein had been largely previously disclosed by the

Bank, Komar Decl. ¶¶ 18-23; Supp. Komar Decl. ¶¶ 2-3; Manfull Decl. ¶ 37; Supp. Manfull

Decl. ¶¶ 21-24.[5]  Towards the end of the investigation, the agencies selected a sample of

transactions about which to receive even more detailed information.  Komar Decl. ¶ 22; Supp.

Komar Decl. ¶ 4; Supp. Manfull Decl. ¶ 25.  But this inquiry, and the involvement of an outside

---

[4] The "blocking" sanctions Relator repeatedly cites, Relator Opp. at 12, 13, 25, 29 (citing
31 C.F.R. § 560.211), which require U.S. banks to freeze assets of certain Iranian entities, did not
come into effect until 2012, after the transactions at issue.  Supp. Manfull Decl. ¶¶ 9-12.

[5] While Relator never suggested during the investigation that the SCB spreadsheets it
produced contained "hidden" columns or cells, Relator Opp. at 24, a re-review of this
information did not reveal any further relevant information, Komar Supp. Decl. ¶ 5 n.3.

consultant in the Bank's provision of responsive information, *id.*, only further confirmed the agencies' investigative conclusions, and is no basis for Relator's quarrel with the *bona fides* of the agencies' investigation in this regard, Relator Opp. at 3.[6]

Furthermore, although it could not corroborate Relator's allegations, the Government kept the *qui tam* case open while the agencies investigated information from other sources that led to the 2019 resolutions with SCB.  Komar Decl. ¶ 31; Boddy Decl. ¶ 13.  While these other investigations were pending, in late 2013, Relator's counsel contacted the Government to indicate that a then-current SCB employee, Anshuman Chandra, may have additional information about the Bank's allegedly illegal activities.  Supp. Komar Decl. ¶ 10.  Mr. Chandra provided some information that was generally similar to that previously provided by Relator (and indeed included information about some of the same entities and transactions), but did not contradict the agencies' conclusions regarding Relator's allegations.  *Id.* ¶ 11.  After reviewing this information, the agencies found no basis to expand the ongoing, separate investigations into the Bank.  *Id.* ¶ 12; Supp. Manfull Decl. ¶ 29.  Relator is thus incorrect that the Government ignored the information provided by Mr. Chandra.  Relator Opp. at 4, 6, 24.

Some of Relator's arguments touch on certain aspects of the 2019 resolutions with SCB, and the Government's determination that the *qui tam* disclosures played no part in them.[7]  None

---

[6] Nor are DFS's findings regarding Promontory Financial Group, LLC, Relator Opp. at 5, 26, relevant to the agencies' investigation of Relator's claims.  Nochlin Decl., Ex. 4, at 2-3.

[7] While Relator purports to challenge the reasonableness of these settlements pursuant to 31 U.S.C. § 3730(c)(2)(B), and to claim a share of the Government's recovery under 31 U.S.C. § 3730(c)(5), *see* Relator Opp. at 20-21 & n.4, these arguments are misplaced and procedurally improper.  *See United States v. L-3 Commc'ns EOTech, Inc.*, 921 F.3d 11, 27-28 (2d Cir. 2019) (strongly suggesting that an FCA relator has no § 3730(c) rights with respect to a criminal proceeding).  However, the Court will need to address these arguments only if it does not dismiss Relator's case, *see New York ex rel. Khurana v. Spherion Corp.*, 246 F. Supp. 3d 995, 1000 (S.D.N.Y. 2017) ("[A] valid *qui tam* action is a prerequisite to a relator's right to recover an

of these arguments have merit either.  In the first instance, Relator mischaracterizes the scope of

its disclosures in an attempt to subsume the agencies' ultimate findings: Relator's claims and

supporting documentary evidence concerned SCB's supposedly illegal continuation of its

preexisting customer relationships with the Bank's known Iranian clients, including Iranian

banks, government agencies, and major companies, after 2007.  Gov't Mot. at 7, 26.  The

agencies looked into the Bank's post-2007 transactions with these entities and concluded they

comprised the winding-down of previous transactions in other currencies (and had largely been

previously disclosed to OFAC and DOJ), or were otherwise appropriate.  *Id.* at 7-8, 26.

The agencies later, and separately, learned that a handful of SCB's Dubai-based clients—

which were never mentioned by Relator, and did not initially present to the Bank as Iranian—

were in fact fronts for Iranian businesses.  *Id.* at 8-10, 26-28.  The improper U.S. dollar

transactions that SCB facilitated for these clients were the basis for the 2019 settlements.  *Id.* at 10-

11.  Although a few of these clients happen to have been included among hundreds or thousands

of legitimate Dubai-based clients on client lists and the like provided by Relator, their discovery

was entirely independent of any information that Relator provided or highlighted.  *Id.* at 13.

These Dubai-based companies that were fronts for Iranian businesses included the petrochemical

company, which does not seem to appear in Relator's documents,[8] and certain companies

associated with Mahmoud Reza Elyassi, some of which are listed among many other entities in

the information furnished by Relator.  *Id.*; Supp. Komar Decl. ¶¶ 6, 8; Supp. Manfull Decl.

---

alternate remedy." (collecting cases)), and the Government requests leave to respond fully to
them if that eventuality arises.

[8] Contrary to Relator's claim, Relator Opp. at 24, the petrochemical company is included
in the 2019 settlements, *see* Manfull Decl. Ex. 2, ¶¶ 5-28.

¶¶ 26, 28.[9]  But Relator never suggested to the agencies that any of these entities had Iranian connections, and none of the information in the documents Relator provided shows those entities had any Iranian links.  Komar Decl. ¶ 41; Supp. Komar Decl. ¶¶ 5-6, 8-9; Boddy Decl. ¶¶ 17-18; Manfull Decl. ¶ 52; Supp. Manfull Decl. ¶¶ 26-28.  There is thus no basis for Relator's apparent confusion, Relator Opp. at 10, as to how the Government could conclude that SCB had not entered into any new post-2007 business with its preexisting Iranian clients, as Relator had alleged, but nevertheless had violated sanctions rules in its dealings with Dubai-based companies it knew or should have known had improper ties to Iran.[10]

Furthermore, despite Relator's arguments to the contrary, Relator Opp. at 4, 6, 8, 24, the federal agencies' 2019 resolutions are fully consistent with those of the other investigating agencies, including DFS and the U.K. Financial Conduct Authority ("UK-FCA").  As explained in the attached declarations, neither of those agencies enforce sanctions laws, but instead rules requiring banks to maintain appropriate safeguards against financial crime.  Nochlin Decl. ¶ 5; Supp. Boddy Decl. ¶¶ 7-8, 11-12, 15.  Those agencies particulated in the same set of parallel investigations as did the federal agencies and, as relevant here, did not have access to any additional information.  Nochlin Decl. ¶¶ 7-8;  Supp. Boddy Decl. ¶¶ 13-14.  Their findings, to the extent they touched on sanctions issues, were fully consistent with the federal agencies' conclusions, or differed from them in light of differences in enforcement parameters, not access

---

[9] As explained in both the Government's original submission and the current one, none of the information provided by Relator led to Mr. Elyassi, nor did Relator identify the employees who conspired with or supervised Mr. Elyassi.  Komar Decl. ¶ 41; Boddy Decl. ¶¶ 17-18; Manfull Decl. ¶¶ 50-52; Supp. Komar Decl. ¶ 7.

[10] Nor are the agencies' findings that some of these Dubai-based companies submitted payment instructions to SCB via fax or online from Iran, a result of Relator's disclosures (Relator Opp. at 24-25).  *See* Gov't Mot. at 27-28.

to different information.  Nochlin Decl. ¶¶ 9-19; Supp. Manfull Decl. ¶¶ 31-33; Supp. Boddy Decl. ¶ 12.

Relator thus cannot show that the agencies' investigation of its allegations was conducted in bad faith or fell below any minimal standard of adequacy.

## IV.     The Government Should Not Be Required to Expend Resources in the Litigation of Meritless Claims

Finally, as explained earlier, *see* Gov't Mot. at 28-30, even under the *Sequoia* standard, the Government may dismiss a relator's complaint if it would have to devote considerable resources to the case should litigation go forward.  *See Sequoia*, 151 F.3d at 1146 ("[T]he government can legitimately consider the burden imposed on the taxpayers by its litigation, and that, even if the relators were to litigate the FCA claims, the government would continue to incur enormous internal staff costs.").  This is true even when a relator's claim could have merit.  *See id.* (recognizing that, under 31 U.S.C. § 3730(c)(2)(A), "a meritorious suit may be dismissed upon a proper showing").

Here, where there is no merit whatsoever to Relator's claim, either legally or factually, the analysis is even easier.  Even if the Government were required to engage in a cost-benefit analysis in certain cases, *see* Relator Opp. at 22, no such analysis can be required here where Relator's claims are facially, fatally flawed and thus would not bring any benefit to the Government.

**CONCLUSION**

For the foregoing reasons and the reasons in the Government's opening brief, the Court

should dismiss Relator's second amended complaint pursuant to 31 U.S.C. § 3730(c)(2)(A).

Dated:    New York, New York
          February 28, 2020

                              Respectfully submitted,

                              GEOFFREY S. BERMAN
                              United States Attorney for the
                              Southern District of New York

                              By: ___s/Jean-David Barnea_____
                                  JEAN-DAVID BARNEA
                                  Assistant United States Attorney
                                  86 Chambers Street, Third Floor
                                  New York, New York 10007
                                  Tel.: (212) 637-2679
                                  Fax: (212) 637-2686
                                  Email: Jean-David.Barnea@usdoj.gov