NEW YORK STATE DEPARTMENT
OF FINANCIAL SERVICES

In the Matter of

STANDARD CHARTERED BANK,
New York Branch

**CONSENT ORDER UNDER**
**NEW YORK BANKING LAW § 44**

WHEREAS, on August 6, 2012, the Department of Financial Services (the "Department") issued an order pursuant to Banking Law § 39, charging Standard Chartered Bank ("SCB"), a wholly owned subsidiary of Standard Chartered plc, with certain apparent violations of law and regulation, and directing that SCB appear before the Department on August 15, 2012 to explain those charges (the "August 6th Order");

WHEREAS, the charges contained in the August 6th Order relate primarily to transactions that SCB conducted on behalf of Iranian parties with a value of approximately $250 billion that were settled through SCB's New York branch ("SCB NY") during the period 2001 through 2007.  These transactions were identified by SCB through its review of its U.S. dollar transactions during the review period;

WHEREAS, on August 14, 2012, prior to appearing before the Department as directed by the August 6th Order, SCB and the Department (collectively, the "Parties") agreed to resolve this matter without formal proceedings or hearings;

NOW, THEREFORE, the Parties are willing to resolve the matters cited herein.  The Department finds as follows:

1.      Throughout the period relevant to the Department's investigation, Iran was subject to U.S. economic sanctions for, among other things, sponsoring international terrorism and attempting to build nuclear weapons.

2.      From at least January 2001 through 2007, SCB provided U.S. dollar clearing services to Iranian state and privately owned banks, corporations, and individuals. In processing transactions on behalf of its Iranian customers, SCB removed or omitted Iranian information from U.S. dollar wire payment messages through a practice known internally at SCB as "repair," which was designed to help SCB compete for Iranian business and to avoid potential processing delays.

3.      The removal or omission of Iranian information, by the use of cover payments or by "repair," occurred with respect to approximately 59,000 transactions totaling approximately $250 billion.

4.      It is the position of the Department that SCB's policies and procedures during the relevant period, pursuant to which certain wire transfers evidencing the transactions did not contain information regarding Iranian parties when sent through SCB NY, prevented New York State regulators from performing complete safety and soundness examinations, and from identifying suspicious patterns of activity, which could, among other things, allow regulators to assist law enforcement authorities.

5.      In 2004, SCB consented to a formal enforcement action and executed a written agreement ("Written Agreement") with the New York Banking Department ("NYSBD"), a predecessor agency of the Department, and the Federal Reserve Bank of New York ("FRBNY") regarding flaws in anti-money-laundering risk controls at SCB NY. The Written Agreement required SCB to adopt sound anti-money laundering practices with respect to foreign bank

correspondent accounts and to hire an independent consultant to conduct a historical transaction review for the period July 2002 to October 2004.  On July 10, 2007, the NYSBD and FRBNY terminated the Written Agreement and ended the ongoing enforcement action.

6. In 2011, the Department conducted an examination of SCB NY, which identified BSA/AML findings, including: (1) weaknesses in the customer risk rating methodology and documentation of certain customer due diligence ("CDD") information; (2) insufficient documentation of decisions to waive potential OFAC matches to customers and associated parties; and (3) offshoring portions of SCB NY's transaction monitoring process to SCB's Global Shared Services with insufficient evidence of oversight or communication between them.

7. SCB NY is undertaking remediation actions to address those examination findings and has hired a third-party consultant to validate corrective measures and the sustainability of the BSA AML program at SCB NY, the report of which has been provided to the Department.

## SETTLEMENT PROVISIONS

**Monetary Payment:**

8. SCB will pay a civil monetary payment to the Department pursuant to Banking Law §§ 44 and 44-A in the amount of three hundred and forty million U.S. dollars ($340,000,000).  SCB will pay the entire payment of $340,000,000 within ten (10) days of executing the Consent Order.

**BSA/AML and OFAC Compliance Review:**

9. Within thirty (30) days of executing the Consent Order, SCB will identify an independent on-site monitor acceptable to the Department (the "Compliance Monitor") who will report directly to the Department to conduct a comprehensive review (the "Compliance

Review") of the BSA/AML and OFAC compliance programs, policies, and procedures now in place at SCB's New York Branch (the "SCB NY Program"). The Compliance Monitor will have authority, to the extent legally permissible, to examine and assess SCB's existing BSA/AML operations that are performed outside the United States on behalf of SCB's New York Branch. Based on the Compliance Review, the Compliance Monitor will identify needed corrective measures to address identified flaws, weaknesses or other deficiencies in the SCB NY Program, and oversee their implementation. The Compliance Monitor will also examine and assess SCB's New York Branch's compliance with those corrective measures.

10. SCB agrees to cooperate fully with the Compliance Monitor by, including but not limited to, providing the Compliance Monitor access to all relevant personnel and records to the extent legally permissible. The term of the Compliance Monitor will extend for two years from the date of formal engagement. Any dispute as to the scope of the Compliance Monitor's authority will be resolved by the Department in the exercise of its sole discretion after appropriate consultation with SCB and/or the Compliance Monitor.

11. Within thirty (30) days of executing the Consent Order, SCB will submit to the Department for approval the proposed terms of the Compliance Monitor's engagement ("Engagement Letter").

12. Within ninety (90) days of SCB's receipt of the Department's written approval of such terms, the Compliance Monitor will submit to the Parties a written report of findings, including proposed corrective measures from the Compliance Review (the "Compliance Review Report"). Thereafter, the Compliance Monitor will submit written monthly progress reports ("Progress Reports") to the Parties.

**BSA/AML and OFAC Compliance Programs:**

13. Within sixty (60) days of the receipt of the Compliance Review Report, SCB will submit to the Department for approval a written plan that is designed to improve and enhance the current SCB NY Program, incorporating the Compliance Review Report (the "Action Plan"). The Action Plan will provide for enhanced internal controls and updates and/or revisions to current policies, procedures and processes of SCB's New York Branch in order to ensure full compliance with all applicable provisions of the BSA, the rules and regulations issued thereunder, OFAC requirements and the requirements of the Consent Order. Upon receipt of written approval by the Department, SCB will begin to implement the changes.

**Management Oversight:**

14. Within sixty (60) days following the receipt of the Compliance Review Report, SCB is to submit to the Department for approval a written plan to improve and enhance management oversight of SCB NY's Program ("Management Oversight Plan"). The Management Oversight Plan will address all relevant matters identified in the Compliance Review Report, provide a sustainable management oversight framework, and will take effect within thirty (30) days of receipt of written approval.

15. The Management Oversight Plan will include, among other things, SCB's New York Branch's employment of a permanent Anti-Money Laundering Auditor ("AMLA"), who will be located on-site at SCB's New York Branch, and who will audit SCB's New York Branch's BSA/AML and OFAC compliance, including compliance work conducted by SCB outside the United States on behalf of SCB's New York Branch. The AMLA will have full access to all personnel and records involved in SCB's BSA/AML compliance, transaction screening, and customer due diligence functions, to the extent legally permissible, and will

further generate quarterly status reports for the Parties.  In addition, Department examiners will remain on-site at SCB's New York Branch, as deemed appropriate by the Department.

16. The Parties agree that SCB's full compliance with paragraphs 9 through 15 of the Consent Order will constitute adoption of adequate corrective measures to address all violations identified by the Department in its 2011 examination of SCB NY.

**Breach of the Consent Order:**

17. In the event that the Department believes SCB to be materially in breach of the Consent Order ("Breach"), the Department will provide written notice to SCB of the Breach and SCB must, within ten (10) business days from the date of receipt of said notice, or on a later date if so determined in the sole discretion of the Department, appear before the Department to demonstrate that no Breach has occurred or, to the extent pertinent, that the Breach is not material or has been cured.

18. The Parties understand and agree that SCB's failure to make the required demonstration within the specified period is presumptive evidence of SCB's Breach.  Upon a finding of Breach, the Department has all the remedies available to it under the New York Banking and Financial Services Laws and may use any and all evidence available to the Department for all ensuing hearings, notices, orders and other remedies that may be available under the Banking and Financial Services Laws.

**Waiver of Rights:**

19. The Parties further understand and agree that no provision of the Consent Order is subject to review in any court or tribunal outside the Department.

**Parties Bound by the Consent Order:**

20. It is further understood that the Consent Order is binding on the Department and SCB, as well as their successors and assigns that are within the supervision of the Department,

but it specifically does not bind any federal or other state agencies or any law enforcement authorities.

21. No further action will be taken by the Department against SCB for the conduct set forth in the Consent Order or the Department's August 6th Order, including the investigation referenced in footnote 1 of the August 6th Order, provided that SCB complies with the terms of the Consent Order.  Notwithstanding any other provision contained in the Consent Order, however, the Department may undertake enforcement action against SCB for transactions or conduct that SCB did not disclose to the Department in the written materials that SCB submitted to the Department in connection with this matter.

22. During the period in which the Consent Order remains in effect, the approved Program, Plans, and Engagement Letter as referenced herein will not be amended or rescinded without the prior written approval of the Department, other than amendments necessary to comply with applicable laws and regulations.

23. Within ten (10) days after the end of each quarter following the execution of the Consent Order, SCB will submit to the Department written progress reports detailing the form and manner of all actions taken to secure compliance with the provisions of the Consent Order and the results thereof.  SCB's responses to any audit reports covering BSA/AML matters prepared by internal and external auditors will be included with the progress report.  The Department may, in writing, and in its discretion, discontinue the requirement for progress reports or modify the reporting schedule.

**Notices:**

24. All communications regarding this Order shall be sent to:

Mr. Gaurav Vasisht
Executive Deputy Superintendent
Banking Division
New York State Department of
Financial Services
One State Street
New York, NY  10004

Dr. Tim Miller
Director, Property, Research & Assurance
Standard Chartered Bank
1 Basinghall Avenue
London EC2V 5DD
United Kingdom

Mr. Edward Kowalcyk
Regional Head of Compliance, Americas
Standard Chartered Bank
1095 Avenue of the Americas
New York, NY 10036

**Miscellaneous:**

25. Each provision of the Consent Order will remain effective and enforceable until stayed, modified, terminated or suspended in writing by the Department.

26. No promise, assurance, representation, or understanding other than those contained in the Consent Order has been made to induce any party to agree to the provisions of the Consent Order.

IN WITNESS WHEREOF, the parties hereto have caused this Consent Order to be executed as of this 21 day of September, 2012

STANDARD CHARTERED BANK

By: _____
Peter Sands
Group Chief Executive

NEW YORK STATE
DEPARTMENT OF FINANCIAL SERVICES

By: _____
Benjamin M. Lawsky
Superintendent

STANDARD CHARTERED BANK
New York Branch

By: _____
Julio Rojas
Chief Executive Officer, Americas