IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ) <br> BRUTUS TRADING, LLC, **)** <br> ) <br>                  Plaintiff, ) <br> ) <br>       -against- ) <br> ) <br> STANDARD CHARTERED BANK, ) <br> STANDARD CHARTERED PLC and ) <br> STANDARD CHARTERED TRADE SERVICES ) <br> CORPORATION, ) <br> ) <br>                 Defendants. ) | Case No. 18-cv-11117 (PAE) |

**RELATOR'S SUR-REPLY TO**
**THE GOVERNMENT'S REPLY MEMORANDUM OF LAW**

Patrick M. McSweeney
McSweeney, Cynkar & Kachouroff, PLLC
3358 John Tree Hill Road
Powhatan, VA 23139
(804) 937-0895
patrick@mck-lawyers.com

Robert J. Cynkar
McSweeney, Cynkar & Kachouroff, PLLC
10506 Milkweed Drive
Great Falls, VA 22066
(703) 621-3300
rcynkar@mck-lawyers.com

*Attorneys for Brutus Trading, LLC*

# TABLE OF AUTHORITIES

**CASES** **PAGE**

*Amerijet Int'l, Inc. v. Pistole,* 753 F.3d 1343 (D.C. Cir. 2014) .......................................... 4

*Foster v. Mabus,* 103 F.Supp.3d 95 (D.D.C. 2015) ............................................................ 4

*Hensley v. United States,* 292 F.Supp.3d 399 (D.D.C. 2018) ............................................. 4

*Public Citizen v. Mineta,* 340 F.3d 39 (2d Cir. 2003) ........................................................ 4

**STATUTES, LEGISLATIVE MATERIALS, AND RULES**

18 U.S.C. § 981 ................................................................................................................... 9

18 U.S.C. § 981(f) ............................................................................................................... 9

31 U.S.C. § 3729(b)(3) ........................................................................................................ 9

S. REP. 99-345, 1986 U.S.C.C.A.N. 5266 ......................................................................... 10

E.O. 12170 ........................................................................................................................... 7

73 Fed. Reg. 66541 (Nov. 10, 2008) .................................................................................. 1

**OTHER AUTHORITIES**

U.S. Department of Justice, Civil Division *Fraud Statistics - Overview:*
    *Oct. 1, 1986-Sep. 30, 2018,* https://www.https://www.justice.gov/civil/
    page/file/1080696/download ....................................................................................... 9

John A. Gallagher, *Legislation Is Necessary for Deferred Prosecution of
    Corporate Crime,* 43 Suffolk U. L. Rev. 447 (2010) ................................................... 9

*Lies, Coaching at StanChart Kept Iran Cash Moving, U.S. Says*, BOURSE & BAZAAR
    (Apr. 10, 2019), https://bourseandbazaar.com/news-1/2019/4/10/lies-coaching-at
    -stanchart-kept-iran-cash-moving-us-says ................................................................... 7

Press Release, Treasury Dept. (Sept. 8, 2006), https://www.treasury.gov/press-
    center/Pages/hp87.aspx ................................................................................................. 2

Press Release, Treasury Dept. (Nov. 6, 2008), https://www.treasury.gov/
    press-center/press-releases/Pages/hp1256.aspx ........................................................... 1

Press Release, Treasury Dept. (Nov. 6, 2008), https://www.treasury.gov/
    press-center/press-releases/Pages/hp1258.aspx ............................................................... 6

Peter Reilly, *Sweetheart Deals, Deferred Prosecution, and Making a Mockery
    of the Criminal Justice System: U.S. Corporate DPAs Rejected on Many Fronts,*
    50 ARIZ. ST. L.J. 1113 (2018) ........................................................................................ 9

Claire M. Sylvia, THE FALSE CLAIMS ACT: FRAUD AGAINST
    THE GOVERNMENT, § 4:16 (2019) .................................................................................. 9

**EXHIBITS**        **NO.**

SCB Bulletin (Oct. 23, 2008) ..................................................................................... 15

Relator's Disclosure Statement (Dec. 19, 2012) ............................................................ 16

Letter from D. Koenigsberg to J.D. Barnea (Jan. 9, 2019) ............................................... 17

Juniper 35 Master List ................................................................................................ 18

Declaration of David A. Koenigsberg ............................................................................ 19

Declaration of Robert G. Marcellus ............................................................................... 20

## GLOSSARY

| | |
|---|---|
| Boddy Supp. Dec. | Second Declaration of Special Agent Wayne C. Boddy, Doc. 56 |
| FCA | The False Claims Act, 31 U.S.C. §§ 3729 *et seq.* |
| Mem. | Memorandum of Law in Support of the Government's Motion to Dismiss Relator's Second Amended Complaint, Doc. 31 |
| Knight Dec. | Declaration of Julian M. Knight, Doc. 48-2 |
| Komar Supp. Dec. | Supplemental Declaration of Special Agent Matthew F. Komar, Doc. 55 |
| Manfull Supp. Dec. | Supplemental Declaration of Alexandre Manfull, Doc. 57 |
| NYDFS | New York State Department of Financial Services |
| Opp. | Relator's Opposition to the Government's Motion to Dismiss Realtor's Second Amended Complaint, Doc. 49 |
| Reply | Reply Memorandum of Law in Further Support of the Government's Motion to Dismiss Relator's Second Amended Complaint, Doc. 54 |
| SCB | Standard Chartered Bank, used to refer to the Defendants collectively |
| SCB Dubai | SCB's Dubai branch |
| SCB NY | SCB's New York branch |
| Sundry account | an omnibus account where miscellaneous trades are recorded and settled, originated as a device to settle trades where an error has been made in identifying the counterparties, and so typically the trades in a sundry account are in the name of an SCB branch only |
| USD | United States dollar |

Relator submits the following as its Sur-reply to the Government's Reply:

1. The Government has failed to refute Relator's argument that transactions by Standard Chartered Bank during 2006-2008 on behalf of parties linked to Iran did not qualify for the U-turn exemption. Mr. Manfull insists that two foreign banks are not required to be involved to qualify for the exemption. Manfull Supp. Dec. ¶ 14. There is plain language to the contrary in 73 Fed. Reg. 66541, as Relator has noted. Opp. 28. Mr. Manfull's contention that the language in 73 Fed. Reg. 66541 simply described a common scenario but not a requirement for U-turn transactions is strained, and contrary to the Government's position stated in its 2012 criminal information in *United States v. Standard Chartered Bank,* Case 1:12-cr-000262-JEB, ¶ 15 (D.D.C. Dec. 10, 2012) (emphasis added):

> The U-turn exemption permitted banks to process Iranian USD transactions that began and ended with a non-U.S. financial institution, but were cleared through a U.S. correspondent bank. In relevant part, the ITR provided that U.S. banks were 'authorized to process transfers of funds to or from Iran, or for the direct or indirect benefit of persons in Iran or the Government of Iran, if the transfer…is *by order of a foreign bank which is not an Iranian entity from its own account in a domestic bank…to an account held by a domestic bank…for a [second] foreign bank which is not an Iranian entity*. 31 CFR §560.516(a)(1).

In addition, the Treasury Department has explained that "the 'U-turn' class of transfers … are so named because, while they are conducted on behalf of Iranian account holders and banks or in connection with Iran-related transactions, they only pass through the U.S. financial system on their way *from one offshore non-Iranian financial institution to another.*" Press Release, Treasury Dept., at 3 (Nov. 6, 2008), https://www.treasury.gov/press-center/press-releases/Pages/hp1256.aspx (emphasis added).

The U-turn license, by its terms, authorized *single* transactions to be processed without being blocked. It did not cover complex *trade financing*, which involves a course of transactions,

as was involved in the syndicated loan agreements that were the subject of the winding down transactions.

2. Mr. Manfull states that Bank Saderat PLC was not prohibited from benefiting from the U-turn general license until October 25, 2007. Manfull Supp. Dec. n. 7. Bank Saderat, *a different entity*, was involved in SCB's winding down transactions. Exh.15 (SCB October 23, 2008, Bulletin). The Treasury Department announced that "Bank Saderat will not be able to participate in any transfers involving U.S. banks, effective from the date that the amendment to the regulations is filed with the Federal Register early next week." Press Release, Treasury Dept. (Sept. 8, 2006), https://www.treasury.gov/press-center/Pages/hp87.aspx. In any event, SCB's transactions involving either Bank Saderat or Bank Saderat PLC did not qualify for the U-turn exemption for reasons set forth in section 1, above.

3. The Government contends that it wrapped up its investigation of Relator's allegations in August 2013 after concluding that all transactions with Iranian parties disclosed in Relator's materials "either were completed in non-U.S. currencies or in accordance with the U-turn rule." Reply 10. Many of the transactions submitted by Relator, however, did not involve the "winding down" of preexisting relationships but rather transactions that occurred after 2008. *See* Relator's Disclosure Statement (Dec. 19, 2012) (Exh. 16); Knight Dec. ¶¶ 40-45, 52-53, 67. For example, Relator's allegation that SCB processed USD transactions in 2009 on behalf of Tanootas Taban Engineering Company, an Iranian company, was never considered by the Government. In fact, the Government mistakenly asserts that it never received an allegation involving Tanootas Taban from Relator. Komar Supp. Dec. ¶ 9; Manfull Supp. Dec. ¶ 27. On January 9, 2019, Relator's counsel wrote to AUSA Barnea and reminded the Government of its allegations regarding Tanootas Taban given to the Government in June 2015. Ex. 17. SCB's USD transactions on

behalf of Tanootas Taban were identified in files produced by Anshuman Chandra in 2013. *See* Exh. 17. Information concerning Tanootas was also hidden on line 5641 of an SCB spreadsheet. That company was first identified to the Government in December 2012 (Client Branch User Set UP 2009 File).

      4. In yet another misrepresentation, the Government states that "Relator never suggested during the investigation that the SCB spreadsheets it produced contained 'hidden' columns or cells," Reply 10 n.5, but the Relator provided very specific instructions on that subject:

> Report 1, dated March 20, 2012, summary tab, lists transactions in 2012 with IFIC Holding Ag (identified by OFAC as an Iran government entity in August 2010), Parsian International Establishment, Iran Aseman Co. (an airline), and Mapna International Fze. Under the RM Summary Tab, these entities are listed by name and SCI code number, but the transaction details are hidden. To reveal those details, place the cursor over the SCI code number, then right click on the mouse, a box will pop up with a list of options, the last of which is "Show Fields List." Click on that item and a box will shows up in the right of the screen entitled "Pivot Table Field List," which shows a series of fields with a box you can check to reveal more data. To uncover the dates for the transactions, click on the "Deal Date" item. When this is done, the data shows that on January 31, 1012 [sic] and February 29, 2012, SCB had transactions with Iran Aseman (code # 2226855); Parsiaan International (code # 2625474); IFIC Holding AG (code # 3294676); and Mapna International (code # 7024762).

Memorandum (Sept. 24, 2013) (Opp. Exh. 10); Exh. 19. Other hidden cells were also noted there.

      5. The Government misrepresents the content and significance of the information produced by Anshuman Chandra, an SCB Dubai employee, in September 2013, as well as the consideration or lack of consideration that it received: "Mr. Chandra provided some information that was generally similar to that previously provided by Relator (and indeed included information about some of the same entities and transactions), but did not contradict the agencies' conclusions regarding Relator's allegations." Reply 11. Chandra provided *20,000 actual records* that were significantly different from what had been available previously,

3

including records of SCB's sundry transactions, evidence of hidden cells in SCB's spreadsheets, an account-opening record for Bank Saderat with the date removed, an analysis of the Iranian connections of numerous SCB customers, records showing the state of SCB's Iran Group customer base, evidence of the tactics employed by Promontory Financial Group, LLC to manipulate computer systems and records of SCB Dubai in 2013, and evidence of SCB's deliberate "flaws" in its anti-money laundering system in the electronic trading platform. Opp. Exh. 10. The Government had already decided to wrap up the investigation before it received the Chandra production. Komar Dec. ¶ 24. The claim in ¶ 11 of the Komar supplemental declaration that he reviewed the Chandra documents "closely" is incredible in light of the Government's numerous misstatements in its Reply and in the supplemental Komar and Manfull declarations about the contents of those documents. *See, e.g.,* Sections 3 & 4, above.

6. Relator previously argued that the Government's resort to bare denials and conclusory language to dismiss Relator's allegations demonstrates the arbitrariness of its dismissal effort. Opp. 23. The Government continues to use conclusory language and to decline to produce the documents that it claims supports its positions. An agency's reliance on conclusory statements "will not do." *Foster v. Mabus,* 103 F.Supp.3d 95, 109 (D.D.C. 2015), *citing Amerijet Int'l, Inc. v. Pistole,* 753 F.3d 1343, 1350 (D.C. Cir. 2014); *see Hensley v. United States,* 292 F.Supp.3d 399, 412 (D.D.C. 2018). The failure to explain its decision adequately and the refusal to provide the referenced documents in support of its decision is arbitrary. *Cf. Public Citizen v. Mineta,* 340 F.3d 39, 56 (2d Cir. 2003) (absence of satisfactory explanation). The Government's generalized statement that "Relator's claims and supporting documentary evidence concerned SCB's supposedly illegal continuation of its preexisting customer relationships with the Bank's known Iranian clients, including Iranian banks, government agencies, and major companies, after 2007,"

4

Reply 12, illustrates the Government's erroneous assumption that Relator's allegations address only preexisting relationships and the winding down transactions. Yet, many of Relator's allegations involved transactions with other customers or those occurring *after 2008 when the U-turn exemption had been revoked.* SCB Presentation (Nov. 7, 2012) (Opp. Exh. 7); Relator's Disclosure Statement (Dec. 19, 2012) (Exh. 16); Knight Dec. ¶¶ 40-45, 52-53, 67.

      7. The Government argues that it has consistently pursued a "maximum pressure" campaign of sanctions against Iran. Manfull Supp. Dec. ¶ 5. Its decision not to proceed against SCB based on Relator's allegations belies that claim. Mr. Manfull has offered an astonishing justification for SCB's evasion of U.S. sanctions that would utterly undermine that regime. He contends that transactions on behalf of Iranian parties may be processed in USDs by a bank outside of the United States beyond the reach of U.S. sanctions by using the bank's USD reserves. *Id.* ¶ 16. Such reasoning is obviously inconsistent with a maximum pressure campaign. By Mr. Manfull's rationale, any foreign bank could establish a reserve of USD and transact business with or for Iranian parties without clearing the transaction through a U.S. correspondent bank and thereby avoid blocking of the transaction. The foreign bank could simply replenish its USD reserves repeatedly and provide Iranian parties virtually endless access to USD. Nations that have opposed U.S. sanctions on Iran would not need to continue their attempts to develop an alternative to the USD or the U.S. financial system. Banks in those nations could avoid U.S. sanctions and still trade with Iran in USDs by resorting to their USD reserves.

      8. Relator argued that new agreements were required for SCB's conversions of USDs to other currencies in the context of complex trade financing. Opp. 30; Knight Dec. ¶ 61. This is consistent with SCB's statement: "We should obtain the beneficiary's written agreement to obtain settlement from the Designated Bank in another freely convertible currency prior to

processing the transaction." SCB October 23, 2008 Bulletin § C.1 (Exh. 15). Mr. Manfull offers the only response: "Nor…does the mere fact that a foreign financial institution accepts the repayment of a U.S. dollar-denominated obligation of an Iranian client in another currency…constitute a sanctions violation, even if it required a separate agreement between the bank and the client." Manfull Supp. Dec ¶ 17. Relator's point is that because a change in currency in their contract could not occur without a new agreement among the parties, the Government did not verify that the currency conversion actually occurred, on what terms it occurred and with what currency. Further, if the loan accounts in question denominated in USD had not been blocked and frozen, there would have been no reason for the elaborate effort to justify the winding down of the loan commitments. But if those accounts had been frozen, SCB would have used its USD reserves, according to Mr. Manfull, to make repayments rather than access funds in the frozen accounts. Those payments would have been recorded on SCB's books as debits. Such double payment was highly unlikely.

9. The Government insists that Relator never advised that Dubai-based customers of SCB were fronts for the Iran Government. Reply 12-13. Relator specifically drew the Government's attention to Anshuman Chandra's warning that SCB Dubai was doing business with companies fronting for Iranian interests. Opp. Exh. 10 at 3. OFAC was well aware of Iran's use of front companies to evade U.S. sanctions. *See* Press Release, Treasury Dept. (Nov. 6, 2008), https://www.treasury.gov/press-center/press-releases/Pages/hp1258.aspx.

10. The Government also stated that Relator "never suggested to the [investigating] agencies that any of these entities [including the companies owned by Mahmoud Reza Elyassi] had Iranian connections." Reply 13. The Elyassi companies were listed on several documents that Relator submitted to the Government in 2012, which Relator represented to the Government

had been selected from a larger group of entities because of their apparent connection to Iran. Marcellus Supp. Dec. (Exh. 20). Mr. Elyassi was an Iranian national whose name is obviously Iranian and who used his Iranian passport to open the SCB account. *See Lies, Coaching at StanChart Kept Iran Cash Moving, U.S. Says*, BOURSE & BAZAAR (Apr. 10, 2019), https://bourseandbazaar.com/news-1/2019/4/10/lies-coaching-at-stanchart-kept-iran-cash-moving-us-says. The Government surely has capable investigators who could have readily confirmed Mr. Elyassi's Iran connection, if in fact any examination of Relator's documents was ever done. With respect to other entities that it identified, Relator provided the Government with an analysis of the Iran connection of numerous SCB customers in the Chandra documents. *See* Juniper 35 Master List (Exh. 18).

11. Mr. Manfull suggests that the blocking regulations affecting USD transactions involving Iranian parties were not in place until 2012. Manfull Supp. Dec. ¶ 10 n. 6. That was not SCB's understanding and it is not accurate. In its October 23, 2008, Bulletin (Exh. 15), SCB stated: "Assets of the Designated Parties [*i.e.,* Export Development Bank of Iran (aka Bank Toseh Saderat Iran), EDBI Exchange Company and EDBI Stock Brokerage Company] in the United States are frozen, and U.S. dollar payments can no longer be made by, to or through these parties." EO 12170, issued by President Jimmy Carter on November 14, 1979 and renewed by subsequent Presidents, ordered the blocking of the property and interests of the Government of Iran and related entities that are or become subject to U.S. jurisdiction.

12. Elizabeth Nochlin's declaration is misleading because she fails in ¶¶ 6, 8, 11 and 12 to acknowledge significant facts. She ignores SCB's persistent pattern of deception and its failure to disclose the extent of its violations (other than "wire-stripping") before its 2012 settlements. *See* Second Amended Compl. ¶¶ 10, 34, 43-59. She does not credit Relator's

7

contribution to the NYDFS investigation by identifying for the monitor SCB intentional flaws in its electronic trading system, which provided a "roadmap" for the monitor's investigation. Marcellus Supp. Dec. ¶ 7 (Exh. 20). *See also* Koenigsberg Dec. (Exh. 19). Relator's disclosure of SCB's system defects, SCB's pattern of deception, the role of Promontory Financial Group, LLC in scrubbing and manipulating data in the SCB Dubai branch, and numerous SCB records of transactions involving Iranian parties (including Mahmoud Reza Elyassi and Caspian Chemical Company) that were provided to NYDFS during the fall of 2012, as well as information supplied during several interviews of Relator's principals by Daniel Alter and Guarav Vasisht that led to Mr. Alter's "game-changing" December 20, 2012, letter to SCB's counsel (Opp. Exh. 8) were too obvious to have been overlooked. *Id.* As is the case in several of the Government's declarations, much of the information provided by Ms. Nochlin is not based on personal knowledge but rather on documents, which should speak for themselves.

13. The Government devotes considerable space to challenging Relator's contention that the Government's findings and conclusions were at odds with those of the U.K.'s Financial Control Authority. Boddy Supp. Dec. ¶¶ 3-15; Manfull Supp. Dec. ¶¶ 31-32. The differences between the Government's conclusions that SCB committed no violations of federal laws or regulations after 2008 (Mem. 28 and Reply 12) and the findings of the Financial Control Authority on (Decision Notice, 15-23 (Feb. 5, 2019) (Opp. Exh. 13) are stark. SCB's conduct described by the Authority constitutes violations of the anti-money laundering laws of the U.S. and the U.K., as well as OFAC sanctions regulations. *See* Opp. 8, 26-27.

14. In continuing to argue that Relator has failed to state a valid claim[1] because SCB was under no obligation to pay the United States any money, the Government relies not on the

---

[1] The Government claims that the Relator has no right to share in the 2019 settlement because it was a "criminal proceeding." Reply 11 n.7. But a deferred prosecution agreement, like that governing the 2019 settlement, is simply

explicit language of the forfeiture statute, but on its notion that because the Government may have to take action to seize forfeited property, 18 U.S.C. § 981 simply allows "the Government to assert" title to property. Reply 6. This is a word game dodging the clear meaning of the statutory text: "All right, title, and interest in [unlawful proceeds] shall vest in the United States upon commission of the act giving rise to forfeiture…." § 981(f). Of course the Government must "assert" its vested right in forfeited property if that property is not surrendered voluntarily by the malefactor. Moreover, a FCA existing obligation to pay is "an established duty, *whether or not fixed*." 31 U.S.C.§ 3729(b)(3). Thus in the contemplation of the FCA an established duty to pay may require further proceedings to determine the precise amount to be paid. *See* Opp. 14 – 16. Tellingly, the Government offers no exegesis of the text of the governing statute to justify its assault on the cause of action here.

The Government strangely laments that the Relator's "misconstruction" of the FCA would mean that those who commit crimes subject to forfeiture would suffer FCA treble damages and penalties "in addition" to the punishments for those crimes, and that all sorts of people could bring FCA cases. Reply 7-8. But the FCA's punishments are triggered by a distinctive offense – fraud against the Government – and are not "in addition" to other punishments. And "[f]rom its inception, the Act's central premise has been that in order to address the lack of information about fraud, the Government must seek the public's assistance." Claire M. Sylvia, THE FALSE CLAIMS ACT: FRAUD AGAINST THE GOVERNMENT ¶ 1:14 (2019). *See also* U.S. Department of Justice, Civil Division *Fraud Statistics - Overview: Oct. 1, 1986- Sep. 30, 2018,* https://www.https://www.justice.gov/civil/page/file/1080696/download. (By the close

---

a civil contract that allows a company to *escape* prosecution. *See* Peter Reilly, *Sweetheart Deals, Deferred Prosecution, and Making a Mockery of the Criminal Justice System: U.S. Corporate DPAs Rejected on Many Fronts,* 50 ARIZ. ST. L.J. 1113, 1115 (2018); John A. Gallagher, *Legislation Is Necessary for Deferred Prosecution of Corporate Crime,* 43 Suffolk U. L. Rev. 447, 449 (2010).

of FY 2018, over $40 billion dollars had been recovered in *qui tam* suits filed by private relators.).

15. If the Government had specific enough information "previously disclosed" by SCB to establish a rational basis for giving SCB a pass for $56.75 billion in transactions dating at least to 2014 (Opp. 1; Second Amended Compl. ¶¶ 58-59), then the Government should have been able to offer far more specific information, especially numbers, to support the broad conclusions it has advanced here. Instead it offers generalizations that these transactions were "mostly" wind-downs, Reply 8, or perhaps U-turns or in non-USDs. *Id.* 10. How many of these transactions are U-turns or non-USDs? Did justifiable "winding down" really stretch to 2014? Such generalities show the Government's dismissal maneuver to be arbitrary and lacking a rational basis. Its Motion should be denied outright for that reason. If not, Relator has "present[ed] a colorable claim that the … dismissal is unreasonable in light of existing evidence, that the Government has not fully investigated the allegations, or that the Government's decision was based on arbitrary and improper considerations," and so an evidentiary hearing is required to adjudicate the Government's Motion. S. REP. 99-345, 26, 1986 U.S.C.C.A.N. 5266, 5291.

March 13, 2020

Respectfully submitted,

BRUTUS TRADING, LLC

By:   /s/ Patrick M. McSweeney

| | |
|---|---|
| Robert J. Cynkar | Patrick M. McSweeney |
| McSweeney, Cynkar & Kachouroff, PLLC | McSweeney, Cynkar & Kachouroff, PLLC |
| 10506 Milkweed Drive | 3358 John Tree Hill Road |
| Great Falls, VA 22066 | Powhatan, VA 23139 |
| (703) 621-3300 | (804) 937-0895 |
| rcynkar@mck-lawyers.com | patrick@mck-lawyers.com |