David A. Koenigsberg
Menz Bonner Komar & Koenigsberg LLP
444 Madison Avenue, 39th Floor
New York, New York   10022
Tel.:  (212) 223-2100
Email: dkoenigsberg@mbkklaw.com

*Attorneys for Relator Brutus Trading, LLC*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | : | |
| BRUTUS TRADING, LLC, | | 12 Civ. 9160 (KBF) |
| | : | |
| Plaintiffs, | | **FILED UNDER SEAL** |
| | : | **Pursuant to 31 U.S.C.** |
| | | **§ 3730(b)** |
| -against- | : | |
| | | |
| STANDARD CHARTERED BANK , | : | |
| STANDARD CHARTERED PLC and | | |
| STANDARD CHATERED TRADE SERVICES | : | |
| CORPORATION, | | |
| | : | |
| Defendants. | : | |

----------------------------------------------------------------x

### RELATOR'S DISCLOSURE STATEMENT
### Pursuant to 31 U.S.C.  § 3730(b)

Relator-Plaintiff  Brutus Trading LLC ("Relator"), through its attorneys, Menz

Bonner Komar & Koenigsberg LLP, pursuant to 31 U.S.C. § 3730(b), submits to the United

States **in camera** this disclosure statement and documents on the accompanying computer disk

that constitute substantially all material information that Relator possesses.

### I.  NATURE OF ACTION

1.      Relator-Plaintiff Brutus Trading LLC ("Relator"), through its attorneys,

Menz Bonner Komar & Koenigsberg LLP, has brought this case against Standard Chartered

Exhibit 16

Bank, Standard Chartered PLC and Standard Chartered Trade Services Corporation

("collectively Defendants") for treble damages and civil penalties arising from Defendants'

violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.*

       2.      In connection with providing foreign exchange bank services in New York

State to international customers, Defendants made false statements to the United States and

thereby  knowingly, made, used or caused to be used, false records or statements material to an

obligation to pay or transmit money and/or concealed, avoided and decreased an obligation to

pay money.  31 U.S.C. § 3729(g).

## II.  PARTIES

       3.      Relator Brutus Trading, LLC ("Brutus") is a Wyoming Limited Liability

Corporation. Brutus's principals possess extensive knowledge and experience with international

foreign exchange transactions and banking and possess personal knowledge to support and

establish the claims asserted in this Complaint.  One of Relator's principals is a former employee

of Standard Chartered Bank.

       4.      Defendant Standard Chartered PLC ("SC"), is a leading international

banking institution with headquarters in London, England.  SC has over 1,700 offices around the

world.

       5.      SC's wholly-owned subsidiary, Standard Chartered Bank ("SCB"), offers

a complete range of banking products and services to its personal, business and wholesale

banking clients worldwide.  SCB has been licensed by the New York State Banking Department[1]

to operate a foreign bank branch in New York State since 1976.  SCB's New York branch is

---

[1]     In 2011, the State's Banking Department and Insurance Department were merged to create the New York Department of Financial Services ("DFS").

currently located at 1095 Avenue of the Americas, New York, NY 10036.  The New York branch office is referred to hereinafter as SCB-NY.

6.        Defendant Standard Chartered Trade Services Corporation, a wholly-owned subsidiary of SCB, is a Delaware corporation registered to do business in New York State as a foreign business corporation.

### III.        STANDARD CHARTERED'S ILLEGAL CONDUCT

### A.        The Bank's Project Green and Sundry Account Practices

7.        SCB-NY primarily conducts a U.S. dollar clearing business which clears approximately $195 billion per day on the Clearing House International Payment System ("CHIPS").  While SCB claims not to service retail customers in the United States, it does offer wholesale banking services, including trade finance services, cash management, treasury, foreign exchange and interest rate products, commodity finance, and structured import and export finance services.  As of March 31, 2012, SCB-NY held $40.8 billion in total assets.

8.        When SCB-NY participates in a U.S. dollar clearing transaction for one of the banks' customers, the SCB's custom and practice since at least 2002 is to allocate for profit and loss purposes approximately one-third of the revenues earned by the bank from these transactions to the SCB-New York branch.

9.        SC's conduct of the U.S. dollar clearing business requires it to clear transactions through SCB-NY and the correspondent U.S. dollar bank accounts domiciled in SCB-NY, used to facilitate such clearing transactions.  As a result, SCB and SCB-NY must comply with the rules and regulation imposed by the U.S. Treasury's economic sanctions regulations.  In short, those regulations forbid or restrict the conduct of financial transactions by institutions located in the United States with the certain foreign governments and their various

instrumentalities and any person or entity that has been identified on the list of Specially Designated Nationals ("SDN") issued by the Treasury Department's Office of Foreign Assets Control ("OFAC").

10.    Notwithstanding its legal obligation to comply with the U.S. sanctions regulations, since at least 2002, SC has operated a program known internally to high level SC officials as "Project Green".  This was a program run by very experienced trade finance experts and senior geographical branch chief executive officers, but no compliance officers were involved in its management or reporting structure.  Compliance officers would be expected to be involved in a project aimed at closing down improper activity or implementing compliance measures. Project Green, however, was designed to assist, conspire, aid and abet non-United States customers that have been made the subject of United States economic sanctions, to evade those sanctions and engage in international financial transactions.  Project Green was listed by name and details available to senior staff as an active project on the company-wide intranet in at least 2008 and 2009.

11.    "Project Green," was initiated at SCB London headquarters and was headed by SCB's Iraq and Afghanistan CEO Stuart Horsewood and Managing Director Vikran Kukreja, a trade finance expert.  Earlier in his career, Horsewood opened the dollar clearing operation for the Bank of Baghdad.  His background has been almost exclusively in the area of Trade Finance Transactions for Emerging Markets Counterparts.  Horsewood considered Iran to be a "major new market for" SCB and supported the Iran government's plans to create the Kish [Island] Free Trade Zone.  According to Horsewood

> We were probably a bit late getting into Islamic finance, but I do
> see this now becoming very significant for us. And we will be
> developing from our existing capability in the UAE, Pakistan and
> Bangladesh, and will be looking to roll out Islamic banking in

Bahrain, Qatar, Iraq, and Iran where we have to do so to meet
Central Bank requirements.

12.     According to Relator, one standard practice, known to senior bank

employees, was to have employees in the Dubai and Kish Island (Iran) International Tax Free

Zone bank branches fill out and sign account paperwork for clients based in Iran, under the

coordination of the Middle East North Africa ("MENA") region Origination and Client Coverage

team headed by Akhil Mahesh, an SCB managing director.  SCB aggressively sought to help

Iranian, Syrian, Lebanese, and Libyan clients evade sanctions.  In Lebanon, the process was

known internally as "coursing" of Lebanese subsidiaries of Syrian entities through international

sanctions. The bank's fees and income for those services were channeled to the Dubai Tax Free

Zone in the Dubai International Finance Center or other low tax regions even though U.S. Dollar

clearing was an essential correspondent service requirement to initiating and completing such

transactions.

13.     Relator has learned from a source currently employed in the SCB-NY

branch in U.S. Dollar clearing sales that SCB has recently taken steps to wind down Project

Green with immediate effect in 2012.  According to Relator's source, since summer of 2012,

personnel in the SCB-NY office have been expressly forbidden to mention "Project Green."

Employees were told "Project Green is now Red." Moreover, as discussed below, since the

summer of 2012, all of the SCB-NY Transactional and Financial Markets employees have been

blocked from access to databases necessary to decipher certain client codes in banking

transactions.

14.     SCB used a team of three high level managing directors who specialized

in sovereign trade finance to devise how to provide trade and cash management services to

sanctioned SDNs in order to allow those entities to continue to engage in foreign trade and

foreign dollar exchange transactions.  The fees for those services were channeled to Dubai or London even though U.S. Dollar clearing was essential to completing such transactions.

15.     In addition to pursuing a policy of assisting, conspiring, aiding, and abetting its clients to operate in defiance of international economic sanctions, SC also failed to operate with proper financial controls and procedures in the processing and settling of foreign exchange transactions for its foreign customers.  One example of SC's loose financial controls was the "Transaction Bank Sundry Foreign Exchange Account," in "OLT3" – the online trading system for all of the bank's transactional business.  This system was at the heart of SCB's transactional back office Straight 2 Bank ("S2B") operation.   The Transaction Bank Sundry Foreign Exchange Account was a holding or error account where SC booked banking revenues from completed transactions that were not properly matched up and settled on SCB's books.  As a result of failing to have proper controls and procedures for closing out transactions, by 2008 the Transaction Bank Sundry Foreign Exchange Account had grown to a balance of approximately $100 million in unassigned revenues to the bank. Bank revenue of $100 million from foreign exchange transactions involved thousands of underlying trades and, based on normal foreign exchange transaction mark-ups, were derived from trade transactions of an estimated total nominal value of well into the hundreds of billions of dollars. The revenues assigned to this account should have been matched to the branches of the client relationship managers and the branches that provided correspondent banking services to the bank's clients for the particular transaction, but instead were left without being properly attributed.  In addition, because these revenues were not properly matched up to the customer or the customer's relationship manager, identifying whether the revenues were derived from customers on the SDN

list or from entities associated with foreign governments, such as Iran, subject to economic sanctions would prove very difficult, if not impossible, for any SCB-NY employee.

16.     Normally, transactions performed for clients are associated with the bank's internal client identifier code number, labeled as the "SCI Customer ID" number.  This number is used on internal bank spread sheets to associate transactions and revenues with the particular client.   Banking employees have computer access to the SCI Customer ID number to obtain on-line the customers' profile information and transaction history.  A New York based employee conducting a U.S. dollar clearing transaction for a customer would be able to query the bank's customer data base using the SCI Customer ID to pull up a full profile of transactions for that customer.

**B.      The Bank's Settlement with New York's
      Department of Financial Services**

17.     On August 6, 2012, the New York Department of Financial Services ("DFS") issued an order pursuant to New York Banking Law § 39 requiring SCB-NY to explain why SCB-NY's license to operate in New York should not be revoked due to SCB's violations of various bank secrecy and anti-money laundering laws. *See In Re Standard Chartered Bank, New York Branch,* Order Pursuant to Banking Law § 39 (N.Y.S. Dep't of Fin'l Services) (Aug. 6, 2012) (the "Order"). The Order explained in great detail that SCB had concealed from regulators at DFS and OFAC, approximately 59,000 transactions conducted for Iranian clients that violated rules and regulations issued by DFS and OFAC.  The Order provided that the Department's investigation initially focused upon SCB's systematic misconduct on behalf of Iranian customers but the investigation also uncovered evidence of similar schemes to do business with other countries that were subject to U.S. sanctions.  Order at n. 1.

18.     On September 21, 2012, DFS and SCB entered into a Consent Order under New York Banking Law § 44 (the "Consent Order"), whereby SCB agreed to pay a civil monetary penalty to DFS in the amount of $340 million, and SCB consented to having a compliance monitor on premises who reported directly to DFS and to conduct a comprehensive review of the bank's compliance programs, policies and procedure.

19.     According to the Consent Order, from January 2001 through January 2007, SCB provided U.S. dollar clearing services to Iranian state and privately owned banks, corporations and individuals.  In processing such transactions, SCB removed or omitted Iranian information from U.S. dollar wire payment messages to avoid having to comply with OFAC banking rules and regulations.  This removal or stripping of wire transfer identifying information occurred with respect to approximately 59,000 transactions with nominal value of approximately $250 billion.  Consent Order ¶¶ 2-3.

20.     By its terms, the size of the civil penalty was determined based upon the 59,000 transactions that occurred during the period January 2001 through 2007 that SCB had disclosed to DFS in the course of the Department's investigation.  Thus, in the Consent Order, DFS agreed that so long as SCB complied with the terms of the Consent Order, "no further action will be taken by the Department against SCB for the conduct set forth in the Consent Order or the August 6th Order, including the investigation referenced in footnote 1 of the August 6th Order."  Consent Order ¶ 21.  The Consent Order provided, however, that "the Department may undertake enforcement action against SCB for transactions or conduct that SCB did not disclose to the Department in written materials that SCB submitted to the Department in connection with this matter."  Consent Order ¶ 21.

C.      **The Bank's Settlement with the United States
        Departments of Justice and Treasury**

21.     On December 10, 2012, SCB entered into a settlement with the U.S.

Department of the Treasury's Office of Foreign Assets Control, agreeing to pay $132,000,000 to

settle its civil liability arising out of SCB's violations of OFAC's rules and regulations. *See*

Settlement Agreement between OFAC and SCB, ¶ 32 (Dec. 10, 2012).  The OFAC Settlement

Agreement states that "SCB has taken remedial action by terminating its business and

prohibiting new business since 2007 with Iranian customers."  OFAC Settlement Agreement

¶ 26.

22.     On December 10, 2012, SCB consented to the filing of a criminal

information by the United States Attorney's Office for the District of Columbia, which charged

that from 2001 until 2007, SCB facilitated U.S. Dollar transactions for financial institutions and

other parties affiliated with Iran.  Information, *United States v. Standard Chartered Bank,* 12-

CR.-262 (JEB) (D.D.C. Dec. 10, 2012) (Dkt. # 1).  The same day, SCB entered into a Deferred

Prosecution Agreement with the Asset Forfeiture and Money Laundering Section of the United

States Department of Justice and the United States Attorney's Office for the District of Columbia

("DPA").  *United States v. Standard Chartered Bank,* 12-CR-262 (D.D.C.) (Dkt. # 2).  Pursuant

to the DPA, SCB agreed to pay the United States forfeiture in the amount of $227,000,000.  DPA

¶ 3,  The payment was made in order to "settle any and all civil and criminal claims currently

held by the United States for any act within the scope of or related to the Factual Statement,"

Exhibit A to the DPA and for which SCB accepted and acknowledged responsibility.  *Id.* at ¶¶ 2,

4(f).

23.     According to the Factual Statement, beginning in "2001 and ending in

2007, SCB violated U.S. and New York State laws by illegally sending payments through the

U.S. financial system on behalf of entities subject to U.S. economic sanctions."  Factual

Statement ¶ 2; *see also id.* ¶¶ 42 & 43.  In addition, "[o]n October 30, 2006, SCB informed the

[Federal Reserve Bank of New York] that it was ending its U.S.-dollar clearing activity for all

the Iranian banks.  The bank ended its U.S.-dollar activity by March 2007."  *Id.* ¶ 103.  The

Factual Statement further states that "[f]rom August 2007, SCB suspended all new Iranian

business in any currency."  *Id.* ¶ 104.

**D.    Defendants Fraudulently Induced
the Settlement With the United States**

24.    Contrary to the representations that SCB made to induce OFAC and the

Department of Justice to enter into the OFAC Settlement Agreement and the DPA,  that SCB

stopped doing business with Iranian government entities and SDNs after 2007, defendants

knowingly engaged in U.S. dollar clearing transactions with and for the benefit of Iranian

government entities and Iranian SDNs in 2008 and 2009.

25.    Defendants' records show that since at least 2006, SC and SCB identified

and targeted as customers the following Iranian government entities or SDNs:  Bank Keshavarzi,

Bank Markazi, Bank Maskan, Bank Mellat, Bank Melli, Bank Tejarat, Export Development

Bank of Iran, Bank Saderat, Iran Overseas Investment Bank Ltd., Persia International Bank PLC,

and Sepah Bank.  In addition, since at least 2008, SCB's client lists included the National Iranian

Oil Company ("NIOC") and its subsidiaries as clients.  In 2008, OFAC identified NIOC as an

entity owned or controlled by the Government of Iran within the meaning of the Iranian

Transactions Regulations.[2]  OFAC also identified NIOC as an affiliate of the Islamic

Revolutionary Guard Corps ("IRGC").  OFAC added IRGC to the SDN list on October 21, 2007.

---

[2]     *See* Fact Sheet:  Increasing Sanctions Against Iran, U.S. Treasury, Office of Public Affairs at
page 7 (July 12, 2012), available at  http://www.treasury.gov/press-center/press-

26.     The following are examples of trades performed by SCB on behalf of banned Iranian government entities or Iranian related SDNs after 2007 or evidence that SCB was performing transactions after 2007 on behalf of clients that were banned Iranian entities.

27.     In or about January 2009, SCB performed an export finance transaction for Bank Tejerat, a bank owned by the Government of Iran.   Relator understands that such a transaction necessarily involved dollar clearing by SCB's New York branch.

28.     In or about January 2009, SCB performed three structured trade finance transactions for National Iranian Tanker Company ("NITC"), an entity owned by the Iranian government[3] and a subsidiary of the National Iranian Oil Company.[4]  Relator understands that such transactions necessarily involved dollar clearing by SCB's New York branch.

29.     SCB conducted a U.S. dollar letter of credit transaction between Bank Markazi and four exporters in or about December 2009.  Bank Markazi-Iran-CB was added to OFAC's SDN list as of October 22, 2008.   Relator understands that such a transaction necessarily involved dollar clearing by SCB's New York branch.

30.     SCB performed a trade finance and cash management transaction for the Iran Ministry of Economic Affairs and Finance in or about December 2009.  Relator understands that such a transaction necessarily involved dollar clearing by SCB's New York branch.

---

releases/Documents/Fact%20Sheet%20-%20Increasing%20Sanctions%20Against%20Iran.pdf (viewed Oct. 23, 2012).

[3]     Prior to 2000, NITC was owned by NIOC, but was divested to three employee pension funds in 2000 and may have been considered a private entity.  See Lakshmanan, A.R., "U.S. Sanctions Iranian Tankers to Tighten Oil Noose", Bloomberg.com (Jul. 12, 2012) ("The Treasury said Iran's government controls the company, a former subsidiary of the state-owned National Iranian Oil Co. that was officially privatized 12 years ago.") (Emphasis added); Pawlak, J., "Europe enacts Iran sanctions", Reuters (Oct. 17, 2012) ("A senior NITC official said … that the group was privatized in 2000 and was owned by three pension funds.") (Emphasis added).
[4]     OFAC fined a U.S. corporation, General Reinsurance, for making reinsurance payments in 2005 for the benefit of NITC.  See OFAC Enforcement Notice, General Reinsurance (June 29, 2011).

31.     SCB records further show that it performed transactions in August, November and December 2009 with the Ministry of Energy of Iran Group, an agency of the Government of Iran, with nominal value of $2,546,419 and cash management and trade finance revenues to the bank in the amount of $259,602.77.  Significant transactional foreign exchange revenues were also earned from this client during the period from August 2009 through December 2009.  Relator understands that such transactions including U.S. dollar foreign exchange trades necessarily involved dollar clearing by SCB's New York branch.

32.     According to SCB records, as of June 2008, Bank Saderat had the authority to conduct foreign exchange transactions directly through SCB with a $1 million limit per transaction and a total settlement limit of $10 million.  This meant that Bank Saderat was independently and remotely able to log into SCB's OLT3 computer system to initiate U.S. dollar foreign exchange transactions that necessarily involved SCB-NY.  In addition, each of the Industrial Development and Renovation Organization of Iran and the Iranian Offshore Engineering Company had on-line trading access and independent authority to engage in U.S. dollar foreign exchange transactions in 2008 and 2009.  Any such foreign exchange trades would have involved SCB-NY.  Bank Saderat was designated a SDN on October 25, 2007, but was cut off from the U.S. Financial system as of September 8, 2006.  71 Fed. Reg. 53569 (Sept. 12, 2006) (OFAC announcing that it will "effectively prohibit all transactions directly or indirectly involving Bank Saderat").[5]

33.     As of 2008, SCB had on its books significant approved U.S. dollar foreign exchange trading limits for the following entities that were listed as SDNs:  Bank Sepah, Bank Keshavarzi, and the Iranian Export Development Bank.

---

[5]          *See* Kessler, Glenn, "U.S. Moves to Isolate Iranian Banks," Washington Post (Sept. 9, 2006).

E.     **Defendants' Activities Post-NY Settlement**

34.     Under the settlement with the Department of Financial Services, the bank consented to a compliance monitor to conduct a comprehensive review of the bank's compliance programs, policies and procedure.  Relator has learned of information that suggests that the bank is not cooperating fully with the compliance monitor.

35.     SCB uses certain internal client codes called "SCI Customer Number" that allow for an authorized user to access all of that particular client's transaction history and other banking data.  Relator has learned that beginning in September 2012, the bank has cut off access by SCB-NY to information normally available to bank employees through use of the SCI Customer ID database.  Access to that information has been restricted to high level bank managing directors in account opening roles who are largely outside the United States.  Without access to the SCI Customer ID database and without correctly maintained global account information, SCB-NY employees cannot effectively monitor or control transactions that violate the U.S. sanctions regime.

## IV.     DOCUMENTS

36.     Documents that support the Relator's information are submitted as Exhibits A-U on the accompanying computer disk and described below.

A.     Order, *In Re Standard Chartered Bank, New York Branch,* Order Pursuant to Banking Law § 39 (N.Y.S. Dep't of Fin'l Services) (Aug. 6, 2012).

B.     Consent Order, *In Re Standard Chartered Bank, New York Branch* pursuant to New York Banking Law § 44 (Sept. 21, 2012).

C.     Settlement Agreement between OFAC and SCB (Dec. 10, 2012).

D.      Information, *United States v. Standard Chartered Bank,* 12-CR.-262 (JEB) (D.D.C. Dec. 10, 2012) (Dkt. # 1).

E.      Deferred Prosecution Agreement, *United States v. Standard Chartered Bank,* 12-CR-262 (D.D.C.) (Dec. 10, 2012) (Dkt. # 2).

F.      SCB spreadsheet entitled "Client Branch & User Set Up -2009" (last modified 02/16/09).  [The spreadsheets being produced with this disclosure were copied from a thumb drive that Relator's principal had in his possession when he left the bank's employment. The "last modified" dates listed refer to the date a spread sheet was last modified as it appears on the thumb drive.  The copies being produced with this disclosure reflect the date when the documents were copied.  The original drive will be provided for inspection and review upon request.]  The tab labeled "User" lists SCB's clients correlated to the SCB branch that handles the relationship and the terms of how trades are to be handled in U.S. currency.  Lines 35, 36, and 37 of this spreadsheet identify Bank Saderat as a client for US Dollar trading purposes. Bank Saderat also appears on the same type of spread sheet for the years 2007 and 2008.

G.      SCB spreadsheet "Dubai_pos_client_limits_extern_credit_chk 29Aug08" (last modified 08/31/08), lists Bank Saderat (line 278), and Iranian Offshore Engineering Company (lines 537 and 1232) as clients. Iranian Offshore Engineering is an affiliate of National Iranian Oil Company ("NIOC") and the Ministry of Petroleum, which is an affiliate of the Islamic Revolutionary Guard Corps (IRGC).  IRGC was added to the SDN list on October 21, 2007.  The SCB spreadsheet also lists IMB Co. (line 1205), which may be state-owned, as well as INECO IRAN KISH PJSC (line 1213).  Column E of this spread sheet, titled "Branch_NM", includes many references to a branch known as IRANCONT, or Continental Iran Branch.

H.      SCB spreadsheets "Regional Bank Target Client List 2006" (last modified 01/04/08) and "Regional Bank Target Client 2007" (last modified 02/07/08) [Exhibit H.1] , each with a tab labeled "Iran", lists the following Iranian banks as targets and possible customers: Bank Keshavarzi, Bank Markazi-Iran-CB, Bank Maskan, Export Development Bank of Iran (added to SDN list Oct. 22, 2008), Saderat Bank, and Sepah Bank (added to SDN list Jan. 9, 2007), with identified spot and forward limits. Per OFAC's January 23, 2012 Fact Sheet about "Regulations involving Sanctions against Iran", OFAC has determined that Bank Keshavarzi, Bank Markazi-Iran-CB, Bank Maskan are "persons determined to be the Government of Iran, as defined in [31 C.F.R.] § 560.304."

I.      SCB spreadsheet labeled "MENA Customerwise Sales Report – Jan 09", Tab "YTD BIP", lists an export finance transaction for Bank Tejerat (line 7169) (added to SDN list Jan. 23, 2012).  The same spreadsheet lists three structured trade finance transactions for National Iranian Tanker Company (lines 7174, 7177 and 7178).  NITC was added to the SDN list in 2012. However, according to a June 29, 2011 OFAC Enforcement Notice, General Reinsurance paid penalties for making reinsurance claim payments for losses arising from vessel operations of NITC.  The payments were made in 2005 for losses incurred from 1998-2002.  At the tab labeled "Summary" at Column J, titled "Iran", itemizes bank revenues from transactions performed for Iran that total $500,000.   The tab labeled "Pipeline" is a column entitled "Iran Kish".  According to Relator, "Pipeline" is a description of potential transactions.

J.      SCB spreadsheet Bank Report –Dec. 09 CB and titled "SCB Banks December 2009 (YTD) Revenue, Cash & Trade" (last modified 04/22/10) lists a trade finance and cash management trade for Bank Markazi (lines 13, 14, 15, 16), Government of Iran

(column C) and a transaction for the Iran Ministry of Economic Affairs and Finance (line 155), SCI Customer Number 111506561.

K.      SCB spreadsheet "Client, Branch & User Setup" for 2007 (last modified 06/15/08), at line 24 shows that Bank Saderat had the authority to conduct foreign exchange transactions directly through SCB with a $1 million limit per transaction and a total settlement limit of $10 million.  A similarly titled spreadsheet "Client, Branch & User Setup 2008" (last modified 01/20/09) [Exhibit K.1] shows Saderat at lines 35, 36, and 37.  Under column J, entitled "Branch" is the phrase "to be advised."  This is the only client with no branch code provided.  Also, under column Q, titled "Administration: Max logons" is the number 1. According to Relator, this indicates that Bank Saderat was able to log into SCB's computer system to initiate U.S. dollar foreign exchange transactions. In addition, under columns AA and AB, labeled "Limits" "Foreign Exchange", "Contract Limit", and "Settlement Limit" the words "to be advised" are also entered.  The spreadsheet "Client, Branch & User Setup 2009" (last modified 02/16/09) has the same set up for Saderat at lines 35, 36, and 37.

L.      SCB spreadsheet "UAE DIB – Faisal" (2/26/07) at line 54 lists Bank Melli Iran and Bank Saderat is listed at line 60.

M.      SCB spreadsheet "HotColdAll" (02/12/08),under "Hot" tab lists Bank Saderat Iran at line 49, Bank Mellat (line 181), Bank Melli Iran (lines 182, 183), Bank Sepah Iran (line 184), and Bank Tejerat (line 185).

N.      SCB spreadsheet "Prospective Clients." (12/06/07) in tab "All Clients" lists Bank Melli (line 127) and Bank Saderat (lines 131, 132, and 133).

O.      SCB spreadsheet "Prospective Clients New" (02/25/08) in the tab "All Clients" lists Bank Saderat Iran at lines 128, 129, and 130 and Bank Melli Iran at line 124.  At

the tab labeled "Small Banks", line 38, the list includes Persia International Bank PLC, which was made subject to U.S. sanctions on October 21, 2007 under Executive Order 13382.

        P.        SCB spreadsheet "Cash and Trade Corporates Clients Groups FX Revenues_6 Sep 2010_MENA_V1", tab labeled "By booking locations", line 193 includes transactions in August, November and December 2009 with the Ministry of Energy of Iran Group, an agency of the Government of Iran, with nominal value of $2,546,419 and revenues to the bank in the amount of $259,602.77.

        Q.        PowerPoint presentation:  "Transaction Banking FX – A single FM Sales Channel for Transaction Banking FX (Aug. 2010) (Presentation for GM Head v.4).  This document and the following PowerPoint documents discuss issues concerning the "Sundry Account."

        R.        PowerPoint presentation:  "Transaction Banking FX Sales; Sales Top Team Update; Internal Use Only" (9 slides) (TBFX1-FMMG-2010-1).

        S.        PowerPoint presentation:  "Transaction Banking FX Sales Update; Internal Use Only" (June 2010) (C. Allington Update 0610).

        T.        PowerPoint presentation:  "Transaction Banking FX Sales; Sales Top Team Update; Internal Use Only" (7 slides) (TBFX-Sales Top Team).

        U.        PowerPoint presentation:  "Establishing TBFX MIS" (Approach to establishing TBFX MIS Jul. 10 v1).

## V.      WITNESSES

37.      In addition to the principals of Relator Brutus, the following persons who are current or former employees of SCB have knowledge of facts concerning SCB's operations or have custody of documents relevant to this matter:

**Current Employees of SCB-NY with Knowledge of Post-2007**
**Dollar Clearing Transactions for Iranian SDNs**

Jen Kim – Director Transaction Banking Sales (Current)

**Officers and Employees of SCB-NY**
**with Knowledge of Project Green**

Ray Ferguson – CEO Americas (up to 2008)

David Stileman – CEO Americas (2008-2011)

Danielo A Benipayo – AVP, Transactional Surveillance Unit/Head of OFAC Compliance (up to 3/2007) (U.S. Citizen)

Jen Kim – Director Transaction Banking Sales (Current)

**Officers and Employees of SCB with**
**Knowledge of Project Green**

Stuart Horsewood – Co-head of Project Green (based in Dubai)

Vikram Kukreja – Co-head of Project Green (based in Dubai)

Akhil Mahesh – Head of Origination and Client Coverage Institutions MENA

Alun Michael Rees – Global head of Wholesale Banking and Main Board Director

Richard Meddings – CFO

Vis Shankar – Global Head of Origination and Client Coverage (until 2010, currently Main Board Director)

Hira Tauqeer Akbar – Project Green Assistant

Farooq Siddiqi – Head of Transaction Banking MENA

**Officers and Employees of MENA Dubai Branch
with Knowledge of Iranian Transactions and Relationship**

Hassan Jarrar -- Head of All Relationship Management MENA (until 2012)

Daniel Azzi – Co-head of Wholesale Bank MENA

Mohammed Sarrazadeh – CEO SCB Iran

David Laws – Co-head of Wholesale Bank MENA (until 2012)

Shayne Nelson -- CEO MENA Region (until 2010)

Lee Boon Huat -- Head of Global Markets MENA (until 2010)

Harish Hermandes -- Head of MENA Markets Sales

Jillian Correa -- Head of Banks Flow Foreign Exchange Executions Dubai

Motassim Iqbal -- Bank Markazi Global Transaction Banking Sales Dubai

Farooq Siddiqi -- Head of Transaction Banking MENA

**Officers and Employees with Knowledge of
Bank Markazi Trade Finance Deal**

Mohammed Sarrafzadeh -- CEO Iran

Karen Ping Ping Ng -- Senior Relationship Manager Singapore

Ishaq Ahmad Mohammed -- Senior Relationship Manager Bahrain

Anjali Anchan -- Senior Relationship Manager India

Motassim Iqbal -- Bank Markazi Global Transaction Banking Sales Dubai

**Officers and Employees with Knowledge of
SCB Lebanon "Coursing" Transactions**

Pik Yee Fong -- CEO SCB Lebanon

Cynthia Mattie Alie -- Head of USD Clearing Sales SCB Lebanon

Dan Scanlan – Head of Transaction Banking Americas

**Officers and Employees with Knowledge of Transaction**
**Bank Sundry Foreign Exchange Account**

Neil Browne -- Head of Financial Markets Operations

Lenny Feder -- Global Head of Financial Markets

Karen Fawcett -- Global Head of Transaction Banking

Adrian Walkling -- Global Head of FI Sales

David Carr -- Global Head of Sales (No longer at SCB from 2011 – ANZ Singapore)

Tarek ElYAfi -- Head of Cash Payments Managements Operations

Chris Jenkins – Global Head of Trade Operations 2008

Stuart Walker – Head of Transaction Banking Markets

Karen Lim – Head of Global Corporate Sales Singapore

Diana Wei Ang (No longer at SCB from 2011)

Daniel Condon – Deputy Head of FM Operations

George Nast – Global Head of Transaction Banking Products (from 2009)

Tom McCabe -- Global Head of Cash Management - Global Head Cash Payments 1997 – 2009
(US Citizen)

**Officers and Employees with Knowledge of SCB Iran**

Mohammed Sarrafzadeh - CEO Iran

PP Verghese – Senior Audit Manager Iran 2008 – current

Robert Essandoh – Senior Operational Risk Manager Iran (until mid-2007)

Majid Zand Miralavand – Rep Office Manager SCB Tehran (until 2005; Senior Adviser for
Trade Finance to Govt Iran from 1983 until present)

Raphael Mapfumo – Manager Cash Operations and Payments Iran Kish Island (until late 2007)

Sara Greenwood – Manager Corporate Real Estate Financing Iran (2008 to present)

**Former SCB (1999 -2001) Employee now with Bank Saderat (2001 – current)**

Shaikh Wahed Ali -- Bank Saderat Senior Group Dealer Treasury (current; was Associate

Director SCB until 2001)

**Former SCB (2005-2007) Employee now with Bank Melli (2007 –current)**

Sataya Prakash C

**Conclusion**

Relator and counsel are available to answer questions and conduct further factual

or legal research as may be requested or required from time to time.

Dated:    New York, New York
          December 19, 2012

Respectfully submitted,

MENZ BONNER KOMAR & KOENIGSBERG LLP

By:        David A. Koenigsberg

444 Madison Avenue, 39th Floor
New York, New York 10022
Tel.: (212) 223-2100

*Attorneys for Brutus Trading, LLC*