## MENZ BONNER KOMAR & KOENIGSBERG LLP

ATTORNEYS AT LAW
ONE NORTH LEXINGTON AVENUE, SUITE 1550
TEL: (914) 949-0222   WHITE PLAINS, NEW YORK 10601   FAX: (914) 997-4117
WWW.MBKKLAW.COM

January 9, 2019

**VIA EMAIL**

Jean-David Barnea, Esq.
Assistant United States Attorney
Southern District of New York
86 Chambers Street
New York, New York 10007

    Re:    *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank,*
            18 Civ. 11117 (PAE) **[UNDER SEAL]**

Dear J.D.:

      On December 21, 2018, the Government and Standard Chartered Bank ("SCB") agreed to extend the Deferred Prosecution Agreement ("DPA") from December 31, 2018 through March 31, 2019. See *United States v. Standard Chartered Bank*, Case No. 12-CR-262, Docket Nos. 12, 12-1 (JEB) (D.D.C.) (copies provided herewith). According to the Government's Notice, Doc. 12, the Government "continues to investigate possible historical violations of U.S. sanctions laws and regulations, which took place after the time specified in the Factual Statement (2001 to 2007)." Doc. 12 at 4. The Notice further states that the Government needs additional time to determine whether SCB has fulfilled its obligations under the DPA, "and for the parties to reach a resolution of the Government's pending investigation of SCB's possible historical violations of U.S. sanctions law and regulations after 2007."

      In light of these statement, we wanted to remind the Government that Relator's action filed in 2012 (re-filed in 2018) spurred the Government to investigate whether SCB had violated the express terms of the DPA and the Factual Statement by not disclosing that the bank had engaged in prohibited transactions with Iranian SDNs and Iranian government entities after 2007 contrary to its express representations to the Government in entering into the DPA, the Factual Statement, and the 2012 settlements with OFAC and the Federal Reserve.

      In fact, according to news reports, SCB's chief executive, in a memo to the bank's senior staff, admitted that the bank had engaged in Iranian related transactions after 2007. *See* "U.S. investigating possible StanChart Iran breaches after 2012 deal: CEO," Reuters Business News (Oct. 9, 2018; 7:10 AM) (copy enclosed). The Reuters article quotes the bank's CEO stating that "the vast majority of the payments under investigation pre-date 2012, and none occurred after 2014[.]" These statements by the bank's CEO corroborate the information Relator provided to the Government in 2012.

Exhibit 17

**MENZ BONNER KOMAR & KOENIGSBERG LLP**

Jean-David Barnea, Esq.
Assistant United States Attorney
January 9, 2019
Page 2 of 5

We wish to emphasize that Relator first introduced the Government's investigators to the fact SCB Dubai was both a processing center for Iranian SDN violations, with an increasing volume of such transactions, and that SCB Dubai was a center for development of Iranian business either directly in Iran or via Dubai-based Iranian backed clients. The business development was identified both with the relation that a SCB Iran Group for client business existed in the region after 2008 and that it was still profitable after 2008 and that it used the full involvement of Origination and Client Coverage ("OCC") in Dubai. This group worked very closely with the satellite office to SCB Dubai in SCB Tehran. A number of files were provided by Relator that contained unique client MIS covering a wide range of clients including Caspian, a range of Dubai based Iranian backed SMEs, Dubai based OFAC sanctioned Iranian banks and BNP Bank in Bahrain. This data was post 2008. The attached appendix to this letter provides highlights of the detailed transactional information and its relevance that Relator provided to the Government.

It bears noting that in December 2018, SCB published on its web site a newsletter entitled "The Importance of Data Quality in tackling Financial Crime." A copy accompanies this letter. This memo is an obvious public relations ploy by the bank to recast its egregious behavior in flouting the law and doing business with sanctioned Iranian entities. The memo discusses the need for "data quality" and attempts to portray itself as an unwitting victim of "incorrect spellings" or "dummy dates of birth", or incorrect addresses. The bank claims it has made financial investments "in getting a better handle around the data needed for financial crime control." The bank then proclaims that "[o]ur journey is by no means complete." Indeed, the bank goes so far as to claim that "Data quality is meaningless in itself." But, the significance of this memo is that the bank is admitting to its past behavior and failure to take seriously the need to be on the lookout for thinly veiled efforts by customers to disguise their true identities. For example, one of the entities that is listed on the spreadsheets provided by Relator was "Tandootas Engineering." Further review revealed that the client's actual name was "Tanootas Engineerig," an Iranian backed SME involved with the Iranian nuclear program and which had Iranian directors and mangers.

In addition, Relator identified Project Green as a subject to be investigated by the Government. According to Relator, Project Green was a covert entity to much of SCB Group that was designed to frustrate U.S. and foreign government regulators by covering up the extent of business conducted mainly through SCB MENA. This was business that was subject to sanctions and going as far as to "omit red flag terms" in reports on this business when it was processed ultimately through SCB NY. All of this information was verified in later New York Department of Finance ("DFS") investigations into Promontory Group.

The Relator also was the first to highlight the AML flaws of SCB's Straight to Bank Transaction system. Uniquely, SCB maintained the process of Account Opening in OCC. This team was essentially a duplicate Sales Team and was walled off from Transaction and Sales. With all the checks in this process it would be impossible not to check an account and account

**MENZ BONNER KOMAR & KOENIGSBERG LLP**

Jean-David Barnea, Esq.
Assistant United States Attorney
January 9, 2019
Page 3 of 5

data against the U.S. sanction lists. However, the flaw remained that the system for transactions such as OLT3 had no direct link to this account data. This enabled deals to evade sanctions lists cross-checks and made it easier to book a transaction to an alternative account post trade in order to mask the trade from SCB NY.

The Relator also provided valuable evidence to the Government investigators of the role of a consultant group based in United States that assisted SCB to obfuscate to regulators the extent of post 2008 violations. This "work" was carried out most especially in 2012, 2013 and 2014 and was the subject of the DFS review of Promontory in 2015.

The foregoing is a summary of the significant and voluminous information Relator Brutus Trading LLC provided to the Government's investigators from 2012 to 2017.  Relator's efforts to bring to the Government's attention the bank's false representations that induced the 2012 settlement should not be overlooked in the event that there is "a resolution of the Government's pending investigation of SCB's possible historical violations of U.S. sanctions law and regulations after 2007."

      Thank you for your consideration of the foregoing.

                Very truly yours,

                */s/ David Koenigsberg*

                David A. Koenigsberg

Encs.

**MENZ BONNER KOMAR & KOENIGSBERG LLP**

Jean-David Barnea, Esq.
Assistant United States Attorney
January 9, 2019
Page 4 of 5

# APPENDIX A

Relator first highlighted the Customer Due Diligence (CDD) inaccuracies that allowed the rulebook for SCB Branches with regard to Iranian sanctions to be broken. In particular, the massive extent of ongoing business with Dubai-based Iranian backed or owned SME's and sanctioned entities was brought to the attention of the government by the relator.

The following are just a few examples of client entities Relator provided to the investigation (among many others listed in our various spreadsheets provided in 2012) : Amesco FZE; Iran and Dubai Company LLC  also traded as A/C BR_MISC IRAN DUBAI; Bright Crescent Trading; Arjomandi  General Trading;Mapna Co LLC (Dubai based branch of Mapna Co Iran); Caspian Chemical known as Caspian Petrochemical; Dubai Aluminium and Bank Tejerat SCB AC Number 3239713.

The document Relator provided, identified as Mena Customerwise Aug 2009 Sheet YTD BIP, listed **Bank Tejerat** as an active SCB client as of 2009 if not later. *See id.*  Line 9170.

**Amesco** (Mena Customerwise Aug 2009 Sheet YTD BIP Line 6139; also OLT Clients CC Aug 09), was trading and showing revenues for the bank through at least 2009. There were no flags or notations to prevent dealing with this account through SCB Group.  This was typical of the flaw Relator identified in the link to transaction systems such OLT3, which showed the only counterparty to be SCB-Dubai. Relator's disclosed that nicknames and partial names were generally used as to prevent a 'hit' on an SDN search by the NY branch during counterparty checks.

Amesco also had OLT3 access also and, to add to the confusion, dealt with the bank under two names.  *See* Final List of OLT clients, Line 2086. The failure to correctly annotate CDD typified how SCB Dubai allowed AML breaches to occur when dealing with Iranian backed clients and clients that traded heavily with sanctioned corporate entities and Iranian government.

**Arjomandi General Trading** is a company wholly owned by an Iranian national Ali Mohammed Arjomandi.  The relator and many SCB staff responsible for processing new client were well aware that, although he had not been banned, Arjomandi, a highly influential Iranian billionaire businessman, did extensive business with the Iranian government, a subject of discussion in management meetings. *See* Mena Customerwise Aug 2009 Sheet YTD BIP, Line 7483.

**Bright Crescent Trading,** which was listed as **Crescent Trading,** *see* Mena Customerwise Aug 2009 Sheet YTD BIP Line 13261, in the Know Your Client query for account opening, and to update its corporate information to SCB Dubai, SCB management knew the beneficial
owner owned Iranian entities and did business with various Iranian based companies. The wner

**MENZ BONNER KOMAR & KOENIGSBERG LLP**

Jean-David Barnea, Esq.
Assistant United States Attorney
January 9, 2019
Page 5 of 5

accessed his accounts through Straight 2 Bank (S2B) from Tehran in 2011. Through at least 2011, SCB continued to do business with Bright or Crescent.

**Caspian Petrochemical FZE** was listed on the one of the spreadsheets Relator as **Caspian Chemical**. *See* Mena Customerwise Aug 2009 Sheet YTD BIP, Line 11417. Caspian Petrochemical, nicknamed 'Caspian Chemical, FZE' on the spreadsheet should have been flagged as a serious risk as a known Iranian entity but evaded scrutiny because the client name was changed slightly.

**Iran and Dubai Co LLC** was owned by an Iranian national resident in UAE, Mr Arjomandi (see Arjomandi Trading). The client was doing significant transactions and business with Iranian entities. No flags were put on this account at least 2011. This entity was was listed in the bank's management information system BR_MISC IRAN DUBAI. *See* Mena Customerwise Aug 2009 Sheet YTD BIP Line 25526.

**Mapna Co LLC,** Dubai_pos_client Aug 08, Line 1387, is the Dubai based branch of the SDN Mapna Co Iran. The flag for this account was added only in March 2010, which permitted this Iranian owned, Dubai based account to deal into SCB and use OLT3 through to 2010. *See* Final List of OLT clients Sheet, Line 2506. MAPNA INTERNATIONAL had been flagged previously when it was identified as a known Iranian entity. *See also* OLT clients, Line 1497 Aug 2009)

**Dubai Aluminium,** Dubai based, but presented a very strong possibility of doing much business in Iran, but there were no flags in place for this customer. *See* Mena Customerwise Aug 2009 Sheet YTD BIP, Line 15377.