UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BRUTUS TRADING, LLC,<br><br>                Plaintiff,<br><br>      v.<br><br>STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, and STANDARD CHARTERED TRADE SERVICES CORPORATION,<br><br>                Defendants. | No. 18 Civ. 11117 (PAE) |

**SECOND SUPPLEMENTAL DECLARATION OF ALEXANDRE MANFULL**

I, Alexandre Manfull, hereby declare the following pursuant to 28 U.S.C. § 1746:

1. I previously submitted two declarations in support of the United States' motion to dismiss Relator's second amended complaint in the above-captioned case. I have reviewed Relator's motion for an indicative ruling and supporting memorandum, *see* Relator's Motion for Indicative Ruling ("Mot.") and the accompanying Memorandum in Support of Motion for Indicative Ruling ("Mem."), and hereby make the following second supplemental declaration to respond to certain fundamental misunderstandings and other points made in Relator's filings with regard to the U.S. government investigations and financial filings at issue.

2. I make this declaration, like the previous two, based on my own personal knowledge, a review of Relator's allegations and documents relating to these investigations, as well as my general familiarity with the procedures and authorities of other Treasury components,

including the Financial Crimes Enforcement Network ("FinCEN").[1, 2]  I have also reviewed the *BuzzFeed News* article (the "BuzzFeed Article") referenced by Relator, *see* Richard Holmes et al., *The Government and the Whistleblowers*, BuzzFeed News (Sept. 25, 2020), https://www.buzzfeednews.com/article/richholmes/standard-chartered-bank-money-iran-fbi. This declaration does not set forth all of my knowledge of the matters discussed herein.  All dates and amounts set forth are approximate and to the best of my recollection, unless otherwise noted.

## OFAC'S MISSION AND AUTHORITY

3. As explained in my initial declaration, OFAC is the agency within Treasury that is principally responsible for administering U.S. economic sanctions programs on behalf of the U.S. government.  Most of OFAC's economic sanctions programs are administered under the authority of the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, and various Executive Orders issued pursuant to that statute.

## RELATOR'S LATEST ARGUMENT

4. In its latest papers, Relator claims that there are at least 31 entities subject to U.S. sanctions in documents that it and Anshuman Chandra provided to the U.S. government in 2012-13 that were also the subject of alleged Suspicious Activity Reports ("SARs") filed by Standard Chartered Bank ("SCB" or the "Bank") with FinCEN, as described in the BuzzFeed Article. Mot. ¶¶ 9, 13; Mem. at 2.  In particular, the article cited by Relator claims that "the bank filed at least 35 SARs on 31 customers that appeared in the documents Chandra and [Julian] Knight [of

---

[1] This declaration uses abbreviations and capitalized terms defined in my earlier declarations.
[2] FinCEN is a Treasury bureau whose mission is to safeguard the financial system from illicit use, money laundering, and related crimes, including terrorism, and to promote national security through the strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence.  *See generally* 31 U.S.C. § 310; https://www.fincen.gov/about/mission.

the Relator entity] sent to the FBI in 2013." Elsewhere, Relator alleges without citation to evidence that the alleged relevant SARs disclosed "hundreds" of SCB transactions that violated Iran sanctions (Mot. ¶¶ 7, 9) and misrepresents the article by suggesting that the alleged SARs all described prohibited transactions with sanctioned Iranian parties (*id.* ¶¶ 9, 11), rather than several types of reportable activities, *cf.* BuzzFeed Article ("*[s]ome* of the 35 SARs mentioning customers in the whistleblowers' documents discussed possible links to Iran" (emphasis added)). Relator admits that it has not reviewed the alleged SARs. Mot. ¶ 14.

## PRIOR INVESTIGATIONS OF STANDARD CHARTERED BANK

5.  As explained in my prior declarations and the accompanying motion papers, Relator never specifically identified to the U.S. government any of the entities that were subsequently determined to be Iranian front companies in the investigation that led to the 2019 settlement agreements with SCB. While some of the entities (or associated individuals) that were ultimately found to be involved in apparent sanctions violations may have appeared within the large number of SCB Dubai customer lists and transaction lists that Relator produced to the U.S. government, Relator never identified any of them as meriting further investigation among the thousands of non-Iranian entities based in Dubai or elsewhere in the United Arab Emirates ("U.A.E."), which have not been accused of illegal associations or transactions with Iranian entities. As Relator admits, it produced "tens of thousands of pages of spreadsheets and other financial records" (Mot. ¶ 4) to the U.S. government, but identified only a small number of those customers or transactions as involving Iran or Iranian parties for the Government to investigate. Specifically, Relator pointed to a small number of known Iran-related entities on these lists (major Iranian banks, government agencies, and companies) as evidence that SCB had continued to engage in business with Iran after 2007. *See* BuzzFeed Article ("[p]oring over Standard

Chartered's accounts, [Knight] found a number of customers in Iran, a country under US sanctions"). Relator did not suggest that the U.S. government should investigate the thousands of seemingly legitimate non-Iranian, U.A.E.-based customers of SCB's Dubai branch that were also listed in the documents it produced to see if they had any undisclosed Iranian connections, nor would it have been within the reasonable scope of the investigation into Relator's claims for the U.S. government to do so.

6. As I explained in my prior declarations, OFAC and other agencies investigated Relator's allegations that SCB had continued to process transactions in U.S. dollars with its known Iranian clients after 2007, when the bank had promised it would terminate such business. However, that investigation concluded that the post-2007 transactions were largely permissible wind-down transactions or otherwise did not constitute violations for reasons discussed in the prior declarations, for example because they were conducted in currencies other than U.S. dollars by non-U.S. financial institutions or otherwise not conducted through U.S. financial institutions. Again, the investigation of Relator's claims was limited to an analysis of the post-2007 transactions by the known and overt Iranian clients identified on the documents provided.

7. As I also explained previously, the separate investigation that led to the 2019 settlements concerning several clients of SCB's Dubai branch—including several entities owned by an Iranian individual, Mahmoud Reza Elyassi—was based on information obtained from another matter. That information identified a U.A.E.-based petrochemical company client (which does not appear in Relator's documents) with improper Iranian connections that the Bank should have identified. This in turn led the U.S. government to investigate several other clients of SCB's Dubai branch, including those associated with Mr. Elyassi, whose interactions with the Bank (by fax and online) suggested Iranian links. Relator did not identify the Iranian

connections of those U.A.E. entities to the U.S. government, nor did it suggest that the government should investigate whether such links existed. Thus, as I explained previously, the presence or absence in Relator's voluminous client lists and transaction registers of any of the U.A.E.-based SCB clients that the U.S. government ultimately identified as having improper Iranian links does not indicate any role by Relator in helping to identify these entities.

## SUSPICIOUS ACTIVITY REPORTS

8. SARs are among a number of non-public reports that are filed by banks and other financial institutions with FinCEN pursuant to a collection of anti-money laundering laws commonly referred to as the Bank Secrecy Act ("BSA").[3] *See generally* 31 U.S.C. § 5318(g); *see also, e.g.*, *id.* § 5313 (statutory authority for the filing of currency transaction reports). Banks file SARs to report a broad spectrum of suspicious activity, including potential money laundering, tax evasion, and other illegal activity. Generally speaking, a transaction at or above a certain dollar threshold must be reported if a bank "knows, suspects, or has reason to suspect" that the transaction: involves funds derived from illegal activity; is designed to evade a BSA requirement; or has no business or apparent lawful purpose or is not the sort in which the particular customer would normally be expected to engage, and the bank knows of no reasonable explanation for the transaction. *See* 31 C.F.R. § 1020.320(a)(2) (outlining the categories for which a bank must file a SAR). This last category of mandatory SAR filings is intentionally broad and covers potentially any suspected unlawful activity. SARs themselves do not constitute evidence of wrongdoing, but rather suspicions of potential illegal activity that can provide leads to U.S. government agencies. *See SAR Confidentiality Final Rule*, 75 Fed. Reg. 75,593, 75,594

---

[3] The BSA includes the Currency and Financial Transactions Reporting Act of 1970, as amended by Title III of the USA PATRIOT Act of 2001 and other legislation codified at 12 U.S.C. §§ 1829b, 1951-1959, and 31 U.S.C. §§ 5311-5314 and 5316-5332.

(Dec. 3, 2010) ("SARs generally are unproven reports of possible violations of law or regulation, or of suspicious activities, that are used for law enforcement or regulatory purposes."). Moreover, as further described below, SARs may be filed for a broad spectrum of potential illegal activities, of which sanctions violations are just one.

9. For example, there are over twenty different specified kinds of suspicious activity that a financial institution can identify through the SAR form (though these categories are not exhaustive of reportable types of suspicious activities). Some examples of specified reportable activity include: structuring (*i.e.*, breaking up a transaction into several transactions to evade a reporting or record-keeping requirement); terrorist financing; financial fraud (*e.g.*, check fraud, consumer loan fraud, credit card fraud, health care fraud, and securities fraud); illegal gaming activities; and money laundering (*i.e.*, disguising the proceeds of illicit activity). In addition, specifiable suspicious activity includes suspected criminal activity involving: a customer's identification; insurance products; securities products; mortgage products; account takeover; bribery; counterfeit instruments; elder financial exploitation; embezzlement; forgeries; human smuggling and trafficking; identify theft; little or no concern for product performance or fees; misuse of position; corruption; use of informal transfer value systems; use of multiple transaction locations; transactions with no business or apparent lawful purpose; transactions involving high-risk jurisdictions; two or more individuals working together; unlicensed or unregistered money services businesses; and a cyber event. *See FinCEN Suspicious Activity Report (FinCEN SAR) Electronic Filing Requirements XML Schema User Guide*, Attachment C, at 153-59 (July 2020), https://bsaefiling.fincen.treas.gov/docs/XMLUserGuide_FinCENSAR.pdf.

10.     Reports filed with regard to activities that banks believe may relate to potential sanctions violations (which usually fall under "transactions involving high-risk jurisdictions") constitute a small fraction of total SAR filings.[4]

11.     SARs are subject to strict confidentiality requirements.  *See generally* 31 U.S.C. § 5318(g)(2); 31 C.F.R. § 1020.320(e); 12 C.F.R. § 21.11(k).  SARs, and any information that would reveal the existence of a SAR, are confidential and cannot be disclosed except as specifically authorized by law.  *Id.*  These confidentiality requirements prohibit financial institutions, government entities, and their respective officers and agents from disclosing SARs and any information that would disclose the existence of a SAR, including in response to discovery requests and subpoenas in private litigation.  *Id.*  Violations of the confidentiality provisions expose violators to criminal liability.  31 U.S.C. § 5322(a).  The unauthorized disclosure of Suspicious Activity Reports can compromise the national security of the United States as well as threaten the safety and security of those institutions and individuals who file such reports.  *See* Statement by FinCEN Regarding Unlawfully Disclosed Suspicious Activity Reports (Sept. 1, 2020), https://www.fincen.gov/news/news-releases/statement-fincen-regarding-unlawfully-disclosed-suspicious-activity-reports ("[T]he unauthorized disclosure of SARs is a crime that can impact the national security of the United States, compromise law enforcement investigations, and threaten the safety and security of the institutions and individuals who file such reports.").

---

[4] *See* FinCEN, *SAR Filings by Industry*, https://www.fincen.gov/reports/sar-stats/sar-filings-industry (showing transactions with high-risk jurisdictions, such as sanctioned countries, account for less than 1% of banks' total SAR filings by type of suspicious activity category from January 1, 2014 to December 31, 2019).

## SARs AND POTENTIAL SANCTIONS VIOLATIONS

12.     As a preliminary matter, the references to the alleged SARs in Relator's motion are nothing more than unsupported allegations recited in a news article.  Based on the text of the article itself, many of the alleged SARs concern issues unrelated to potential sanctions violations generally or specific violations of Iran sanctions that were not otherwise reported to OFAC.  Due to the strict confidentiality requirements identified above, *see* ¶ 10 *supra*, Treasury cannot confirm or deny herein the veracity of any descriptions in the BuzzFeed Article of alleged SARs or otherwise discuss the contents of any alleged SAR.  As discussed in this declaration and in the U.S. government's accompanying response to Relator's motion, any discussion or review of any alleged or actual SARs is not necessary as it is not relevant to the determinative legal issue currently before the Court.

13.     Relator's allegations that SCB may have filed such alleged SARs would not change the U.S. government's conclusion from its investigation of Relator's allegations: that the Bank's post-2007 transactions with its known Iranian clients did not give rise to additional Iran sanctions violations charges.  The presence in Relator's documents of known Iranian SCB clients was evident—and the investigation was able to relatively easily identify those entities and look more closely at their post-2007 transactions.  Whether SCB filed any alleged SARs related to these known Iranian clients is irrelevant because the principal question under investigation was whether the Bank's own post-2007 transactions with those Iranian entities violated any sanctions rules.

14.     It was also irrelevant to the investigation into Relator's claims whether SCB had filed alleged SARs relating to its non-Iranian Dubai-based clients as these entities were not part of that investigation, which again focused on Relator's claims regarding identifiable Iranian

entities. Certainly nothing in Relator's disclosures suggested that such entities in general, or any specific ones, required a further review.

15. Moreover, as the BuzzFeed Article makes clear, at least many of the alleged SARs it describes were purportedly filed after Relator provided its disclosures to the U.S. government and thus would not have even been in existence at the time the government investigated Relator's claims. The only alleged SARs discussed in the BuzzFeed Article for which dates are provided were filed between 2014 and 2017, well after the investigation into Relator's allegations was completed in 2013.

16. As for the separate investigation that led to the 2019 settlements with SCB, I understand that the FBI has filed a supplemental declaration in this case, which describes searches that government investigators conducted in certain circumstances when the investigative agencies uncovered evidence during that investigation relating to possible Iranian connections of particular clients of SCB's Dubai branch, without any consideration of whether such entities may have coincidentally also appeared on lengthy client lists or transaction registers provided by Relator years earlier.

## THE ALLEGATIONS IN THE BUZZFEED ARTICLE

17. The BuzzFeed Article makes vague and unsupported allegations that SCB continued to process transactions for Iranian customers after 2007 in violation of U.S. sanctions, without any evidence from the alleged SARs or otherwise. Furthermore, it does not appear that the alleged SARs discussed in the BuzzFeed Article describe any Iranian companies or Iranian front companies based in the U.A.E.—which were the focus of the investigation into SCB Dubai's clients that led to the 2019 settlements. The article provides details regarding only four

of the alleged 35 SARs that supposedly relate to entities appearing on Relator's documents, none of which seem to be Iranian entities.

18.     First, the article discusses alleged SARs relating to SCB transactions with Al Zarooni Exchange, a U.A.E. (not Iranian) company that has never been subject to Iran-related sanctions.  Treasury sanctioned Al Zarooni Exchange in 2015 for providing support to a Dubai money-laundering organization, the Khanani Money Laundering Organization, which had laundered funds for Chinese, Columbian, and Mexican crime groups, and whose head was involved in moving funds for the Taliban along with the Al Zarooni Exchange.  *See* U.S. Dep't of Treasury, Press Release, *Treasury Sanctions the Khanani Money Laundering Organization* (Nov. 12, 2015), https://www.treasury.gov/press-center/press-releases/Pages/jl0265.aspx.  The sanctions imposed on this organization were thus based on illegal activity entirely unrelated to the Iranian sanctions at issue in this case.  Moreover, according to the article, the transactions that SCB reported in the alleged SARs had been processed in 2009 and 2010, more than five years before sanctions were imposed on Al Zarooni Exchange.

19.     Next, the BuzzFeed Article describes an alleged SAR filing from 2017 relating to transactions with a diamond trading company that had been accused "by prosecutors" of "black market diamond sales, tax evasion, and bribery."  There is no indication that this company was an Iranian entity or was ever subject to Iran sanctions.

20.     Finally, the BuzzFeed Article states that "some" (it does not specify how many) "of the 35 SARs mentioning customers in the whistleblowers' documents discussed possible links to Iran."  Of course, not any "possible link[] to Iran" would subject a company to Iran sanctions.  A non-Iranian company might have been linked to Iran or engaged in a transaction with an Iranian entity without being an Iranian front company or otherwise subjecting itself to

sanctions.  From the article's description, it is clear that the two examples provided are of non-Iranian entities: one "used 'fraudulent documents' to hide trade with Iran until at least 2014" and the other "'may have sought to obfuscate' payments to Iran for the leasing of containers at Iranian airports, according to a 2017 [alleged] SAR."  As discussed above, Relator does not appear to have highlighted the Iran-related links of these two non-Iranian companies—or any non-Iranian entities—to the U.S. government during its investigation.

21.     As explained in my prior declarations, the relevant Iran sanctions regulations prohibit the exportation to Iran of financial services from the United States or by "U.S. persons" (such as U.S. financial institutions), including exports of financial services from the United States to third countries with knowledge or reason to know the services are intended specifically for Iran.  *See* 31 C.F.R. § 560.204.  The fact that non-Iranian companies previously engaged in transactions that were subsequently linked to Iran does not mean that the specific transactions processed by SCB related to Iran, or if they did, that they violated sanctions rules.  Moreover, even if a company had engaged in some improper Iran-related transactions, it does not mean that all of its other transactions with non-Iranian parties violate the sanctions rules.  For example, in recent years OFAC has taken enforcement actions for Iran sanctions violations against major American and international companies and financial institutions including Apple, Amazon, Berkshire Hathaway, HSBC, and Société Générale (a French bank)—but that does not mean that the Iran sanctions rules prohibit any transactions with those companies by U.S. persons or involving the United States.

22.     Further, in terms of whether *SCB* could be potentially viewed as having violated sanctions regulations by facilitating the transactions described in the supposed SARs, Relator fails to demonstrate that the Bank was aware of any Iranian components of these transactions at

the time it processed these transactions for its non-Iranian customers, or that the transactions were ever confirmed to violate Iran sanctions regulations.  At the very least, if SCB reported these transactions to FinCEN in alleged SARs, the Bank does not appear to have attempted to conceal from the U.S. government its role in these transactions.

23. In any event, the mere presence in Relator's documents of a handful of non-Iranian companies that SCB allegedly reported to FinCEN, sometimes years later, for having engaged in suspicious transactions with Iranian entities does not bolster Relator's claim.  It still remains the case that Relator never identified these (or any other non-Iranian) entities to the U.S. government.

## THE MAXIMUM PRESSURE CAMPAIGN AGAINST IRAN

24. Finally, Relator's new motion repeats an inaccurate accusation it made in its previous briefing: that the agencies investigating SCB in this case failed to implement the "maximum pressure" sanctions campaign against Iran announced after the United States withdrew in 2018 from the Joint Comprehensive Plan of Action ("JCPOA") nuclear deal.  As noted in the State Department fact sheet about the maximum pressure campaign cited by Relator, OFAC and State have sanctioned a large number of individuals and entities on OFAC's List of Specially Designated Nationals and Blocked Persons ("SDN List") and re-imposed a range of secondary sanctions since the JCPOA withdrawal.  *See* U.S. Dep't of State, *Fact Sheet: Maximum Pressure on the Regime in Iran* (Apr. 4, 2019), https://www.state.gov/maximum-pressure-campaign-on-the-regime-in-iran.

25. However, OFAC primary sanctions—such as those relevant to the SCB investigations—have broadly prohibited the processing of transactions with Iran through U.S. financial institutions since November 2008 under separate prohibitions that have been in effect

before, during, and after the United States' participation in the JCPOA. *See* 31 C.F.R. § 560.204.[5] The "maximum pressure" campaign does not allow OFAC to apply penalties for transactions that were not U.S. sanctions violations at the time they occurred. The Iran sanctions program, and all sanctions programs, are subject to the agency's general enforcement framework of undertaking a case-by-case evaluation of specific facts and circumstances when determining the appropriate enforcement response. Indeed, OFAC's Economic Sanctions Enforcement Guidelines require the consideration of a range of factors when assessing an apparent violation of its sanctions programs. *See* 31 C.F.R. §§ 560.703(c)-(d), 560.704; OFAC Economic Sanctions Enforcement Guidelines, 31 C.F.R. Part 501, App. A.

26. As noted in prior declarations in this case, OFAC and other federal agencies have aggressively and consistently enforced the relevant primary sanctions against both U.S. and non-U.S. financial institutions alleged to have processed transactions through the United States for as long as those sanctions have been in effect. For example, OFAC concluded 26 sanctions enforcement actions in 2019 resulting in over $1.28 billion in penalties and settlement amounts for alleged violations of its sanctions programs, including the $639 million 2019 Settlement Agreement with SCB, which was part of a combined $1.1 billion settlement with OFAC's federal, state, local, and United Kingdom government partners.[6] From 2009 to 2019, OFAC

---

[5] Primary sanctions are those that prohibit virtually all transactions with Iran by U.S. persons or through the United States and were not lifted under the JCPOA (with limited exceptions not relevant here). *See* Iranian Transactions and Sanctions Regulations, 31 C.F.R. Part 560. By contrast, secondary sanctions are generally those that allow the U.S. government to impose sanctions on non-U.S. persons for engaging in targeted activity with designated Iran-related persons or specific sectors in Iran, which was the focus of the re-imposition of sanctions following the U.S. withdrawal from the JCPOA.

[6] U.S. Dep't of Treasury, Press Release, *U.S. Treasury Department Announces Settlement with Standard Chartered Bank* (Apr. 9, 2019), https://home.treasury.gov/news/press-releases/sm647.

collected over $5.64 billion in penalties and settlements for alleged violations of OFAC's sanctions regulations, including $5.27 billion from U.S. and foreign banks.

\* \* \*

27. Ultimately, Relator has not provided any evidence that the vague and unsupported allegations in the BuzzFeed Article relate to transactions with Iranian entities identified by Relator, much less transactions that represent violations of U.S. sanctions against Iran that were not investigated by OFAC. The alleged SARs described in the BuzzFeed Article do not show that OFAC failed to investigate Relator's allegations against SCB of Iran sanctions violations. Relator has not provided any new information in its motion to change OFAC's view that dismissal of its case is appropriate.

Dated: Washington, D.C.
December 22, 2020

*[signature]*
ALEXANDRE MANFULL
Assistant Director
Sanctions Compliance and Evaluation
Office of Compliance and Enforcement
Office of Foreign Assets Control