UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

        Plaintiff,       Case No. 18 Civ. 11117 (PAE)

    v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVIICES
CORPORATION,

        Defendants.

-------------------------------------------------------------x

### RELATORS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SET ASIDE JUDGMENT

Patrick M. McSweeney
Robert J. Cynkar
McSweeney Cynkar & Kachouroff PLLC
*Attorneys for Relator*
3358 John Tree Hill Road
Powhatan, VA 23139
(804) 937-0895

## TABLE OF CONTENTS

Preliminary Statement ..................................................................................................1

Procedural and Factual Background ...............................................................................3

   A.  The Government's motion to dismiss Brutus' Second Amended Complaint ......................3

   B.  Brutus's motion for an indicative ruling ...............................................................7

   C.  The decloaked Brutus Data .................................................................................9

Argument

   I.     The Government Defrauded the Court ....................................................13

      A.  Legal Standard .................................................................................13

      B.  The Government's false and misleading statements constitute 'fraud on the court' ...14

   II.    The Record Presents more than a colorable claim of Fraud Warranting Targeted Discovery ...16

Conclusion ............................................................................................................18

TABLE OF AUTHORITIES

PAGE(S)

Cases

*Brutus Trading LLC v. Standard Chartered Bank*
2023 WL 5344973 (2d Cir. August 21, 2023) ..................................................................... 9, 15

*Dobyns v. United States*
2014 WL 7934306 (Fed. Cl. Dec. 14, 2014) ........................................................................ 16

*Grynberg v. BP P.L.C.*
2016 WL 11472270 (D.D.C. March 1, 2016) ...................................................................... 16

*Hadges v. Yonkers Racing Corp.*
48 F.3d 1320 (2d Cir. 1995) .................................................................................................. 13

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*
322 U.S. 238 (1944) ............................................................................................................... 2

*King v. First American Investigations, Inc.*
287 F.3d 91 (2d Cir. 2002) .................................................................................................... 13

*Kraus v. Wells Fargo & Co.*
943 F.3d 588 (2d Cir. 2019) .................................................................................................. 12

*LabMD, Inc. v. Tiversa, Inc.*
2016 WL 3695381 (N.D. Ga. May 12, 2016) ...................................................................... 16

*Leber-Krebs, Inc. v. Capitol Records*
779 F.2d 895 (2d Cir. 1985) .................................................................................................. 13

*Pearson v. First NH Mortg. Corp.*
200 F.3d 30 (1st Cir. 1999) ...................................................................................... 13, 15, 16

*Pfizer, Inc v. United States Dep't of Health & Hum. Servs.*
42 F.4th 67 (2d Cir. 2022) ..................................................................................................... 12

*United States ex rel. Brutus Trading v. Standard Chartered Bank*
2020 WL 3619050 (S.D.N.Y. July 2, 2020) ................................................................. 3, 6, 7

*United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank*
2021 WL 4772142 (S.D.N.Y. Oct. 13, 2021) .................................................................... 7, 9

*United States v. Universita*
298 F.2d 365 (2d Cir. 1962) .................................................................................................. 14

*United States v. Wey*
256 F. Supp.3d 355 (S.D.N.Y. 2017) ...................................................................................... 4

*Whitmore v. Symons Intern'l Grp., Inc.*
2011 WL 806624 (S.D. Ind. March 1, 2011) ...................................................................... 16

Statutes

31 U.S.C. §3729(a)(1)(G) ........................................................................................................... 12

31 U.S.C. § 3703(c)(2)(A) ............................................................................................................ 3

§ 3729(a)(1)(A) ................................................................................................................ 12, 13

Rules

Fed. R. Civ. P. 60 ................................................................................................................ 7

Fed. R. Civ. P. 60(d)(3) ...................................................................................................... 1

Fed. R. Civ. P. 62.1 .......................................................................................................... 7, 9

## PRELIMINARY STATEMENT

Relator Brutus Trading, LLC ("Brutus") respectfully submits this memorandum of law in support of its motion, pursuant to Fed. R. Civ. P. 60(d)(3) ("Rule 60(d)(3)") and the Court's inherent power, to set aside the final judgment dismissing this action (the "Motion").  As demonstrated below, plaintiff United States of America (the "Government") perpetrated a colossal fraud on this Court by falsely denying that Brutus gave the Government previously unknown, damning evidence that defendants Standard Chartered Bank, Standard Chartered PLC, and Standard Chartered Trade Services Corporation (collectively, "SCB" or the "Bank") violated U.S. and international sanctions.  Although the Government denied it, SCB transacted with Iranian entities and foreign terrorist organizations for years after it claimed to have stopped.  False declarations submitted to the Court by the Government thus corrupted the integrity of this judicial proceeding to its very core.

Brutus does not make the Motion lightly.  It tried to set aside the judgment once before, but was defeated by the Government's persistent and impenetrable misrepresentations.  At that time, Brutus had no meaningful opportunity to challenge the Government's false statements, which the Court accepted at face value.  "But in the end truth will out."  Now, the question is not *if* the Government misled the Court; the question has become the full extent of the Government's deception.

With the assistance of forensic data analysis, Brutus was only recently able to reveal or "decloak" countless illegal transactions that were hidden deep in the Bank's electronic spreadsheets, which Brutus gave to the Government ("Brutus Data").  One cannot overstate the significance of that discovery.  The decloaked Brutus Data definitively shows that – long after the Bank supposedly discontinued its Iranian operations in 2007 – SCB facilitated *many billions of*

*dollars* in banking transactions for Iran, numerous international terror groups, and the front companies for those groups (including those for Hamas, Hezbollah, the Taliban, and al-Queda). Because Brutus gave those spreadsheets to the Government in 2012 and 2013, they refute any claim that Brutus did not provide the Government with new evidence of SCB's post-2007 sanctions violations.

Those false representations had profound consequences.  For example, they concealed from the Court SCB's transactions with a notorious Pakastani fertilizer company, which sold explosive materials to al-Queda and the Taliban for the roadside bombs that killed or maimed hundreds of U.S. and U.K. military personnel in Afghanistan.  They similarly concealed evidence that SCB used money borrowed from the United States during the global financial crisis to finance the operations of the Central Bank of Iran.  And they also concealed illegal foreign currency transactions by an Iranian steel manufacturer that supplies the Iranian military with components for its ballistic missiles and drones – lethal Iranian weapons that have lately rained down on both Ukraine and Israel.  The list goes on.

Long ago, the Supreme Court underscored that a fraud on the court "involves far more than an injury to a single litigant."  *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944).  It "is a wrong against the institutions set up to protect and safeguard the public; institutions in which fraud cannot complacently be tolerated consistently with the good order of society."  *Id.* Where, as here, the fraud is perpetrated by a coordinate branch of government, and involves "issues of great public moment" – such as the investigation and interdiction of global terror financing – the repercussions for "the good order of society" are exponentially more grave.  *Id.*  The Court should grant the Motion.

## PROCEDURAL AND FACTUAL BACKGROUND

As the Court is aware, the history of this case is long and somewhat complicated. Accordingly, Brutus will limit its procedural and factual statement to only the most relevant portions of the record.

### A. The Government's motion to dismiss Brutus' Second Amended Complaint.

Brutus filed its second amended complaint in this matter ("SAC") on September 20, 2019. *See United States ex rel. Brutus Trading v. Standard Chartered Bank*, 2020 WL 3619050, at *2 (S.D.N.Y. July 2, 2020) ("*Brutus Trading I")*. On November 21, 2019, the Government moved, pursuant to 31 U.S.C. § 3703(c)(2)(A), to dismiss the SAC. *See id.* The Government argued, *inter alia*, that Brutus's "allegations did not lead to the discovery of any new [False Claims Act] violations by [SCB] and were not the impetus for the 2013 Investigation." *Id.* at *3. The Government further argued that dismissal was appropriate "because, were the case to proceed to discovery, the Government would be required to expend resources on a matter that it found meritless." *Id.*

In support of its dismissal motion, the Government submitted the declarations of: (1) FBI Special Agent Matthew F. Komar ("Komar"); (2) FBI Special Agent Wayne Boddy ("Boddy"); (3) Alexandre Manfull, Assistant Director, Sanctions Compliance and Evaluation, Office of Foreign Assets Control ("Manfull"); (4) Patrick Bryan, Assistant General Counsel for Enforcement, Board of Governors of the Federal Reserve System ("Bryan"); and (5) Elizabeth Nochlin, Director, Investigations and Intelligence Division, New York State Department of Financial Services ("Nochlin"). *See Brutus Trading I*, 2020 WL 3619050, at *2. In addition to other information, the declarants provided the following sworn written testimony:

3

1.  <u>FBI Special Agent Komar</u>[1]

Komar stated categorically that the FBI's investigation of SCB, including the Brutus Data,

did *not lead us to uncover any evidence of sanctions violations* or violations of the [Government's 2012 Deferred Prosecution Agreement with SCB] of the types alleged by the Relator.  Instead, we found that the information provided by the Relator *related almost entirely to the Bank's winding down of its pre-existing transactions with Iranian clients in a manner that did not appear to violate the U.S. sanctions laws, or to the presence of Irian entities on client lists and similar types of records without any evidence that these clients had engaged in any illegal transactions*.  We also verified that the Bank had previously disclosed most of the specific customer relationships at issue to DOJ and OFAC.

*See* Declaration of Patrick McSweeney, dated May 31, 2024 ("McSweeney Dec."), Exh. A, ¶ 24

(emphasis added).

Komar later reiterated that,

[a]s explained in my prior declaration, and in the declaration provided by Alexandre Manfull of OFAC, our investigation concluded that SCB's post-2007 transactions with [Iranian] clients which were referenced in [Brutus's] documents *were either legitimate wind-down transactions* that the Bank had previously (*i.e.,* before [Brutus] filed its complaint) disclosed to DOJ and OFAC *or otherwise did not appear to violate any sanctions rules.*

McSweeney Dec., Exh. B, ¶ 2 (emphasis added).  Komar also represented that the Government

"did *not find evidence that the bank had facilitated improper foreign exchange transactions* with

known Iranian entities or that it had hidden such transactions by booking the associated revenue

in 'sundry' accounts." *Id.*, Exh. B, ¶ 3 (emphasis added).  He insisted that,

as part as preparing this declaration, I have re-reviewed [the materials provided by Brutus], *including all "hidden" information I could locate*, and did not see any additional material information that would have been relevant to our investigation, such as information suggesting that any entities other than those [Brutus] brought to our attention at the time were Iranian.

---

[1]    It is noteworthy that Komar's official actions have failed to meet acceptable standards before.  In *United States v. Wey*, 256 F. Supp.3d 355 (S.D.N.Y. 2017), then-District Judge Nathan suppressed evidence that had been seized by the FBI while executing search warrants.  Komar supervised the FBI warrant execution teams.  Judge Nathan found that those "agents – who are charged with reasonable knowledge of what the law prohibits – appear to have disregarded well-established constitutional principles that provide a bulwark against the execution of [unlawful] warrants." *Id.* at 408.  She further concluded that their actions "reflect[ed], at least, gross negligence or recklessness." *Id.*

*Id.*, Exh. B, ¶ 5 n.3 (emphasis added).

    2.  <u>Alexandre Manfull (OFAC)</u>

Manfull made similar statements.  For example, Manfull stated that the Brutus Data

> showed that seven Iranian entities held U.S. dollar accounts at SCB after January 1, 2008.  Of these, five accounts had no activity after 2007, and the remaining two (Bank Saderat and National Iranian tanker Company) reflected activity that was limited to wind-down obligations, for which Iranian customers' payments to SCB were made in non-U.S. dollar currencies.

McSweeney Dec., Exh. C, ¶ 35.  "As for SCB's online foreign-exchange system," he further stated

that "*only one Iranian customer (Bank Saderat) had access to the system after January1, 2008*,

but SCB access logs showed that this customer did not access the system in that timeframe."  *Id.,*

Exh. C, ¶ 36 (emphasis added).

> Manfull represented to the Court that OFAC, having reviewed the Brutus Data,

> concluded that the information [Brutus] provided likely *reflected neither any new business with a U.S. nexus that SCB had entered into with Iran after 2007, nor transactions with any SDN*, but rather the bank's wind-down of its pre-2007 relationships with its Iranian clients.  Moreover, to the extent any of the transactions between Iranian clients and SCB reflected in [Brutus's] documents were processed through the U.S. financial system, OFAC concluded that those transactions were likely consistent with the "U-turn' general license, and did not constitute apparent violations of OFAC's regulations.

McSweeney Dec., Exh. C, ¶ 37 (emphasis added) *see also id.*, Exh. D, ¶¶ 21-23.  He also stated

that "OFAC did not have to determine whether" SCB's pre-2007 Iranian clients had access to

SCB's online foreign exchange system because other federal agencies had "found no evidence that

any of the Iran-based clients identified as a result of the [Brutus data] engaged in online foreign-

exchange transactions with SCB after 2008."  *Id.*, Exh. C, ¶ 55.

### 3.  Patrick M. Bryan (Federal Reserve Board)

Bryan's statement was succinct.  After "participat[ing]in a multiagency investigation of [Brutus's] allegations, including . . . [a] review of the materials provided by [Brutus]," he wrote, the Federal Reserve Board "determined that the information provided by [Brutus] and obtained in connection with the investigation of its allegations *did not warrant further administrative action by the Board* and did not undermine or otherwise affect the basis for the Board's 2012 Orders." McSweeney Dec., Exh. E, ¶ 10 (emphasis added).

### 4.  Elizabeth Nochlin (NYS Department of Financial Services)

Nochlin's statement placed the actions of the NYS Department of Financial Services (the "Department") and OFAC squarely in lockstep.  According to her account, "[w]hile the Department and OFAC cited SCB for a different total number of violations, . . . the *difference does not represent a distinction in the investigation* undertaken by the two agencies."  McSweeney Dec., Exh. F, ¶ 18 (emphasis added).  The difference, she explained, was "based on the different statutes of limitations that apply to the different agencies and their different conclusions regarding the transactions should be included in a settlement given the agencies' respective enforcement priorities."  *Id.*

Convinced by the Government's declarations, the Court dismissed the SAC.  It had "no difficulty finding that the Government [had] proffered a valid government purpose for seeking to dismiss the *qui tam* action – namely, the early termination of actions as to which the Government has determined that the factual allegations are meritless."  *Brutus Trading I*, 2020 WL 3619050, at *3.  Indeed, relying on those declarations, the Court concluded that it had "no basis to doubt[] that the Government undertook a lengthy, costly, and substantial investigation into [relator]'s claims

that spanned several years and multiple offices and agencies." *Id*. (internal quotation marks omitted).

**B. Brutus's motion for an indicative ruling.**

Brutus appealed the dismissal of the SAC to the United States Court of Appeals for the Second Circuit. *See United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank*, 2021 WL 4772142, at *1 (S.D.N.Y. Oct. 13, 2021) ("*Brutus Trading II*"). While that appeal was pending, Brutus moved in this Court, pursuant to Fed. R. Civ. P. 62.1, for an indicative ruling ("Rule 62.1 Motion"). *See id.* Based on certain news-report disclosures involving post-2007 illegal transactions by SCB, Brutus argued that the Court should vacate the SAC's dismissal under several provisions of Fed. R. Civ. P. 60. *See id.* In opposing the Rule 62.1 Motion, the Government again submitted a series of declarations by Komar and Manfull. *See id.* at *3.

1. FBI Special Agent Komar

In response to the Rule 62.1 Motion, Komar reiterated that the post-2007 transactions contained in the Brutus Data "were either legitimate wind-down transactions that the Bank had previously disclosed to DOJ and OFAC or otherwise did not appear to violate any sanctions rules." McSweeney Dec., Exh. G, ¶ 3. He further restated that the FBI "did not find evidence of any wrongdoing in connection with SCB's foreign-exchange sundry account, nor did it appear that any Iranian client had engaged in foreign-exchange transactions through the Bank's online system after 2007." *Id.*, Exh. G, ¶ 13.

But for the first time, Komar went on to detail that the Brutus Data contained 49 files that "were Microsoft Excel spreadsheets containing monthly reports from 2010 to 2012." McSweeney Dec., Exh. H, ¶ 16. He stated that the "reports were in the form of pivot tables that display the information in summary form, which can be expanded to show the underlying full data." *Id.*

7

Komar surmised that those pivot tables "appear[] to be what [Brutus] repeatedly refers to as 'hidden cells' in the documents." *Id.*  He then stated that the "clients identified as Iranian in these reports consisted largely of the same Iranian entities that had been included in [Brutus's] documents and whose relationships with the Bank had been previously reviewed as part of the investigation into [Brutus'] allegations." *Id.*  In the same dismissive way, Komar also discussed evidence contained in the Brutus Data "regarding SCB's relationships or potential relationships with known Iranian clients," but again asserted that "none of these documents indicated or suggested that the Bank had engaged in improper U.S. dollar transactions with such clients after 2007." *Id.*, Exh. H, ¶ 18.

    2.  <u>Alexandre Manfull (OFAC)</u>

Manfull hammered home the same fundamental point over and over: "OFAC and other agencies investigated [Brutus's] allegations that SCB had continued to process transactions in U.S. dollars with its known Iranian clients after 2007, when the bank had promised it would terminate such business."  McSweeney Dec., Exh. I, ¶ 6.  He also repeatedly asserted that the "investigation concluded that the post-2007 transactions were largely permissible wind-down transactions or otherwise did not constitute [sanctions] violations." *Id.*  Lest there be any doubt, Manfull made clear the "the U.S. government's conclusion from its investigation of [Brutus's] allegations" was "that the bank's post-2007 transactions with its known Iranian clients did not give rise to additional Iran sanctions violations charges." *Id.*, Exh. H, ¶ 13; *see also id.*, Exh. J, ¶ 28 ("OFAC and other agencies carefully investigated [Brutus's] allegations . . . and did not find they provided evidence of sanctions violations.").  And with great indignation, Manfull stated that he "and other OFAC personnel [had] spent hundreds of hours of agency time and countless agency resources responding

to and refuting [Brutus's] misstatements . . . which would otherwise have been used to support active sanctions investigations and other agency priorities." *Id.*, Exh. J, ¶ 29.

The Court denied the Rule 62.1 Motion, concluding in relevant part that Brutus had "not demonstrated that the Court's decision to dismiss [Brutus's] claims was the product of any misrepresentation whatsoever." *Brutus Trading II*, 2021 WL 4772142, at *6.

The Court's dismissal and Rule 62.1 orders were both affirmed on appeal. *See Brutus Trading LLC v. Standard Chartered Bank*, 2023 WL 5344973, at *4 (2d Cir. August 21, 2023) (summary order) ("*Brutus Trading III*"), *cert. denied* 144 S. Ct. 1011 (2024).

### C. The decloaked Brutus Data.

In July 2023, Brutus principal Julian Knight began working with David J. Scanting, a highly accomplished intelligence analyst and forensic investigator who specializes in global terror financing. *See* Declaration of Julian M. Knight, dated May 21 2024 ("Knight Dec."), ¶¶ 5-6; Declaration of David J. Scantling, dated May 20, 2024 ("Scantling Dec."), ¶¶ 8-23. When Mr. Knight and Robert Marcellus (Brutus's other principal) began examining the Brutus Data in 2012, they were not familiar with the ability to embed undisclosed data caches within an Excel spreadsheet using hidden pivot tables. *See* Knight Dec., ¶ 8 n.1; Scantling Dec., ¶ 31 n.5. Once Mr. Scantling instructed Knight and Marcellus how to decloak that hidden data, the three men worked together to reveal millions of SCB transactions that were hidden within the Brutus Data. *See* Knight Dec., ¶¶ 8-11.

By February 2024, Scanting, Knight, and Marcellus had identified over 3.3 million previously undisclosed transactional records, of which 500,000 documented unique transactions spanning from *2008 to 2013*. *See* Knight Dec., ¶ 12; Scantling Dec., ¶ 3. Knight identified at least 20,000 unique FX transactions involving USD vs FX transactions

between SCB Dubai/SCB NY and Iranian-related clients, comprising *approximately $100 Billion* in notional value. *See* Knight Dec., ¶ 12. For his part, Mr. Scantling has isolated more than 906 Iranian-related transactions, executed between January 2008 and March 2012, totaling approximately *$9.6 Billion* in value, and which involved entities and individuals subject to international sanctions. *See* Scantling Dec., ¶¶ 3, 38. Ninety-two of those transactions also involved previously sanctioned entities. *See id.,* ¶¶ 3, 30.

    1.   Decloaked FX transactions

The 20,000 unique Iranian-related FX transactions extracted from the decloaked Brutus Data by Mr. Knight were executed between *2008 and 2013*, and have the cumulative notional value of $100 Billion. *See* Knight Dec. ¶¶ 12, 14. SCB performed each of those transaction using its New York branch and the U.S. Fedwire clearing system, and approximately 65% or 13,000 of them were executed using the OLT3 platform, SCB's online trading system. *See id.* ¶¶ 12, 15-16, 24.

Included in those 20,000 FX transactions are thousands of transactions involving SDNs, FTOs, and their front companies (including Hamas and Hezbollah fronts). *See* Knight Dec. ¶¶ 18-23. And there is evidence that SCB charged huge commissions for those transactions, a method of profiteering known as "gouging" that is commonplace in bank transactions involving known terrorist organizations. *See id.* ¶ 25.

    2.   Specific examples of disturbing SCB post-2007 transactions in the Brutus Data.

Mr. Scantling's breakout of nearly *$10 Billion* in Iranian-related transactions is chilling. *See generally* Scantling Dec. ¶¶ 39-150. It is a catalogue of global terror groups and their financiers. The following is a summary list of SCB's transactional relationships involving some of those entities:

- **Tajco Ltd.** – funder of Hezbollah terror operations.   *See* Scantling Dec. ¶¶ 40-57.

- **Euro African Group Ltd.** – funder of Hezbollah terror operations. *See id.* ¶¶ 40, 54-66.

- **Fatima Group** – Pakastani fertilizer company that sold explosive chemicals to al-Queda, Haqqani Network, and Taliba fronts for manufacturing improvised explosive devices and other bombs used against U.S. troops in Afghanistan. *See id.* ¶¶ 40, 67-79.

- **Lebanese Canadian Bank SAL** – provider of financial services to Hezbollah. *See id.* ¶¶ 40, 80-97.

- **FAL Oil Ltd.** – front company for IRCG-controlled National Iranian Oil Company. *See id.* ¶¶ 103-113.

- **Bank Markazi/Central Bank of Iran** – Iranian central bank that funds Islamic Revolutionary Guards Corps.-Qods Force ("IRGC-QF") and Hezbollah. *See id.* ¶¶ 114-117.

- **Bank Tejarat** – Iranian bank that provides financial services to OFAC designated Iranian shipping and military entities. *See id.* ¶¶ 118-121.

- **National Iranian Tanker Company** – exporter of Iranian crude oil and funder of IRGC-QF and Hezbollah. *See id.* ¶¶ 122-126.

- **Khorasan Steel Company** – Iranian steel producer and funder of Iran's nuclear program, missile development, terrorism, and terrorist proxy networks. *See id.* ¶¶ 128-133.

- **Khouzestan Steel Company** – Iranian steel producer and funder of Iran's nuclear program, missile development, terrorism, and terrorist proxy networks. *See id.* ¶¶ 134-141.

- **Banque d'Algerie** – Central Bank of Algeria that processed foreign exchange transactions through SCB for the ultimate benefit of the Central Bank of Iran. *See id.* ¶¶ 142-143.

Indeed, one especially noteworthy transaction with Banque d'Algerie shows that SCB used money borrowed from the United States Government to fund the Central Bank of Iran. During the height of the 2007–2009 global monetary crisis, SCB's New York branch required substantial

"lender of last resort" funding from the Federal Reserve Bank of New York ("FRBNY"), which acts as part of the U.S. central bank.  To alleviate the severe liquidity shortages faced by domestic and foreign banks during this period, the Federal Reserve implemented, among other programs, the Term Auction Facility ("TAF") program, which provided short-term loans to banks in need of emergency funding.  *See* Scantling Dec. ¶¶ 145-146.

According to the FRBNY, between February 28, 2008, and June 3, 2009, SCB borrowed an aggregate sum of $859,450,000,000 U.S. dollars under the FRBNY's TAF program.  During this period, SCB maintained an average daily outstanding loan balance of $1,864,100,000 U.S. dollars, highlighting the extent to which SCB relied on the U.S. Government's financial support to remain solvent and survive the monetary crisis.  *See* Scantling Dec. ¶¶ 147-148.

On January 29, 2009, SCB received emergency TAF funding in the amount of $2,550,000,000 U.S. dollars from the FRBNY.  On the same day, SCB processed a foreign exchange transaction worth $14,625,102.10 U.S. dollars with its counterparty Central Bank of Algeria, account number "***7349," for the ultimate benefit of the Central Bank of Iran, account number "*****1201."  Incredibly, those decloaked SCB transactions in the Brutus Data reveal that funds provided by the U.S. Government, and ultimately backed by American taxpayers, were used to facilitate illicit transactions for the Iranian regime.  *See* Scantling Dec. ¶¶ 149-150.[2]

---

[2]    The SAC alleges "reverse false claims" by SCB in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(G). The de-cloaked Brutus Data now reveals that SCB also violated § 3729(a)(1)(A) through implied false certifications in the TAF program. That is, "FCA liability can be premised on specific representations about the goods or services provided which, while not expressly false, fail[ ] to disclose noncompliance with material statutory, regulatory, or contractual requirements." *Pfizer, Inc v. United States Dep't of Health & Hum. Servs.*, 42 F.4th 67, 78–79 (2d Cir. 2022) (internal quotation marks omitted). The Second Circuit has recognized "that loan requests presented to the [Federal Reserve Banks] under the … Term Auction Facility are … 'claims' under the FCA." United States ex rel. Kraus v. Wells Fargo & Co., 943 F.3d 588, 592 (2d Cir. 2019). Each time a borrower requests an advance from the TAF program, the borrower "represents and warrants" that it "is not is not in violation of any laws or regulations in any respect which could have any adverse effect whatsoever upon the validity, performance, or enforceability" of the loan. Federal Reserve Banks Operating Circular No. 10, § 9.1(b), 9.2, available at https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/071613-operating-circular-10.pdf. Under the Iran sanctions regime, a TAF loan could not validly be used to fund the Central Bank of Iran, as we

# ARGUMENT

# I

## THE GOVERNMENT DEFRAUDED THE COURT

### A.  Legal Standard

The evidentiary burden for a successful Rule 60(d)(3) motion is very high.  "'Fraud upon the court' as distinguished from fraud on an adverse party is limited to fraud which seriously affects the integrity of the normal process of adjudication."  *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1325 (2d Cir. 1995) (cleaned up) (construing predecessor provision codified as Rule 60(b)(3); *see also King v. First American Investigations, Inc.*, 287 F.3d 91, 95 (2d Cir. 2002).  It is a charge that "embraces only that species of fraud which does or attempts to, defile the court itself, or is perpetuated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudicating cases."  *Hadges*, 48 F.3d at 1325 (internal quotation marks omitted); *see also Pearson v. First NH Mortg. Corp.*, 200 F.3d 30, 37 (1st Cir. 1999) ('fraud on the court' occurs where party "has sentiently set in motion some unconscionable scheme calculated to interfere" with impartial adjudication).

Further, any such showing "must be established by clear and convincing evidence."  *King*, 287 F.3d at 95.  But that said, the standard "has always been characterized by flexibility which enables it to meet new situations which demand equitable intervention, and to accord all the relief necessary to correct the particular injustices involved in these situations."  *Leber-Krebs, Inc. v. Capitol Records*, 779 F.2d 895, 899 (2d Cir. 1985) (internal quotation marks omitted).  The Brutus Data is clear and convincing evidence of the Government's fraud upon the Court.

---

now know SCB did. Accordingly, if this Motion is granted, Brutus intends to move to amend its complaint to add an additional count alleging a violation of 31 U.S.C.§ 3729(a)(1)(A).

**B. The Government's false and misleading statements constitute 'fraud on the court.'**

In federal court, "the government should, of course, never make affirmative statements contrary to what it knows to be the truth." *United States v. Universita*, 298 F.2d 365, 367 (2d Cir. 1962). Whichever way one analyzes the Government's actions in this case, that fundamental rule was unconscionably shattered by the Government's lies to this Court. Either the Government lied that it had conducted "a lengthy, costly, and substantial investigation" into Brutus's claims only to find them "meritless." *Brutus Trading I*, 202 WL 3619050, at *4 (internal quotation marks omitted). Or, the Government was fully aware of the decloaked transactions and simply lied to conceal them. The Government's own statements support the latter scenario.

Quite clearly, the decloaked Brutus Data explodes the Government's core misrepresentations, *i.e.* that:

- SCB's post-2007 transactions with Iranian entities referenced in the Brutus Data are either legitimate wind-down transactions that the Bank had previously (*i.e.,* before Brutus filed its complaint) disclosed to DOJ and OFAC or otherwise did not appear to violate any sanctions rules, *see* McSweeney Dec., Exhs. A ¶ 24; B ¶ 2; C ¶¶ 35, 37*;* G ¶ 3; H ¶ 18; I ¶¶ 6, 13; J ¶ 28;

-  none of SCB's Iranian-related clients used the Bank's online trading system after 2007, *see* McSweeney Dec., Exhs. B ¶ 3; C ¶¶ 36, 55; H ¶ 13;

- SCB did not use its sundry account for any wrongdoing associated with the Bank's Iranian-related clients, *see* McSweeney Dec., Exh. H ¶ 13.

The decloaked Brutus Data overwhelmingly refutes each of those false statements. *See generally* Knight Dec.; Scantling Dec. ¶¶ 38-153. But it is the Government's own evidence that shows those statements to be knowingly false. In a fleeting moment of candor, Komar disclosed that the Brutus Data contained 49 files that "were Microsoft Excel spreadsheets containing monthly reports from 2010 to 2012." McSweeney Dec., Exh. H, ¶ 16. He further revealed that

those "reports were in the form of pivot tables that display the information in summary form, which can be expanded to show the underlying full data." *Id.*

Remarkably, Komar also represented to the Court that he had "re-reviewed" the Brutus Data, "including all 'hidden' information [he] could locate, and did not see any additional material information that would have been relevant to [the] investigation, such as information suggesting that any entities other than those [Brutus] brought to our attention at the time were Iranian." McSweeney Dec., Exh. B, ¶ 5 n.3. That statement cannot be true. If, unsurprisingly, a trained forensic investigator like FBI Agent Komar knew how to decloak the Brutus Data – which he confessedly did – then he must have seen all the hidden transactions that Brutus only recently discovered. And if he saw those transactions, he knew that his sworn declarations were false and misleading.

This case involves an "unconscionable scheme calculated to interfere" with this Court's most basic duty to adjudicate Brutus's claim impartially. *Pearson*, 200 F.3d at 37. It was a broad scheme, involving four federal investigative entities and a state financial regulator. The FBI and OFAC apparently fabricated a sham analysis of the Brutus Data, and both the Federal Reserve and the NYS Department of Financial Services readily endorsed it. The Government's strategy presented the Court with a powerful and united front of law enforcement and regulatory officials. It was also an impenetrable front because this Court denied Brutus's request for discovery to test the Government's representations. *See Brutus Trading III*, 2023 WL 5344973, at *3.

For its part, the U.S. Department of Justice ("DOJ") coordinated the Government's false evidentiary submissions from *all the agencies* and repeatedly (and successfully) made the Government's counterfactual arguments to the Court on their behalf. Its thus strains credulity to think that DOJ lawyers were somehow unaware of that the Government's declarations were

dishonest and misleading.  At the very least, DOJ's knowledge regarding those misrepresentations is an issue that demands discovery.

## II

### THIS RECORD PRESENTS MORE THAN A COLORABLE CLAIM OF FRAUD WARRANTING TARGETED DISCOVERY

With the record now before the Court, the Court should at least grant Brutus targeted discovery to reveal the Government's fraud in even greater detail. Numerous decisions involving 'fraud on the court' have held that "[o]nce the record evidence demonstrates a 'colorable' claim of fraud, the court may exercise its discretion to permit preliminary discovery and evidentiary proceedings." *Pearson*, 200 F.3d at 35; *see also LabMD, Inc. v. Tiversa, Inc.*, 2016 WL 3695381, at *3, 6 (N.D. Ga. May 12, 2016) (granting discovery upon showing of "some evidence" of fraud); *Dobyns v. United States*, 2014 WL 7934306, at *2 (Fed. Cl. Dec. 14, 2014) (granting discovery on "colorable claim" of fraud); *Whitmore v. Symons Intern'l Grp., Inc.*, 2011 WL 806624, at *1-2 (S.D. Ind. March 1, 2011) (same).  Brutus has indisputably presented evidence of the Government's fraud, which, by any measure, is far more than colorable.  It is compelling.

Discovery in such circumstances is generally limited to information that "is directly relevant" to the claimed fraud.  *Grynberg v. BP P.L.C.*, 2016 WL 11472270, at *2 (D.D.C. March 1, 2016) (internal quotation marks omitted); *see also LabMD*, 2016 WL 3695381, at *6 (granting specific discovery related to fraud claim); *Whitmore*, 2011 WL 806624, at *2 (same).  Brutus seeks that disclosure now.  Considering the Government's astonishing and repeated misrepresentations about the Brutus Data, the basis for those statements is "directly relevant" to the requested relief.

Accordingly, "to unearth" additional evidence of fraud on the court, *see LabMD*, 2016 WL 3695381, at *3, Brutus respectfully requests that the Government be directed to produce:

(1)    all documents and communications (except for suspicious activity reports) that Komar reviewed and/or upon which he relied in submitting his declarations to the Court;

(2)    all documents and communications (except for suspicious activity reports) that Manfull reviewed and/or upon which he relied in submitting his declarations to the Court;

(3)    all documents and communications (except for suspicious activity reports) that Bryan reviewed and/or upon which he relied in submitting his declarations to the Court;

(4)    all documents and communications (except for suspicious activity reports) that Nochlin reviewed and/or upon which he relied in submitting his declarations to the Court;

(5)  all documents and communications concerning any forensic or other analyses by the Government of the Brutus Data;

(6)  all communications between the Government and SCB regarding the Brutus Data or any part thereof; and

(7)  Brutus also seeks to depose Komar, Manfull, Bryan, Nochlin, and Assistant United States Attorney Jean-David Barnea.

## CONCLUSION

For all these reasons, the Court should set aside the judgement in this action.  Alternatively, the Court should grant Brutus's request for targeted discovery to demonstrate even more clearly the Government's fraud on the Court.

Dated: May 31, 2024

Respectfully submitted,

*Patrick M. McSweeney*

_____

Patrick M. McSweeney
Robert J. Cynkar
McSweeney Cynkar & Kachouroff PLLC
3358 John Tree Hill Road
Powhatan, VA 23139
(804) 937-0895
*Attorneys for Relator Brutus Trading LLC*

18