# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BRUTUS TRADING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, and STANDARD CHARTERED TRADE SERVICES CORPORATION,<br><br>Defendants. | No. 18 Civ. 11117 (PAE) |

## DECLARATION OF SPECIAL AGENT MATTHEW F. KOMAR

I, Special Agent Matthew F. Komar of the Federal Bureau of Investigation, hereby declare the following pursuant to 28 U.S.C. § 1746:

1. I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since 2008. From December 2010 to November 2014, I was assigned to a squad designated to investigate securities fraud, money laundering and other financial crimes in New York, New York. Since December of 2014, I have been assigned to the FBI's office in Cleveland, Ohio.

2. In December 2012, I was assigned as the lead agent in assisting the Civil Division of the U.S. Attorney's Office for the Southern District of New York ("SDNY") in investigating the allegations in a *qui tam* complaint filed by relator Brutus Trading, LLC (the "Relator"), against Standard Chartered Bank, Standard Chartered plc, and Standard Chartered Trade Services Corporation (together, "SCB" or the "Bank") in a case captioned *United States ex rel. Brutus Trading LLC v. Standard Chartered Bank et al.*, No. 12 Civ. 9160 (KBF) (S.D.N.Y.).

3. Starting in June 2011, I also served as the case agent for an investigation of SCB by the Criminal Division of the U.S. Attorney's Office for the District of Columbia and what is now known as the Money Laundering and Asset Recovery Section of the U.S. Department of Justice's Criminal Division (together, "DOJ"). This investigation initially resulted in a Deferred Prosecution Agreement between the Bank and DOJ dated December 10, 2012 (the "2012 DPA"). *See* Exhibit 1. After the *qui tam* complaint was filed, I assisted DOJ in its investigation of the Relator's allegations to determine whether SCB had violated the DPA and/or committed additional crimes. And, as further explained below, beginning in August 2013 until I left New York in 2014, I participated in a separate aspect of the investigation of SCB's conduct that ultimately—several years after my departure—resulted in an Amended Deferred Prosecution Agreement with the Bank on April 9, 2019 (the "2019 DPA").

4. I make this declaration based on my own personal knowledge as well as a review of documents relating to these investigations, in support of the motion by the United States of America (the "United States") to dismiss the Relator's second amended complaint in the above-captioned case. This declaration does not set forth all of my knowledge of the matters discussed herein. All dates and amounts set forth are approximate and to the best of my recollection, unless otherwise noted.

### A. The 2012 DPA with SCB and the Associated Investigation

5. In January 2010, SCB approached federal and state authorities to self-report that it had facilitated transactions in violation of U.S. sanctions laws. As a result, FBI and DOJ began an investigation of the Bank relating to this disclosure, to which I was assigned beginning in June 2011. Other federal and state agencies also began parallel investigations. The investigations uncovered, among other things, that, from 2001 to 2007, SCB had conspired to violate U.S. economic sanctions laws and processed a large number of illegal payments through

2

the U.S. financial system on behalf of entities subject to U.S. economic sanctions. As relevant here, SCB processed U.S. dollar transactions on behalf of several Iranian banks and companies, but altered the associated wire-transaction records to remove references to sanctioned countries or entities or processed the payments in a non-transparent manner so as to minimize the chances that the transactions would be caught by other banks' sanctions filters and blocked, rejected, or stopped for further investigation. The Bank informed DOJ that it had formally ended its relationships with customers based in Iran in 2006 (in U.S. dollars) and at the end of 2007 (in all other currencies).

6. On December 10, 2012, SCB entered into the 2012 DPA with DOJ, which was filed in the U.S. District Court for the District of Columbia, *see United States v. Standard Chartered Bank*, No. 12 Cr. 262 (JEB) (D.D.C.). As part of the 2012 DPA, the Bank acknowledged that it had facilitated at least $227 million worth of illegal transactions, and agreed to forfeit $227 million to the United States. Among other things, the Bank also agreed to implement improved monitoring for sanctions violations. Around the same time as the 2012 DPA, several of the other agencies that were investigating similar misconduct at SCB also announced resolutions of their investigations, including the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the Board of Governors of the Federal Reserve System (the "Federal Reserve"), and the New York County District Attorney's Office ("DANY"), as well as what is now known as the New York State Department of Financial Services ("DFS"), which had publicly announced its findings a few months earlier.

### B. The Relator's First *Qui Tam* Complaint and Disclosure Statement

7. On December 17, 2012, approximately one week after the 2012 DPA and certain other agreements were finalized, the Relator—an entity created for the purpose of the lawsuit,

3

whose members are Julian Knight, a former SCB employee, and Robert Marcellus, a friend of Mr. Knight's who had banking experience—filed its original *qui tam* complaint under seal. *See* Exhibit 2.

8. The Relator's complaint alleged that the Bank had misled DOJ and OFAC leading up to the 2012 DPA and 2012 OFAC settlement agreement by failing to disclose certain sanctions-violative transactions in which it had engaged with Iranian entities after 2007.[1] The complaint alleged that, despite its commitment to have ended its relationships with Iranian banks and companies located in Iran in 2006-07, the Bank continued to knowingly facilitate U.S. dollar transactions for its preexisting Iranian clients for several years after that date.

9. Specifically, the Relator claimed that after 2007, SCB had knowingly facilitated specific trade-finance and foreign-exchange transactions on behalf of Iranian government agencies (such as Bank Markazi, which is Iran's central bank, and entities affiliated with the "Ministry of Energy of Iran Group"), and state-owned and private Iranian banks (such as Bank Saderat) and energy groups (such as the National Iranian Tanker Company and the Iranian Offshore Engineering Company)—including several that OFAC had listed as Specially Designated Nationals, *i.e.*, persons or entities with whom financial transactions in U.S. dollars are specifically prohibited. According to the Relator, these illegal transactions were part of an SCB program known as Project Green, which was run by high-level Bank officials and was designed to hide evidence of these transactions, including by booking the revenue the Bank earned from them in a special "sundry" account and by failing to include the clients' internal

---

[1] Relator amended its complaint on November 14, 2014, solely to add a claim that SCB had also misled the Federal Reserve in the same respect with regard to that agency's 2012 resolution with the Bank. *See* Exhibit 3.

4

customer identification numbers in the associated records. The Relator claimed that Project Green was wound down in 2012, in the lead-up to the 2012 DPA.

10. Along with the *qui tam* complaint, the Relator provided SDNY with a disclosure statement that attached several internal SCB documents that Mr. Knight asserted were in his possession when he left the Bank. These documents included customer lists of SCB's Dubai branch that, as the Relator pointed out, included the Iranian entities described above. These documents also showed, according to the Relator, that the Bank had facilitated certain trade-finance and foreign-exchange transactions for these clients after 2007. Finally, the disclosure statement listed several current and former SCB employees who, according to the Relator, could corroborate the allegations in the *qui tam* complaint.

### C. The Investigation of the Relator's Allegations

11. Shortly after the Relator's complaint was filed, SDNY notified several other agencies, including DOJ, OFAC, the Federal Reserve, DANY, and DFS, of the Relator's allegations and SDNY's investigation into them, and these other agencies began their own parallel investigations. As mentioned above, I was assigned as the lead agent both to the SDNY investigation of the *qui tam* complaint and to DOJ's parallel criminal investigation of the Bank.

12. Our investigation began with a joint interview of Mr. Knight and Mr. Marcellus on January 16, 2013, which representatives from each of the above agencies attended. Mr. Knight told us that he had worked at SCB's Dubai branch from January 2009 to November 2011. He reported that, during that time, he had spoken with Bank employees about Project Green and was told it was related to sanctions evasion. He also described contacts between Bank employees and Iranian entities. He stated that he was not aware of any SCB accounts opened for

5

Iranian clients while he was at the Bank, but had heard that some SCB employees may have used their own names to open accounts for Iranian entities.

13. Mr. Knight described some of the documents attached to the disclosure statement and described in the *qui tam* complaint. According to these documents, he believed Iranian banks had active login capabilities for SCB's online foreign-exchange system at least as of 2009. These and other Iranian banks appeared on customer lists of SCB's Dubai branch that Relator provided. Other documents he discussed appeared to reflect trade-finance and foreign-exchange transactions in U.S. dollars in 2008 and 2009 between SCB and Iranian banks, government agencies, and companies, such as the National Iranian Tanker Company and corporate entities associated with the "Iranian Ministry of Energy Group." All of the entities referenced by these documents that Mr. Knight brought to our attention were clearly identifiable as Iranian or based in Iran.

14. Mr. Marcellus told us that he had never worked at SCB, but was knowledgeable about the mechanics of foreign-exchange transactions. He told us that when a bank such as SCB converted one non-U.S. dollar currency to another, especially currencies that were not commonly traded such as the United Arab Emirates dirham, it likely converted first into U.S. dollars and then into the other currency. Relatedly, Mr. Knight explained that any transactions at SCB involving U.S. dollars would have necessarily had to involve the Bank's New York branch.

15. Mr. Knight further stated that when he learned of the government investigation that led to the 2012 DPA, after he left the Bank, he reviewed Bank documents still in his possession, and decided to file a *qui tam* complaint. Mr. Knight also provided the names of several SCB employees who he said could corroborate his allegations.

16. After the interview, the Relator provided SDNY with additional SCB documents of the same type as those attached to the disclosure statement. These documents, which were shared with DOJ, FBI, and other agencies, showed similar information regarding possible transactions involving Iranian clients of SCB.

17. DOJ, SDNY, and other agencies made several requests for information and documents to the Bank relating to the Relator's allegations, including a Civil Investigative Demand ("CID") issued by SDNY on February 4, 2013. In addition, after coordinating with the Relator's then-counsel, SDNY sent the Bank copies of most of the documents the Relator had provided with the disclosure statement, to request the Bank's explanation of them. I understand that these documents were first cleaned of metadata connecting them to Mr. Knight by the Relator's counsel.

18. Over the next several months, SCB produced hundreds of thousands of pages of documents in response to these requests, which I and other members of the investigative team reviewed. We also obtained certain documents directly from former SCB employees whom we contacted, which we also reviewed.

19. Furthermore, counsel for SCB gave two presentations, on February 8 and April 24, 2013, that addressed the transactions alleged by the Relator to be sanctions violations that the Bank failed to disclose before the 2012 DPA. At these presentations, the Bank's counsel reiterated that SCB had committed not to enter into any *new* U.S. dollar transactions with Iranian clients after 2006 and in other currencies after 2007, but that its existing commitments with those clients could not always be immediately broken off. Thus, most of the documents the Relator had provided related to the "wind down" of SCB's pre-2007 business with Iranian clients.

20. In some instances, SCB had open transactions and commitments with its Iranian clients that were outstanding when the Bank suspended its business with them, such as outstanding loans, trade transactions (letters of credit), and bank accounts. It therefore sought to wind down those transactions in a manner compliant with U.S. sanctions rules by, for example, permitting its Iranian clients to repay their outstanding loans from the Bank in currencies other than U.S. dollars, or to withdraw their existing balances from bank accounts that were otherwise blocked.[2] These clients, who had ongoing wind-down transactions with the Bank, continued to be included in client lists and the like until the underlying transactions were completely unwound. The Bank further reiterated that it had disclosed many of these clients and their associated wind-down activity to DOJ and OFAC in 2011 as part of the investigation that led to the 2012 DPA.

21. SCB also disclosed that it had facilitated certain other U.S. dollar transactions for these clients as an intermediary between two foreign banks, which was permitted under OFAC rules until mid-2008. As for the access that Iranian banks and other entities may have had to conduct transactions using SCB's online foreign-transaction system, the Bank explained that these entities had not engaged in any such transactions since early 2007, and indeed were not given access to a new online banking system set up in late 2007 to which other SCB clients were transitioned.

---

[2] Furthermore, the Bank explained that its internal reporting currency was the U.S. dollar, so that any transaction in any currency would be reflected in the Bank's records in its U.S. dollar value, even when the transaction actually took place in another currency. Moreover, in some of the documents, the category or heading of "Iran" confusingly referred to customers from certain third-party countries, such as Kuwait and others in addition to Iran, that were managed from the Bank's Dubai office, and thus some of the entities under this heading were neither Iranian nor subject to sanctions.

8

22. The documents produced by the Bank included several "wind down" reports, which detailed how its pre-2007 business with Iranian clients was wound down over the following years, including several such reports that the Bank had previously provided to DOJ and OFAC, as discussed above. DOJ, SDNY, and the other agencies selected a sample of these transactions and asked SCB to provide more detailed information about them. In response, the Bank produced records regarding these transactions as well as an independent report analyzing them, which confirmed the Bank's account of the transactions as wind-down activity.

23. Furthermore, we interviewed many current and former employees of SCB, including most of the employees the Relator suggested that we contact. Among other things, we learned that Project Green was the internal name that SCB had given to the matter that ultimately led to the 2012 DPA and related settlements.

24. Our investigation into the Relator's allegations largely wrapped up in August 2013. That investigation did not lead us to uncover any evidence of sanctions violations or violations of the 2012 DPA of the types alleged by the Relator. Instead, we found that the information provided by the Relator related almost entirely to the Bank's winding down of its preexisting transactions with Iranian clients in a manner that did not appear to violate the U.S. sanctions laws, or to the presence of Iranian entities on client lists and similar types of records without any evidence that these clients had engaged in any illegal transactions. We also verified that the Bank had previously disclosed most of the specific customer relationships at issue to DOJ and OFAC.

25. Based on these findings, SDNY and DOJ concluded that they were not able to corroborate or validate the Relator's allegations. SDNY informed Relator's counsel that it had not been able to substantiate the Relator's allegations, and intended to decline to intervene in the

*qui tam*. Furthermore, DOJ informed the Bank's counsel that it did not need to finish producing privilege logs for documents it had withheld from its productions in response to the CID and other requests.

### D. New Evidence Separately Emerges of Potential Sanctions Violations by SCB

26. In 2013, I was also the case agent assigned to a separate, ongoing criminal investigation of another financial institution for providing financial services in violation of U.S. economic sanctions laws.

27. On or about August 15, 2013, this other financial institution disclosed to DOJ and FBI information relating to certain U.S. dollar transactions it had processed involving a Dubai-based petrochemical company with Iranian links, which had a prior banking relationship with SCB, and its Iranian owner.

28. This information was promptly disclosed to the team responsible for the 2012 DPA with SCB, as well as to SDNY.

29. None of the information provided by the Relator prompted this disclosure by this other financial institution or led, even indirectly, to the DOJ's identification of the petrochemical company as an entity whose financial transactions would be subject to U.S. economic sanctions.

### E. The Investigation of SCB's Connection with the Petrochemical Company

30. Shortly after learning, from the investigation of the other financial institution, about SCB's connection with the petrochemical company, DOJ and FBI asked SCB in August 2013 for information about its dealings with the company and its knowledge about the company's Iranian connections. The petrochemical company was registered as a Dubai corporate entity, and ultimately owned by an Iranian national who had a Dubai residence permit.

31. SDNY informed the Relator's counsel that the Government was investigating new information from another source, and had decided to keep the *qui tam* complaint under seal so as not to interfere with this investigation, and in recognition of the possibility that this new investigation might corroborate some of the Relator's allegations.

32. Over the following months, the Bank produced documents in response to the investigating agencies' requests regarding its client relationship with the petrochemical company, as well as its "know your customer" ("KYC") processes at the Bank's Dubai branch, which I and the other members of the investigative team reviewed. Furthermore, we interviewed current and former SCB employees regarding, among other things, the Bank's relationship with the petrochemical company and KYC procedures in Dubai.

33. As a result of this investigation, we identified Bank records indicating that the petrochemical company was a front for an Iranian energy company. This evidence included, among other things, a fax transmission from the petrochemical company's president to SCB's Dubai branch requesting that the Bank execute a U.S. dollar transaction from the company's account. The fax header indicated that it was sent from an Iranian number and suggested to the Bank's employees that the company was connected to Iran.

**F. The SCB Investigation Expands**

34. Based on the discovery of the fax transmission from the president of the petrochemical company, in the spring of 2014, DOJ requested information from the Bank regarding faxes received by SCB's Dubai branch that requested the execution of U.S. dollar transactions and had headers indicating they were received from Iranian numbers. A review of those fax transmissions showed that a substantial number of them came from a small number of customers, who became the focus of the next phase of our investigation.

11

35. Those customers included two Dubai-incorporated companies controlled by an Iranian national who ordinarily resided in Iran named Mahmoud Reza Elyassi, who had a Dubai residence permit. This was the first time the investigating agencies learned of potential wrongdoing by Mr. Elyassi in connection with this investigation.

36. I understand that over the following several years, DOJ and FBI investigated the Bank's relationships with Mr. Elyassi's companies and others like it, but I was not part of that investigation. I understand that this investigation ultimately led to the 2019 DPA. Other FBI colleagues, including Special Agent Wayne C. Boddy, were the lead agents on the investigation in its later stages.

### G. The Relator's Second *Qui Tam* Complaint

37. I am aware that on September 19, 2017, the Relator voluntarily withdrew its *qui tam* case after it had been unsealed. The following year, the Relator filed a second *qui tam* action against SCB, which it amended twice, most recently on September 23, 2019. In the latest second amended *qui tam* complaint, which I have reviewed, the Relator alleges that its original complaint and disclosures were the source of the information that led to the agency investigations of SCB that culminated in the 2019 DPA and other related settlement agreements. This is not correct.

38. First, the investigation of SCB that ultimately led to the 2019 DPA began after SDNY, DOJ, and FBI had initially determined that they could not corroborate the allegations in the original *qui tam* complaint, and the subsequent investigation prompted by the disclosure of the Bank's relationship with the petrochemical company did not change that determination.

39. Furthermore, as explained above, the investigation that led to the 2019 DPA began as a result of the information DOJ and FBI learned from the separate, ongoing

12

investigation of a different financial institution, which revealed that SCB had a client relationship with the petrochemical company with Iranian connections discussed above. This led to the broader investigation of faxed instructions for U.S. dollar payments from Iran and other sanctioned countries, which I understand was one of the principal bases for the 2019 DPA.

40. Moreover, the Relator's allegations are different in kind from what was uncovered in the later investigation of SCB. While the Relator claimed that the Bank continued after 2007 to process illegal transactions in U.S. dollars for its known, preexisting Iranian clients, our recent investigation found that the Bank, among other things, knowingly and willfully violated U.S. economic sanctions laws by processing U.S. dollar transactions through the United States on behalf of customers of SCB's Dubai branch with known Iranian connections. Most of these violations were the result of deficiencies in SCB's compliance program that allowed customers to order U.S. dollar transactions via fax and online payment instructions from Iran and other sanctioned countries. The criminal conspiracy that serves as the basis for the 2019 DPA primarily involved two former employees of SCB's Dubai branch who conspired to help the Bank's Iran-connected customers process U.S. dollar transactions through the United States in violation of U.S. law.

41. With regard to Mr. Elyassi in particular, although the Relator notes that his name appears on certain client lists of SCB's Dubai branch that the Relator provided to SDNY in connection with its original *qui tam* complaint, that was not the reason why Mr. Elyassi and his activities became subject to investigation. It is true that Mr. Elyassi's name and companies appear on these client lists, among more than 1,400 other Bank clients. But at the time these lists were provided to SDNY, the Relator indicated that they were significant because they included the known Iranian entities identified in the Relator's disclosure statement and discussed during

13

our interview with Mr. Knight and Mr. Marcellus. During our investigation of the Relator's *qui tam* allegations, the Relator never identified or pointed to Mr. Elyassi's name on those lists, or suggested that we should look into any of the hundreds of other listed Dubai-based SCB clients, including Mr. Elyassi's companies, and never suggested that Mr. Elyassi or his companies had engaged in any wrongdoing.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 21, 2019
        Cleveland, Ohio

_____
Matthew F. Komar
Special Agent
Federal Bureau of Investigation