# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*<br>BRUTUS TRADING, LLC,<br><br>     Plaintiff,<br><br>    v.<br><br>STANDARD CHARTERED BANK, STANDARD<br>CHARTERED PLC, and STANDARD<br>CHARTERED TRADE SERVICES<br>CORPORATION,<br><br>     Defendants. | No. 18 Civ. 11117 (PAE) |

**SUPPLEMENTAL DECLARATION OF ALEXANDRE MANFULL**

I, Alexandre Manfull, hereby declare the following pursuant to 28 U.S.C. § 1746:

1.  I previously submitted a declaration in support of the United States' motion to dismiss Relator's second amended complaint in the above-captioned case. I have reviewed the Relator's opposition to this motion, *see* Relator's Opposition to the Government's Motion to Dismiss Relator's Second Amended Complaint ("Opp."), and the accompanying declarations, and hereby make the following supplemental declaration to respond to certain inaccuracies and other points made in Relator's opposition papers with regard to the government investigations at issue.

2.  I make this declaration, like the previous one, based on my own personal knowledge as well as a review of documents relating to these investigations. This declaration does not set forth all of my knowledge of the matters discussed herein. All dates and amounts set forth are approximate and to the best of my recollection, unless otherwise noted.

## OFAC'S MISSION AND AUTHORITY

3. As explained in my initial declaration, OFAC is the agency principally responsible for administering U.S. economic sanctions programs on behalf of the U.S. government.[1] Most of OFAC's economic sanctions programs are administered under the authority of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-06, and various Executive Orders issued pursuant to that statute. OFAC may impose sanctions by, *inter alia*, (i) prohibiting transactions by U.S. persons with sanctioned foreign countries or (ii) freezing (or "blocking") the property and interests in property within U.S. jurisdiction of certain sanctioned individuals, entities, and governments. As part of its sanctions implementation efforts, OFAC publishes a List of Specially Designated Nationals and Blocked Persons ("SDN List"), which is a list of individuals and entities known colloquially as "SDNs," whose property and interests in property are blocked if they are or come within the United States or the possession or control of a U.S. person.

4. Contrary to the Relator's allegations, Opp. at 2, 27-28, OFAC and other federal agencies aggressively enforce these sanctions against both U.S. and non-U.S. banks. OFAC concluded 26 sanctions enforcement actions in 2019 resulting in over $1.28 billion in penalties and settlement amounts for alleged violations of its sanctions programs. Among these settlements were OFAC's $639 million 2019 Settlement Agreement with SCB, which was part of a combined $1.1 billion settlement with federal, state, local, and United Kingdom government partners.[2] From 2009 to 2019, OFAC collected over $5.64 billion in penalties and settlement

---

[1] This declaration uses abbreviations and capitalized terms defined in my first declaration.
[2] U.S. Treasury Department, Press Release, "U.S. Treasury Department Announces Settlement with Standard Chartered Bank" (Apr. 9, 2019), *available at* https://home.treasury.gov/news/press-releases/sm647.

amounts for alleged violations of OFAC sanctions, including $5.27 billion from U.S. and non-U.S. banks.

5.  In addition, OFAC is an integral part of the U.S. Government's current "maximum pressure" campaign against Iran, which is applying unprecedented financial pressure on the Iranian regime. Since the United States' withdrawal from the Joint Comprehensive Plan of Action with Iran relating to its nuclear program, OFAC has re-imposed all the sanctions that were lifted or waived in connection with that deal and has sanctioned over 800 targets in connection with Iran.[3]

## OFAC-ADMINISTERED SANCTIONS

### A. OFAC-Administered Export Sanctions Against Iran

6.  As explained in my initial declaration, OFAC administers U.S. sanctions against Iran imposed under Executive Orders issued pursuant to IEEPA. The IEEPA-based sanctions on Iran at issue in this case were issued pursuant to a national emergency declared in 1995. *See, e.g.*, Executive Order (E.O.) 12,957, 60 Fed. Reg. 14,615 (Mar. 15, 1995) (declaring national emergency); E.O. 12,959, 60 Fed. Reg. 24,757 (May 6, 1995) (imposing comprehensive trade and financial sanctions on Iran); E.O. 13,059, 62 Fed. Reg. 44,531 (Aug. 19, 1997) (among other things, clarifying export and import prohibitions from previous Executive Orders).[4]

7.  Treasury promulgates regulations to implement economic sanctions, including the Iranian Transactions and Sanctions Regulations, 31 C.F.R. part 560, which implement the

---

[3] U.S. Treasury Department, Press Release, "U.S. Government Fully Re-Imposes Sanctions on the Iranian Regime as Part of Unprecedented U.S. Economic Pressure Campaign" (Nov. 5, 2018), *available at* https://home.treasury.gov/news/press-releases/sm541.

[4] The Executive Order cited by the Relator, *see, e.g.*, Opp. at 12 (citing E.O. 12,170, 44 Fed. Reg. 65,729 (Nov. 14, 1979)), was revoked in 1981, and is not the basis for any of the sanctions at issue in this case. *See* E.O. 12,282, 46 Fed. Reg. 7925 (Jan. 19, 1981) (revocation).

3

comprehensive sanctions on Iran imposed pursuant to E.O. 13,059 and related orders.[5]  The export prohibition in Section 2(a) of E.O. 13,059 is implemented at 31 C.F.R. § 560.204, and is further explained in 31 C.F.R. § 560.410(b).  These regulations prohibit the export of services, including financial services, by a U.S. person or from the United States to, *inter alia*, (i) the Government of Iran, including its agencies, and (ii) individuals and entities in Iran, including banks in Iran.

8.  These prohibitions do not presumptively apply to exports of services to Iranian citizens ordinarily resident outside of Iran, or to corporate entities outside Iran that are owned and operated by Iranian individuals ordinarily resident outside of Iran.  In addition, the prohibitions described above also do not apply to financial transactions conducted outside the United States that do not involve U.S. financial institutions or other U.S. persons, even if the transactions are denominated in U.S. dollars.  Such transactions are not prohibited by 31 C.F.R. part 560 because they are outside of U.S. jurisdiction for purposes of these sanctions.

**B. OFAC-Administered "Blocking" Sanctions Against Iran**

9.  Separate and distinct from the export prohibitions described above, OFAC also administers "blocking" sanctions against a more limited set of Iranian "blocked persons."  Rather than prohibiting exports of financial services (and other exports) to Iran by U.S. persons or from the United States, these blocking sanctions require any property and interests in property of particular blocked persons to be frozen (or "blocked") if the property or interests in property are or come within the United States or the possession or control of a U.S. person.

---

[5] On October 22, 2012, OFAC revised and renamed 31 C.F.R. part 560, and reissued the regulations in their entirety.  *See* 77 Fed. Reg. 64,664 (Oct. 22, 2012).  This declaration discusses and cites the regulations that were in place at the relevant times.

4

10. On February 5, 2012, the President issued an Executive Order blocking the property and interests in property of the Government of Iran and Iranian financial institutions. *See* E.O. 13,599, 77 Fed. Reg., 6,659 (Feb. 5, 2012).[6] Sections 1(a) and (b) of the Executive Order state:

> All property and interests in property of the Government of Iran [and of any Iranian financial institution], including the Central Bank of Iran, that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, including any foreign branch, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in.

These blocking sanctions became effective on February 5, 2012, and were codified into regulation on October 22, 2012. 31 C.F.R. § 560.211(a), (b) (promulgated by 77 Fed. Reg. 64,666, 64,669 (Oct. 22, 2012)). The regulations further define the terms "blocked account and blocked property" to mean:

> [A]ny account or property subject to the prohibitions in § 560.211 held in the name of the Government of Iran, any Iranian financial institution, or any other person whose property and interests in property are blocked pursuant to § 560.211, or in which the Government of Iran, an Iranian financial institution, or such person has an interest, and with respect to which payments, transfers, exportations, withdrawals, or other dealings may not be made or effected except pursuant to an authorization or license from [OFAC] expressly authorizing such action.

31 C.F.R. § 560.322 (promulgated by 77 Fed. Reg. 64,666, 64,672-73 (Oct. 22, 2012)). These blocking sanctions apply only with respect to property and interests in property in the United States or the possession or control of a U.S. person; thus, an account or property would only be a "blocked account or blocked property" within the meaning of section 560.322 if it were "subject to the prohibitions in § 560.211" because it was within the United States or the possession or

---

[6] Until February 5, 2012, the only applicable blocking sanctions relating to Iran applied with respect to particular SDNs designated under other OFAC sanctions programs, such as those targeting global terrorism and proliferation of weapons of mass destruction, which are not primarily at issue here. *See, e.g.*, 31 C.F.R. parts 544, 594.

5

control of a U.S. person.  *See id.* §§ 560.211, 560.322.  The blocking sanctions do not presumptively apply to transactions conducted outside the United States by a non-U.S. bank, even if denominated in U.S. dollars.

11.  The Relator incorrectly states that "[t]ransactions that involve or benefit individuals or entities subject to U.S. sanctions when the transactions are based in [U.S. dollars] must be blocked during the dollar-clearing process."  Opp. at 12; *accord id.* at 13, 25; Sweeney Decl. ¶¶ 13-14; Knight Decl. ¶¶ 48-49.  This is not accurate, however, because, as explained above, OFAC blocking sanctions do not apply to all transactions involving Iran, but rather only to dealings in the property or interests in property of blocked persons, such as the Government of Iran or Iranian financial institutions, that are or come within the United States or the possession or control of a U.S. person.  Moreover, these sanctions did not come into effect until February 5, 2012.  As a result, U.S. financial institutions were not required to block all U.S. dollar transactions relating to Iran.

12.  Because the Relator documents that OFAC reviewed did not indicate that SCB engaged in transactions with the property or interests in property of the Government of Iran or Iranian financial institutions that took place in the United States or within the possession or control of a U.S. person after February 5, 2012, it does not appear the blocking provisions are relevant to this matter.  The applicable sanctions rules are the export prohibitions discussed above.

**C. The "U-turn" General License**

13.  Relator's Opposition inaccurately describes the requirements of the general license in 31 C.F.R. § 560.516(a)(1) that authorized certain Iran-related funds transfers until November 10, 2008 (the so-called "U-turn" general license).  *See* Opp. at 28.  Until November 10, 2008, this license provided that:

6

> (a) U.S. depository institutions are authorized to process funds transfers to or from Iran, or for the direct or indirect benefit of persons in Iran or the Government of Iran, if the transfer is covered in full by any of the following conditions and does not involve debiting or crediting an Iranian account [*i.e.*, an account of persons located in Iran or of the Government of Iran maintained on the books of a U.S. depository institution or a U.S. registered broker or dealer in securities]: …
>
> (1) The transfer is *by order of a foreign bank which is not an Iranian entity* from its own account in a domestic bank (directly or through a foreign branch or subsidiary of a domestic bank) to an account held by a domestic bank (directly or through a foreign branch or subsidiary of a domestic bank) *for a foreign bank which is not an Iranian entity*. For purposes of this section, 'foreign bank' includes a foreign subsidiary, but not a foreign branch of a domestic bank.

31 C.F.R. §§ 560.516(a) (emphasis added), 560.320 (2007) (bracketed definition of "Iranian account"); *see also* 73 Fed. Reg. 66,541 (Nov. 10, 2008) (revocation of U-turn general license). Put simply, this license authorized foreign banks, before November 10, 2008, to route U.S. dollar transactions for Iranian clients through U.S. banks so long as the transaction both originated and terminated outside the United States.

14. Contrary to Relator's description, this general license did not require the involvement of two different foreign banks, but instead required only that transfers be initiated and received by foreign banks. As a result, this rule did not foreclose a foreign bank like SCB from conducting U-turn transfers through its own New York branch on behalf of two foreign clients, even if no other foreign banks were involved in the transactions. The *Federal Register* notice cited by Relator, 73 Fed. Reg. 66,541 (Nov. 10, 2008) (preamble to the rule revoking the U-turn general license), described the most common scenario for U-turn transactions (*i.e.*, funds transfers from one foreign bank to another), but did not impose a requirement for two different foreign banks be involved.

Case 2:18-cv-11117-PAE-ED Document 574 Filed 02/28/2024 Page 7 of 16

7

15. The U-turn general license did not, however, authorize funds transfers involving SDNs. In particular, it explicitly excluded transactions directly or indirectly involving Bank Saderat, an Iranian bank, effective September 8, 2006, 31 C.F.R. § 560.516(f) (2007). Certain transactions involving that bank that were ordinarily incident and necessary to a licensed transaction entered into before that date could nonetheless be completed until December 7, 2006, *see id.* § 560.405(a) (2007). OFAC subsequently designated Bank Saderat and a related U.K. entity, Bank Saderat PLC, on the SDN List on October 25, 2007, pursuant to E.O. 13,224, 72 Fed. Reg. 65,837, 65,838 (Nov. 23, 2007).[7]

### D. Transactions by Non-U.S. Persons Outside the United States

16. As explained above, the applicable OFAC sanctions prohibit exports of financial services from the United States or by U.S. persons. In contrast, non-U.S. banks are generally *not* prohibited from conducting transactions involving Iran outside the United States, even if denominated in U.S. dollars and even if the non-U.S. bank has a separate U.S. branch. The mere fact that a transaction was denominated in U.S. dollars does not necessarily mean it was conducted in U.S. dollars through a U.S. financial institution. For example, transactions may be denominated in U.S. dollars but processed outside the United States using non-U.S. dollar currencies or U.S. dollar reserves.

17. The Relator is thus incorrect that non-U.S. banks such as SCB were prohibited from engaging in wind-down (or any) transactions in non-U.S. dollar currencies or for which they used funds in their U.S. dollar accounts outside the United States. *See* Opp. at 1, 29; Knight Decl. ¶¶ 48-49. Nor, contrary to Mr. Knight's statement, does the mere fact that a foreign

---

[7] Note that Bank Saderat PLC was not excluded from the U-turn general license in September 2006. Bank Saderat PLC was designated by OFAC on the SDN List on October 25, 2007, at which point it became ineligible for the U-turn general license.

8

financial institution accepts the repayment of a U.S. dollar-denominated obligation of an Iranian client in another currency (in order to ensure compliance with OFAC regulations), constitute a sanctions violation, even if it required a separate agreement between the bank and the client. *See* Knight Decl. ¶¶ 61, 63.

18. Moreover, as explained in my initial declaration and discussed further below, many of the transactions in the Relator's documents related to SCB's winding down of its pre-existing relationships with Iranian clients, which the Bank disclosed to OFAC in several wind-down reports.

19. Not objecting to wind-down transactions outside the United States was consistent with the U.S. government's sanctions policies, at the relevant times, of restricting financial benefits to Iran. By terminating their business relationships with Iran in an orderly way, non-U.S. banks reduced their legal exposures to Iranian counterparties, who otherwise could have pursued legal claims against SCB for contract terminations and benefitted from a windfall from any awarded damages or liabilities. In addition, many of the wind-down transactions processed by SCB involved collection of outstanding loan payments from Iranian parties, which otherwise similarly would have resulted in a windfall for Iran.

## OFAC'S INVESTIGATIONS OF STANDARD CHARTERED BANK

### A. OFAC's Investigation of Relator's Claims

20. I detailed in my prior declaration how OFAC learned of, and investigated, the information provided by the Relator and by Robert Marcellus before the Relator filed its complaint. As previously explained, OFAC reviewed this information and concluded it largely related to the Bank's wind-down of its pre-2007 relationships with its Iranian clients in non-U.S. dollar currencies outside of the United States or, to the extent the transactions were processed

9

through the U.S. financial system, to transactions that were consistent with the "U-turn" general license, and therefore did not constitute apparent violations of OFAC's regulations.[8]

21. Specifically, the Relator's documents reflected that SCB had processed U.S. dollar transactions for several Iranian entities (banks and commercial entities related to government agencies) between November 14, 2006, and December 31, 2007. These transactions did not appear to violate OFAC regulations, due to the U-turn general license in place at the time of the transactions. We also learned that a handful of Iranian entities held U.S. dollar accounts at SCB after January 1, 2008. Of these, most had no activity after 2007, and the remainder reflected only wind-down obligations, for which the Iranian customers' payments to SCB were made in non-U.S. dollar currencies, which thus did not constitute apparent sanctions violations either.

22. Other transactions reflected in the Relator's documents had not been conducted in U.S. dollars through the U.S. financial system at all, but instead were recorded in their U.S. dollar equivalent in SCB's internal systems for record-keeping purposes, as the U.S. dollar was the Bank's reporting currency. And yet other transactions related to countries other than Iran which were overseen by the Bank's group for "Significant Non-Presence Countries," which covered Iran as well as other Middle Eastern countries. These categories of transactions did not appear to violate any sanctions rules either as they did not involve Iran or sanctioned parties.

23. As I also noted previously, during the agencies' first investigation of SCB, which resulted in the 2012 settlement agreement, the Bank sent OFAC a number of wind-down reports in 2011 regarding its attempts to close out its pre-August 2007 existing obligations related to its

---

[8] As noted in my initial declaration, OFAC uses the term "apparent violation" whenever it has not made a formal finding whether a particular transaction violated the applicable sanctions rules.

10

Iranian customers. OFAC reviewed these reports and found that they did not reflect apparent sanctions violations.

24. Many of the transactions in the Relator's disclosures were with clients listed in these wind-down reports. These include IFIC Holding AG, *see* Opp. at 4; Marcellus Decl. ¶ 95, and all but one of the entities discussed in paragraphs 40-44 of Julian Knight's declaration, including the National Iranian Tanker Company, Bank Markazi, and the Iranian Ministry of Economic Affairs and Finance. The reports indicated that SCB's transactions with these clients were processed in non-U.S. dollar currencies outside the United States or that the clients maintained accounts in which there was no transactional activity. In other words, SCB provided details to OFAC of most of the relevant entities before Mr. Marcellus contacted OFAC and the Relator filed its complaint, and OFAC concluded that the relevant transactions did not appear to violate sanctions rules.

25. Relator is incorrect that OFAC's investigation of its allegations relied to any significant extent on the report prepared by a consultant to the Bank regarding a sample of transactions selected by the investigating agencies. Opp. at 5, 22-23. This sample was selected only after most of the investigation of Relator's allegations had concluded, and was simply intended to spot-check and confirm the agencies' findings, which it did.[9]

26. The Relator's disclosures pertained specifically to the handful of clearly identified Iranian customers on the documents it provided, as opposed to the hundreds of other clients of

---

[9] Nor is there any relevance to the discussion of OFAC's sampling processes in an internal email attached to a Congressional report cited by Relator. *See* Opp. at 3 & Ex. 6; Repub. Staff of H. Comm. on Financial Services, 114th Cong., 2d Sess., *Too Big to Jail: Inside the Obama Justice Department's Decision Not to Hold Wall Street Accountable*, appendix 27 (July 11, 2016), *available at* https://financialservices.house.gov/uploadedfiles/07072016_oi_tbtj_sr.pdf. This email addresses the opposite concern than the one cited by the Relator: namely, that OFAC had treated transactions as sanctions violations (in another case) without reviewing the underlying documents to confirm they were in fact prohibited.

11

SCB's Dubai branch listed therein. Relator is thus incorrect that it was a source of information regarding any such clients that, through the subsequent and separate investigative efforts of OFAC and the other agencies, were determined to be fronts for Iranian companies. Thus, as explained in my previous declaration, Relator never identified Mahmoud Reza Elyassi or his companies to OFAC. And nothing in the documents provided indicated that Mr. Elyassi had any connection to Iran.

27. In regard to Tanootas Taban Engineering, Relator never identified that entity in its written or oral disclosures, and that name does not appear on any of the Relator documents reviewed by OFAC. The Relator's documents include an entity with a similar, but not identical, name which is identified as a United Arab Emirates company without any indication of Iran-related ties.

28. Relator is further incorrect that the documents it provided reference the petrochemical company whose transactions with the Bank, disclosed to OFAC through an unrelated criminal matter, launched the investigation that ultimately led to the 2019 settlement with SCB. A similar name appears on the Relator documents reviewed by OFAC, which lists it as a United Arab Emirates company without any indication of Iran-related ties, but it is not clear these are the same entities. In any event, Relator never identified either of those entities in its disclosures.

29. With regard to the documents and information provided by Anshuman Chandra to the FBI after the agencies wound down their investigation of the Relator's allegations, OFAC received these documents and, as with the Relator's documents, did not allege any additional apparent sanctions violations based on those documents. One of the banks mentioned in these documents, which Mr. Chandra says he reported to his superior, is Al Rajhi (or Al Rhajhi) Bank

of Saudi Arabia. Chandra Decl. ¶ 5; Marcellus Decl. ¶¶ 88-89. This bank is not an Iranian bank and was never on the SDN List or otherwise subject to OFAC sanctions. SCB was thus not generally prohibited from dealing with it under U.S. sanctions rules during the relevant period.

### B. The 2019 SCB Settlements

30. As explained in my initial declaration, OFAC launched a separate investigation of SCB in August 2013, based on information obtained from an unrelated investigation into another financial institution. This investigation resulted in OFAC's 2019 settlement agreement with SCB, as well as resolutions with the other investigating agencies.

31. The Relator argues that OFAC's 2019 settlement agreement is inconsistent with the contemporaneous resolutions of the New York State Department of Financial Services ("DFS") and the U.K. Financial Conduct Authority ("FCA") with the Bank. *See* Opp. at 1, 3, 4, 6, 8. This is incorrect. These other agencies participated in the same investigation as OFAC and received, as relevant here, the same information from SCB. Any differences between the various agencies' resolutions primarily reflect each agency's statutory or regulatory remit, rather than any differences in the factual findings of their investigations. Moreover, unlike OFAC, which is expressly charged with enforcing U.S. sanctions laws, neither DFS nor FCA enforce any sanctions rules, but rather apply laws relating broadly to internal bank controls, such as anti-money laundering rules.

32. The FCA decision notice explains that it relies on that agency's findings of violations of U.K. anti-money laundering and anti-terrorism laws and regulations, and that it calculated the penalty imposed on SCB based on the profits that the relevant SCB departments earned during the time period in which its controls were deficient. Although the FCA notice mentions sanctions issues in passing—and its statements in that regard are fully consistent with

13

OFAC's findings—it makes no determinations that any particular transactions violated U.S. sanctions rules.

33. Similarly, the DFS 2019 consent order concerns banking control deficiencies rather than sanctions violations. It, too, mentions sanctions issues in concluding that SCB's controls were insufficient, but draws no specific conclusions that particular transactions actually violated U.S. sanctions laws. Relator argues, *see* Opp. at 8, that a numerical difference between DFS's order and OFAC's settlement agreement suggests that OFAC missed certain sanctions-violative transactions. *See* DFS Consent Order ¶ 38 ("[D]uring the period November 2008 through July 2014, the Bank processed nearly 15,000 illegal payments for the benefit of sanctioned Iranian parties, totaling more than $600 million."); OFAC Enforcement Information for April 9, 2019, "Standard Chartered Bank Settles Potential Civil Liability for Apparent Violations of Multiple Sanctions Programs," *available at* https://www.treasury.gov/resource-center/sanctions/CivPen/Documents/20190408_scb_webpost.pdf (summarizing OFAC findings in 2019 settlement; approximately 9,335 sanctions-violative transactions from June 2009 to May 2014, totaling approximately $457 million). Relator is incorrect. The difference between the two agencies' findings is due to two factors: First, some of the transactions took place between November 2008 and May 2009, and thus were not included in the OFAC settlement agreement because they fell outside the relevant statute of limitations governing OFAC sanctions. As for the remaining transactions, OFAC knew of these transactions, but exercised its discretion not to charge them, which is consistent with OFAC's regulatory discretion. *See* Economic Sanctions Enforcement Guidelines, 31 C.F.R. part 501, appendix A, §§ V.B-C. As noted in my initial declaration, none of the transactions eventually determined to constitute apparent violations in

14

the 2019 settlement agreement with OFAC were made on behalf of any of the Iranian entities brought to OFAC's attention by Mr. Marcellus or the Relator.

34. In any event, neither the information provided by Relator nor any findings by OFAC or, to OFAC's knowledge, any other agency provides any basis for Relator's conclusion that SCB engaged in sanctions-violative transactions with Iranian clients totaling $56.75 billion or any similar amount. Opp. at 1; Knight Decl. ¶¶ 46, 65.

Dated: Washington, D.C.
February 28, 2020

*[signature]*

ALEXANDRE MANFULL
Assistant Director
Sanctions Compliance and Evaluation
Office of Compliance and Enforcement
Office of Foreign Assets Control

15