# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

        Plaintiff,

v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVICES
CORPORATION,

        Defendants.

No. 18 Civ. 11117 (PAE)

## DECLARATION OF ELIZABETH NOCHLIN

    I, Elizabeth Nochlin, hereby declare the following pursuant to 28 U.S.C. § 1746:

    1.    I am an attorney duly admitted to practice law before the courts of New York State, currently employed by the New York State Department of Financial Services ("Department") as Director, Investigations and Intelligence Division, and I have worked for the Department in various positions since February 2008. Throughout my tenure, part of my responsibilities has been to investigate suspected wrongdoing by entities regulated by the Department and help craft orders to compel institutions to remediate any violations of the laws and regulations that apply to their operation in New York.

    2.    I have worked on the Department's sanctions-related investigation of Standard Chartered Bank and its New York Branch, which is licensed by the Department (collectively referred to as "SCB"), since 2012. In that capacity, I was a principal drafter of the three sanctions-related consent orders issued by the Department to SCB, dated September 21, 2012, August 19, 2014, and April 9, 2019, and am fully familiar with the findings underlying each of

the three consent orders. Copies of these consent orders are attached hereto as Exhibits 1, 2, and 3, respectively.

3. I submit this declaration based on my personal knowledge as well as a review of documents relating to the Department's investigation of SCB.

4. The Department is tasked with supervising a broad array of state licensed financial institutions, including all New York state-chartered banking organizations, such as banks, trust companies, savings banks, and credit unions and, as relevant here, branch offices of foreign banks.

5. In this role, the Department is responsible for assessing the continued safety and soundness of New York's banking industry and its compliance with applicable laws and regulations, including title 3, N.Y. Codes, Rules, and Regulations part 116, which requires that all licensed foreign banking institutions establish and maintain anti-money laundering ("AML") and sanctions compliance programs necessary to comply with all applicable New York and federal requirements. Such compliance with applicable legal and regulatory requirements is tested through, *inter alia*, the bank examination process, enforcement investigations, and self-reporting by institutions.

6. Based on self-reporting by SCB, the Department opened an investigation into SCB's sanctions compliance program and its use of its New York branch to clear U.S. dollar trades in or around 2010.

7. The Department's investigation of SCB's sanctions compliance program was conducted simultaneously with the U.S. Department of Justice ("DOJ"), the Office of the District Attorney of New York County ("DANY"), the Federal Reserve Bank of New York and the

Board of Governors of the Federal Reserve System ("Federal Reserve"), and U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC").

8. Throughout the investigations, the Department, DOJ, DANY, the Federal Reserve, and OFAC often received and reviewed the same document productions. As far as I know, the Department did not obtain any documents that were not also obtained by DOJ, nor did the Department interview any witnesses other than together with DOJ.

9. As a result, the Department's findings, as reflected in the parallel settlements entered into 2012 and 2019, are consistent with those of DOJ, DANY, the Federal Reserve, and OFAC, with any differences due to language choices or the different mandates of the agencies involved in the investigation.

10. The September 2012 consent order issued by the Department, and the December 2012 agreements issued by DOJ and OFAC, similarly detailed how SCB cleared millions of dollars of transactions through SCB's New York branch using nontransparent means to mask that the transactions were for the benefit of parties from Iran and other countries that are the subject of the United States sanctions laws. Accordingly, for example, the Department's 2012 consent order stated that between 2001 and 2007, SCB "removed Iranian information from U.S. dollar wire payment messages," Ex. 1, ¶ 2, while DOJ's 2012 deferred prosecution agreement states that, during the same 2001 to 2007 time frame, SCB processed "payments … on behalf of sanctioned customers without reference to the payments' origin," and eliminated "payment data that would have revealed the involvement of sanctioned countries," Declaration of Matthew Komar, Ex. 1, Factual Statement, ¶ 5. As demonstrated in those documents, the Department's main jurisdictional focus was on the lack of transparency on the face of wire payment messages

passing through its licensee, the New York Branch, while the DOJ's was on the criminal violations of sanctions regulations that resulted.

11. The basis for the August 2014 consent order issued by the Department to SCB, for which there is no parallel settlement by DOJ, the Federal Reserve, OFAC, or DANY, was gleaned entirely from the work of a monitor installed at SCB as a result of the 2012 consent order issued by the Department. Specifically, the 2012 consent order required SCB to retain an independent monitor to "conduct a comprehensive review … of the [Bank Secrecy Act]/AML and OFAC compliance programs, policies, and procedures now in place at SCB's New York Branch" that led to that order. Ex. 1, ¶ 9. The monitor identified significant flaws in SCB's transaction monitoring system, leading to a consent order that sought to compel SCB to remediate the deficiencies in its transaction monitoring system.

12. The investigation underlying the most recent parallel settlements began in late 2013, when a joint investigation of a different bank, in which the Department, DOJ, OFAC, DANY, and the Federal Reserve were participating, revealed that a Dubai-based petrochemical company, which was owned by an Iranian national, held an account at SCB's Dubai branch. This investigation was coordinated between the Department, DOJ, DANY, the Federal Reserve, and OFAC, with the agencies generally receiving the same document productions and participating in joint witness interviews.

13. This new investigation revealed that SCB's Dubai branch processed transactions for this client despite indicia, including faxed correspondence indicating that the transmission originated in Iran, that the beneficial owner of the account was Iranian. Based on these findings, the investigation expanded to include other clients of the Dubai branch, the receipt of facsimile

transmissions originating in Iran, and the ability of SCB clients to access its online banking platforms from Iran to conduct prohibited transactions.

14. As in the 2012 settlements, the Department's April 2019 consent order addressed the same conduct addressed in the parallel orders issued by DOJ, OFAC, DANY, and the Federal Reserve.

15. For example, addressing the abuse of SCB's online banking system, the Department's consent order stated that between "November 2008 and 2012, the Bank's failure to block online banking access permitted more than 100 customers to conduct USD transactions from Iran and other sanctioned countries." Ex. 3, ¶ 19. The consent order also noted that SCB operated a facsimile system that "could facilitate USD payments initiated by requests originating in Iran." *Id.* ¶ 24.

16. The order issued by the Federal Reserve stated that, "between 2009 and 2014, [SCB] processed hundreds of millions of dollars in additional transactions in violation of the U.S. sanctions regimes … which primarily resulted from deficiencies in compliance procedures at certain of [SCB's] foreign offices related to international funds transfers initiated through faxed payment instructions and online banking channels." Declaration of Patrick M. Bryan, Ex. C, at 2.

17. Similarly, the settlement agreement executed by OFAC and SCB noted the same issues with SCB's online and facsimile systems, noting, among other things, that during the relevant period SCB processed "689 fax payments with a value of $35,348,468, and 705 USD-denominated online payments to or through the United States with a total value of $46,911,754 in apparent violation of § 560.204" of the Iranian Transactions and Sanctions Regulations. Declaration of Alexandre Manfull, Ex. 2, ¶ 55.

18. While the Department and OFAC cited SCB for a different total number of violations, with OFAC citing SCB, between June 2009 until June 2014, for processing $437,553,380 in illicit transactions, and the Department citing SCB for processing approximately $600 million in illicit transactions between 2008 and 2014, the difference does not represent a distinction in the investigation undertaken by the two agencies. Rather, the distinction is based on the different statutes of limitations that apply to the different agencies and their different conclusions regarding which transactions should be included in a settlement given the agencies' respective enforcement priorities.

19. The front companies referenced by the Department, OFAC and DOJ are the same companies. *See* Ex. 3, ¶¶ 30-37; Declaration of Alexandre Manfull, Ex. 2, ¶¶ 7-28; Declaration of Wayne Boddy, Ex. 1, Supplemental Factual Statement.

20. Although I was not personally involved in the review of relator's claims, I understand that Department staff undertook a thorough review of the information provided by relator at the time it was produced. I understand, however, that the Department was unable to verify the allegations made by relator and took no enforcement action against SCB arising out of the information provided by relator.

21. A copy of the letter from Kevin Bishop, the Department's Acting General Counsel, dated December 11, 2019, discussing, among other things, the Department's investigation of Promontory Financial Group, LLC, is attached hereto as Exhibit 4.

Dated: February 28, 2020
New York, New York

Elizabeth Nochlin
New York State Department of Financial Services