EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BRUTUS TRADING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, and STANDARD CHARTERED TRADE SERVICES CORPORATION,<br><br>Defendants. | No. 18 Civ. 11117 (PAE) |

### SECOND SUPPLEMENTAL DECLARATION OF SPECIAL AGENT MATTHEW F. KOMAR

I, Special Agent Matthew F. Komar of the Federal Bureau of Investigation, hereby declare the following pursuant to 28 U.S.C. § 1746:

1. I previously submitted two declarations in support of the United States' motion to dismiss Relator's second amended complaint in the above-captioned case.[1] I have reviewed Relator's motion for an indicative ruling, and hereby make the following second supplemental declaration to respond to certain factual inaccuracies and other points made in Relator's papers with regard to the government investigations at issue.

2. I make this declaration, like the previous ones, based on my own personal knowledge as well as a review of documents relating to these investigations. This declaration does not set forth all of my knowledge of the matters discussed herein. All dates and amounts set forth are approximate and to the best of my recollection, unless otherwise noted.

---

[1] This declaration uses abbreviations and capitalized terms defined in my earlier declarations.

3.      As discussed in my earlier declarations, Relator provided the government with certain SCB documents that included lengthy client lists and transaction registers for SCB's Dubai branch. Relator never suggested or alleged that any or all of the thousands of non-Iranian clients of SCB's Dubai branch were involved in sanctions violations through illicit and undisclosed Iranian connections. Instead, and as explained in my prior declarations, Relator and its principals directed us to certain entries in those customer lists (among the thousands of entries in those documents) that were particular known Iranian clients of SCB. These known Iranian customers included major Iranian banks, Iranian government agencies, and large Iranian companies. Relator claimed that these Iranian entities had continued to transact with the Bank after 2007—despite the Bank's representation to the U.S. government that it had suspended new Iranian business after 2007. As discussed in my earlier declarations, we reviewed the Bank's transactions with the Bank's known Iranian clients for the relevant time period and concluded that they were either legitimate wind-down transactions that the Bank had previously disclosed to DOJ and OFAC or otherwise did not appear to violate any sanctions rules.

4.      Relator never suggested that non-Iranian corporate clients of SCB may have illegally used their relationships with the Bank to violate the Iran sanctions rules. Thus there was no reason for the investigating agencies to search for Suspicious Activity Reports ("SARs") associated with such clients. Relator's allegations were limited to Iranian customers of the bank, which we were able to identify from the client lists and other materials. Database searches for SARs relating to thousands of non-Iranian customers of the Bank would not have been an appropriate investigative step where Relator raised no allegations about any of those customers.

5.      After the conclusion of our investigation into Relator's allegations, as described previously, the agencies separately looked into certain non-Iranian clients of SCB's Dubai

branch—primarily business organizations incorporated in the United Arab Emirates—that may have operated as fronts for Iranian companies or were controlled by Iranian nationals ordinarily resident in Iran. This phase of the investigation focused not just on whether these non-Iranian SCB clients had actually participated in transactions that violated U.S. sanctions on Iran, but also on whether SCB and its employees knew of these violations.

6. As part of this separate investigation, I and my colleagues at FBI and other investigating agencies queried government databases that included SARs for information regarding certain entities that we suspected may have participated in sanctions-violative transactions. We conducted limited searches with respect to a relatively small number of entities for which we had uncovered other evidence suggesting an Iranian connection. The mere fact that SCB (or another financial institution) could have filed a SAR with regard to a particular entity would not have proven that there was criminal activity associated with that entity. Instead, the existence of a SAR and its contents would simply be additional information that sometimes but not always sheds light on whether particular entities were connected to Iran and whether SCB was aware of such Iranian connections.

7. I do not recall that we conducted (or considered conducting) broad searches for SARs relating to all of the thousands of clients of SCB's Dubai branch, nor would such searches have been consistent with a reasonable investigative strategy. And, as explained previously, we did not consult or consider any of the materials provided by Relator (or Mr. Chandra) in this separate investigation pertaining to certain of the Bank's non-Iranian clients, which ultimately led to the 2019 DPA and related agreements with other agencies.

3

4

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  December 22, 2020
        Cleveland, Ohio

                                        _____
                                        Matthew F. Komar
                                        Special Agent
                                        Federal Bureau of Investigation