# EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BRUTUS TRADING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, and STANDARD CHARTERED TRADE SERVICES CORPORATION,<br><br>Defendants. | No. 18 Civ. 11117 (PAE) |

### THIRD SUPPLEMENTAL DECLARATION OF SPECIAL AGENT MATTHEW F. KOMAR

I, Special Agent Matthew F. Komar of the Federal Bureau of Investigation, hereby declare the following pursuant to 28 U.S.C. § 1746:

1. I previously submitted three declarations in support of the United States' motion to dismiss Relator's second amended complaint in the above-captioned case.[1] I have reviewed Relator's reply brief in support of its motion for an indicative ruling, and hereby make the following third supplemental declaration to respond to certain factual inaccuracies and other points made in Relator's papers with regard to the government investigations at issue.

2. I make this declaration, like the previous ones, based on my own personal knowledge, my training and experience, as well as a review of documents relating to these investigations and discussions with members of the investigatory team. This declaration does

---

[1] This declaration uses abbreviations and capitalized terms defined in my earlier declarations.

not set forth all of my knowledge of the matters discussed herein. All dates and amounts set forth are approximate and to the best of my recollection, unless otherwise noted.

***Information Provided by Messrs. Knight and Marcellus***

3. As discussed in my earlier declarations, Relator's allegations pertained to known Iranian clients of SCB that supposedly continued to transact with the Bank in U.S. dollars after 2007. Relator never claimed that SCB had Dubai-based clients that were fronts for Iranian businesses, which was what the Government uncovered in its separate investigation that led to the 2019 settlements.

4. I was the case agent assigned to the Government's investigation into Relator's allegations as well as to the first part of the subsequent SCB investigation. As part of this assignment, I was responsible for taking detailed notes during the agencies' joint interview of Relator's members, Julian Knight and Robert Marcellus, which took place on January 16, 2013, at the U.S. Attorney's Office for the Southern District of New York. I then converted these notes into detailed interview reports, on FBI Forms FD-302, which became part of the official record of the investigation. True and correct copies of my interview reports for Messrs. Knight and Marcellus are attached hereto as Exhibits 1 and 2.[2]

5. As a special agent of the FBI, I have been trained to carefully summarize pertinent information witnesses provide during interviews and memorialize that information in formal interview reports. Interview reports such as these are used to record information that may become evidence in criminal and civil proceedings.

---

[2] Pursuant to FBI protocols, I have redacted the agency case numbers and identifiers as well as all telephone numbers from these reports.

6.      This interview was the only time, of which I am aware, that the Government formally interviewed Messrs. Knight and Marcellus in this matter, although I am told that Mr. Marcellus communicated with representatives of DFS and OFAC (separately) to provide a preview of the allegations in Relator's *qui tam* complaint before it was filed. Besides this interview and the complaint itself, Relator provided a disclosure statement (which was attached to Relator's sur-reply in opposition to the Government's motion to dismiss, ECF No. 61-2) and certain documents relating to SCB, and Relator's counsel provided certain information to the investigative team through the U.S. Attorney's Office.

7.      As relevant here, and as I previously summarized, Mr. Knight discussed several main points during the interview, including his work tenure at SCB, his knowledge about its historical efforts to engage with Iranian clients, and his understanding of scope and purpose of the Bank's Project Green. Furthermore, Mr. Knight explained that he had been assigned to work on SCB's foreign-exchange "sundry" account, which had been used to book the Bank's revenues from certain foreign-exchange transactions that had not been linked with the relevant clients, by retroactively associating them with the correct clients—though none of the clients he identified with regard to this account were Iranian.

8.      Mr. Knight and Mr. Marcellus provided their general understanding that SCB executed foreign-exchange transactions between two non-U.S. dollar currencies by interposing an intermediate conversion to U.S. dollars—especially if one of the currencies was pegged to the dollar, such as the United Arab Emirates dirham. They further noted their belief that such transactions would necessarily involve the Bank's New York branch.

9.      Mr. Knight also described the pertinent portions of the documents that had been provided with Relator's disclosure statement. First, he explained his understanding of the

3

operation of an online system by which Bank clients could initiate foreign-exchange transactions, and pointed to documents listing many clients that had access to this system in 2007, 2008, and 2009. He noted that these clients included Bank Saderat, an Iranian bank, but explained that he did not know if Bank Saderat had actually logged in to this system or executed any transactions through it. He also discussed a document that listed a large number of clients that had access to this system in 2006 and 2007, and noted that the list included several Iranian banks though, as he recalled, these banks did not appear in a similar document from 2008.

10. Mr. Knight also reviewed a few documents that described transactions or SCB revenues associated with a large number of transactions. In these documents, he pointed our attention to what appeared to be the Bank's trade-finance and foreign-exchange revenues in 2009 and 2010 from transactions with the National Iranian Tanker Company, Bank Markazi Jomhouri Islami Iran (Iran's central bank), the Iranian Ministry of Economic Affairs and Finance, and a group of entities referred to as the Ministry of Energy Iran Group, which comprised several Iranian energy companies including Mapna Co. LLC. The documents listed all SCB revenues in U.S. dollars.

11. Another set of documents described by Mr. Knight listed various Iranian banks on long lists of potential SCB clients, and a final document was a presentation he had given his SCB colleagues about the sundry account.

12. Additional, similar documents provided by Relator's counsel after the interview also listed many of the same Iranian banks, companies, and government agencies among long lists of non-Iranian clients and transactions.

13. As explained in my previous declarations, we reviewed the documents, focusing specifically on SCB's relationships and transactions with its Iranian clients, and ultimately

concluded that the post-2007 transactions with these clients appeared legitimate as most of them represented winding-down of pre-2007 transactions in currencies other than the U.S. dollar (even where Bank documents listed them in dollars for internal accounting purposes), and the rest appeared to comply with applicable rules such as the U-turn license. We further did not find evidence of wrongdoing in connection with SCB's foreign-exchange sundry account, nor did it appear that any Iranian client had engaged in foreign-exchange transactions through the Bank's online system after 2007.

***Information Provided by Mr. Chandra***

14. I spoke by telephone four times with Anshuman Chandra, a Bank employee then living in Dubai who had contacted Mr. Knight and indicated that he wished to speak with us regarding the investigation: on September 26, 2013; October 29, 2013; January 23, 2014; and October 28, 2014.[3] Each of these conversations was memorialized in a formal interview report, like the ones I prepared for the interviews with Messrs. Knight and Marcellus. These reports are attached hereto as Exhibits 3, 4, 5, 6, and 7.[4]

15. Mr. Chandra told me that he had several SCB documents relating to the Bank's transactions with Iranian clients, the sundry account, and other topics. He transmitted these

---

[3] About two years later, in 2016 when I was no longer working on the case, Mr. Chandra sent me an email about STB General Trading Company, a client of SCB's Dubai's branch that he suspected may have been involved in money laundering (unrelated to Iran or sanctions) due to suspicious foreign-exchange transactions. I forwarded this email to the prosecutors and agents who were working on the SCB investigation at that time, and I understand that they requested information about this entity from the Bank, but ultimately did not conclude the Bank was involved in any criminal wrongdoing with respect to STB.

[4] For the first of these interviews, I was joined by Special Agent Michael Fleischmann of the Internal Revenue Service's Criminal Investigation division, who prepared the formal report of the interview, while I prepared a brief memorandum noting my participation. Both memoranda are attached.

documents to me on three CDs, via the FBI attaché at the U.S consulate in Dubai. The CDs contained a total of 79 electronic documents, regarding which I interviewed Mr. Chandra.[5]

16.     Forty-nine of the files were Microsoft Excel spreadsheets containing monthly reports from 2010 to 2012 entitled "Performance Summary – Iran (SNPC)." Ex. 5, at 2-3; Ex. 6, at 2. These reports summarized foreign-exchange transactions for SCB's clients handled by the Bank's Dubai-based group that covered Iran and other "Significant Non-Presence Countries," *i.e.*, countries where the Bank did not have offices. The reports were in the form of pivot tables that display the information in summary form, which can be expanded to show the underlying full data; this appears to be what Relator repeatedly refers to as "hidden cells" in the documents. The clients identified as Iranian in these reports consisted largely of the same Iranian entities that had been included in Relator's documents and whose relationships with the Bank had been previously reviewed as part of the investigation into Relator's allegations. Mr. Chandra told me that he thought these documents would be relevant to the investigation as the name of the relevant Bank unit contained "Iran."

17.     Mr. Chandra also provided several documents he said had been prepared by the SCB team assisting in the Bank's response to the Government's investigation of Relator's allegations. Ex. 5, at 3, 4, 5; Ex. 6 at 3, 5.[6] These documents included lists of the Bank's Iranian clients, records of their foreign-exchange activity, and information about when the accounts were

---

[5] Relator mistakenly states that Mr. Chandra's CDs contained 20,000 files rather than 79, *see* Relator Reply at 2, 10, perhaps misunderstanding the statement in a memorandum by Relator's former counsel summarizing the documents which indicated that the one of the documents is a "spreadsheet [that] lists over 20,000 foreign exchange [transaction] records," ECF No. 79-4, ¶ 2. The information in counsel's memorandum largely duplicates what Mr. Chandra told me directly about the documents.

[6] In his memorandum discussing Mr. Chandra's documents, Relator's former counsel opined that the documents relating to the Bank's investigation "appear to be possibly attorney work product," and thus did not discuss them further. ECF No. 79-4, at 1.

6

blocked or closed. Mr. Chandra told me that one of these documents (with a long title beginning with "Juniper 35")—a copy of which he attached to his latest declaration—had been transmitted to SCB's attorneys, who in turn provided the information in it to the Government. The document appears to be dated several days before SCB's attorneys presented their review of the transaction activity by the Bank's Iranian clients to the Government. The document contains a list of certain SCB clients that had access to an SCB foreign-exchange system and information about whether they were Iranian and when, if ever, the Bank closed, blocked or flagged their accounts (as indicated by the codes "BLI" and "IRA" in the last column of the document).[7] SCB's presentation to the Government included information consistent with this report about the Bank's Iranian and Iran-associated clients.

18.     Mr. Chandra provided several other documents regarding SCB's relationships or potential relationships with known Iranian clients Bank Saderat, Mapna International, IFIC Holding AG (Iran Foreign Investment Company), and Air Iran, but none of these documents indicated or suggested that the Bank had engaged in improper U.S. dollar transactions with such clients after 2007. Further, Mr. Chandra provided documents relating to the sundry account and to SCB's relationship with Al Rajhi Bank, a Saudi bank that he had been told had unspecified "legal and compliance" issues.

19.     A review of all of these documents, which Mr. Chandra provided on the three CDs, did not change our conclusion regarding the viability of Relator's allegations.

---

[7] Like Messrs. Knight and Marcellus, Mr. Chandra never suggested that any of SCB's clients, including any of the clients listed on the documents he provided, were non-Iranian entities operating as fronts for Iranian companies.

7

*The Petrochemical Company*

20.     As I explained in my prior declarations, the investigation that ultimately led to the 2019 settlements began when the Government learned, as part of an investigation of a different financial institution, of information suggesting that a Dubai-incorporated petrochemical company that was a client of SCB's Dubai branch was actually a front for an Iranian business. I also previously noted that this petrochemical company was never mentioned by Relator or Mr. Chandra, nor is it included in any of the documents they provided. Mr. Marcellus now claims that Caspian Chemical FZCO, an entity listed in one of Relator's documents—though never mentioned by Messrs. Knight, Marcellus, or Chandra—is a corporate affiliate of the petrochemical company at issue. As part of our investigations, we reviewed documents relating to the ownership and corporate family structure of the petrochemical company and (although its name is somewhat similar), Caspian Chemical does not appear to have any relationship with the petrochemical company.[8]

*The Alleged Leaked Suspicious Activity Reports*

21.     Mr. Marcellus attaches to his latest declaration a list of entities regarding which— he claims—SCB allegedly filed SARs that were leaked to Buzzfeed and formed the basis of the BuzzFeed article that is the subject of the instant motion. 2d Supp. Marcellus Decl., Attachment D (ECF No. 79-1, at 21). I reviewed this list and compared it to our case files for the relevant investigations. None of the listed entities were ever mentioned by Messrs. Knight, Marcellus, or

---

[8] Mr. Marcellus is also incorrect that the revelation by the other financial institution about the petrochemical company was prompted by the SCB investigation. As I and others (including DFS's declarant) have previously pointed out, it was the other way around—the other bank provided information that led the agencies that had been investigating Relator's claims to open a new investigation into SCB. *E.g.*, Komar Decl. (ECF No. 32), ¶¶ 26-29; Nochlin Decl. (ECF No. 58), ¶ 12.

8

Chandra during our investigation of Relator's allegations. The listed entities also were never part of the separate investigation of SCB that led to the 2019 DPA. Thus, regardless of whether Mr. Marcellus's list is accurate or whether any such SARs actually exist, the entities listed on it are not relevant to the SCB investigations in which I participated.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:    March 8, 2021
          Cleveland, Ohio

_____
Matthew F. Komar
Special Agent
Federal Bureau of Investigation

9