# EXHIBIT J

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

        Plaintiff,

        v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVICES
CORPORATION,

        Defendants.

No. 18 Civ. 11117 (PAE)

**THIRD SUPPLEMENTAL DECLARATION OF ALEXANDRE MANFULL**

I, Alexandre Manfull, hereby declare the following pursuant to 28 U.S.C. § 1746:

1. I previously submitted three declarations in connection with the United States' motion to dismiss Relator's second amended complaint in the above-captioned case and Relator's application to reopen the Court's determination of that motion. I have reviewed Relator's reply brief in support of its motion for an indicative ruling ("Relator Reply") and its February 1, 2021, letter to the Court ("Relator Letter"), and hereby make the following third supplemental declaration to respond to additional inaccuracies and other points made in Relator's latest set of filings with regard to the Government investigations and financial filings at issue.

2. I make this declaration, like the previous three, based on my own personal knowledge, a review of Relator's allegations and documents relating to these investigations, as well as my general familiarity with the procedures and authorities of other Treasury components,

including FinCEN.[1]  As with my previous declarations, this declaration does not set forth all of my knowledge of the matters discussed herein.  All dates and amounts set forth are approximate and to the best of my recollection, unless otherwise noted.

3. As explained in my prior declarations, I participated personally in part of OFAC's investigation into Relator's claims, including by taking part in a pre-complaint telephone call and email communications between OFAC and Robert Marcellus in September 2012 and in the (post-complaint) multiagency interview of Mr. Marcellus and Julian Knight in January 2013.  I also reviewed the documents provided by Relator in connection with the *qui tam* lawsuit as well as relevant documents provided by the Bank.  Although I did not work at OFAC from March 2013 to August 2014, upon my return I participated directly in the investigation of SCB that led to the 2019 settlement with OFAC.  Furthermore, as part of preparing my declarations in this matter, I have reviewed (and in many cases re-reviewed) numerous pertinent documents, including emails, memoranda summarizing interviews and meetings, Bank documents received in the course of the investigation, and documents provided by Relator and Anshuman Chandra.

**Relator's *Qui Tam* Allegations Were Limited to Iranian Entities and SDNs**

4. As explained in my prior declarations, Relator's original allegations in this case were that SCB improperly conducted U.S. dollar transactions for Iranian entities and SDNs after 2007.  These were the types of clients that Messrs. Knight, Marcellus, and Chandra identified to the Government as suspect in various communications and interviews—including in a telephone call between Mr. Marcellus and OFAC in September 2012, a few months before the *qui tam* complaint was filed.  Like the other communications involving Relator's *qui tam* complaint, this

---

[1] This declaration uses abbreviations and capitalized terms defined in my earlier declarations.

2

conversation described Mr. Marcellus's allegations regarding Iranian and SDN clients of SCB. These allegations were investigated and were not corroborated.

5. Relator's recent filings claim that its allegations also included hundreds of companies based in the United Arab Emirates (U.A.E.) and elsewhere, which it now asserts conducted U.S. dollar transactions with Iran or had undefined Iranian affiliations. *See, e.g.*, Relator Reply at 9 (discussing "numerous customers with Iranian ties, some having a location in the UAE or other country"). While there were indeed thousands of non-Iranian entities listed in the documents Relator and Mr. Chandra provided, as detailed in my prior declarations, Relator and Mr. Chandra's allegations related to the known Iranian banks and entities identified on these documents that were indisputably based in or connected to Iran—including because they had "Iran" in their names (*e.g.*, Iran & Dubai Co. LLC) or were subsidiaries of known Iranian companies (*e.g.*, Mapna International FZE). Relator's allegations were not, as it now claims, that SCB conducted violative Iran-related U.S. dollar transactions through U.S. jurisdiction for hundreds of non-Iranian entities on Relator's lists with no apparent Iranian affiliations.

6. In any case, as part of preparing my declarations in this case, I have examined several lists produced by the Relator and Mr. Chandra in its latest filings, as further described below. In particular, these lists include several entities, such as Mapna International FZE and approximately 30 Iranian clients on the chart produced by Mr. Chandra, whose Iranian affiliations were apparent during the investigation, and whose post-2007 transactions with SCB were already investigated by the Government. The lists also include a large number of non-Iranian entities that do not appear to be Iranian or otherwise subject to sanctions—for example, because they were SDNs, owned by Iranian entities or individuals ordinarily resident in Iran, or owned or controlled by the Iranian government, as further described below, *see* 31 C.F.R.

§§ 560.204, 560.206, 560.211—and which Relator did not identify to OFAC as suspect among the thousands of companies listed in its original productions. In particular, Relator did not suggest that these non-Iranian companies in its original productions were Iranian front companies—*i.e.*, sham or shell companies that hold themselves out as non-Iranian companies but in actuality operate on behalf of Iranian entities or persons ordinarily resident in Iran—which were the subject of the investigation that led to the 2019 settlement.[2]

### The Alleged Leaked SARs Do Not Relate to Iranian Front Companies

7. In its latest set of papers, Relator claims that the BuzzFeed Article describes alleged leaked Suspicious Activity Reports ("SARs") filed by SCB purportedly showing that the Bank "processed hundreds of millions of dollars in transactions suspected of violating the Iran sanctions until 2017, including transactions involving at least 31 companies identified in information the Relator had produced" to the Government in 2012 and 2013. Relator Reply at 1. As I explained previously, 2d Supp. Manfull Decl. (ECF No. 75) ¶ 4, Relator misinterprets the BuzzFeed Article by suggesting that the alleged SARs all described transactions with sanctioned Iranian parties in violation of OFAC sanctions, rather than reportable transactions across a broad range of suspicious activities, *see* BuzzFeed Article ("*[s]ome* of the 35 SARs mentioning customers in the whistleblowers' documents discussed *possible links* to Iran" (emphases

---

[2] As noted in my prior declarations, individuals of Iranian nationality or background who are ordinarily resident outside of Iran, such as in the U.A.E., are generally not considered Iranian for purposes of the OFAC sanctions. Manfull Decl. (ECF No. 34) ¶ 15; Supp. Manfull Decl. (ECF No. 57) ¶ 8.

added)).³ Mr. Marcellus admits that neither he nor Mr. Knight has seen the alleged leaked SARs. *See* 2d Supp. Marcellus Decl. ¶ 10 & Attachment D.⁴

8. I have re-reviewed Relator's disclosure statement, notes from the January 2013 Relator interview, notes from OFAC's pre-complaint telephone conversation with Mr. Marcellus, notes from the FBI's interviews with Mr. Chandra, and relevant contemporaneous correspondence with Mr. Marcellus. Relator and Mr. Chandra do not appear to have mentioned any of the subjects of alleged leaked SARs in those communications.⁵

9. In any event, I have reviewed the names of the entities on Mr. Marcellus's list, which includes entities he claims are subjects of alleged leaked SARs, and none of them appear to be Iranian entities or SDNs, Iranian front companies, or otherwise subject to the Iran sanctions. Relator did not allege or provide evidence in its communications to the Government

---

³ As I have noted, SARs may be filed to report a broad range of suspicious activity unrelated to sanctions violations, such as suspicions of tax evasion, irregular business patterns, or unusual flows of funds. 2d Supp. Manfull Decl. ¶¶ 8-9. The BuzzFeed Article does not claim that the alleged leaked SARs all describe transactions with Iranian companies or Iranian front companies, and indeed, most of the identified examples of alleged SARs discussed in the body of the article do not relate to Iran sanctions.

⁴ Due to the applicable SAR confidentiality requirements, I address the alleged SAR information herein only as it was provided in allegations made by Mr. Marcellus and the BuzzFeed Article, and cannot discuss SAR information or otherwise comment on the existence or accuracy of any such information. Out of an abundance of caution, given the allegations of specific SAR information and governing confidentiality requirements, and consistent with the Government's request to seal Paragraph 10 and Attachment D to the Marcellus Declaration, I submit portions of this information under seal to ensure confidentiality of any alleged SAR information.

⁵ As I noted previously, the mere fact that certain non-Iranian entities in Mr. Marcellus's list also appear among thousands of others in the lengthy client lists or transaction registers provided by Relator or Mr. Chandra, without evidence from Relator or Mr. Chandra of an improper Iranian affiliation, would not have led OFAC to investigate all transactions involving each such non-Iranian entity in the off-chance that an Iranian sanctions violation might be found. Nor would such an investigation have been reasonable given the information actually provided by Relator, which was far more specific—and was thoroughly investigated.

5

as part of the *qui tam* matter that SCB had facilitated violative Iran-related transactions through U.S. jurisdiction for the entities on Mr. Marcellus's list.

10. Most of the entities on Mr. Marcellus's list are non-Iranian multinational or foreign companies based outside the U.A.E. that clearly are not fronts for Iranian companies or otherwise subject to U.S. sanctions. These companies include affiliates of large multinational companies ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.

11. At least two of the non-U.A.E. companies on this list have been subject to enforcement actions by OFAC for alleged violations of U.S. sanctions: ▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

However, as explained in my prior declarations, the fact that a non-Iranian company is known or suspected of having engaged in particular violative transactions does not mean that it is subject to sanctions[6] or that all transactions between a U.S. financial institution and the non-Iranian company would be prohibited.[7] The types of allegedly violative transactions that the Relator disclosed were different in kind, in that they related to transactions in U.S. dollars on behalf of the Bank's pre-2007 Iranian clients.

---

[6] As explained in my prior declarations, an entity is considered subject to sanctions when OFAC blocks (*i.e.*, "freezes") its interests in property and adds it to the SDN List. By contrast, an entity may be subject to an enforcement action by OFAC if it violates the prohibitions on transactions under U.S. jurisdiction that involve sanctioned countries or SDNs.

[7] Indeed, as I mentioned previously, many major American and European companies, including Apple and Amazon, have been penalized for engaging in transactions with Iran through U.S. jurisdiction, but U.S. financial institutions do not necessarily violate the Iran sanctions simply by processing transactions for such companies. 2d Supp. Manfull Decl. ¶ 21.

12. The remaining entities on Mr. Marcellus's list are a group of Lebanese banks and companies ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████ The connection of these Lebanese entities to this matter is unclear, ████████████████████████████

████████████ Moreover, none of these entities appear to have been identified as subject to sanctions by Messrs. Knight, Marcellus, or Chandra in their communications with the Government in 2012 and 2013. ████████████████████████

████████████████████████████████████████

████████████████████████ However, even if the allegations that they facilitated terrorist financing transactions were proven, it would not mean that the Lebanese entities were subject to OFAC sanctions, such that SCB would have violated sanctions regulations by dealing with them at the time of any relevant transactions.

**Relator and Mr. Chandra Did Not Identify SCB Sanctions Violations**

13. Messrs. Knight, Marcellus, and Chandra's latest declarations also incorrectly claim that they had identified to the Government in the course of its investigation various SCB clients that were fronts for Iranian companies. They do not allege any connection to alleged leaked SARs described in the BuzzFeed Article, and thus it is not clear why they are pertinent to this motion. In any event, Relator did not specifically identify these entities as suspect to OFAC in the investigations.

---

████████████████████████████████████████
████████████████████████████████████████

7

*Mr. Marcellus's Purported Pre-Complaint Email to OFAC*

14. One of the documents attached to Mr. Marcellus's latest declaration is a purported copy of an email message dated September 19, 2012, that he claims to have sent to me and other OFAC personnel, which includes a list of SCB clients he now alleges may have been involved in sanctions violations. 2d Supp. Marcellus Decl., Attachment B (ECF No. 79-1, at 14-18). Upon closer review, the material attached to Mr. Marcellus's declaration is substantially different from the actual email he sent OFAC in 2012, which I have attached hereto as Exhibit A, and which specifically does not include the same list of entities to which he refers in his declaration.

15. To conduct my comparison, I reviewed the email message in question not only in my archived email records, but also in the archived records of other OFAC employee recipients of the email in question (none of whom still work at OFAC), which I obtained through the agency's information technology division. The first two pages of the email attached to Mr. Marcellus's declaration match the corresponding section of the email that was sent to OFAC. *Compare* ECF No. 79-1, at 14-15, *with* Exhibit A at 1-2 (through numbered item 2). The remaining material in the email attached to Mr. Marcellus's declaration, however, is completely different from the remainder of the email message (and attachment) that OFAC actually received. *Compare* ECF No. 79-1, at 16-18, *with* Exhibit A at 1-5 (after numbered item 2). I have reviewed my email correspondence and that of several of my former colleagues with Mr. Marcellus and could not locate material that matches the lists on the last three pages of the document attached to Mr. Marcellus's declaration. From a visual inspection of the attachment to the Marcellus declaration, it appears that the document has been printed and scanned, rather than produced in native format.

8

16. The email message Mr. Marcellus actually sent to OFAC described documents that Mr. Knight would be able to provide relating to accounts and activity by known Iranian banks and companies on SCB's foreign-exchange electronic system (*e.g.*, Bank Melli, Bank Saderat), and attached notes relating to the Bank's relationship with Bank Markazi, Iran's central bank. This material is consistent with what Relator's complaint later alleged and OFAC investigated.

17. The material that was not part of Mr. Marcellus's email consists of a list of "Further Files we have," which appears to include summaries of some of the documents that OFAC received from Relator in connection with the *qui tam* complaint, ECF No. 79-1, at 16; and, more importantly—as relevant here—two pages listing what appear to be various SCB clients, *id.* at 17-18. This list is presumably what Mr. Marcellus is referring to in his declaration when he incorrectly claims that he "gave OFAC and Mr. Manfull names of numerous entities to investigate in [his] September 19, 2012 email," 2d Supp. Marcellus Decl. ¶ 7; *accord id.* ¶ 9(a). Only a few of the entities on that list were identified by Relator or Mr. Chandra in connection with the *qui tam* complaint—known Iranian entities whose transactions with SCB were reviewed by OFAC as part of its investigation. Moreover, Mr. Marcellus does not allege any connection to any alleged leaked SARs. Thus, it is not clear what relevance this list has to Relator's latest motion, which pertains to the BuzzFeed Article and the alleged leaked SARs it discusses.

18. Moreover, even if Mr. Marcellus had sent OFAC this list in 2012, it would not have changed our assessment of the prior investigation. Upon examination, the list seems to include (as further explained below): (i) known Iranian entities, including several known Iranian banks—of which nearly all were included in Relator's original allegations and reviewed as part of the *qui tam* investigation or whose accounts SCB appears to have largely blocked or closed by

9

2007 (according to the chart attached to Mr. Chandra's declaration, discussed below); many of these entities were also addressed in SCB's wind-down reports submitted to OFAC before Relator's *qui tam* complaint (which described permissible post-2007 transactions); (ii) what the Bank seems to have characterized as possibly Iranian entities or entities with possibly improper Iranian affiliations, nearly all of whose accounts SCB appears to have blocked or closed by 2007 (as noted in Mr. Chandra's chart); and (iii) non-Iranian entities for which SCB found no improper affiliations with Iran (as noted in Mr. Chandra's chart). Thus, Mr. Marcellus's list does not support Relator's claim that SCB conducted violative Iran-related transactions with its Iranian clients after 2007 or that any alleged SARs would support this accusation.

### Chart Attached to Mr. Chandra's Declaration

19. Mr. Chandra, for his part, attaches to his latest declaration (Supp. Chandra Decl., Ex. A) a spreadsheet that he claims is the result of an internal SCB investigation into "Iranian entities and Iran-linked entities in Dubai that were in the SCB customer base." Supp. Chandra Decl. ¶ 4; *see also* Relator Letter at 1 (describing the document as the result of an "internal SCB review identifying 30 SCB Dubai customers with clear Iranian connections"). As Mr. Chandra explained it at the time to the FBI agent working on the SCB investigation (recounted in the agent's latest declaration), however, this chart was actually prepared as part of the Bank's response to the Government's investigation of Relator's allegations. The findings of this chart are indeed, with respect to identified Iranian entities, consistent with SCB's presentations and disclosures to OFAC and the other investigating agencies.

20. In particular, Mr. Chandra's chart identifies many known Iranian entities (*e.g.*, known Iranian banks, Mapna International, (Iran) Ministry of Economic Affairs and Finance), some of which were previously disclosed by Relator and reviewed as part of the *qui tam*

10

investigation or whose accounts were largely either closed or blocked by 2007 according to the chart (code "BLI" in the far-right column, indicating that further transactions out of the account would be restricted without approval); many of these entities are also described in SCB's wind-down reports . The chart also includes a number of what the Bank appears to characterize as possibly Iranian clients or entities with possibly improper Iranian affiliations (*e.g.*, Sanat Chimie Novin and Iran & Dubai Company LLC), some of which are known to be affiliated with Iran; the chart indicates the Bank had also largely closed or blocked those accounts by 2007. The remaining entities on the list appear to be non-Iranian customers that the Bank either concluded were not Iranian (*e.g.*, Archirodon Construction, a Greek construction company) or entities whose accounts it had blocked or closed or with whom it no longer had a relationship. Thus, Mr. Chandra's chart does not appear to provide evidence of SCB engaging in transactions through U.S. jurisdiction with Iranian clients after 2007 (the subject of Relator's original allegations).

21. In any case, none of these entities are alleged to be related to any alleged leaked SARs that Mr. Marcellus claims are described in the BuzzFeed Article.

***Other Alleged Iranian Entities***

22. Mr. Marcellus's latest declaration claims that the thousands of entities listed in the various client lists and transaction registers that Relator provided to the Government were Iranian, fronts for Iranian entities, or conducted U.S. dollar transactions with Iranian entities after 2007 because of their supposed connection to the Bank's "Iran group." 2d Supp. Marcellus Decl. ¶ 8 (claiming that *all* of these entities were "Iranian front companies domiciled in other locations, known Iranian entities, and unrelated entities transacting with known Iranian entities"). This is plainly not what Relator indicated to the Government about these entities at the time—in the complaint or disclosure statement, or the interviews of Messrs. Knight and Marcellus.

11

23. Nor is it a plausible allegation, as many of the documents do not relate to such a group at SCB, and—as I noted previously, and as Mr. Chandra explained to the FBI agent at the time—the other documents pertain to a group at SCB's Dubai branch that handled non-U.A.E.-based clients from Iran and other "Significant Non-Presence Countries" in which the Bank did not have an office, including Kuwait and other Middle Eastern countries. Supp. Manfull Decl. ¶ 22; 3d Supp. Komar Decl. ¶ 16 & Ex. 6 at 2. Moreover, these documents include many entities that are clearly non-Iranian and have no apparent connection to Iran.[9]

24. Only a few of the entities listed in Relator's documents have any apparent connection to Iran and many of these were identified by name by Relator during the investigation. OFAC and the other agencies reviewed the Bank's transactions with these clients and did not find evidence of wrongdoing.

25. Mr. Marcellus claims that Relator identified to the Government the Dubai-based petrochemical company that was one of the subjects of OFAC's 2019 settlement. As I have explained previously, this is incorrect. Supp. Manfull Decl. ¶ 28. Messrs. Knight, Marcellus, and Chandra never identified this entity to the Government, and it is not listed, even incidentally, in any of the documents they provided to OFAC. Mr. Marcellus claims that Caspian Chemical Company FZCO, an entity that is listed in one of the documents (though never identified by Relator), is a corporate affiliate of the petrochemical company. He is incorrect. OFAC and the other investigating agencies examined the corporate affiliation of the petrochemical company as

---

[9] While Relator's counsel may have described some of Mr. Chandra's documents as including certain Kuwaiti and other non-Iranian clients serving as potential intermediaries in transactions involving Iranian entities, *see* Koenigsburg Memorandum (ECF No. 79-4), at 3, as the Government explained in its opposition to the instant motion, that description misunderstands the relevant documents as Mr. Chandra himself explained them to the FBI agent. *See* Gov't Opp. [ECF No. 73] at 14-15. Counsel's misunderstanding was based on a misapprehension of the nature of the Bank's Iran and Significant Non-Presence Countries group.

12

part of their investigation and concluded that although their names are similar, the petrochemical company is not related to Caspian Chemical.

26. Other entities mentioned in the various declarations include known Iranian-affiliated entities such as Well Services of Iran (Schlumberger Methods) and Nestle Iran PJSC, whose connections to Iran were recognized and reviewed during the investigation or as part of the wind-down reports, and which cannot be characterized as front companies. 2d Supp. Marcellus Decl. ¶ 9(b); Supp. Knight Decl. ¶ 3. According to the information OFAC received, and consistent with Mr. Chandra's chart, SCB had largely closed its accounts for these companies by 2007, or engaged in only permissible wind-down transactions thereafter.[10] Conversely, Mr. Marcellus also claims that certain entities are Iranian front companies when they are clearly not, such as the Bank D'Algerie (Algeria's central bank). 2d Supp. Marcellus Decl. ¶ 9(c).

27. Moreover, none of these entities are alleged to be related to any alleged leaked SARs that Mr. Marcellus claims are described in the BuzzFeed article.

\* \* \*

28. Ultimately, Relator has not supplied evidence that the unsubstantiated claims in the BuzzFeed Article corroborate or relate to Relator's allegations of undisclosed transactions for Iranian or SDN clients in violation of OFAC's sanctions. OFAC and other agencies carefully investigated Relator's allegations at the time and did not find they provided evidence of sanctions violations.

---

[10] As for Tanootas Taban Engineering Company, as I explained previously, Relator did not specifically identify this entity to OFAC. Supp. Manfull Decl. ¶ 27. An entity with a similar name, however, was disclosed to OFAC by SCB before the Relator filed its *qui tam* complaint.

13

29. Relator's repeated distortions of its allegations in a futile attempt to revise them to match the findings of OFAC and other agencies from the separate investigation that led to the 2019 settlements are without merit. I and other OFAC personnel have spent hundreds of hours of agency time and countless agency resources responding to and refuting Relator's misstatements over the past year which would otherwise have been used to support active sanctions investigations and other agency priorities. Any further expenditure of such resources, as would be required by further discovery or depositions in connection with this matter, would be detrimental to OFAC priorities.

Dated: Washington, D.C.
March 8, 2021

*[signature]*
ALEXANDRE MANFULL
Assistant Director
Sanctions Compliance and Evaluation
Office of Compliance and Enforcement
Office of Foreign Assets Control