UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

                           Plaintiff,                              Case No. 18 Civ. 11117 (PAE)

        v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVIICES
CORPORATION,

                           Defendants.

-------------------------------------------------------------x

### DECLARATION OF DAVID J. SCANTLING

       DAVID J. SCANTLING, pursuant to 28 U.S.C. § 1746, declares as follows subject to the penalties of perjury:

### I.  FORENSIC ASSIGNMENT AND SUMMARY CONCLUSIONS

       1.      I submit this declaration in support of Relator Brutus Trading LLC's ("Relator's") motion to vacate the judgment entered in the above-captioned matter. The statements included in this declaration are based on my own personal knowledge of threat finance, intelligence analysis, payment systems, software and database engineering, telecommunications networks, information retrieval, and forensic accounting.[1]

       2.      I have been asked by Relator to provide my expert opinion regarding the contents of certain transactional electronic data from defendant Standard Chartered Bank PLC ("SCB"),

---

[1]     I am providing this declaration as part of my ongoing commitment to *pro bono* public service.  Accordingly, I have not received, nor will I accept, any form of compensation from Relator for my work on this declaration.

which the Relator provided to the United States Government, (the "Government") in 2012 and 2013 ("Brutus Data"). Those conclusions are based on my comprehensive forensic and technical analysis of the Brutus Data, including a thorough examination of all relevant data and metadata, with a particular focus on a recently extracted set of at least 512,721 unique transactional records ("Newly Extracted Data").

3.      Based upon that work, I have:

- identified over **3.3 million** previously undisclosed transactional records, deduplicated to 512,721 unique records, contained in hidden pivot table caches, which are concealed within SCB Excel spreadsheets; and

- further isolated **906 Iranian-related** transactions (identified as such by SCB in the bank's own records) between January 2008 and March 2012 totaling approximately **$9.6 billion U.S. dollars** and involving entities and individuals subject to international sanctions), including, as discussed below, 92 transactions involving contemporaneously U.S. sanctioned entities. That $9.6 billion sum does *not* fully reflect the approximately $100 billion U.S. dollars in Iran-related foreign exchange transactions that Relator's Julian Knight has independently identified from the Newly Extracted Data.[2]

4.      The Newly Extracted Data I have reviewed include numerous SCB transactions with and on behalf of Iranian banks, Iranian companies, and Middle Eastern money exchanges that, according to the U.S. Dep't of Treasury's Office of Financial Assets Control ("OFAC"), finance designated foreign terrorist organizations ("FTOs")[3] such as the IRCG, IRCG-Quds Force,

---

[2]      My understanding is that Mr. Knight is providing a declaration to the Court explaining what the Newly Extracted Data demonstrates regarding SCB Iran-related foreign exchange transactions.

[3]      The U.S. Dep't of State designates a "Foreign Terrorist Organization" under section 219 of the Immigration and Nationality Act ("INA") (8 U.S.C. § 1189). To be designated as an FTO, an organization must engage in terrorist activity or terrorism, as defined in the INA, and must threaten the security of U.S. nationals or the national security (national defense, foreign relations, or the economic interests) of the United States.

Hezbollah, HAMAS, and Speicallly Desingated Global Terrorist ("SDGT")[4] organizations like the Taliban.

5.      For example, they include SCB's transactions with a Pakastani fertilizer company that, according to the U.S Dep't of Defense, was known for selling explosive materials to Al Qaeda and Haqqani Network fronts and subsequently used by the Taliban to build the roadside bombs that killed or maimed thousands of U.S. and U.K. military personnel in Afghanistan.[5]

6.      They also document SCB's use of funds that it borrowed from the United States during the 2007–2009 global monetary crisis, in connection with the Federal Reserve Bank's Term Auction Facility ("TAF") program to help fund the money-laundering and sanctions evasion operations of the Central Bank of Iran ("CBI").

7.      The Newly Extracted Data simply cannot be reconciled with the Government's representations to the Court in this matter that the Brutus Data contains no evidence of undisclosed sanctions violations.

## II.  BACKGROUND AND PROFESSIONAL EXPERIENCE

8.      Since 2012, I have worked as an independent intelligence analyst, researcher, and technical advisor to various commercial and government clients.

9.      During this period, my project work has covered threat finance, anti-money laundering, counter-financing of terrorism, open-source intelligence, forensic analysis, and electronic discovery market segments.

---

[4]      Exec. Ord. No. 13,224.

[5]      *Terrorist Networks in Pakistan and the Proliferation of IEDs: Hearing Before the Subcomm. on Near Eastern and South and Central Asian Affairs, S. Comm. on Foreign Relations*, 112th Cong. 2 (2012) (statement of Lt. Gen. Michael Barbero).

10.     I have extensive experience conducting forensic examinations of financial transactions to identify evidence of terrorist financing and violations of sanctions laws.

11.     From 1984 to 1991, I served in the U.S. Air Force, both on active duty and in the reserves.  I was awarded the Air Force Achievement Medal and National Defense Service Medal. In October 1991, I was honorably discharged from the U.S. Air Force. In May 1991, I earned a Bachelor of Arts degree from the University of Notre Dame.

12.     From 1992 to 1994, I worked for agencies within the U.S. Intelligence Community as a technical intelligence advisor conducting operations in various foreign countries.

13.     From 1995 to 2002, I worked in the commercial banking sector as a software engineer and technical architect for, among other information technology companies, IBM and Hewlett-Packard. During this period, I managed an Internet payment services and electronic funds transfer company that was regulated by the U.S. Department of the Treasury's Office of Comptroller of the Currency.

14.     From 2003 to 2005, I worked for agencies within the U.S. Intelligence Community as a technical intelligence advisor conducting operations in various foreign countries.

15.     From 2006 to 2008, I worked as a Highly Qualified Expert and civilian federal employee at the U.S. Department of Defense. During this period, I held the equivalent civilian rank of a two-star general, and I served as the lead DoD executive for business systems and networks in the U.S. Central Command area-of-operations.

16.     During that period, I led a team from the Office of the Secretary of Defense, Defense Intelligence Agency and Iraq Threat Finance Cell that successfully disrupted and eliminated terrorist financing networks and bomb-making supply-chains across Iraq, including insurgent cells run by Al Qaeda in Iraq, Islamic State, and Iraqi Shia militia groups. By conducting

forensic examinations of financial transactions using Excel and leveraging my expertise in database architecture and data analysis, we were able to uncover patterns of terrorist financing and sanctions evasion, ultimately leading to the disruption of these networks and a significant reduction in their terrorist capabilities.

17.     I received the Secretary of Defense Medal for Outstanding Public Service from then-Secretary of Defense Robert Gates for my counter-threat finance work in Iraq. In my last position with DoD, I served at the Pentagon as Assistant Deputy Under Secretary of Defense for Expeditionary Business Systems.

18.     From 2008 to 2009, I worked for agencies within the U.S. Intelligence Community as a technical intelligence advisor conducting operations in various foreign countries.

19.     From 2009 to 2010, I worked as a technical advisor to the U.S. Navy's Naval Air Systems Command. During that period, I deployed to Afghanistan and conducted operational testing and evaluations of U.S. Navy and Air Force airborne electronic warfare systems that were used for jamming commercial cellular telecommunications networks to counter, among other things, improvised explosive devices and explosively formed penetrators.

20.     In 2011, I deployed to Iraq and Afghanistan as a technical advisor to the Pentagon's Task Force for Business and Stability Operations. During that period, I assisted DoD personnel with the information technology and cyber-security components, including Excel-based data analytics and structured query language ("SQL")-based database searches, of their various economic development and counter-insurgency mission areas.

21.     Furthermore, my understanding of financial messaging systems like SWIFT, and my knowledge of electronic funds transfers, correspondent banking, and CHIPS clearing and settlement have been critical in identifying instances of sanctions evasion and money laundering.

By examining the technical details of these transactions, including the specific messaging formats and data fields used, I have been able to uncover attempts to conceal the true nature of illicit transactions and identify the ultimate beneficiaries of these funds.

22.     In support of my work for the U.S. Government, I was granted a Top Secret/Sensitive Compartmented Information security clearance by agencies within the U.S. Intelligence Community.

23.     Although my knowledge of terrorist financing, money laundering, and sanctions evasion includes information I reviewed during my government service, my expert opinion, as stated in this declaration, is based solely on public source and commercial source information.

### III.   DOCUMENTS AND SOURCES REVIEWED

24.     I have reviewed documents, data, and metadata contained in a sub-set of Relator's SCB files, including Excel spreadsheets, Word documents, PowerPoint presentations, Adobe PDF documents, and e-mail messages involving over 160 hours of technical effort.

25.     My primary focus was on the seventy-two SCB files that Relator has advised me it produced to the U.S. Government.

26.     Specifically, the following ten SCB files which Relator produced to the U.S. Government in December 2012:

        a.  "CLIENT, BRANCH & USER SETUP.xlsx"
        b.  "CLIENT, BRANCH & USER SETUP -2009.xlsx"
        c.  "Regional Bank Target Client List2006.xls"
        d.  "MENA Customerwise Sales Report- Jan 09.xlsx"
        e.  "Bank report – Dec 09 CB.xlsx"
        f.  "UAE DIB – Faisal.xls"
        g.  "Hot Cold All.xlsx"
        h.  "Prospective Clients.xls"
        i.  "Prospective Clients New.xls"

      j.   "Cash and Trade Corporates Client Groups FX Revenues_6 Sep 2010_MENA_V1.xlsx"

27.    And I reviewed the following fifty-six SCB files which Relator produced to the U.S. Government in September 2013:

      a.   "Performance Summary -Iran(SNPC)[numbered 1–12 and 14–50]['.xls' or '.xlsx' file extension]"; (49 Excel spreadsheets)
      b.   "Sundry.xlsx";
      c.   "MENA April to Dec 2012.xlsx";
      d.   "GCS MENA 2012-01-01 30.xls";
      e.   "Iran Air TS_1.doc";
      f.   "depos 19th august showing difference.xlsx";
      g.   "Saderat Client Agreement.pdf"; and,
      h.   "UnitWise Vs DPL Recon_31 May-2011.xlsx"

28.    A more detailed technical analysis of the Brutus Data, which I incorporate by reference into this declaration, is annexed hereto as an Addendum.

29.    As described above, these files include over 3.3 million hidden transactional records, dated between January 2, 2008, and August 31, 2012, relating to SCB's banking activities with its customers and counter-party banks in, among other banking segments, foreign exchange, trade finance, Eurodollar[6] deposits, and cross-border electronic funds transfers.

30.    Based on SCB's detailed spreadsheet records, originally populated with data from the bank's internal database systems, I have identified 92 transactions involving entities in Iran that were contemporaneously sanctioned by the U.S. Dep't of Treasury or U.S. Dep't of State

---

[6]    Eurodollars are defined as "deposit liabilities, denominated in dollars, of banks outside the United States." *See*, Milton Friedman, *The Euro-Dollar Market: Some First Principles*, FEDERAL RESERVE BANK OF ST. LOUIS (July 1971), at 17, https://files.stlouisfed.org/files/htdocs/publications/review/71/07/Principles_Jul1971.pdf .*See also*, *Citibank v. Wells Fargo Asia*, 495 U.S. 660, 662–63 (1990) ("Eurodollars are United States dollars that have been deposited with a banking institution located outside the United States, with a corresponding obligation on the part of the banking institution to repay the deposit in United States dollars.").

under various U.S. Government sanctions programs, including OFAC's Specially Designated Nationals ("SDN") list.[7]

## A. SCB's Hidden Transactional Records

31.     My forensic analysis of SCB's Microsoft Excel spreadsheet files unveiled a staggering number of hidden transactional records and revealed deeply troubling connections to sanctioned entities and terrorist organizations.[8]

32.     I successfully extracted over 3.3 million transactional records from the "pivot table caches", explained below, that were concealed within numerous Excel files from SCB Dubai.

### 1. Excel File Contents

33.     The following table is a breakout of the 3,375,798 hidden transactional records that I extracted from 53 of SCB's Excel files that Relator had produced to the U.S. Government in December 2012 and September 2013:

---

[7]     OFAC's Specially Designated Nationals ("SDN") list is a critical tool used for identifying individuals, groups, and entities that are owned or controlled by, or acting for or on behalf of, targeted countries, such as Iran, as well as terrorists, narcotics traffickers, and those engaged in activities related to the proliferation of weapons of mass destruction. When OFAC places an individual or entity on the SDN list, their assets within U.S. jurisdiction are frozen, and U.S. persons are generally prohibited from engaging in any transactions or dealings with them. This prohibition extends to entities that are fifty percent or more owned, directly, or indirectly, by one or more SDNs. Financial institutions like SCB, among others, that are subject to U.S. jurisdiction must screen their transactions and customers against the SDN list to ensure they are not engaging in prohibited dealings. The SDN list is part of the broader framework of U.S. economic sanctions, which are designed to advance America's national security, foreign policy, and economic objectives. In the case of Iran, the United States has imposed comprehensive sanctions in response to Iran's nuclear weapons, ballistic missile, and drone programs; support for international terrorism; and human rights abuses. *See*, "Specially Designated Nationals List", OFFICE OF FOREIGN ASSETS CONTROL (2024), https://sanctionslist.ofac.treas.gov/Home/SdnList.

[8]     When Relator initially searched SCB's Excel files between 2012 and 2019, it employed two search methods: the built-in search functionality of Microsoft's Windows 8, Windows 8.1, and Windows 10 operating systems and Excel's own search feature within each spreadsheet. However, the search function on neither system delves into the underlying XML structure of the file to index the contents of the pivot table caches. Relator, not being forensic technical experts, could not reasonably have known about the limitations of these search tools regarding hidden data in Excel files.

| Date Range of Transactions | Hidden Records | Value of Hidden Records | SCB Filename |
|---|---|---|---|
| Jan. 1, 2009, to Jul. 31, 2010 | 24,262 | $660,623,587,379.55 U.S. dollars | "Cash and Trade Corporates Client Groups FX Revenues_6 Sep 2010_MENA_V1.xlsx" |
| Jan. 2009, to Jan 31, 2009 | 8,245 | $49,585,463.34 U.S. dollars | "MENA Customerwise Sales Report- Jan 09.xls" |
| Oct. 17, 2006, to Aug. 19, 2009 | 1,568 | $2,776,538,825.29 U.S. dollars | "depos 19th august showing difference.xlsx" |
| Jan. 2, 2012, to Jan. 30, 2012 | 64,006 | $166,557,512,823.70 U.S. dollars | "GCS MENA 2012-01-01 – 30.xls" |
| Jan. 2, 2012, to Mar. 20, 2012 | 32,972 | $65,159,906,674.75 U.S. dollars | "Performance Summary -Iran(SNPC)1.xlsx" |
| Jan. 2, 2008, to Dec. 31, 2008 | 52,921 | $154,787,260,499.86 U.S. dollars | "Performance Summary -Iran(SNPC)2.xls" |
| Jan. 2, 2012, to Feb. 20, 2012 | 21,131 | $54,555,886,673.25 U.S. dollars | "Performance Summary -Iran(SNPC)3.xlsx" |
| Jan. 2, 2012, to Feb. 29, 2012 | 26,986 | $56,791,072,710.94 U.S. dollars | "Performance Summary -Iran(SNPC)4.xlsx" |
| Jan. 3, 2011, to Oct. 14, 2011 | 127,580 | $152,292,237,252.56 U.S. dollars | "Performance Summary -Iran(SNPC)5.xlsx" |
| Jan. 3, 2011, to Oct. 26, 2011 | 132,382 | $317,875,719,588.58 U.S. dollars | "Performance Summary -Iran(SNPC)6.xlsx" |
| Jan. 3, 2011, to Oct. 31, 2011 | 140,540 | $329,770,232,625.91 U.S. dollars | "Performance Summary -Iran(SNPC)7.xlsx" |
| Jan. 3, 2011, to Nov. 25, 2011 | 151,000 | $341,971,005,446.72 U.S. dollars | "Performance Summary -Iran(SNPC)8.xlsx" |
| Jan. 3, 2011, to Nov. 30, 2011 | 155,349 | $346,613,279,106.53 U.S. dollars | "Performance Summary -Iran(SNPC)9.xlsx" |
| Jan. 3, 2011, to Nov. 14, 2011 | 145,960 | $335,745,886,310.24 U.S. dollars | "Performance Summary -Iran(SNPC)10.xlsx" |
| Jan. 3, 2011, to May 18, 2011 | 55,393 | $170,930,580,431.93 U.S. dollars | "Performance Summary -Iran(SNPC)11.xlsx" |
| Jan. 3, 2011, to May 24, 2011 | 57,445 | $174,631,430,077.74 U.S. dollars | "Performance Summary -Iran(SNPC)12.xlsx" |
| Jan. 3, 2011, to Mar. 15, 2011 | 18,765 | $30,576,137,222.96 U.S. dollars | "Performance Summary -Iran(SNPC)14.xlsx" |
| Jan. 3, 2011, to Mar. 28, 2011 | 23,876 | $76,007,951,333.87 U.S. dollars | "Performance Summary -Iran(SNPC)15.xlsx" |
| Jan. 3, 2011, to Mar. 31, 2011 | 27,116 | $88,029,493,093.75 U.S. dollars | "Performance Summary -Iran(SNPC)16.xlsx" |
| Jan. 3, 2011, to Jun. 16, 2011 | 68,430 | $201,031,517,180.69 U.S. dollars | "Performance Summary -Iran(SNPC)17.xlsx" |
| Jan. 3, 2011, to Jun. 24, 2011 | 71,683 | $207,942,565,397.87 U.S. dollars | "Performance Summary -Iran(SNPC)18.xlsx" |
| Jan. 3, 2011, to Jun. 30, 2011 | 77,055 | $222,043,633,386.97 U.S. dollars | "Performance Summary -Iran(SNPC)19.xlsx" |

| Date Range of Transactions | Hidden Records | Value of Hidden Records | SCB Filename |
|---|---|---|---|
| Jan. 3, 2011, to Jul. 15, 2011 | 83,640 | $232,571,489,569.30 U.S. dollars | "Performance Summary -Iran(SNPC)20.xlsx" |
| Jan. 3, 2011, to Jul. 22, 2011 | 86,159 | $236,432,818,454.61 U.S. dollars | "Performance Summary -Iran(SNPC)21.xlsx" |
| Jan. 3, 2011, to Jul. 29, 2011 | 91,006 | $244,326,946,756.66 U.S. dollars | "Performance Summary -Iran(SNPC)22.xlsx" |
| Jan. 3, 2011, to Jan. 17, 2011 | 3,010 | $17,350,040,204.06 U.S. dollars | "Performance Summary -Iran(SNPC)23.xlsx" |
| Jan. 3, 2011, to Feb. 15, 2011 | 5,626 | $25,426,240,424.40 U.S. dollars | "Performance Summary -Iran(SNPC)24.xlsx" |
| Jan. 3, 2011, to Feb. 15, 2011 | 7,729 | $28,132,329,828.44 U.S. dollars | "Performance Summary -Iran(SNPC)25.xlsx" |
| Jan. 3, 2011, to Feb. 28, 2011 | 12,434 | $54,716,440,531.99 U.S. dollars | "Performance Summary -Iran(SNPC)26.xlsx" |
| Jan. 3, 2011, to Dec. 15, 2011 | 161,731 | $355,577,077,718.49 U.S. dollars | "Performance Summary -Iran(SNPC)27.xlsx" |
| Jan. 3, 2011, to Dec. 23, 2011 | 164,674 | $359,506,450,017.62 U.S. dollars | "Performance Summary -Iran(SNPC)28.xlsx" |
| Jan. 3, 2011, to Aug. 15, 2011 | 97,403 | $254,244,400,426.28 U.S. dollars | "Performance Summary -Iran(SNPC)29.xlsx" |
| Jan. 3, 2011, to Aug. 25, 2011 | 101,880 | $263,233,953,090.03 U.S. dollars | "Performance Summary -Iran(SNPC)30.xlsx" |
| Jan. 3, 2011, to Aug. 31, 2011 | 106,268 | $267,839,721,007.12 U.S. dollars | "Performance Summary -Iran(SNPC)31.xlsx" |
| Jan. 3, 2011, to Apr. 15, 2011 | 33,287 | $97,484,192,422.63 U.S. dollars | "Performance Summary -Iran(SNPC)32.xlsx" |
| Jan. 3, 2011, to Apr. 27, 2011 | 39,568 | $119,247,491,987.10 U.S. dollars | "Performance Summary -Iran(SNPC)33.xlsx" |
| Jan. 3, 2011, to Apr. 30, 2011 | 46,850 | $157,856,342,778.13 U.S. dollars | "Performance Summary -Iran(SNPC)34.xlsx" |
| Jan. 4, 2010, to Sep. 14, 2010 | 60,514 | $113,693,245,426.21 U.S. dollars | "Performance Summary -Iran(SNPC)35.xlsx" |
| Jan. 4, 2010, to Sep. 22, 2010 | 65,536 | $118,132,098,780.69 U.S. dollars | "Performance Summary -Iran(SNPC)36.xlsx" |
| Jan. 4, 2010, to Sep. 22, 2010 | 65,536 | $125,749,480,771.49 U.S. dollars | "Performance Summary -Iran(SNPC)37.xlsx" |
| Jan. 4, 2010, to Oct. 11, 2010 | 66,651 | $130,210,812,302.35 U.S. dollars | "Performance Summary -Iran(SNPC)38.xlsx" |
| Jan. 4, 2010, to Oct. 22, 2010 | 69,832 | $137,570,721,782.82 U.S. dollars | "Performance Summary -Iran(SNPC)39.xlsx" |
| Jan. 4, 2010, to Oct. 31, 2010 | 72,741 | $145,812,483,063.41 U.S. dollars | "Performance Summary -Iran(SNPC)40.xlsx" |
| Jan. 4, 2010, to Nov. 10, 2010 | 75,440 | $153,704,760,016.69 U.S. dollars | "Performance Summary -Iran(SNPC)41.xlsx" |

| Date Range of Transactions | Hidden Records | Value of Hidden Records | SCB Filename |
|---|---|---|---|
| Jan. 4, 2010, to Nov. 25, 2010 | 77,337 | $158,709,147,818.52 U.S. dollars | "Performance Summary -Iran(SNPC)42.xlsx" |
| Jan. 4, 2010, to Nov. 30, 2010 | 79,227 | $167,090,904,740.30 U.S. dollars | "Performance Summary -Iran(SNPC)43.xlsx" |
| Jan. 4, 2010, to May 13, 2010 | 39,418 | $157,839,114,028.79U.S. dollars | "Performance Summary -Iran(SNPC)44.xls" |
| Jan. 4, 2010, to May 24, 2010 | 41,743 | $171,464,856,086.88 U.S. dollars | "Performance Summary -Iran(SNPC)45.xls" |
| Jan. 4, 2010, to May 31, 2010 | 44,882 | $72,996,511,759.26 U.S. dollars | "Performance Summary -Iran(SNPC)46.xls" |
| Jan. 4, 2010, to Mar. 10, 2010 | 23,136 | $68,117,864,909.36 U.S. dollars | "Performance Summary -Iran(SNPC)47.xls" |
| Jan. 4, 2010, to Mar. 18, 2010 | 21,013 | $81,329,904,170.10 U.S. dollars | "Performance Summary -Iran(SNPC)48.xls" |
| Jan. 4, 2010, to Mar. 25, 2010 | 22,766 | $92,541,145,060.80 U.S. dollars | "Performance Summary -Iran(SNPC)49.xls" |
| Jan. 4, 2010, to Mar. 31, 2010 | 24,096 | $104,099,879,799.07 U.S. dollars | "Performance Summary -Iran(SNPC)50.xls" |

## 2.  SCB's Iran Group and "Project Green"

34.     Relator alleged that SCB's Iran Group, a specialized unit within the bank's Middle East and North Africa ("MENA") Origination and Client Coverage ("OCC") team, was instrumental in facilitating the bank's illicit transactions with sanctioned Iranian entities.

35.     Composed of senior managers with extensive knowledge of the Iranian market and client relationships, the Iran Group was responsible for overseeing and maintaining SCB's lucrative Iranian business portfolio, which generated hundreds of millions of dollars in revenue for the bank.

36.     According to New York's Department of Financial Services ("DFS"), at the heart of the Iran Group's operations was ensuring the smooth functioning of "Project Green", SCB's

covert scheme to evade U.S. sanctions by processing payments for Iranian clients while concealing their involvement.[9]

37.     The following table, based on the Newly Extracted Data, shows the entities that SCB's "Iran Group" did business with between January 2008 and March 2012 and the bank coded as relating to "Iran" in its internal platforms:

| Entity Name | Location | Volume | Type | Total Value |
|---|---|---|---|---|
| Arab Petroleum Investments Corporation | Riyad, Saudi Arabia | 4 | Interest rate swap, term deposit | $10,666,667 |
| Arian Sea Scent | Tehran, Iran | 20 | Term deposit | [not listed] |
| Attijariwafa Bank | Casablanca, Morocco | 16 | FX option | $168,008,410 |
| Bader al Mulla and Brothers Company WLL | Kuwait City, Kuwait | 62 | FX forward, spot | $424,684,538 |
| Bank Tejarat | Tehran, Iran | 5 | Trade finance | $93,000,000 |
| Banque d'Algerie | Algiers, Algeria | 46 | Interest rate swap, FX option, spot | $631,692,007 |
| Banque de Commerce et de Placements SA | Dubai, UAE | 1 | FX forward | $115,000 |
| Banque Marocaine du Commere Exterieur ("BCME") | Casablanca, Morocco | 1 | FX spot | $1,633,542 |
| Blue Com Trading Company LLC | Dubai, UAE | 4 | FX forward | $614,966 |
| CDG Capital SA | Casablanca, Morocco | 4 | Interest rate swap | $55,537,866 |
| Commercial International Bank | Cairo, Egypt | 17 | Interest rate swap, FX option | $297,283,894 |
| Dalahoo Engineering and Manufacturing Company ("DEMCO") | Tehran, Iran | 24 | Term deposit | [not listed] |
| Darman Yab Omid Company LTD | Tehran, Iran | 23 | Term deposit | [not listed] |
| DSGS FZCO | Dubai, UAE | 3 | FX spot | $109,102 |
| IFIC Holding AG | Dusseldorf, Germany | 23 | Term deposit | [not listed] |
| Iran Aseman Company | Tehran, Iran | 23 | Term deposit | [not listed] |
| Iran Industrial Exchange Company | Jebel Ali, UAE | 1 | FX forward | $67,818 |
| Khorasan Steel Company | Neyshabur, Iran | 1 | Trade finance | $209,000,000 |
| Khouzestan Steel Company | Ahvaz, Iran | 15 | FX forward | 63,702,164 |
| Kuwait Automotive Imports Company WLL | Kuwait City, Kuwait | 19 | Interest rate swap, FX forward, option, spot, | $19,934,939 |

---

[9]    *See*, REPORT ON INVESTIGATION OF PROMONTORY FINANCIAL GROUP, LLC, NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES (2015), https://www.dfs.ny.gov/system/files/documents/2020/03/promontory_inv_rpt_201508.pdf

| Entity Name | Location | Volume | Type | Total Value |
|---|---|---|---|---|
| Kuwait Projects Holding Company KSC | Kuwait City, Kuwait | 24 | FX spot | $260,000,000 |
| MAPNA International FZE | Dubai, UAE | 33 | FX forward | $1,570,051 |
| MH Alshaya Company WLL | Kuwait City, Kuwait | 176 | Term deposit, FX forward, spot | $221,217,742 |
| Minerex General Trading Company LLC | Dubai, UAE | 1 | FX forward | $122,558 |
| Mobile Telecommunications Company KSC | Kuwait City, Kuwait | 1 | FX swap | $3,303,000,000 |
| Mohamed Naser Al Sayer and Sons Company WLL | Kuwait City, Kuwait | 66 | FX forward, option, spot | $356,552,822 |
| National Aluminium Products Company SAO | Muscat, Oman | 4 | FX derivative | [not listed] |
| National Bank of Egypt | Cairo, Egypt | 16 | Interest rate swap, FX option | $50,085,968 |
| National Iranian Tanker Company ("NITC") | Tehran, Iran | 1 | Trade finance | $23,263,352 |
| Oil Industries Engineering and Construction | Tehran, Iran | 1 | Trade finance | $145,535,570 |
| Oriental Oil Company FZE | Dubai, UAE | 2 | FX forward | $2,327,071 |
| Parsian High Voltage Substations Development Company | Tehran, Iran | 1 | FX forward | $1,739,485 |
| Parsian International Establishment | Tehran, Iran | 23 | Term deposit | [not listed] |
| Petropars LTD | Tehran, Iran | 1 | FX forward | $8,125,797 |
| Retail International Company WLL | Kuwait City, Kuwait | 13 | FX forward, option, spot | 18,641,666 |
| Techno Parts FZCO | Dubai, UAE | 3 | FX forward | $845,348 |
| The Public Warehousing Company KSC | Kuwait City, Kuwait | 212 | FX forward, option, spot | $3,220,456,848 |
| United Arab Shipping Company SAG | Kuwait City, Kuwait | 12 | Term deposit, FX spot | $40,849 |
| Yusuf A Alghanim and Sons WLL | Kuwait City, Kuwait | 4 | FX spot | $512,808 |

38.     In total, between 2008 and 2012, SCB's Iran Group processed at least 906 Iran-related foreign exchange, trade finance, and term deposit transactions worth a total of $9,590,088,848 U.S. dollars.[10]

---

[10]     Of the 906 "Iran"-coded transactions, seven were with three Iranian entities that OFAC would later designate for funding and materially supporting the IRGC: Bank Tejarat, National Iranian Tanker Company, and Petropars LTD.

39.     SCB's nearly $10 billion U.S. dollars in post-2007 Iran-related business powerfully indicates that the bank's Iran Group not only continued to service existing Iranian clients but also onboarded new clients and developed new business opportunities in Iran.

**3. SCB's Post-2007 Business with FTO Front Companies**

40.     Based on my forensic analysis of the Newly Extracted Data, I have also compiled the following summary of SCB's post-2007 SCB direct and indirect transactions involving known front companies of U.S. designated foreign terrorist organizations ("FTOs"):

| *Entity Name* | *High-Risk Description* | *SCB's Post-2007 Business* |
|---|---|---|
| Tajco LTD | On December 9, 2010, OFAC designated Tajco LTD, an import-export company based in Banjul, Gambia, as a Specially Designated Global Terrorist ("SDGT") for providing millions of dollars in financial support to Hezbollah. Tajco is owned and operated by Ali Tajideen, Husayn Tajideen, and Kassem Tajideen, who are brothers and prominent Hezbollah supporters and financiers.[11] | Between 2008 and 2010, SCB Gambia maintained U.S. dollar ("USD") and Gambian dalasi ("GMD") denominated bank accounts for Tajco LTD, identified by SCB group ID number "*****7865", and processed funds transfers worth millions of U.S. dollars through SWIFT's Viriginia data center, CHIPS in New York, and SCB New York. Further, in August 2010, SCB Dubai processed a foreign exchange transaction worth a total of $290,803.56 U.S. dollars for the benefit of Tajco's transactional account, number "*****9201". |
| Euro African Group LTD | On May 17, 2018, OFAC designated Euro African Group LTD, a petroleum company based in Banjul, Gambia, as an SDGT for being owned by Mohammad Ibrahim Bazzi. Mr. Bazzi is a key Hezbollah financier who, along with Hezbollah's representative to Iran, Abdallah Safi-Al-Din, worked with the Central Bank of Iran between 2009 and 2010 to expand banking access between Iran and Lebanon. Mr. Bazzi serves as the Managing Director and majority shareholder of Euro African Group.[12] | Between 2008 and 2012, SCB Gambia maintained USD and GMD denominated bank accounts for Euro African Group LTD, identified by SCB group ID number "*****7340", and processed funds transfers worth millions of U.S. dollars through SWIFT's data center in Virginia, CHIPS in New York, and SCB New York. Further, between January 2009 and June 2010, SCB Dubai processed 73 foreign exchange transactions worth a total of $16,659,286.07 U.S. dollars for the benefit of Euro African Group's transactional account, number "*****7701". |
| Fatima Group | On November 25, 2011, the *Washington Post* reported that Fatima Group, a | Between 2008 and 2012, SCB Pakistan maintained USD and Pakistani rupee ("PKR") |

---

[11]     Press Release, *Treasury Targets Hizballah Network in Africa*, U.S. DEP'T OF TREASURY (May 27, 2009), https://home.treasury.gov/news/press-releases/tg149.

[12]     Press Release, *Treasury Targets Key Hizballah Financing Network and Iranian Conduit*, U.S. DEP'T OF TREASURY (May 17, 2018), https://home.treasury.gov/news/press-releases/sm0388.

| Entity Name | High-Risk Description | SCB's Post-2007 Business |
|---|---|---|
| | fertilizer production conglomerate based in Pakistan, manufactured almost all the calcium ammonium nitrate ("CAN") used by the Taliban in its improvised explosive devices ("IEDs"). Further, in 2011, the Taliban's use of CAN produced by two of Fatima Group's subsidiaries—Fatima Fertilizer Company LTD and PakArab Fertilizer PVT LTD—wounded about 3,200 U.S. troops in IED attacks across Afghanistan.[13] Fatima sold CAN to entities it knew were fronts for FTOs Al Qaeda and the Haqqani Network. In 2011, U.S. Dep't of Defense officials informed Fatima that its CAN was being used to create bombs killing U.S. troops in Afghanistan. Yet, Fatima refused to take measures, such as adding identifying dyes, to help stem the flow of CAN into Afghanistan. | denominated bank accounts for, respectively, Fatima Fertilizer Company LTD, identified by account number "****5590", and PakArab Fertilizers PVT LTD, identified by account number "***0133". For each entity, SCB processed funds transfers worth millions of U.S. dollars through SWIFT's data center in Virginia, CHIPS in New York, and SCB New York. Further, between January and August 2009, SCB Pakistan processed 10 trade finance transactions for Fatima Fertilizer which generated profit for the bank worth total of $467,080 U.S. dollars. And in April 2009, SCB Pakistan processed a trade finance transaction for PakArab Fertilizers which generated profit for the bank worth $31,000 U.S. dollars. |
| Lebanese Canadian Bank SAL | In February 2011, the U.S. Dep't of Treasury's Financial Crimes Enforcement Network ("FinCEN") took significant action against Lebanese Canadian Bank ("LCB'), designating it as a "financial institution of primary money laundering concern" under Section 311 of the USA PATRIOT Act.[14] This designation was based on FinCEN's finding that LCB played a key role in facilitating the money laundering activities of an international narcotics trafficking and money laundering network with ties to Hezbollah. In December 2011, the U.S. Dep't of Justice ("DoJ") filed a civil Amended Complaint against LCB and other related parties, seeking nearly half a billion dollars in civil money laundering penalties and forfeiture of illicit funds. DoJ alleged that, from approximately January 2007 to early 2011, LCB used the U.S. financial system to launder narcotics trafficking and other criminal proceeds through the | SCB maintained at least four Eurodollar accounts for LCB, including account numbers "****4308", "****4556", "****4929", and "****4005". SCB processed four Eurodollar deposit transactions for these LCB accounts worth a total of $68,879,495.50 between September 22, 2008 and October 22, 2008. |

---

[13] Greg Jaffe, *To Stop Afghan Bombs, a Focus on Pakistani Fertilizer*, WASHINGTON POST, (Nov. 25, 2011), https://wapo.st/4dexbd5.

[14] Notice of Finding, *Lebanese Canadian Bank SAL is a Financial Institution of Primary Money Laundering Concern*, FINANCIAL CRIMES ENFORCEMENT NETWORK (Feb. 2011), https://www.fincen.gov/sites/default/files/shared/LCBNoticeofFinding.pdf.

| Entity Name | High-Risk Description | SCB's Post-2007 Business |
|---|---|---|
| | United States for the benefit of Hezbollah-controlled money laundering channels.[15] | |

### a) Tajco LTD.

41.     Tajco LTD is owned and controlled by the Tajideen brothers: Ali, Husayn, and Kassim Tajideen. (Tajco's credit report is attached as Exhibit A)

42.     In May 2009, OFAC designated Kassim Tajideen as a Specially Designated Global Terrorist ("SDGT") for being a major financial contributor to Hezbollah.[16]

43.     In December 2010, OFAC designated Ali and Husayn Tajideen as SDGTs for their roles as top Hezbollah financiers in Africa.[17]

44.     The U.S. Dep't of Treasury has confirmed that the Tajideen brothers are part of Hezbollah's Business Affairs Component ("BAC"), which funds and supports Hezbollah's terrorist activities.

45.     Further, Tajco is identified as a key entity used by the Tajideen network to generate millions of dollars for Hezbollah.

46.     As of February 2007, Kassim Tajideen owned Tajco and used the proceeds to provide millions of dollars to Hezbollah.

47.     Husayn Tajideen co-owned Tajco's Gambia branch and served as its managing director, while Ali Tajideen was a co-owner of the company's Lebanon branch.

---

[15]     *United States v Lebanese Canadian Bank*, 11 Civ. 9186 (PAE) (S.D.N.Y.).

[16]     Press Release, *Treasury Targets Hizballah Network in Africa*, U.S. DEP'T OF TREASURY (May 27, 2009), https://home.treasury.gov/news/press-releases/tg149.

[17]     Press Release, *Treasury Targets Hizballah Financial Network*, U.S. DEP'T OF TREASURY (Dec. 9, 2010), https://home.treasury.gov/news/press-releases/tg997.

48.     This demonstrates the Tajideen brothers' direct control over Tajco in multiple countries.

49.     According to OFAC, Ali Tajideen used Tajco in Lebanon since at least December 2007 to purchase and develop properties on behalf of Hezbollah, establishing a mechanism to invest in real estate and generate funds for the terrorist group.

50.     Tajco's subsidiary, Kairaba Supermarket in The Gambia, shares the same manager and address as Tajco, indicating it is an integrated part of the Tajideens' network of Hezbollah-linked companies.

51.     Tajco is associated with a Lebanese clan named in a 2002 UN Security Council Report as being involved in blood diamond smuggling and money laundering to fund Hezbollah and other terrorist groups.[18]

52.     This further evidences Tajco's long history of involvement in illicit activities to financially support Hezbollah.

53.     Between 2008–2010, SCB Gambia and SCB Dubai maintained Eurodollar accounts for Tajco and processed millions of dollars in transactions through the U.S. financial system on the company's behalf.

54.     In 2010, SCB Dubai also processed a $290,803.56 foreign exchange transaction for Tajco.

55.     This financial activity shows Tajco's substantial financial operations, international reach, and access to the U.S. financial system, likely enabling the company to covertly move funds to Hezbollah.

---

[18]     Final Report of the Panel of Experts on the Illegal Exploitation of Natural Resources and Other Forms of Wealth of the Democratic Republic of the Congo (2002), transmitted by Letter dated 16 October 2002 from the Chairman of the Security Council, 9, U.N. Doc. S/2002/1146 (Oct. 8, 2002).

56.     OFAC designation of at least seven other Tajideen-owned companies in Lebanon, Africa, and the British Virgin Islands ("BVI") as SDGTs clearly demonstrates the broad scope of the Tajideen network's financial support for Hezbollah across several continents.

57.     OFAC's related designations underscore Tajco's position as a key commercial asset within Hezbollah's money-laundering and terrorist financing network.

### b) Euro African Group LTD.

58.     Euro African Group LTD is controlled by Muhammad Bazzi, who OFAC designated as an SDGT for being a key Hezbollah financier and facilitator.[19] (Euro African Group's credit report is attached as Exhibit B)

59.     As a prominent Hezbollah BAC operative, Bazzi has provided millions of dollars to Hezbollah and has worked closely with other Hezbollah financiers like Adham Tabaja (also an OFAC designated SDGT) on oil ventures in Iraq to generate funds for the terrorist group.[20]

60.     Euro African Group held exclusive rights to import fuel to The Gambia between 2008 and 2013 and held a fuel supply deal with the country's state-run utility.

61.     This dominant market position enabled the company to generate substantial revenues that could be diverted to support Hezbollah.

---

[19]     Press Release, *Treasury Targets Key Hizballah Financing Network and Iranian Conduit*, U.S. DEP'T OF TREASURY (May 17, 2018), https://home.treasury.gov/news/press-releases/sm0388.

[20]     *See*, Press Release, *Treasury Sanctions Hizballah Front Companies and Facilitators in Lebanon and Iraq*, U.S. DEP'T OF TREASURY (Jun. 10, 2015), https://home.treasury.gov/news/press-releases/jl0069; *see, also*, Press Release, *Treasury Targets Sanctions Evasion Conduits for Major Hizballah Financiers*, U.S. DEP'T OF TREASURY (Apr. 24, 2019), https://home.treasury.gov/news/press-releases/sm668.

62.     In 2013, Euro African Group made multiple payments totaling $2.55 million U.S. dollars to a foundation controlled by the then-President of Gambia, likely as part of a corrupt arrangement to maintain its exclusive fuel import rights.[21]

63.     These suspicious payments point to Euro African Group's involvement in corruption and illicit financial activities.



64.     According to OFAC, Muhammad Bazzi's close business ties to FTO IRGC, as evidenced by his efforts to coordinate an oil venture in Iraq between Hezbollah and FTO IRGC-

---

[21]     *The Great Gambia Heist*, ORGANIZED CRIME AND CORRUPTION REPORTING PROJECT (Mar. 27, 2019), https://www.occrp.org/en/greatgambiaheist/.

Quds Force in 2010, indicate that Euro African Group may was also used to financially support Iran's terrorist foreign policies.

65.     Between 2008 and 2012, SCB Gambia maintained Eurodollar and Gambian dalasi ("GMD") denominated bank accounts for Euro African Group LTD, processing funds transfers worth millions of U.S. dollars through SWIFT's data center in Culpepper, Virginia, CHIPS in New York, and SCB New York.

66.     Additionally, between January 2009 and June 2010, SCB Dubai processed 73 foreign exchange transactions worth a total of $16,659,286.07 U.S. dollars for the benefit of Euro African Group's transactional account, number "******7701".

*c) Fatima Group.*

67.     Fatima Group, including Fatima Fertilizer and PakArab Fertilizer, is the largest producer of calcium ammonium nitrate ("CAN") fertilizer in Pakistan and knowingly supplied massive quantities of CAN to fronts for FTO al-Qaeda, FTO Haqqani Network, and the Taliban, despite being fully aware that the CAN was being used to manufacture improvised explosive devices ("IEDs") and other bombs deployed against U.S. forces in Afghanistan.[22]

68.     Fatima sold an estimated 200 tons of CAN annually that was used to produce IEDs, with its product accounting for a staggering 70–80 percent of all IEDs used against Coalition troops.

69.     According to the U.S. Dep't of Defense's Joint Improvised Explosive Device Defeat Organization (JIEDDO"), this made Fatima the single most significant source of explosives precursors for these terrorist organizations.

---

[22]     *Terrorist Networks in Pakistan and the Proliferation of IEDs: Hearing Before the Subcomm. on Near Eastern and South and Central Asian Affairs, S. Comm. on Foreign Relations*, 112th Cong. 2 (2012) (statement of Lt. Gen. Michael Barbero).

70.     When confronted by U.S. officials in 2011 about the devastating impact of its CAN on American lives, Fatima displayed a disregard for U.S. causalties in Afghanistan and an unwillingness to cooperate.

71.     For instance, according to JIEDDO, the company refused to implement basic measures like dying the CAN to assist in tracking smuggling routes, falsely claiming that the Pakistani government opposed such steps.[23]

72.     Fatima then quickly cut off all contact with U.S. officials after a few initial meetings, despite pledges to coordinate with the U.S.

73.     According to the U.S. Dep't of Defense, this clearly demonstrated Fatima's lack of concern for how its products were being used by terrorist groups to kill and maim U.S. service members.[24]

74.     From 2008 to 2012, SCB Pakistan and SCB Dubai provided extensive financial services to Fatima Fertilizer and its subsidiary PakArab Fertilizers, maintaining bank accounts and processing numerous high-value foreign exchange transactions for the companies.

75.      Further, SCB moved millions of dollars through these accounts via SWIFT, correspondent accounts at SCB New York and key U.S. payment systems like CHIPS and Fedwire, enabling Fatima to access the U.S. financial system to facilitate its business operations.

76.     According to Relator's Newly Extracted Data, SCB generated substantial profits from these services, including over $450,000 U.S. dollars from just ten Fatima foreign exchange

---

[23]     *Terrorist Networks in Pakistan and the Proliferation of IEDs: Hearing Before the Subcomm. on Near Eastern and South and Central Asian Affairs, S. Comm. on Foreign Relations*, 112th Cong. 2 (2012) (statement of Lt. Gen. Michael Barbero).

[24]     *Id*.

transactions in 2009, while Fatima was actively supplying CAN to terrorist groups attacking U.S. forces across Afghanistan.

77.    Even more troubling, in January 2013, Lieutenant General Michael Barbero, head of JIEDDO, personally briefed senior SCB executives at SCB New Yorks offices about Fatima's undeniable role in providing critical bomb-making materials to terrorists in Afghanistan.[25]

78.    According to Lt. Gen. Barbero, SCB's response was "utterly useless," as it continued to maintain its lucrative banking relationship with Fatima and showed complete indifference to the U.S. Government's dire warnings.[26]

79.    Further, this demonstrates SCB disregarded crystal-clear evidence that its client was directly enabling deadly attacks against American troops in Afghanistan.[27]

### d)  Lebanese Canadian Bank SAL.

80.    Lebanese Canadian Bank SAL ("LCB"), founded in 1960 and headquartered in Beirut, Lebanon, was a mid-sized commercial bank operating within the Lebanese financial sector.

81.    As of 2011, the bank had over 600 employees and total assets exceeding $5 billion, making it the eighth-largest bank in Lebanon.

82.    According to FATF, as a significant participant in the Lebanese banking sector, LCB was required to comply with applicable Lebanese laws and regulations, including those related to anti-money laundering ("AML") and combating the financing of terrorism ("CFT").

---

[25]    Adam Luck, *US General Claims He Told Standard Chartered its Client Helped the Taliban—But the Bank did Nothing*, THIS IS MONEY (London) (Dec. 8, 2019), https://www.thisismoney.co.uk/money/news/article-7767683/US-general-told-Standard-Chartered-client-helped-Taliban-did-nothing.html.

[26]    *Id*.

[27]    *Id*.

83.     The Banque du Liban (Central Bank of Lebanon) was responsible for ensuring that LCB and other Lebanese banks adhered to these regulations and maintained adequate internal controls to mitigate financial crime risks.[28]

84.     According to the U.S. Drug Enforcement Administration ("DEA"), LCB maintained accounts and provided financial services to individuals and companies belonging to Hezbollah's BAC, which manages the terrorist group's illicit business and financial activities worldwide.[29]

85.     The U.S. Dep't of Justice ("DoJ"), alleged that LCB was a "favored bank" for key Hezbollah institutions, operatives, and facilitators.[30]

86.     According to OFAC, LCB participated in Hezbollah's trade-based money laundering schemes by knowingly providing financial services to companies and individuals that were laundering narcotics proceeds and other illicit funds on behalf of Hezbollah and the Ayman Joumaa criminal network.[31]

---

[28]     *See*, "BDL Role and Function", BANQUE DU LIBAN (2024), https://www.bdl.gov.lb/roleandfunction.php.

[29]     Press Release, *DEA and European Authorities Uncover Massive Hizballah Drug and Money Laundering Scheme*, DRUG ENFORCEMENT ADMINISTRATION (Feb. 1, 2016), https://www.dea.gov/press-releases/2016/02/01/dea-and-european-authorities-uncover-massive-hizballah-drug-and-money.

[30]     *United States v. Lebanese Canadian Bank SAL*, 11 Civ. 9186 (PAE) (S.D.N.Y.), ECF 1 (Verified Complaint).

[31]     Press Release, *Treasury Identifies Lebanese Canadian Bank Sal as a "Primary Money Laundering Concern"*, U.S. DEP'T OF TREASURY (Feb. 10, 2011), https://home.treasury.gov/news/press-releases/tg1057.



87.     Further, according to DoJ, LCB facilitated hundreds of millions of dollars in money laundering through channels including bulk cash smuggling from West Africa and used car purchases in the U.S.

88.     LCB disregarded anti-money laundering rules for Hezbollah-linked accounts, granted exemptions allowing large cash transactions without proper reporting, and in some cases bank managers were complicit in the laundering activity.

89.     LCB owned subsidiaries, like Prime Bank LTD in Gambia, that served as Hezbollah's preeminent money laundering vehicles in West Africa, providing the terrorist group access to the international financial system.[32]

90.     According to DEA, LCB also maintained accounts for senior Hezbollah officials, including Abdallah Safieddine, the head of Hezbollah's Tehran-based envoy and a key conduit between Hezbollah and the IRGC.[33]

91.     Further, Mr. Safieddine was allegedly involved in providing Iran and Hezbollah operatives access to LCB and its management.

92.     LCB was a crucial cog in Hezbollah's illicit financial apparatus, knowingly providing extensive support to the terrorist group's BAC networks in Lebanon and abroad.

93.     By granting Hezbollah access to the U.S. and international financial systems, LCB enabled the terrorist group to launder vast sums of criminal proceeds to fund its violent activities.

94.     Relator's Newly Extracted Data reveals that, between 2008 and 2011, SCB Dubai maintained at least four Eurodollar accounts for LCB, including account numbers "***4308", "***4556", "***4929", and "***4005".

95.     Further, SCB Dubai processed four Eurodollar deposit transactions for these LCB accounts worth a total of $68,879,495.50 U.S. dollars between September 22, 2008, and October 22, 2008.

---

[32]     Notice of Finding, *Lebanese Canadian Bank SAL is a Financial Institution of Primary Money Laundering Concern*, FINANCIAL CRIMES ENFORCEMENT NETWORK (Feb. 2011), https://www.fincen.gov/sites/default/files/shared/LCBNoticeofFinding.pdf.

[33]     Press Release, *Drug Investigations Lead to Treasury 311 Patriot Act Designation Against Lebanese Bank Tied to Hizballah*, DRUG ENFORCEMENT ADMINISTRATION (Feb. 10, 2011), https://www.dea.gov/press-releases/2011/02/10/drug-investigations-lead-treasury-311-patriot-act-designation-against.

96.     In addition, according to the *Banker's Almanac*, between 2008 and 2011, SCB New York maintained a U.S. dollar-denominated correspondent account for LCB, number "*********7001".

97.     Relator's Newly Extracted Data reveals that SCB Dubai maintained Eurodollar account, number "***2579", for LCB's Prime Bank LTD (Banjul, Gambia).

### e)   Additional connections to FTOs

98.     I have further identified from the Newly Extracted Data Eurodollar bank accounts, foreign exchange transactions, and trade finance records that establish clear business relationships and financial dealings between SCB and companies and individuals associated with, majority-owned by, or serving as fronts for the following notorious FTOs:

     a.  Hezbollah (FTO 1997);
     b.  Al Qaeda (FTO 1999);
     c.  HAMAS (FTO 1997);
     d.  ISIS (formerly Al Qaeda in Iraq) (FTO 2004);
     e.  Kata'ib Hezbollah (FTO 2009)
     f.  IRGC (FTO 2019);
     g.  IRGC–QF (FTO 2019), and,
     h.  Asa'ib Ahl al-Haq (FTO 2021).

99.     Those connections trigger grave concerns about SCB's apparent involvement in the direct and indirect financing of terrorist groups that have killed American and UK military personnel and innocent civilians in Iraq and Afghanistan.[34]

---

[34]     However, I must emphasize that my analysis of Relator's Newly Extracted Data is still at a preliminary stage. The painstaking work of fully investigating and documenting SCB's potential terror financing exposure and alleged money-laundering activities has only just begun and numerous leads must be pursued to trace the ultimate sources and beneficiaries of these transactions.  With the vast trove of SCB data still to be analyzed, it is highly likely that Relator will uncover further evidence of the bank's ties to FTOs and other OFAC sanctioned individuals and entities.

### 4. SCB's Online Foreign Exchange Platform

100.    Relator's Newly Extracted Data also clearly reveals that SCB provided the following Iranian entities access to its online foreign exchange platform, OLT–3,[35] enabling them to conduct cross-border financial transactions with the bank *from within Iran* from 2008 to 2009:

- Khorasan Steel Company (Neyshabur, Iran);
- Khouzestan Steel Company (Ahvaz, Iran);
- Parisian High Voltage Substations Development Company (Tehran, Iran); and
- Petropars LTD (Tehran, Iran).[36]

## B. SCB's "Sundry" Account

101.    I conducted a thorough entity name resolution process for over 20,000 foreign exchange transactional records in SCB's Excel file titled "Sundry.xlsx" that were linked to SCB Dubai's internal "sundry" foreign exchange reconciliation account.

---

[35]    In January 2013, Relator's Julian Knight described SCB's OLT–3 foreign exchange platform to the FBI as follows:

> In the OLT–3 System a client would login and enter a request for pricing on a foreign exchange trade. The trader would respond and price the trade. Subsequently, the client could decide to execute the trade and the trader would then record the trade in the system. Clients did not have to use the OLT–3 System and could rather call-in pricing requests. If a client called in the appropriate client information was provided for the foreign exchange trade.

(Interview of Julian Knight by SA Mathew Komar, FD–302a, FEDERAL BUREAU OF INVESTIGATION, Jan. 16, 2013, ECF No. 87–1.)

[36]    On June 10, 2010, OFAC designated Petropars LTD, a key subsidiary of IRGC-controlled NIOC, under the Iranian Transactions Regulations to implement UN Security Council Resolution 1929, which targeted entities helping Iran fund its nuclear and missile programs and evade sanctions. *See* Fact Sheet, *U.S. Treasury Department Targets Iran's Nuclear and Missile Programs*, U.S. DEP'T OF TREASURY (Jun. 16, 2010), https://home.treasury.gov/news/press-releases/tg747. In 2010, Iranian Transactions Regulations ("ITR") represented the main body of U.S. regulations that implement the broad sanctions program against Iran. In October 2012, OFAC amended and reissued the ITR as the Iranian Transactions and Sanctions Regulations to implement the blocking measures imposed by E.O. 13599 and new Iran sanctions legislation passed by Congress in the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 and the Iran Threat Reduction and Syria Human Rights Act of 2012.

102.     This analysis allowed me to uncover the true nature of the parties involved in these foreign exchange transactions in one of SCB Dubai's internal sundry accounts.

103.     FAL Oil LTD (Dubai, UAE) ("FAL Oil") is one example.

104.     On January 13, 2012, the U.S. Dep't of State sanctioned FAL Oil under the Iran Sanctions Act for providing "over $70 million in refined petroleum to Iran over multiple shipments in late 2010."[37]

105.     According to the U.S. Dep't of Treasury, FAL Oil is a front company for the IRGC-controlled National Iranian Oil Company ("NOIC").[38]

106.     Yet, as my analysis of the "Sundry.xlsx" discloses, SCB maintained a Eurodollar account for FAL Oil, number "***1265", and processed thirteen post-sanction USD/AED, EUR/AED, and SGD/AED FX spot and forward transactions worth a total notional value of $9,811,552.78 U.S. dollars between March 5, 2012, and September 7, 2012.

107.     Further, my analysis of the Newly Extracted Evidence shows that, between January 2, 2008, and January 5, 2012, SCB processed 314 foreign exchange transactions for FAL Oil worth a total notional value of $3,059,171,977.11 U.S. dollars.

108.     Crucially, my resolution of entities in the "Sundry.xlsx" file revealed that SCB Dubai processed five Singapore dollar ("SGD") to UAE dirham ("AED") foreign exchange transactions for FAL Oil after it was sanctioned in January 2012.

109.     These transactions appear to be directly related to FAL Oil's sanctioned activities.

---

[37]     Press Release, *Three Companies Sanctioned Under the Amended Iran Sanctions Act*, U.S. DEP'T OF STATE (Jan. 12, 2012), https://2009-2017.state.gov/e/eb/rls/fs/2012/180645.htm.

[38]     Press Release, *Treasury Submits Report to Congress on NIOC and NITC*, U.S. DEP'T OF TREASURY (Sep. 24, 2012), https://home.treasury.gov/news/press-releases/tg1718. ("[T]he Treasury Department has determined that the National Iranian Oil Company (NIOC) is an agent or affiliate of Iran's Islamic Revolutionary Guard Corps (IRGC)")

110.    In January 2012, the U.S. Dep't of State sanctioned two other companies along with

FAL Oil:

      a.    Kuo Oil, based in Singapore, was sanctioned for providing over $25 million in
           refined petroleum to Iran; and,
      b.    Zhenrong Zhuhai, a Chinese company, was sanctioned as the largest supplier
           of refined petroleum products to Iran, brokering the delivery of over $500
           million in gasoline.[39]

111.    Given Kuo Oil's involvement in providing refined petroleum to Iran and its base in

Singapore, SCB Dubai's SGD transactions raise serious concerns about the bank's potential role

in facilitating Kuo Oil's sanctioned activities for the CBI and IRGC–controlled NIOC.

112.    SCB Dubai's processing of transactions for sanctioned entities through sundry

accounts constitutes a clear violation of U.S. sanctions regulations, irrespective of the currency

involved or the specific banking channel used.

113.    Because SCB Dubai relies on its correspondent banking relationship with SCB

New York to access the U.S. financial system for processing, clearing, and settling cross-border

Eurodollar payment transactions, any transactions processed by SCB Dubai that involve

sanctioned parties, directly or indirectly, and included at least one leg of transaction processed by

SCB New York are subject to U.S. sanctions regulations.

## C.  Examples of Other Revealed Iranian Transactions

### 5.  Central Bank of Iran (Tehran, Iran)

114.    Bank Markazi Jomhouri Islami Iran ("Bank Markazi"), also known as the Central

Bank of the Islamic Republic of Iran ("CBI"), is the country's central bank, responsible for

---

[39]      Fact Sheet, *Three Companies Sanctioned Under the Amended Iran Sanctions Act*, U.S. DEP'T OF STATE (Jan.
12, 2012), https://2009-2017.state.gov/e/eb/rls/fs/2012/180645.htm.

formulating and implementing monetary and credit policies, maintaining price stability, and supervising Iran' payment systems and government-owned and commercial banks.[40]

115. SCB Dubai maintained at least nine Eurodollar bank accounts for CBI, including numbers "*****1201", "***4045", "***2025", "***3472", "***1365", "***6723", "***4045", "***0123", and "***1961".

116. According to Relator's Newly Extracted Data, SCB Dubai processed at least two trade finance transactions for CBI worth a total SCB profit value of $50,679.00 U.S. dollars between December 1, 2009, and December 31, 2009.

117. In September 2019, OFAC designated CBI under E.O. 13,224 for providing "billions of dollars to the Islamic Revolutionary Guards Corps (IRGC), its Qods Force (IRGC–QF) and its terrorist proxy, Hizballah."[41]

### 6. Bank Tejarat (Tehran, Iran)

118. Bank Tejarat, Iran's third-largest bank, was established in 1979 through the merger of Bank Bazargani and several other domestic and international banks following the nationalization of Iran's banking sector during the Islamic Revolution.[42]

119. SCB Dubai maintained at least eight Eurodollar bank accounts for Bank Tejarat, including numbers "***6043", "***1099", "***4406", "***1796", "***8577", "***5432", "***0889", and "***9713".

---

[40] *See*, "About the Bank", CENTRAL BANK OF IRAN (2024), https://www.cbi.ir/page/GeneralInformation.aspx.

[41] Press Release, *Treasury Sanctions Iran's Central Bank and National Development Fund*, U.S. DEP'T OF TREASURY (Sep. 20, 2019), https://home.treasury.gov/news/press-releases/sm780.

[42] *See*, "History", BANK TEJARAT (2024), https://www.tejaratbank.ir/general_content/1520653-History.html.

120.    Relator's Newly Extracted Data shows that SCB Dubai processed eight project export and structured finance transactions for Bank Tejarat worth a total notional value of $93,000,000 U.S. dollars between January 1, 2009, and August 31, 2009.

121.    On January 23, 2012, the U.S. Dep't of Treasury designated Bank Tejarat under E.O. 13382 for providing financial services to previously designated Bank Mellat, the Export Development Bank of Iran, the Islamic Republic of Iran Shipping Lines, and the Ministry of Defense for Armed Forces Logistics.[43]

### 7.  National Iranian Tanker Company (Tehran, Iran)

122.    The National Iranian Tanker Company ("NITC") is a subsidiary of the National Iranian Oil Company ("NIOC") and is responsible for transporting Iranian crude oil exports.[44]

123.    According to the U.S. Dep't of Treasury, NITC has played a significant role in generating revenue for the ("IRGC–QF") and Hezbollah by coordinating with the IRGC–QF on the loading of NIOC-provided oil and working with Hezbollah on logistics and pricing for oil shipments to Syria.[45]

124.    Further, NITC personnel, including its Managing Director Nasrollah Sardashti, have worked closely with IRGC–QF officials and Hezbollah to facilitate these shipments.

125.    To obfuscate its involvement, NITC has also set up front companies in UAE.[46]

---

[43]    Press Release, *Treasury Designates Major Iranian State-Owned Bank*, U.S. DEP'T OF TREASURY (Jan. 23, 2012), https://home.treasury.gov/news/press-releases/tg1397.

[44]    OFAC ADVISORY TO THE MARITIME PETROLEUM SHIPPING COMMUNITY, OFFICE OF FOREIGN ASSETS CONTROL (2019), https://ofac.treasury.gov/media/46006/download?inline.

[45]    Press Release, *Treasury Sanctions Key Actors in Iran's Oil Sector for Supporting Islamic Revolutionary Guard Corps-Qods Force*, U.S. DEP'T OF TREASURY (Oct. 26, 2020), https://home.treasury.gov/news/press-releases/sm1165.

[46]    *Id*.

126.    SCB Dubai maintained a Eurodollar bank account for NITC and processed 10 structured trade finance transactions worth a total of $23,263,352.30 U.S. dollars between January 1, 2009, and August 31, 2009.

127.    In October 2020, OFAC designated NITC as an SDGT under E.O. 13224.[47]

**8.  Khorasan Steel Complex Company (Nishapur, Iran)**

128.    Khorasan Steel Company ("KSC") is one of Iran's largest steel producers, located in the northeastern province of Razavi Khorasan.[48]

129.    Established in 1989, the KSC operates an integrated steel plant that produces a wide range of steel products, including hot-rolled coils, cold-rolled coils, galvanized sheets, and rebar with an annual production capacity of around 1.5 million tons of steel.

130.    Relator's Newly Extracted Data reveals that SCB Dubai maintained a Eurodollar bank account for KSC, number "4488261" and processed a structured trade finance transaction worth $209,000,000 U.S. dollars on June 30, 2009.

131.    In January 2020, OFAC designated KSC pursuant to E.O. 13,871 for operating in the iron, steel, aluminum, or copper sectors of Iran.[49]

---

[47]    Press Release, *Treasury Sanctions Key Actors in Iran's Oil Sector for Supporting Islamic Revolutionary Guard Corps-Qods Force*, U.S. DEP'T OF TREASURY (Oct. 26, 2020), https://home.treasury.gov/news/press-releases/sm1165.

[48]    *See*, "History", KHORASAN STEEL COMPLEX COMPANY (2024), https://www.kscco.ir/en/history.

[49]    Press Release, *Treasury Targets Iran's Billion Dollar Metals Industry and Senior Regime Officials*, U.S. DEP'T OF TREASURY (Jan. 10, 2020), https://home.treasury.gov/news/press-releases/sm870.

132.    By targeting these major metal producers, OFAC aimed to disrupt a significant source of revenue that the Iranian regime relies on to fund and support its nuclear program, missile development, terrorism and terrorist proxy networks, and malign regional influence.

133.    The designation of KSC was part of a broader set of actions taken by the U.S. Dep't of Treasury which also included designations of senior Iranian regime officials, a network of China- and Seychelles-based entities, and a vessel involved in the purchase, sale, and transfer of Iranian metals products.[50]

### 9.  Khouzestan Steel Company (Ahvaz, Iran)

134.    Khouzestan Steel Company ("Khouzestan Steel") was founded in 1973 as a state-owned enterprise as part of Iran's efforts to industrialize and expand its steel production capabilities.[51]

135.    Located in the southwestern Iranian city of Ahvaz, Khouzestan Steel is one of the largest steel producers in the Middle East, with an annual production capacity of around 3.5 million tons of steel products, including hot and cold-rolled coils, sheets, and tinplate.[52]

136.    SCB Dubai maintained two Eurodollar bank accounts for Khouzestan Steel, numbers "***4730" and "***5496".

137.    Relator's Newly Extracted Data show that SCB Dubai processed thirteen forward EUR/USD transactions, one interest rate swap EUR/USD transaction, and one spot EUR/USD

---

[50]    Press Release, *Treasury Targets Iranian UAV Program, Steel Industry, and Automobile Companies in Response to Unprecedented Attack on Israel*, U.S. DEP'T OF TREASURY (Apr. 18, 2024), https://home.treasury.gov/news/press-releases/jy2270.

[51]    *See*, "Introduction", KHOUZESTAN STEEL COMPANY (2024), https://www.ksc.ir/en/introduction.

[52]    *Id.*

transaction for Khouzestan Steel worth a total notional value of $63,702,163.57 U.S. dollars between January 7, 2008, and May 31, 2009.

138.    Further, Khouzestan Steel logged on to SCB's OLT–3 foreign exchange platform via the Internet to initiate and execute the fourteen forward and swap transactions.

139.    In January 2020, OFAC designated Khouzestan Steel under E.O. 13,871[53] for providing "billions of dollars annually" which supports the Iranian regime's "funding of global terrorism", ballistic missile and drone programs, and pursuit of nuclear weapons.[54]

140.    In July 2020, *Radio Farda* reported that the IRGC owned 49 percent of Khousestan Steel and was attempting to "illegally acquire" the remaining 51 percent.[55]

141.    Further, in April 2024, OFAC designated numerous affiliates of Khouzestan Steel under E.O. 13,871 in response to Iran's "unprecedented" ballistic missile and drone attack against Israel on April 13, 2024.[56]

### 10.  Banque d'Algerie (Central Bank of Algeria)

142.    Relator's Newly Extracted Data record that SCB processed 44 foreign exchange transactions for the Banque d'Algerie, account number "***7349", worth a total of $726,729,007.47 U.S. dollars between January 10, 2008, and November 29, 2011.

---

[53]    Exec. Order No. 13,871, *Imposing Sanctions with Respect to the Iron, Steel, Aluminum, and Copper Sectors of Iran*, 31 C.F.R. § 562, Appendix B (May 8, 2019).

[54]    Press Release, *Treasury Targets Iran's Billion Dollar Metals Industry and Senior Regime Officials, U.S. Dep't of Treasury*, U.S. DEP'T OF TREASURY (Jan. 10, 2020), https://home.treasury.gov/news/press-releases/sm870.

[55]    *Iran's IRGC Trying Illegally To Take Ownership Of Major Steel Producer*, RADIO FARDA (Jul. 11, 2020), https://en.radiofarda.com/a/exclusive-iran-s-irgc-trying-illegally-to-take-ownership-of-major-steel-producer/30720865.html.

[56]    Press Release, *Treasury Targets Iranian UAV Program, Steel Industry, and Automobile Companies in Response to Unprecedented Attack on Israel*, U.S. DEP'T OF TREASURY (Apr. 18, 2024), https://home.treasury.gov/news/press-releases/jy2270.

143.    Each of these foreign exchange transactions was apparently for the ultimate benefit of the Central Bank of Iran, account number "*****1201", thereby helping Iran circumvent U.S. economic sanctions and launder money generated by IRGC-controlled NIOC's crude oil sales.

144.    Another SCB transaction involving Banque d'Algerie is especially noteworthy.

145.    During the height of the 2007–2009 global monetary crisis, SCB's New York branch required substantial "lender of last resort" funding from the Federal Reserve Bank of New York ("FRBNY"), which acts as part of the U.S. central bank. (see FRBNY's TAF loan data for SCB at Exhibit C)

146.    To alleviate the severe liquidity shortages faced by domestic and foreign banks during this period, the Federal Reserve implemented, among other programs, the Term Auction Facility ("TAF") program, which provided short-term loans to banks in need of emergency funding.[57]

147.    According to FRBNY, between February 28, 2008, and June 3, 2009, SCB borrowed an aggregate sum of $859,450,000,000 U.S. dollars under FRBNY's TAF program.

148.    During this period, SCB maintained an average daily outstanding loan balance of $1,864,100,000 U.S. dollars, highlighting the extent to which SCB relied on the U.S. Government's financial support to remain solvent and survive the monetary crisis.

149.    On January 29, 2009, SCB received emergency TAF funding in the amount of $2,550,000,000 U.S. dollars from FRBNY.

150.    On the same day, SCB processed a foreign exchange transaction worth $14,625,102.10 U.S. dollars with its counterparty Central Bank of Algeria, account number

---

[57]    *Term Auction Facility (TAF)*, BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM (2024), https://www.federalreserve.gov/regreform/reform-taf.htm.

"4217349", for the ultimate benefit of the Central Bank of Iran, account number "*****1201", indicating that funds provided by the U.S. Government, and ultimately backed by American taxpayers, were used to facilitate illicit transactions for the Iranian regime.

### IV.  SUMMARY AND CONCLUSIONS

151.    Relator's Newly Extracted Data, consisting of at least 512,571 unique transactional records, when thoroughly examined, expose deeply troubling connections between SCB and numerous OFAC sanctioned entities, U.S. Dep't of State designated foreign terrorist organizations ("FTOs"), and State Sponsor of Terrorism Iran.

152.    The discovery of SCB's apparent misconduct in processing transactions for individuals and companies linked to terrorist groups such as Hezbollah, Al Qaeda, HAMAS, and the IRGC, among others, raises grave concerns about the bank's role in facilitating the flow of funds to these dangerous organizations.

153.    Furthermore, Relator's Newly Extracted Data suggests that SCB may have used funds borrowed from the U.S. Government during the 2007–2009 global financial crisis to process transactions for the Central Bank of Iran, potentially undermining the very sanctions put in place to prevent such illicit activities.

154.    The implications of Relator's Newly Extracted Data and these forensic findings cannot be overstated.

155.    By seemingly allowing sanctioned entities and FTO front companies to access the U.S. financial system, SCB has undermined the effectiveness of international sanctions regimes and potentially enabled the financing of terrorist activities that threaten the lives of innocent civilians and military personnel.

156.   Moreover, the concealment of such a vast number of transactions suggests a deliberate effort to obscure illicit activities and evade detection, further compounding the severity of SCB's apparent misconduct.

157.   The importance of this forensic analysis lies not only in uncovering the hidden records but also in highlighting the urgent need for further investigation and accountability.

\* \* \* \* \* \*

I reserve the right to amend this declaration and the opinions herein upon the production or availability of additional information.

Executed on May 20, 2024, in Akron, Ohio.

David J. Scantling