## ADDENDUM: DETAILED TECHNICAL ANALYSIS

### FORENSIC ANALYSIS OF SCB'S FILES PRODUCED BY RELATOR TO THE U.S. GOVERNMENT

### A.  Extraction of Hidden Transactional Records from SCB's Excel Files

#### 1.  Interaction between Excel and Networked Databases:

1.      Microsoft's Excel is a versatile spreadsheet application that offers powerful features for data analysis and reporting.

2.      One of Excel's key capabilities is its ability to connect to and retrieve data from various sources, including networked databases like the relational databases underlying SCB's Centralized Online Real-time Exchange ("CORE") banking system[1] (named "electronic Branch Banking System" or "eBBS") and foreign exchange platform (named "On-Line Trading–3" or "OLT–3").

3.      To establish a connection between Excel and a networked database, users can leverage Excel's built-in data connection tools.

4.      These tools allow Excel users to specify the database type, server name, authentication credentials, and other necessary parameters to create a secure network connection.

5.      Once the connection is set up, Excel can communicate with the database using structured query language ("SQL") or other database-specific protocols.

---

[1]      A CORE banking system is a centralized system that enables banks to perform essential banking services such as, among other things, opening and managing accounts, processing deposits and withdrawals, and calculating interest. The "real-time" aspect of a CORE banking system ensures that the effect of any transaction is reflected immediately in the relevant accounts, providing up-to-date information about balances and transactions. A bank's centralized, real-time processing of transactions is crucial for modern banking operations, enabling efficient and accurate management of customer data and payments across multiple branches and delivery channels. *See, for example*, Julian Alcazar, Sam Baird, Emma Cronenweth, Fumiko Hayashi,
and Ken Isaacson, CORE BANKING SYSTEMS AND OPTIONS FOR MODERNIZATION, FEDERAL RESERVE BANK OF KANSAS CITY (Feb. 28, 2024), https://www.kansascityfed.org/Payments%20Systems%20Research%20Briefings/documents/10016/PaymentsSystemResearchBriefing24AlcazarBairdCronenwethHayashiIsaacson0228.pdf.

6.     With an active database connection, users can import data from the networked database into Excel worksheets.

7.     This process involves querying the database to retrieve specific subsets of data based on user-defined criteria.

8.     For example, a user could write an SQL query to extract all foreign exchange transactions from SCB''s OLT–3 platform within a specific date range and import that data into an Excel worksheet.

9.     Once the data is imported into Excel, users can leverage the application's extensive features for data manipulation, analysis, and visualization.

10.     This includes creating pivot tables, generating charts and graphs, performing calculations, and applying formatting to the data like in SCB's Excel file named "Cash and Trade Corporates Client Groups FX Revenues_6 Sep 2010_MENA_V1".

11.     This file includes a worksheet with the following chart showing a breakdown of SCB''s foreign exchange volumes by geographic location:



12.     The data in the above chart shows Excel's flexibility in allowing SCB's users to transform the raw data from the bank's eBBS and OLT–3 databases into meaningful insights and reports.

13.     SCB's eBBS and OLT–3 systems are critical components of the bank's core banking infrastructure, handling a wide range of transactional data.

14.     eBBS, as the bank's central electronic banking system, stores comprehensive data on customer accounts, transactions, and balances.

15.     This includes data on deposits, withdrawals, transfers, loans, and other basic banking activities.

16.     OLT–3, as SCB's online foreign exchange trading platform, handles more specialized data related to foreign exchange transactions.

17.     This includes data on currency pairs traded, amounts, rates, counterparties, and timestamps for each trade.

18.     OLT–3 also stores data on related hedging activities and derivatives contracts.

19.     Both eBBS and OLT–3 databases store this transactional data in structured tables, with each row representing a unique transaction and columns for the various attributes of that transaction.

20.     These databases are typically hosted on secure servers and accessed by front-end applications for day-to-day use by bank staff.

21.     For data to flow from eBBS and OLT–3 into Excel, a user must first establish a connection between Excel and these databases.

22.     This is typically done through Excel's built-in data connection features, which allow users to specify the server, database, and login credentials.

23.     Once connected, users can query the databases and pull selected data into Excel.

24.     The specific data pulled into Excel depends on the user's query. For example, a user could pull all foreign exchange trades above a certain dollar amount from OLT–3 for a given time period.

25.     Or they could pull all transactions associated with a specific customer account from eBBS.

26.     The queried data is typically imported into Excel as a table in a worksheet.

27.     Once in Excel, users can manipulate, analyze, and visualize the data using Excel's various features.

28.     They can also set up automated data refreshes, where Excel will periodically re-query the database to pull in updated data.

29.     Normally, at a multinational financial institution like SCB, robust internal controls should govern these data flows between eBBS, OLT–3, and Excel.

30.     Access to SCB's internal databases should be strictly controlled based on user roles and permissions.

31.     The bank's sensitive data should be encrypted both at rest in the databases and in transit to Excel.

32.     Data pulled into Excel should be subject to SCB's data loss prevention ("DLP") controls to prevent unauthorized exfiltration.

33.     However, Relator's analysis suggests significant gaps in SCB's controls around these data flows.

34. The presence of massive amounts of sensitive transaction data in Excel files, including data on sanctioned entities, suggests that SCB's controls were either inadequate or poorly enforced.

35. The extraction of data from eBBS and OLT–3 into Excel appears to have been largely unconstrained, allowing users to pull in data on sanctioned transactions without triggering any alarms.

36. Once in Excel, this data seems to have been stored without appropriate protection, as evidenced by the unencrypted pivot table caches.

37. The data flows between SCB's core systems and Excel represent a significant vulnerability in the bank's sanctions compliance controls.

38. By allowing uncontrolled extraction of sensitive data into an environment like Excel, which lacks robust audit trails and access controls, SCB created opportunities for sanctions violations to occur and be concealed.

39. Relator's findings suggest that SCB either failed to recognize the sanctions risks inherent in these data flows, or worse, actively exploited these vulnerabilities to evade sanctions controls.

40. The systematic nature of the data issues uncovered, spanning multiple years and involving thousands of transactions, points to a serious and sustained breakdown in SCB's internal controls.

***Purpose and Function of Excel's pivot tables.***

41. Pivot tables are one of the most powerful and widely used features in Microsoft Excel for summarizing and analyzing large datasets.

42. They allow users to dynamically explore and visualize data by dragging and dropping fields, applying filters, and aggregating values.

43.     However, a significant capability behind pivot tables lies in the "pivot table cache", a hidden component that plays a crucial role in their performance and functionality with networked database applications like SCB's eBBS and OLT–3.

44.     When a pivot table is created, Excel generates a pivot table cache that stores a compressed replica of the source data.

45.     This cache is essentially a snapshot and optimized version of the original data, designed to improve the speed and efficiency of pivot table operations.

46.     The pivot table cache acts as a reference for the pivot table, providing it with the necessary data to perform calculations and data manipulations.

47.     It is important to note that data stored in the pivot table cache is not readily visible to end users.

48.     The pivot cache is stored in a separate part of the Excel file from the visible worksheets, typically in a binary format.

49.     This storage format compresses the data, reducing file size and improving performance.

50.     However, it also makes the cached data less readily visible to anyone inspecting the file.

51.     The process of extracting data from SCB's pivot table caches required technical expertise in understanding the structure of Excel files, working with XML, and utilizing specialized tools for data extraction and analysis.

52.     The significance of this process cannot be overstated.

53.     By extracting data from the pivot table caches, I uncovered a substantial volume of transactional records that were not immediately visible in the Excel worksheets themselves.

54.    These hidden records, sourced from SCB's eBBS CORE banking system and OLT–3 foreign exchange platform, provided valuable insights into the bank's activities and transactions between 2008 and 2012.

55.    SCB's Newly Extracted Data, consisting of at least 512,721 unique foreign exchange transactional records, serves as crucial evidence in support of Relator's case.

56.    As a whistleblower, Relator obtained these internal SCB files from Julian Knight (who received them in the ordinary course of his employment with the bank), and it appears that SCB failed to disclose to the U.S. Government the extensive use of pivot table caches to store transactional records in a way that end users, including regulators, would not be able to easily access them.

57.    The fact that these records were only uncovered through advanced forensic analysis conducted by Relator underscores the importance of thorough, independent investigations into the bank's activities and highlights the potential for deception and concealment within SCB's data practices.

58.    Furthermore, the nature of SCB's hidden transactional data, which includes dealings with sanctioned entities, high-risk jurisdictions, and potential terrorist financing, indicates that SCB may have been actively concealing illicit activities.

59.    The sheer volume of concealed data—over 3.3 million transactional records involving foreign exchange, trade finance, and Eurodollar placements and deposits—suggests that this was not a mere oversight but rather a systematic effort to obscure potentially incriminating information.

60.    The fact that the U.S. Government claims that it did not extract and analyze these hidden records after receiving the files from Relator raises questions about the depth and

effectiveness of their investigation and underscores the critical role of whistleblowers in exposing misconduct.

61.     The strategic concealment of vast amounts of transactional data within pivot table caches and hidden worksheets, coupled with SCB's apparent failure to disclose this practice to the U.S. Government, suggests a concerted effort by the bank to evade regulatory scrutiny and maintain plausible deniability.

62.     By burying incriminating records in hard-to-find places and not proactively disclosing the existence of these hidden data caches, SCB appears to have created a veneer of compliance while simultaneously engaging in prohibited transactions and relationships.

63.     This behavior not only undermines the effectiveness of international sanctions regimes but also erodes the trust and stability of the global financial system as a whole, highlighting the crucial importance of whistleblower-driven investigations in uncovering financial misconduct.

**B. Forensic Accounting and Threat Finance Analysis of SCB's Individual Files**

**1. Scope of Review**

64.     As described above, I have conducted a thorough examination of the documents, data, and metadata contained within seventy-two SCB files provided to me by Relator.

65.     As discussed above, the SCB files I reviewed encompass a diverse range of file formats, including:

- *Microsoft Excel spreadsheets*. I have scrutinized the content, structure, and metadata of SCB's Excel files, paying special attention to the pivot tables and their underlying data sources and caches. This involved examining the worksheets, formulas, and hidden data stored within worksheets and the pivot table caches.
- *Microsoft Word documents*. I have reviewed the text, formatting, and metadata of SCB's Word documents to identify any relevant

information related to SCB's banking practices, policies, or transactions.

- *Microsoft PowerPoint presentations*. I have analyzed the content, slide layouts, and metadata of the PowerPoint files to uncover any pertinent information or data related to SCB's operations or Relator's allegations.
- *Adobe PDF documents*. I have examined the text, images, and metadata of the PDF files to extract any relevant data or information that supports the Relator's case against SCB.

**2. Focus on Relator's Production of SCB's Files to the U.S. Government.**

66. As per Relator's guidance, I have placed primary emphasis on sixty-six of the seventy-two SCB files that Relator has confirmed were produced to the U.S. Government.

67. I have examined each of these seventy-two files, applying my expertise in data analysis and forensic examination to extract and interpret the relevant information.

68. This targeted approach has allowed me to concentrate my efforts on the most critical files and data that form the basis of Relator's allegations against SCB, including the following activities:

a. Identify key pieces of evidence that support Relator's claims regarding SCB's illicit banking practices and transactions;

b. Uncover hidden data and metadata that appear to have been overlooked in the initial review by the U.S. Government, such as the transactional data stored within the pivot table caches of SCB's Excel files;

c. Analyze the content and context of SCB's documents to establish a clear narrative and timeline of events related to Relator's allegations;

d. Highlight any discrepancies, inconsistencies, or "red flags" within the produced files that warrant further investigation or support Relator's case.

**3. SCB Files Containing Hidden Pivot Table Caches and Worksheets**

69. The following SCB Excel files, produced by Relator the U.S. Government in 2012 and 2013, contain hidden pivot table caches and worksheets.

### a) SCB Excel file titled "Performance Summary -Iran(SNPC)2.xls"

#### 1) Overview of file content.

70.     This SCB Excel spreadsheet file, titled "Performance Summary - Iran(SNPC)2.xlsx", details its Iran Group's foreign exchange, trade finance, and deposit business between January 2, 2008, and December 31, 2008.

71.     The visible worksheets list entities that the bank coded as relating to "Iran" in its internal database systems such as eBBS and OLT–3.

72.     The file contains two pivot tables, two hidden pivot table caches, and one hidden unnamed worksheet ("Sheet 3").

73.     For instance, the following screenshot, from the "RM Summary" worksheet, shows one of the pivot tables that was visible to the U.S. Government in the Excel file indicating SCB''s Iran-related revenue for the period was $818,654,000 U.S. dollars: (in the screenshot, U.S. dollar amounts are shown in thousands, $000)



74.     The hidden pivot table cache underlying the above pivot table contains 52,922 foreign exchange transactional records with an aggregate notional value of $161,211,444,280.46 U.S. dollars.

75.     The second pivot table cache underlying the second pivot table, visible in the "FX Double Count" worksheet, contains 14,349 foreign exchange transactional records worth a total 2008 revenue value to SCB of $7,278,210,141.57 U.S. dollars.

### 2) Analysis of file content.

76.     SCB's hidden foreign exchange transactional records show that, between January 2008 and November 2008, SCB's Dubai branch processed 220 Iran-related transactions (as defined by SCB), totaling $913,458,507.53 U.S. dollars, on behalf of entities and individuals located in Iran and other high-risk jurisdictions.

77.     Key concerning factors and "red flags" include:

- *Direct transactions with Iranian entities*. SCB maintained Eurodollar accounts for and processed transactions on behalf companies located in Iran, including Khouzestan Steel Company, Parsian High Voltage Substations Development Company, and Petropars LTD.
- *Use of SCB's online platform*. All of the Iranian entities, as well as some in UAE, used SCB's OLT–3 online trading platform to directly process their transactions in U.S. dollars. This suggests SCB may have knowingly provided Iranian parties with access to the U.S. financial system.
- *Types of transactions*. Beyond normal account activity, SCB facilitated high-risk trade finance, foreign exchange trading, and derivatives transactions like FX forwards, swaps, options for these entities.

78.     In summary, the scale, nature, and origination of these transactions raise serious concerns that SCB was continuing to systematically process foreign exchange and Eurodollar payment transactions for sanctioned entities, including their respective front companies, and allowing them access to the U.S. financial system, as alleged by the Relator.

### 3) *Entity transaction summaries.*

79.    *Iran*. SCB processed sixteen foreign exchange transactions for customers in Iran worth a total of $13,412,445.59. Notably, the respective Iranian entities processed all sixteen transactions using SCB's OLT–3 online trading platform.

    a. SCB maintained a Eurodollar account for Khouzestan Steel Company (Ahvaz, Iran), number "***4730", and processed fourteen Iran-related EUR/USD FX forward transactions worth an aggregate nominal value of $3,547,163.59 U.S. dollars between January 7, 2008, and August 18, 2008. Notably, all fourteen of these transactions were processed by Khouzestan Steel Company using SCB's OLT–3 online trading platform.

    b. SCB maintained a Eurodollar account for Parsian High Voltage Substations Development Company (Tehran, Iran), number "***7165", and processed one Iran-related EUR/AED FX forward transaction worth an aggregate nominal value of $1,739,485 U.S. dollars on February 26, 2008. Notably, this transaction was processed by Parsian High Voltage Substations Development Company using SCB's OLT–3 online trading platform.

    c. SCB maintained a Eurodollar account for Petropars LTD (Tehran, Iran), number "***6681", and processed one Iran-related EUR/AED FX forward transaction worth an aggregate nominal value of $8,125,797 U.S. dollars on January 21, 2008. Notably, this transaction was processed by Petropars LTD using SCB's OLT–3 online trading platform.

80.    *Algeria*.

    a. SCB maintained a Eurodollar account for Banque d'Algerie ("Central Bank of Algeria") (Algiers, Algeria), number "***7349", and processed twenty-two Iran-related EUR/USD FX option and interest rate swap transactions worth an aggregate nominal value of $351,179,905.37 U.S. dollars between January 10, 2008, and August 27, 2008.

81.    *Egypt.*

    a. SCB maintained a Eurodollar correspondent account for Commercial International Bank (Cairo, Egypt), number "***3218", and processed thirteen Iran-related interest rate swap and FX option transactions worth

an aggregate nominal value of $127,059,782.27 U.S. dollars between January 30, 2008, and June 30, 2008.

b. SCB maintained a Eurodollar correspondent account for National Bank of Egypt (Cairo, Egypt), number "***0378", and processed sixteen Iran-related interest rate swap and FX option transactions worth an aggregate nominal value of $50,085,967.50 U.S. dollars between May 22, 2008, and August 25, 2008.

82.    *Kuwait*.

a. SCB maintained a Eurodollar account for Kuwait Automotive Imports Company WLL (Safat, Kuwait), number "***8926", and processed nineteen Iran-related USD/KWD and USD/JPY interest rate swap, FX option, FX forward, and FX spot transactions worth an aggregate nominal value of $19,934,939.14 U.S. dollars between March 31, 2008, and November 3, 2008.

b. SCB maintained a Eurodollar account for M. H. Alshaya Company WLL (Safat, Kuwait), number "***5370", and processed five Iran-related GBP/USD FX forward and FX spot transactions worth an aggregate nominal value of $ 20,301,375.00 U.S. dollars between January 24, 2008, and August 13, 2008.

c. SCB maintained a Eurodollar account for Mohamed Naser Al-Sayer and Son (Safat, Kuwait), number "***1857", and processed sixty-three Iran-related USD/KWD and USD/JPY FX forward, FX option, and FX spot transactions worth an aggregate nominal value of $108,498,821.71 U.S. dollars between July 17, 2008, and November 13, 2008.

d. SCB maintained a Eurodollar account for Retail International Company WLL (Safat, Kuwait), number "***4412", and processed five Iran-related FX option and FX forward transactions worth an aggregate nominal value of $15,437,850 U.S. dollars between August 14, 2008, and December 11, 2008.

83.    *Morocco*.

a. SCB maintained a Eurodollar correspondent account for Attijariwafa Bank (Casablanca, Morocco), number "***9888", and processed sixteen Iran-related FX option transactions worth an aggregate nominal value of $168,008,410 U.S. dollars between March 11, 2008, and August 8, 2008.

b. SCB maintained a Eurodollar account for CDG Captial (Rabat, Morocco) and processed four Iran-related interest rate swap transactions

worth an aggregate nominal value of $55,537,866 U.S. dollars between January 23, 2008, and March 5, 2008.

84. *Oman.*

    a. SCB maintained a Eurodollar account for National Aluminium Production Company SAO (Rusayl, Oman) and processed four Iran-related FX derivative contract transactions worth an aggregate nominal value of $90,000 U.S. dollars between August 7, 2008, and August 27, 2008.

85. *Saudi Arabia.*

    a. SCB maintained a Eurodollar account for Arab Petroleum Investments Corporation (Dammam, Saudi Arabia) and processed one Iran-related interest rate swap transaction worth an aggregate nominal value of $10,666,667 U.S. dollars on May 22, 2008.

86. *United Arab Emirates.*

    a. SCB maintained a Eurodollar account for Banque de Commerce et de Placements SA, Dubai Branch (Dubai, UAE), number "***3815", and processed one Iran-related FX forward transaction worth $115,000 U.S. dollars on March 31, 2008.

    b. SCB maintained a Eurodollar account for Blue Com Trading Company LLC (Dubai, UAE), number "***8322", and processed four Iran-related FX forward transactions worth an aggregate nominal value of $614,965.99 U.S. dollars between August 4, 2008, and November 19, 2008. Notably, all four of these transactions were processed by Blue Com Trading Company (LLC) using SCB's OLT–3 online trading platform.

    c. SCB maintained a Eurodollar account for DSGS FZCO (Dubai, UAE), number "***6962", and processed three Iran-related FX spot transactions worth an aggregate nominal value of $109,102.49 U.S. dollars between February 27, 2008, and March 26, 2008. Notably, two of these transactions were processed by DSGS FZCO using SCB's OLT–3 online trading platform.

    d. SCB maintained a Eurodollar account for Iran Industrial Exchange Company (Jebel Ali, UAE), number "*****0345", and processed one Iran-related FX forward transaction worth an aggregate nominal value of $67,818.03 U.S. dollars on May 5, 2008.

    e. SCB maintained a Eurodollar account for MAPNA International FZE

14

(Dubai, UAE), number "***4762", and processed two Iran-related EUR/USD and EUR/AED FX forward transactions worth an aggregate nominal value of $348,943.66 U.S. dollars between January 24, 2008, and June 16, 2008. Notably, two of these transactions were processed by MAPNA International FZE using SCB's OLT–3 online trading platform.

f.  SCB maintained a Eurodollar account for Minerex General Trading Company LLC (Dubai, UAE), number "***1743", and processed one Iran-related USD/AED FX forward transaction worth an aggregate nominal value of $122,557.63 U.S. dollars on January 16, 2008. Notably, this transaction was processed by Minerex General Trading Company LLC using SCB's OLT–3 online trading platform.

g.  SCB maintained a Eurodollar account for Oriental Oil Company FZE (Dubai, UAE), number "***5141", and processed two Iran-related FX forward transactions worth an aggregate nominal value of $2,327,071 U.S. dollars between January 21, 2008, and May 29, 2008. Notably, both of these transactions were processed by Oriental Oil Company FZE using SCB's OLT–3 online trading platform.

h.  SCB maintained a Eurodollar account for Techno Parts FZCO (Dubai, UAE), number "***4363", and processed three Iran-related FX forward transactions worth an aggregate nominal value of $845,348 U.S. dollars between January 31, 2008, and May 19, 2008. Notably, all three of these transactions were processed by Techno Parts FZCO using SCB's OLT–3 online trading platform.

### b)  2010 Iran Group Excel files.

87.  The following Iran Group Excel spreadsheets contain hidden pivot table caches for 2010, containing a total of at least 867,422 hidden transactional records:

| SCB Filename | Date Range | Hidden Transactions |
|---|---|---|
| "Performance Summary -Iran(SNPC)47.xlsx" | Jan. 4, 2010, to Mar. 10, 2010 | 23,136 |
| "Performance Summary -Iran(SNPC)48.xlsx" | Jan. 4, 2010, to Mar. 18, 2010 | 25,283 |
| "Performance Summary -Iran(SNPC)49.xlsx" | Jan. 4, 2010, to Mar. 25, 2010 | 27,036 |
| "Performance Summary -Iran(SNPC)50.xlsx" | Jan. 4, 2010, to Mar. 31, 2010 | 28,366 |
| "Performance Summary -Iran(SNPC)44.xlsx" | Jan. 4, 2010, to May 13, 2010 | 43,688 |
| "Performance Summary -Iran(SNPC)45.xlsx" | Jan. 4, 2010, to May 24, 2010 | 46,014 |

| SCB Filename | Date Range | Hidden Transactions |
|---|---|---|
| "Performance Summary -Iran(SNPC)46.xlsx" | Jan. 4, 2010, to May 31, 2010 | 44,882 |
| "Performance Summary -Iran(SNPC)35.xlsx" | Jan. 4, 2010, to Sep. 14, 2010 | 60,468 |
| "Performance Summary -Iran(SNPC)36.xlsx" | Jan. 4, 2010, to Sep. 22, 2010 | 62,068 |
| "Performance Summary -Iran(SNPC)37.xlsx" | Jan. 4, 2010, to Sep. 30, 2010 | 65,535 |
| "Performance Summary -Iran(SNPC)38.xlsx" | Jan. 4, 2010, to Oct. 11, 2010 | 66,604 |
| "Performance Summary -Iran(SNPC)39.xlsx" | Jan. 4, 2010, to Oct. 22, 2010 | 69,784 |
| "Performance Summary -Iran(SNPC)40.xlsx" | Jan. 4, 2010, to Oct. 31, 2010 | 72,694 |
| "Performance Summary -Iran(SNPC)41.xlsx" | Jan. 4, 2010, to Nov. 10, 2010 | 75,394 |
| "Performance Summary -Iran(SNPC)42.xlsx" | Jan. 4, 2010, to Nov. 25, 2010 | 77,290 |
| "Performance Summary -Iran(SNPC)43.xlsx" | Jan. 4, 2010, Nov. 30, 2010 | 79,180 |

### c)  2011 Iran Group Excel files.

88.     The following Iran Group Excel spreadsheets contain hidden pivot table caches for 2011, containing a total of at least 2,292,113 hidden transactional records:

| SCB Filename | Date Range | Number of Hidden Transactions |
|---|---|---|
| "Performance Summary -Iran(SNPC)23.xlsx" | Jan. 3, 2011, to Jan. 17, 2011 | 2,954 |
| "Performance Summary -Iran(SNPC)24.xlsx" | Jan. 3, 2011, to Jan. 31, 2011 | 5,570 |
| "Performance Summary -Iran(SNPC)25.xlsx" | Jan. 3, 2011, to Feb. 15, 2011 | 7,673 |
| "Performance Summary -Iran(SNPC)26.xlsx" | Jan. 3, 2011, to March 31, 2011 | 12,378 |
| "Performance Summary -Iran(SNPC)14.xlsx" | Jan. 3, 2011, to May 13, 2011 | 18,708 |
| "Performance Summary -Iran(SNPC)15.xlsx" | Jan. 4, 2011, to May 24, 2011 | 23,820 |
| "Performance Summary -Iran(SNPC)16.xlsx" | Jan. 4, 2011, to May 31, 2011 | 27,060 |
| "Performance Summary -Iran(SNPC)32.xlsx" | Jan. 4, 2011, to Sep. 22, 2011 | 33,231 |
| "Performance Summary -Iran(SNPC)33.xlsx" | Jan. 4, 2011, to Sep. 22, 2011 | 39,512 |

| SCB Filename | Date Range | Number of Hidden Transactions |
|---|---|---|
| "Performance Summary -Iran(SNPC)34.xlsx" | Jan. 4, 2011, to Sep. 30, 2011 | 46,794 |
| "Performance Summary -Iran(SNPC)11.xlsx" | Jan. 4, 2011, to Oct. 11, 2011 | 55,337 |
| "Performance Summary -Iran(SNPC)12.xlsx" | Jan. 4, 2011, to Oct. 22, 2011 | 57,390 |
| "Performance Summary -Iran(SNPC)17.xlsx" | Jan. 4, 2011, to Oct. 31, 2011 | 68,374 |
| "Performance Summary -Iran(SNPC)18.xlsx" | Jan. 4, 2011, to Nov. 10, 2011 | 71,627 |
| "Performance Summary -Iran(SNPC)19.xlsx" | Jan. 4, 2011, to Nov. 25, 2011 | 76,999 |
| "Performance Summary -Iran(SNPC)20.xlsx" | Jan. 4, 2011, Nov. 30, 2011 | 83,584 |
| "Performance Summary -Iran(SNPC)21.xlsx" | Jan. 4, 2011, to May 24, 2011 | 86,103 |
| "Performance Summary -Iran(SNPC)22.xlsx" | Jan. 4, 2011, to May 24, 2011 | 90,951 |
| "Performance Summary -Iran(SNPC)29.xlsx" | Jan. 4, 2011, to May 24, 2011 | 97,347 |
| "Performance Summary -Iran(SNPC)30.xlsx" | Jan. 4, 2011, to May 24, 2011 | 101.824 |
| "Performance Summary -Iran(SNPC)31.xlsx" | Jan. 4, 2011, to May 24, 2011 | 106,212 |
| "Performance Summary -Iran(SNPC)5.xlsx" | Jan. 4, 2011, to May 24, 2011 | 127,524 |
| "Performance Summary -Iran(SNPC)6.xlsx" | Jan. 4, 2011, to May 24, 2011 | 132,326 |
| "Performance Summary -Iran(SNPC)7.xlsx" | Jan. 4, 2011, to May 24, 2011 | 140,385 |
| "Performance Summary -Iran(SNPC)10.xlsx" | Jan. 4, 2011, to May 24, 2011 | 145,900 |
| "Performance Summary -Iran(SNPC)8.xlsx" | Jan. 4, 2011, to Nov. 25, 2011 | 150,944 |
| "Performance Summary -Iran(SNPC)9.xlsx" | Jan. 4, 2011, to Nov. 30, 2011 | 155,293 |
| "Performance Summary -Iran(SNPC)27.xlsx" | Jan. 4, 2011, to Dec. 15, 2011 | 161,675 |
| "Performance Summary -Iran(SNPC)28.xlsx" | Jan. 4, 2011, Dec. 25, 2011 | 164,618 |

### d) 2012 Iran Group Excel files.

89.     The following Iran Group Excel spreadsheets contain hidden pivot table caches for 2012, containing a total of at least 100,949 hidden transactional records:

| SCB Filename | Date Range | Number of Hidden Transactions |
|---|---|---|
| "Performance Summary -Iran(SNPC)3.xlsx" | Jan. 2, 2012, to Feb. 20, 2012 | 22,266 |
| "Performance Summary -Iran(SNPC)4.xlsx" | Jan. 2, 2012, to Feb. 20, 2012 | 36,362 |
| "Performance Summary -Iran(SNPC)1.xlsx" | Jan. 2, 2012, to Mar. 20, 2012 | 42,321 |

### 1)  SCB File Titled "Performance Summary -Iran(SNPC)1.xlsx".

90.     This SCB Excel spreadsheet file, titled "Performance Summary - Iran(SNPC)1.xlsx", details its Iran Group's foreign exchange, trade finance, and deposit business between January 1, 2012, and March 20, 2012.

91.     The visible worksheets list entities that the bank coded as relating to "Iran" in its internal database systems such as eBBS and OLT–3.

92.     The file contains two pivot tables, two hidden pivot table caches, and one hidden unnamed worksheet ("Sheet 3").

93.     For instance, the following screenshot, from the "RM Summary" worksheet, shows one of the pivot tables that was visible to the U.S. Government in the Excel file, indicating SCB''s Iran-related revenue for the period was $9,669,290 U.S. dollars: (in the screenshot, U.S. dollar amounts are shown in thousands, $000)



| Unit Head - Trsy | Iran | | | |
|---|---|---|---|---|
| Trsy RM | (All) | | | |
| CBD RM | (All) | | | |
| Unit head - CBD | (All) | | | |
| | | | | |
| Sum of RevenueUSD | | Product | | |
| szAccountCode | szCptyCode | CTD | FX | Grand Total |
| 3855 | IRAN ASEMAN CO | 3 | | 3 |
| 5232 | UNITED ARAB SHIPPING CO.(S.A.G) | | 138 | 138 |
| 1121 | ARIAN SEA SCENT | 13 | | 13 |
| 7569 | DARMAN YAB OMID COMPANY LTD. | 22 | | 22 |
| 5474 | PARSIAN INTERNATIONAL ESTABLISHMENT | 14 | | 14 |
| 1387 | DEMCO (DALAHOO -RAHGOSTAR ENG. & MANUF. CO.) | 8 | | 8 |
| 1129 | THE PUBLIC WAREHOUSING COMPANY (KSC) | | 4,323 | 4,323 |
| 1242 | KUWAIT PROJECTS CO (HOLDING) KSC | | - | - |
| 1439 | BADER ALMULLA  & BROTHERS COMPANY WLL | | 1,043 | 1,043 |
| 1676 | IFIC HOLDING AG | 4,106 | | 4,106 |
| 1762 | MAPNA INTERNATIONAL FZE | - | | - |
| Grand Total | | 4,165 | 5,504 | 9,669 |

18

94.     The hidden pivot table cache underlying the above pivot table contains 32,950 foreign exchange transactional records with an aggregate notional value of $84,062,156,991.71 U.S. dollars.

95.     The second pivot table cache underlying the second pivot table, visible in the "FX Double Count" worksheet, contains 9,480 foreign exchange transactional records worth a total Q1 2012 revenue value to SCB of $806,341.87 U.S. dollars.

96.     The following SCB Excel files from 2008 each contain a sub-set of the transactions in this file:

97.     Based on SCB's hidden pivot table cache data, the five most frequently occurring currency pairs in the foreign exchange transactions are:

- U.S. dollar to UAE dirham ("USD/AED").
- EU euro to UAE. dirham ("EUR/AED").
- British pound to UAE dirham ("GBP/AED").
- E.U. euro to U.S. dollar ("EUR/USD").
- British pound to U.S. dollar ("GBP/USD").

98.     Other notable currency pairs include:

- UAE dirham to Saudi riyal ("AED/SAR").
- UAE dirham to Kuwaiti dinar ("AED/KWD").
- UAE dirham to Indian rupee ("AED/INR").
- Qatari riyal to U.A.E. dirham ("QAR/AED").
- U.S. dollar to Saudi riyal ("USD/SAR").
- U.S. dollar to Kuwaiti dinar ("USD/KWD").
- Omani rial to UAE dirham ("OMR/AED").
- Bahraini dinar to UAE dirham ("BHD/AED").
- U.S. dollar to Swiss franc ("USD/CHF").
- Canadian dollar to UAE dirham ("CAD/AED").
- Japanese yen to UAE dirham ("JPY/AED").

### 2) *Analysis of file content.*

99.     *IFIC Holding AG.* According to the U.S. Dep't of Treasury, IFIC Holding AG is a Dusseldorf, Germany-based entity that has been identified as being wholly-owned by Iran Foreign Investment Company ("IFIC").

100.    On August 3, 2010, OFAC designated IFIC Holding AG as "owned or controlled by the Government of Iran" and added it to the SDN list.[2]

101.    IFIC Holding AG serves as a key foreign investment arm for the Iranian regime and its status as a German-registered entity provides a veneer of legitimacy to obfuscate its true ownership and control by Iran.

102.    This corporate structure allows Iran to manage and expand its international holdings while sidestepping sanctions and avoiding scrutiny.

103.    While portraying itself as an innocuous holding company, IFIC Holding AG is assessed by OFAC to be an integral component of Iran's efforts to access foreign markets, secure goods, and materials, and generate revenues in support of the regime's priorities.

104.    The entity allegedly exploits its base in Germany, an international financial and commercial hub, to engage with unsuspecting European and global partners.

105.    As a cut-out for the Iranian government, IFIC Holding AG allegedly participates in Iran's documented efforts to evade sanctions, procure illicit goods, and finance destabilizing activities.

---

[2]     Press Release, *Treasury Identifies 21 Entities Determined to be Owned or Controlled by the Government of Iran Treasury Exposes Iran's Foreign Trade Network,Identifies Entities Operating in Belarus, Germany, Iran, Italy, Japan and Luxembourg*, U.S. DEP'T OF TREASURY (Aug. 3, 2010), https://home.treasury.gov/news/press-releases/tg811.

106.    *MAPNA International FZE*. MAPNA International FZE, based in Dubai, UAE, is a key subsidiary of Iran's MAPNA Group, a major conglomerate involved in the development of power, oil and gas, and railroad projects.

107.    While portraying itself as a legitimate industrial enterprise, MAPNA Group and its network of over thirty subsidiaries are assessed to be ultimately owned or controlled by the Government of Iran.

108.    The MAPNA Group is a key component of Iran's Defense Industries Organization ("MODAFL") and IRGC procurement chain.

109.    MODAFL serves as the principal procurement arm of Iran's military and terror apparatus.[3]

110.    Abbas Aliaabadi, Chairman of MAPNA International FZE and President of the Mapna Group, is a former member of the Iranian Ministry of Construction Jihad and the Iranian Air Force.

111.    Mr. Aliaabadi was also instrumental in the creation of Hezbollah during his tenure with the Ministry of Culture & Islamic Guidance and maintains close links to the IRGC.

112.    In 2011, the British government listed MAPNA Group and several of its subsidiaries as entities of concern for procurement activities related to weapons of mass destruction ("WMD").

113.    MAPNA International FZE, operating out of the UAE, is suspected of serving as a key facilitator for MAPNA Group's international activities, including procurement efforts and engagement with foreign partners..

---

[3]      Press Release, *United States Disrupts Large Scale Front Company Network Transferring Hundreds of Millions of Dollars and Euros to the IRGC and Iran's Ministry of Defense*, U.S. DEP'T OF TREASURY (Mar. 26, 2019), https://home.treasury.gov/news/press-releases/sm639.

### 3) *Entity transaction summaries.*

114. *Iran*. SCB processed eight time-deposit transactions which generated interest income for SCB worth a total of $142,444.76.

- SCB maintained a Eurodollar account for Arian Sea Scent (Tehran, Iran), number "***1121", and processed two Iran-related time deposit transactions between January 31, 2012, and February 29, 2012, which generated interest income for SCB worth $12,904.98 U.S. dollars.
- SCB maintained a Eurodollar account for Darman Yab Omid Company LTD (Tehran, Iran), number "***7569", and processed two Iran-related time deposit transactions between January 31, 2012, and February 29, 2012, which generated interest income for SCB worth $21,726 U.S. dollars.
- SCB maintained a Eurodollar account for Dalahoo–Rahgostar Engineering & Manufacturing Company ("DEMCO") (Tehran, Iran), number "***1387", and processed two Iran-related time deposit transactions between January 31, 2012, and February 29, 2012, which generated interest income for SCB worth $80,043.56 U.S. dollars.
- SCB maintained a Eurodollar account for Iran Aseman Airlines Company (Tehran, Iran), number "***6855", and processed two Iran-related time deposit transactions between January 31, 2012, and February 29, 2012, which generated interest income for SCB worth $27,770.22 U.S. dollars.

115. *Germany*.

- SCB maintained a Eurodollar account for IFIC Holding AG (Dusseldorf, Germany), number "***4676", and processed two Iran-related time deposit transactions worth an aggregate nominal value of $0.00 U.S. dollars on January 31, 2012, which generated interest income for SCB worth $4,106,251.02 U.S. dollars.

116. *Kuwait*.

- SCB maintained a Eurodollar account for Bader Almulla & Brothers Company WLL (Kuwait City, Kuwait), number "***4439", and processed seven Iran-related FX spot transactions worth an aggregate nominal value of $18,735,498.86 U.S. dollars between January 3, 2012, and February 16, 2012.

- SCB maintained a Eurodollar account for Kuwait Projects Holding Company KSC (Kuwait City, Kuwait), number "***4242", and processed sixteen Iran-related FX spot transactions worth an aggregate nominal value of $260,000,000 U.S. dollars between February 20, 2012, and February 29, 2012.
- SCB maintained a Eurodollar account for The Public Warehousing Company KSC (Kuwait City, Kuwait), number "***4129", and processed twenty-seven Iran-related FX spot and forward transactions worth an aggregate nominal value of $77,379,295.98 U.S. dollars between January 17, 2012, and March 20, 2012.

117.   *Liechtenstein*.

- SCB maintained a Eurodollar account for Parsian International Establishment (Vaduz, Liechtenstein), number "***5474", and processed two Iran-related time deposit transactions between January 31, 2012, and February 29, 2012, which generated interest income for SCB worth $13,623.74 U.S. dollars.

118.   *United Arab Emirates*.

- SCB maintained a Eurodollar account for MAPNA International FZE (Dubai, UAE), number "***4762", and processed two Iran-related time deposit transactions between January 31, 2012, and February 29, 2012.

## 4.  SCB File "Sundry.xlsx"

### a)  Overview of file content

119.   This SCB Excel file comprises one worksheet with 132 columns that contain a wide array of information pertaining to SCB's foreign exchange transactions, audit data, and various transaction-related parameters.

120.   The dataset also encompasses several key SCB foreign exchange metrics in various cells, including "SpotMargin" and other relevant attributes, which are instrumental in SCB's monitoring and analyzing the characteristics and performance of individual transactions.

121.    Data in these cells provide insights into the various SCB security measures, processing methodologies, and reporting frameworks employed by the bank in managing its foreign exchange transactions.

   b)  *Analysis of file content.*

122.    SCB's use of "sundry" accounts and other unusual booking practices appears to have served as a mechanism for obfuscating the involvement of sanctioned parties and high-risk transactions.

123.    By pooling multiple transactions together under a generic "sundry" label, SCB made it more difficult to identify the specific counterparties and nature of each transaction.

124.    In a typical banking environment, transactions are booked under specific client or account names, allowing for clear traceability and monitoring.

125.    However, SCB's practice of aggregating transactions under a "sundry" account effectively anonymized the individual transactions, making it much harder to detect those involving sanctioned entities.

126.    This pooling of transactions apparently allowed SCB to continue processing payments for sanctioned parties without triggering red flags in their compliance systems or during external audits.

127.    Moreover, the geographic distribution of SCB's income booking for these transactions deviates significantly from what one would expect based on the counterparties involved.

128.    Transactions involving Iranian entities, for example, are often booked through SCB's UAE branch rather than its Iranian branch.

129.    This abnormal booking pattern suggests an effort to distance these transactions from direct association with sanctioned jurisdictions.

130.    By booking Iran Group entity transactions through the UAE, SCB exploited the UAE's reputation as a global financial hub to lend an air of legitimacy to these transactions.

131.    This booking structure, combined with the use of "sundry" accounts, created additional layers of opacity around SCB's Project Green Iran-related business, further obscuring it from regulatory scrutiny.

132.    When examining SCB's metrics for government-linked accounts, significant discrepancies emerge between the expected and observed patterns.

133.    Government entities, particularly central banks, typically engage in large, frequent transactions directly linked to their domestic economy.

134.    As such, one would expect to see these transactions concentrated in the entity's home jurisdiction and currency.

135.    However, SCB's files reveal a much more dispersed pattern of activity for these government accounts.

136.    Transactions are often booked through multiple SCB branches across different regions, with no clear connection to the entity's home country.

137.    Moreover, the currencies involved are often inconsistent with what one would expect based on the entity's domestic economy, with a high prevalence of USD and EUR transactions even for entities in countries with their own strong currencies.

138.    This discrepancy suggests that SCB may have been using these government accounts as a conduit for processing transactions on behalf of other, potentially sanctioned, parties.

139.    By intermixing legitimate government transactions with more questionable flows, SCB could have exploited the expected legitimacy of these accounts to evade closer scrutiny.

140. SCB's "sundry" accounts, abnormal geographic booking, and inconsistent metrics for government-linked accounts all point to a deliberate effort to conceal the true nature and scope of its sanctions-related business.

141. These practices allowed SCB to maintain a veneer of compliance while continuing to process transactions for sanctioned entities and high-risk jurisdictions.

142. The systematic nature of these obfuscation techniques, as evidenced across multiple SCB files and over a sustained time period, belies any claim of mere technical glitches or isolated oversights.

143. Rather, it suggests a concerted, bank-wide effort to evade sanctions controls and deceive regulators.

### c) SCB's potential justifications for its sundry accounts.

144. SCB might attempt to provide alternative explanations to the U.S. Government for the significant volume of transactions with Iran Group entities in the "sundry" account, such as:

- *Legitimate business purposes*. SCB might claim that these transactions were related to permissible, non-sanctioned business activities, and thus did not violate U.S. sanctions regulations.
- *Reliance on internal controls*. The bank may argue that its internal compliance systems and procedures were sufficient to ensure that any transactions processed through the "sundry" account were properly screened and vetted for sanctions compliance.
- *Immateriality of violations*. SCB might characterize any potential sanctions violations in the "sundry" account as minor, isolated incidents that do not reflect a larger pattern of misconduct or systemic compliance failures.

145. However, the evidence uncovered by my entity resolution analysis of the "Sundry.xlsx" file directly challenges these potential explanations:

26

a. The sheer volume and frequency of transactions with Iran Group entities in the "sundry" account belies any claim of isolated incidents or immaterial violations.

b. The data reveals a sustained pattern of SCB using this account to process transactions for Iran Group clients, suggesting a deliberate, systematic practice rather than occasional lapses.

c. As discussed above, the use of the "sundry" account itself, which appears to have been used to pool and process transactions in a way that obscured the involvement of Iran Group parties, suggests a deliberate effort by SCB to circumvent sanctions controls and avoid scrutiny.

**5. SCB's conduct was fundamentally inconsistent with claims of robust internal compliance procedures and a commitment to transparency -- SCB File Named "MENA April to Dec 2012.xlsx"**

146.   This SCB Excel file, titled "MENA April to Dec 2012.xlsx", contains foreign exchange transactional records spot trades executed by SCB Dubai for clients in 2012.

147.   The list includes over 1,700 Standard Chartered Bank customers across the Middle East, Africa, and Asia regions, including:

**6. SCB File Named "GCS MENA 2012-01-01 30.xls"**

148.   The pivot table cache data contains 64,006 trades executed by SCB Dubai between January 2, 2012, and January 30, 2012, across various products, including FX spots, forwards, swaps, options, commodities, rates, corporate deposits.

**7. SCB File Titled "depos 19th august showing difference.xlsx"**

149.   This SCB file contains various worksheets related to financial data concerning deposits and deals involving customers and institutions in UAE and DIFC.

150.   The Excel file's worksheets include:

- "UAE - ALM CTD": Contains data on customer deposits, including customer names, deal dates, account types, and financial figures such as principal amounts, interest rates, and accrued earnings.
- "UAE – OCC": Provides information on customers and their details, along with unit, department, and client segment categorization.

- "DIFC - ALM CTD": Similar to the UAE ALM CTD sheet, but specific to DIFC, it lists deposits, deals, and associated financial metrics.
- "DIFC – OCC": Includes customer details, unit information, and other attributes for DIFC customers.
- "Mapping": Appears to provide a mapping of various codes and identifiers, potentially linking different sheets or metrics.

151.     Overall, the document offers an extensive overview of the deposits and deals involving customers and institutions, categorized by regions and types, along with various financial metrics.

**8. SCB Files "CLIENT, BRANCH & USER SETUP.xlsx" and "CLIENT, BRANCH & USER SETUP -2009.xlsx"**

*a) Overview of file content.*

152.     These SCB Excel files contain data for setting up clients, branches, and users for financial transactions.

153.     Each file includes three main worksheets: "Branch", "Client", and "User".

154.     The "Branch" worksheet details the structure of SCB's various branches, including branch codes, types, parent branches, and operational settings such as contract limits and foreign exchange limits.

155.     The "Client" worksheet outlines SCB's client information, including segment types, client names, and account setups, such as settlement instructions and credit checks.

156.     The "User" sheet details information on SCB's users associated with these clients, including user codes, names, types, and privileges, creating a complete overview of the client, branch, and user setup for the bank's operational and management purposes.

*b)  Analysis of file content.*

157.    The spreadsheets reveal that in 2009, Bank Saderat Iran had three active user accounts assigned to its employees—Hamid Khalaizadeh, Madhula Bhatia, and Haresh Bhatia—for accessing SCB's OLT–3 foreign exchange platform.

158.    According to Relator, because SCB's OLT–3 system is an online platform used for quoting foreign exchange pairs in U.S. dollars, it is primarily utilized when a client requires a U.S. dollar bridge for their transactions.

159.    Uniquely, the three Bank Saderat Iran employees have "To Be Advised" listed for their Contract Limit and Settlement Limit, which is not the case for other users.

160.    Furthermore, the profit and contract currency for Bank Saderat Iran's foreign exchange trades is designated as U.S. dollars.

161.    The spreadsheet's "Branch" column, which indicates the SCB branch responsible for handling the trades, lists "To Be Advised" for the Bank Saderat Iran employees.

162.    Additional columns in the spreadsheet provide further insights into the account setup:

- The "Privilege Groups" column specifies the account's associated SCB Dubai market group.
- The "Max Logons" column indicates the maximum number of simultaneous logins permitted for each user.

## 9.  SCB File "MENA Customerwise Sales Report- Jan 09.xlsx"

*a)  Overview of file content.*

163.    The Excel file "MENA Customerwise Sales Report- Jan 09" contains several sheets, each with different types of data:

- *Summary.* This worksheet contains a Corporate & Institutions Revenue Summary Report for the year-to-date as of January 2009. It features columns for different business groups and regions such as UAE, DBU,

OBU, DIFC, Qatar, Oman, Iran, Jordan, Pakistan, and some summary columns about sales figures in different contexts.

- *Customerwise Report*. This worksheet provides a detailed customer-wise sales report for the MENA region for the year-to-date 2009. It includes various metrics across different unnamed columns, which may represent financial figures, customer identifiers, or transaction details.
- *Mapping*. This sheet contains mappings for customer class codes. It lists customer codes and associates them with different levels of customer categories like Corporates, Middle Market, and specific types like Commercial Real Estate.

164.     Each sheet focuses on various aspects of customer and sales data across different geographical locations and business units within the MENA region.

### b) *Analysis of file content.*

165.     The "Summary" worksheet presents a comprehensive breakdown of all SCB's business units operating in the Middle East, which includes the Iranian business unit listed in Column J.

166.     This Iranian business unit generates substantial profits during the month of January 2009.

167.     The profits are categorized and presented by various product types.

168.     Notably, the values displayed in the spreadsheet are denominated in thousands of U.S. Dollars, providing a clear understanding of the financial scale of the transactions.

169.      One specific product, labeled as "CORP ADV," generates a significant amount of $344,000 U.S. dollars in revenue for SCB from Iran in January 2009.

170.     Further investigation reveals that this product apparently represents a new loan advance extended to an Iranian entity during that month.

171.     The spreadsheet also includes a "Customerwise Report" worksheet, which presents a detailed breakdown of customer accounts attributable to sales for each of SCB's business units.

**10. SCB File "Bank report – Dec 09 CB.xlsx"**

*a) Overview of file content.*

172.     The document titled "Bank report - Dec 09 CB.xlsx" is an Excel file containing data related to the banking operations of a financial institution as of December 2009.

173.     Additionally, it contains data on transaction volumes, client segments, and market analyses, offering comprehensive insights into the bank's performance and strategies for that period.

174.     This document serves as an essential reference for understanding the financial health and operational strategies of the institution at the end of 2009.

*b) Recurring involvement of Iran Group entities.*

175.     Across multiple SCB files, there is a consistent presence of Iranian individuals, companies, and government-linked entities, particularly those connected to the Central Bank of Iran ("CBI").

176.     The repeated appearance of SCB's Iran Group clients, often in combination with high-risk jurisdictions like the UAE, suggests that the bank's dealings with Iran were not one-off occurrences but rather part of a larger pattern of engagement that persisted despite the escalating OFAC sanctions against the country.

177.     This trend raises serious concerns about SCB's adherence to international sanctions and its ability to effectively manage the risks associated with doing business with Iran Group's Project Green entities.

*c) Analysis of file content.*

- *Iranian exposure.* The file reveals significant financial exposure to Iranian government entities, particularly the Central Bank of Iran ("CBI"). This suggests a substantial level of financial activity and

engagement with CBI during a period when Iran was subject to extensive international sanctions.

- *Geographic distribution of Iranian business*. Relator's new evidence indicates that SCB's Iranian business was primarily booked through its UAE offices, with the relationship managed by the Iran Group staff. This raises potential red flags, as the UAE has historically been identified as a jurisdiction of concern for illicit financial flows, particularly in relation to Iran.

- *Inconsistent income figures*. There are notable discrepancies in the income figures reported for the Iranian central bank across different data records. For instance, one CBI record shows total profit of $36,421 U.S dollars, yet another shows $4,274 of CBI profit booked in Singapore. This inconsistency merits deeper investigation to rule out any potential misreporting or efforts to conceal the true extent of the relationship.

- *Other sanctioned jurisdictions*. Beyond Iran, the file reveals SCB's financial exposure to several other countries that have faced sanctions or heightened AML/CFT scrutiny, such as Sudan, Syria, and Myanmar.

- *Unusual booking arrangements*. In several instances, income from certain government entities is booked across multiple SCB locations globally, sometimes in jurisdictions seemingly unrelated to the entity's home country.

- *Concentration of risk*. The file demonstrates a significant concentration of SCB's financial exposure to government entities and central banks. Given the inherently higher risk profile of such politically exposed persons ("PEPs") and state-owned entities from an AML/CFT perspective, this concentration warrants enhanced due diligence and ongoing monitoring to mitigate potential compliance risks.

## 11. SCB File "Cash and Trade Corporates Client Groups FX Revenues_6 Sep 2010_MENA_V1.xlsx"

### a) *Overview of file content.*

178.   This SCB internal Excel file, titled "Cash and Trade Corporates Client Groups FX Revenues_6 Sep 2010_MENA_V1.xlsx" document is a spreadsheet detailing foreign exchange ("FX") revenues and volumes from Cash and Trade Corporate clients across various booking locations, with a focus on the Middle East and North Africa ("MENA") region.

179.    The data covers monthly FX revenues and volumes for each client from January 2009 through July 2010, as well as full-year 2009 and year-to-date 2010 totals.

180.    Clients are identified by group ID numbers and names.

181.    A comprehensive analysis of the SCB files reveals a disturbing pattern of the bank maintaining Eurodollar accounts and processing transactions for entities based in high-risk jurisdictions, particularly those with known ties to Iran.

182.    The recurring appearance of certain geographic regions, such as the UAE, and the involvement of Iranian Government-linked entities across multiple files suggest that SCB's compliance failures were not isolated incidents but rather indicative of systemic issues in the bank's due diligence and risk management processes.

### b) *Analysis of file content.*

183.    For SCB, this file contains the following potential "red flags" worth noting:

- *High-risk geographies*. Many of the booking locations and client entities appear to be based in higher-risk emerging markets across the Middle East, Africa, and Asia. SCB New York would need to exercise heightened due diligence on transactions and client activity emanating from these jurisdictions to mitigate potential money laundering, terrorist financing, and sanctions evasion risks.
- *Large transaction volumes*. Some of the monthly and annual FX volumes for certain clients are very large, in the tens or hundreds of millions of U.S. dollars.
- *Government-linked entities*. A number of the group names suggest clients may be government-affiliated entities, central banks, sovereign wealth funds or state-owned enterprises. Transactions with these types of clients, especially in high-risk geographies, carry elevated risks due to the potential for corruption and money laundering by politically exposed persons ("PEPs").
- *Defense and infrastructure sectors*. Some SCB clients appear to be involved in sensitive industries like defense contracting, energy and extractives, and large infrastructure projects. These sectors have

historically been vulnerable to bribery, corruption and money laundering risks that likely complicated SCB's compliance obligations.

- *Potential NGOs and charities*. A few group names indicate the client may be a charitable organization or NGO. These types of entities can pose heightened risks, as some charities have been exploited for terrorist financing or as fronts for sanctions evasion. SCB should have carefully verified the legitimacy of these organizations.

- *Unusual patterns or concentrations.* The presence of very large FX transactions concentrated in particular months or a pattern of activity inconsistent with the client's profile could raise red flags. SCB New York should monitor for unusual spikes or volumes that don't align with expected activity.

## C.  Summary of SCB File Analysis

184.    The recurring presence of SCB's Iran Group, Project Green, and UAE booking center across multiple files paints a disturbing picture of the bank's extensive and sustained exposure to sanctioned entities and high-risk jurisdictions.

185.    Despite escalating U.S. sanctions against Iran between 2008 and 2012, SCB appears to have not only maintained but actively cultivated its Iran Group relationships over many years.

186.    Quantifying SCB's Iran exposure reveals the staggering scale of the problem.

187.    Across just a sample of the files analyzed, thousands of transactions worth billions of dollars flow between SCB and Iranian entities, many of which are directly linked to the Iranian government or sanctioned individuals.

188.    In the "Performance Summary" file for 2012 alone, there are over 42,000 Iran-related transactions totaling over $84 billion U.S. dollars.

189.    The "UAE - ALM CTD" and "UAE - OCC" worksheets further illustrate the extent to which Iranian business was routed through SCB's UAE operations.

190.     The pivot caches in these files contain tens of thousands of additional transactions, painting a picture of a major Iranian sanctions evasion hub operating out of Dubai.

191.     This Iranian business, particularly when booked through the UAE, carries significantly elevated sanctions and illicit finance risks.

192.     Iran's status as a comprehensively sanctioned jurisdiction means that any Iranian transactions, whether with government entities, private companies, or individuals, should be treated as extremely high-risk and subject to enhanced due diligence ("EDD").

193.     Moreover, the UAE, particularly Dubai, has long been recognized as a jurisdiction of concern for money laundering and sanctions evasion.

194.     The emirate's role as a global trading hub, combined with its historically lax regulatory environment, has made it an attractive waypoint for illicit flows from Iran and other high-risk countries.

195.     SCB's heavy reliance on its UAE branch for booking Iranian business should have been a clear red flag warranting intensified scrutiny.

196.     Despite these risks, SCB not only maintained its Iranian relationships but seems to have proactively sought to expand them through initiatives like Project Green.

197.     Mentioned across several files, Project Green appears to be a concerted effort by SCB to onboard and service more Iranian clients, even as international sanctions on Iran were tightening.

198.     The fact that Project Green was still active as late as 2012, as evidenced in the "Performance Summary" files, is particularly alarming.

199.     By this time, the severity of US and international sanctions on Iran had significantly escalated, with the US imposing comprehensive secondary sanctions that threatened penalties against even non-US entities doing business with Iran.

200.     This backdrop makes SCB's failure to wind down its Iranian relationships all the more egregious.

201.     A prudent and compliant financial institution would have been rapidly scaling back its Iranian exposure in line with the escalating sanctions.

202.     Instead, SCB appears to have doubled down, maintaining extensive ties to Iranian entities and booking ever-larger volumes of transactions through high-risk centers like Dubai.

203.     This pattern of behavior, visible across multiple files and years, strongly suggests that SCB's sanctions breaches were not the result of mere negligence or isolated failures in compliance.

204.     Rather, they point to a systematic, management-directed effort to evade sanctions and maintain lucrative business with Iran at any cost.